1  BRYAN WILSON (CA SBN 138842)
   BWilson@mofo.com
2  KENNETH A. KUWAYTI (CA SBN 145384)
   KKuwayti@mofo.com
3  MORRISON & FOERSTER LLP
   755 Page Mill Road
4  Palo Alto, California  94304-1018
   Telephone: 650.813.5600
5  Facsimile:  650.494.0792

6  ARTURO J. GONZALEZ (CA SBN 121490)
   AGonzalez@mofo.com
7  DIEK O. VAN NORT (CA SBN 273823)
   DVanNort@mofo.com
8  MORRISON & FOERSTER LLP
   425 Market Street
9  San Francisco, California  94105-2482
   Telephone: 415.268.7000
10 Facsimile:  415.268.7522

11 MARY PRENDERGAST (CA SBN 272737)
   MPrendergast@mofo.com
12 MORRISON & FOERSTER LLP
   2100 L Street, NW, Suite 900
13 Washington, District of Columbia  20037
   Telephone: 202.887.1500
14 Facsimile:  202.887.0763

15 Attorneys for Plaintiff,
   APPLE INC.
16

17                 UNITED STATES DISTRICT COURT

18               NORTHERN DISTRICT OF CALIFORNIA

19                      SAN JOSE DIVISION

20

21 APPLE INC., a California corporation,      Case No. 5:22-cv-2637

22              Plaintiff,                     **COMPLAINT**

23       v.                                    **(1)  Breach of Contract**

24 RIVOS, INC., a Delaware corporation; WEN    **(2)  Violation of the Defend Trade Secrets**
   SHIH-CHIEH a/k/a RICKY WEN, and                 **Act (18 U.S.C. § 1836 *et seq.*)**
25 BHASI KAITHAMANA,

26              Defendants.                    **DEMAND FOR JURY TRIAL**

27

28

Plaintiff Apple Inc. ("Apple") brings this Complaint against Defendant Rivos, Inc. ("Rivos") and current Rivos employees Wen Shih-Chieh a/k/a Ricky Wen and Bhasi Kaithamana (together, the "Individual Defendants") (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1.      Apple brings this action to prevent Rivos and its employees from exploiting Apple's most valuable trade secrets to compete with Apple unlawfully and unfairly.

2.      Apple's cutting-edge, advanced system-on-chip ("SoC") designs, including its M1 laptop SoC and A15 mobile phone SoC, have revolutionized the personal and mobile computing worlds.  Apple has devoted billions of dollars and more than a decade of effort to develop the proprietary technologies and expertise necessary to engineer these revolutionary SoC designs and become a leader in the field of semiconductor design.

3.      "Stealth mode" startup Rivos, which was founded to design and market its own competing SoCs, has filled out its ranks with dozens of former Apple engineers.  Starting in June 2021, Rivos began a coordinated campaign to target Apple employees with access to Apple proprietary and trade secret information about Apple's SoC designs.  Apple promptly sent Rivos a letter informing Rivos of the confidentiality obligations of Apple's former employees, but Rivos never responded.

4.      After accepting their offers from Rivos, some of these employees took gigabytes of sensitive SoC specifications and design files during their last days of employment with Apple. Some used multiple USB storage drives to offload material to personal devices, accessed Apple's most proprietary specifications stored within collaboration applications, and used AirDrop to transfer files to personal devices.  Others saved voluminous presentations on existing and unreleased Apple SoCs—marked Apple Proprietary and Confidential—to their personal cloud storage drives.  One even made a full Time Machine backup of his entire Apple device onto a personal external drive.  Apple has reason to believe that Rivos instructed at least some of these individuals to download and install apps for encrypted communications before conducting further conversations.  And several of the employees deleted information or wiped their Apple devices entirely to try to cover their tracks, later falsely representing to Apple that they had not done so.

5.      Apple welcomes and values open competition and the innovation that can result. But that competition cannot be built on the back of trade secret theft.  The sheer volume of information taken, the highly sensitive nature of that information, and the fact that these employees are now performing the same duties for a competitor with ongoing access to some of Apple's most valuable trade secrets, leave Apple with few alternatives.  If Apple does not act to protect its most sensitive secrets now, Apple could lose trade secret status over them entirely. That outcome is untenable given Apple's extensive investments of time and resources into its SoC programs.  The full extent of the use and disclosure of Apple's trade secret information at Rivos also is uniquely within the possession of the Individual Defendants and Rivos, particularly since Defendants have taken actions to conceal evidence regarding their misconduct.  Apple therefore has no choice but to bring this action to recover its trade secrets, to protect them from further disclosure, and to uncover the full extent of their use to try to mitigate the harm that has and will occur.

## JURISDICTION, VENUE, AND PARTIES

6.      This Court has original jurisdiction of the asserted federal law claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and under federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1357 because it is part of the same case or controversy.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c), because Apple resides in this District and Individual Defendants, all former Apple employees, have signed an Intellectual Property Agreement and "consent[ed] to personal jurisdiction of and venue in the state and federal courts within Santa Clara County, California" and agreed that any "judicial action between the parties relating to this Agreement will take place in Santa Clary County, California."[1]  Individual Defendant Ricky Wen also committed the wrongful acts within this District.

---

[1] Ex. A, Apple Intellectual Property Agreement (executed by Ricky Wen) ("Wen IPA") § 6.0(b); Ex. B, Apple Intellectual Property Agreement (executed by Bhasi Kaithamana) ("Kaithamana IPA") § 6.0(b).

8.      Apple is and at all times mentioned herein has been a California corporation having its principal place of business at One Apple Park Way, Cupertino, California 95014.

9.      Upon information and belief, Defendant Rivos is and at all times mentioned herein has been a Delaware corporation having its principal place of business at 2811 Mission College Blvd, 7th Floor, Santa Clara, CA, 95054-1884.  Rivos currently employs each of the Individual Defendants, as well as numerous other former employees of Apple, many of whom were formerly employed by Apple in this District.  At least some of these former employees perform their work for Rivos within this District.  Rivos's intended business will derive substantial revenue from sales within this District.

10.     Upon information and belief, Defendant Bhasi Kaithamana resides in Austin, Texas.  He is a "CPU Implementation Lead" at Rivos.  He was a Senior Engineering Manager (CPU Design) employed by Apple and working at Apple's facilities in Austin, Texas until August 16, 2021, in coordination with other Apple employees in Apple's facilities in Cupertino, California, including when the facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Kaithamana signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

11.     Upon information and belief, Defendant Ricky Wen resides in San Jose, California.  He is currently employed as a "Principal Member of Technical Staff" with a focus generally on "Hardware Engineering" at Rivos.  He was a CPU design engineer employed by Apple and worked at Apple's facilities in Cupertino, California until August 6, 2021, including when the events described in this Complaint occurred.

## **BACKGROUND**

12.     Founded in 1976, Apple is a world-renowned technology company and global leader in consumer electronics, mobile communications, and computing.  It designs, manufactures, and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services.  Apple's success and ability to compete successfully depend heavily upon its ability to ensure a continual and timely flow of competitive products, services, and technologies to the marketplace.  Apple continues to develop new technologies to

enhance existing products and services, and to expand the range of its offerings through, among other avenues, its significant investments in research and development.

13.     One key aspect of Apple's newest cutting-edge products is its use of highly advanced SoCs, which Apple custom designs.  SoCs are integrated circuits that contain, in a single chip, multiple processing components, such as one or more central processing units ("CPUs"), graphics processing units ("GPUs"), cache memories, and specialized processors. Apple custom designs its own processing components and integrates them together in SoC designs that reduce the area footprint of the chips and achieve tighter component integration compared to traditional computer systems.  Apple's SoCs allow for faster, more efficient, and more powerful computing.  Apple's unique designs and architecture are critical to its competitive edge in the marketplace.  Apple's first ARM-based SoCs for laptop and desktop computers, the M1 chip family, was released in November 2020 to great success.  The M1 family has now expanded to include the M1 Pro, M1 Max, and M1 Ultra chips.

14.     The M1 chip is the first personal computer chip built using cutting-edge 5-nanometer process technology.  It features a unified memory architecture for dramatically improved performance and efficiency.  At the time it was released, it featured among the world's fastest CPU cores in low-power silicon, best CPU performance per watt, and fastest integrated graphics in a personal computer, while boasting breakthrough machine learning performance. The M1 Pro, Max, and Ultra chips have only extended Apple's lead in performance, custom technologies, and power efficiency.

**A.     SoC Design**

15.     SoC design is complex and challenging, and requires considerable expertise and experience.  Instruction Set Architectures ("ISAs") define processor instructions that perform various processing functions (*e.g.*, accessing memory, comparing data, arithmetic).  ISAs are implemented through physical processor components that execute an ISA's various instructions. Designing SoC chips based on an ISA involves developing abstract models for these physical components that act as the interface between the SoC and the software.  Chip designers use these abstract models to design the physical structure of SoCs.

16.     Some modern ISAs utilize the popular reduced instruction set computer ("RISC") architecture design.  RISC-based ISAs focus on creating a relatively small set of simple, commonly used instructions for carrying out processor functions to run typical programs.  These simple instructions require less physical hardware to execute and can be combined to accomplish more complex functions.

17.     Arm Ltd. develops leading RISC-based architectures for SoCs.  Arm Ltd.'s proprietary "Advanced RISC Machine," or "ARM," architectures are licensed to its customers, which include Apple, and are used in some of the most advanced SoCs in the world, such as Apple's M1 SoC.

18.     The RISC-V ISA is an ISA that can be freely used to develop RISC-based SoCs. Although the ARM and RISC-V architectures are not the same, they share many common features, and corresponding SoC designs can share many common elements.  As a result, certain foundational elements and microarchitectural designs of ARM-based SoCs are useful in designing RISC-V-based SoCs.  Thus Rivos, which develops RISC-V SoCs, can take advantage of ARM-based SoC designs to shorten its development timelines.

**B.      Apple's Innovative SoC Designs**

19.     Apple has developed a number of highly successful, groundbreaking ARM-based SoCs.  Apple's SoC research, development, and manufacturing are led by teams of Apple engineers.  Apple entrusts these engineers with developing, among other things, its ARM technology, chip designs, and other elements of Apple's SoC business.  Apple has dedicated billions of dollars to this critical work.

20.     Apple's SoC engineers work on some of Apple's most sensitive and critical projects.  Since 2010, Apple has designed and developed more than a dozen high-performance SoCs for use in Apple's flagship iPad and iPhone projects.  Recent work includes the A15 SoC at the heart of Apple's latest iPhones and the M1 family of SoCs that power Apple's desktops, laptops, and high-performance iPads.

21.     As is necessary for their cutting-edge work, select Apple engineers have access to some of Apple's most closely guarded proprietary and trade secret information.  These trade

secrets include SoC designs, component designs, customized ISA instructions, and other Apple-developed know-how gained from years of developing advanced SoCs.

### C.   Apple Diligently Protects Its Trade Secret Chip Designs

22.     Apple diligently protects its proprietary and trade secret designs and investments in research and development.  As a condition of employment, Apple employees, including the Individual Defendants, are required to sign a confidentiality agreement that legally obligates them to protect and not disclose to third parties confidential information acquired during their employment.  This obligation continues even after the employee leaves Apple.

23.     One of the most critical agreements for protecting Apple's proprietary and trade secret information is the Intellectual Property Agreement ("IPA").  Under the IPA, which Apple employees, including the Individual Defendants, must execute at the start of their employment, employees attest that:

> You understand that your employment by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple.  Upon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper, magnetic or optical media, or any other medium, containing any Proprietary Information.

24.     Apple employees, including the Individual Defendants, also agree that Apple would be entitled to injunctive relief for any violations of the IPA.  In particular, the IPA provides:

> A breach of the provisions of sections 1 or 2 of this Agreement would cause irreparable harm and significant injury to Apple, the quantification of which is difficult to ascertain.  Because such harm and injury could not be compensable by damages alone, you agree that Apple will have the right to enforce sections 1 and 2 of this Agreement by injunction, specific performance or other equitable relief without prejudice to any other rights and remedies available to Apple in the event of a breach of this Agreement.

25.     Each of the Individual Defendants executed a copy of the IPA upon commencing employment with Apple.

26.     Apple also has certain Hardware Technologies ("HWT") employees, who handle Apple's highly-sensitive, proprietary, and trade secret information relating to hardware design, function, and operation, such as for Apple's SoCs.  During employee exit interviews for these HWT Apple employees, including the Individual Defendants, Apple provides a "Checklist for HWT Departing Employees" to "help employees leaving Apple understand their responsibility to preserve confidentiality of intellectual property."  Each of the Individual Defendants acknowledged that he "signed an Intellectual Property Agreement (IPA) that does not expire" upon leaving Apple.

27.     By signing the Checklist for HWT Departing Employees, each departing HWT employee, including the Individual Defendants, acknowledges that the IPA says he or she "will not use or share Apple confidential information while you are an Apple employee and after you leave Apple.  Everything you worked on at Apple stays here."  Each departing employee, including the Individual Defendants, acknowledges that "[a]ll employees must return all Apple confidential information prior to leaving Apple[.]"  Each employee must also "[c]onfirm that you have done a diligent search of spaces you could have stored Apple property," including "[p]ersonal computer(s) or laptop(s)," "[f]lash drive(s)," "[p]ersonal email," and "[e]xternal hard drive(s)."  Each departing employee, including the Individual Defendants, additionally must confirm that they had "returned or destroyed all Apple confidential information prior to leaving Apple" and that they "returned all Apple Owned Devices (AOU) and [had] not wiped any AOU."

28.     Each Individual Defendant executed a copy of the Checklist for HWT Departing Employees during or shortly after their exit interview following resignation from Apple.

29.     Apple takes additional measures to maintain the confidentiality of its proprietary information, including the trade secrets at issue in this lawsuit.  With regard to terminated HWT employees, for example, Apple protects its proprietary information by requiring the return of Apple laptops, mobile devices, and other equipment and the removal of Apple and third-party files, documents, and software from the terminated employees' possession.

30.     Apple also provides HWT employees with rules and guidelines on how to preserve the confidentiality of Apple's proprietary information.  These materials specifically forbid

distribution of Apple's confidential information to others except on a need-to-know basis.

31.     Apple further protects its most valuable SoC designs and specifications by limiting access to its Confluence and Perforce databases to only those projects that an employee is currently working on and authorized to view.  Confluence and Perforce are collaborative information management tools that allow Apple SoC engineers and designers to share and store their work on Apple's trade secret SoC designs.  Engineers require login credentials to access these tools, and the level of access is limited to what a particular engineer's job responsibilities require.

**D.      Former Apple Employees Leaving for Rivos Retained Apple Confidential and Proprietary Trade Secrets After Accepting Offers From Rivos**

32.     Rivos was founded in or around May 2021 to design a full stack computing solution based on custom-designed reduced instruction set computer-based SoCs that will compete with Apple's ARM SoCs.

33.     Since June 2021, over 40 former Apple employees have joined Rivos.  Rivos continues to target Apple engineers, with more departures occurring this month.  A majority of these former Apple employees were design engineers, developing Apple's cutting-edge proprietary and trade secret SoC designs.  These designs represent the culmination of substantial research and development costs and could be used to significantly accelerate development of a custom reduced instruction set computer-based SoC.

34.     Rivos targeted and solicited Apple employees who were highly experienced engineers with both substantial expertise with SoC design and significant and extensive access to trade secrets at the core of Apple's SoC designs.  Apple has reason to believe that Rivos instructed at least some Apple employees to download and install apps for encrypted communications (*e.g.*, the Signal app) before communicating with them further.

35.     As noted above, many of the employees who left Apple to join Rivos were trusted by Apple with its most sensitive trade secret SoC designs and technology.  Many have taken Apple's proprietary and trade secret information with them.

36.     The certifications made by the Individual Defendants during their exit interviews that they had returned or deleted Apple's proprietary and trade secret information were false. Apple's forensic analysis of the Individual Defendants' computing devices has revealed that they took and retained Apple's proprietary and trade secret information when they departed Apple. This information is protected by the IPA and was falsely confirmed to have been returned or deleted when the Individual Defendants executed their Checklist for HWT Departing Employees.

37.     Following interviews with Rivos and accepting offers for employment but before leaving Apple, each Individual Defendant accessed and downloaded Apple's proprietary and trade secret information regarding the design and operation of Apple's most advanced SoCs. These actions are in direct violation of the IPAs each Individual Defendant executed as a condition of their employment with Apple.  The Individual Defendants have each retained Apple proprietary and trade secret information, giving Apple reason to believe that it is being used by Rivos to improperly advance Rivos's own SoC design program.

a.     **Bhasi Kaithamana**

38.     Apple employed Individual Defendant Bhasi Kaithamana for nearly 8 years, from September 2013 until August 2021.  During his tenure with Apple, Mr. Kaithamana was a CPU implementation engineer, responsible for managing CPU design for Apple's SoCs.  Mr. Kaithamana was responsible for, among other things, designing and developing proprietary and trade secret physical structures for carrying out critical functions in Apple's ARM-based SoCs.

39.     As a condition of his employment, Mr. Kaithamana executed an Apple IPA on August 26, 2013, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple[.]"  He further agreed that "[u]pon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

40.     According to his LinkedIn profile, Mr. Kaithamana is now employed by Rivos. His position with Rivos is nearly identical to his previous position at Apple, CPU Implementation Lead.

41.     Mr. Kaithamana decided to accept Rivos's offer of employment sometime between July 20, 2021 and August 9, 2021.  On or about August 9, 2021, Mr. Kaithamana asked for August 10 as a vacation day.

42.     During his day off, Mr. Kaithamana created a new folder on his Apple-issued computer and began copying over Apple documents containing proprietary and trade secret information.  He worked to continue amassing a collection of Apple's proprietary and trade secret SoC files until the day before he left Apple on August 16, 2021.  Many of the files Mr. Kaithamana copied related to Apple's proprietary and trade secret SoC designs, including those for unreleased projects.

43.     On August 13, 2021, after Mr. Kaithamana was accessing Apple's sensitive, proprietary information, Mr. Kaithamana resigned from his position at Apple.

44.     On Saturday, August 14, 2021, Mr. Kaithamana renamed his new folder "APPLE_WORK_DOCS" and continued adding Apple documents to it through the weekend. Mr. Kaithamana also connected a USB drive seven times between Saturday evening, August 14, 2021, and Sunday afternoon, August 15, 2021.  In the same time period, he opened untitled Excel, Keynote, and Numbers documents on the USB drive.  Some of these document file names correspond to documents on Mr. Kaithamana's computer that contain Apple confidential information, at least some of which were marked Apple Proprietary & Confidential.  He then proceeded to view file listings for folders containing Apple files with proprietary and trade secret information.  While viewing these file listings, Mr. Kaithamana repeatedly opened documents, but then would clear the list of recently opened documents to conceal the documents he was accessing.

45.     By Monday, August 16, 2021, Mr. Kaithamana's last day at Apple, his APPLE_WORK_DOCS folder contained thousands of Apple documents.  Mr. Kaithamana

copied files to his USB drive over the weekend.  His last recorded moving and copying of files before turning in his computer to Apple was to that same USB drive.

46.     On August 16, 2021, Mr. Kaithamana conducted his exit interview.  On August 18, 2021, he executed a Checklist for HWT Departing Employees, acknowledging that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession and had not wiped his Apple-issued devices.  Mr. Kaithamana nevertheless had attempted to hide his activity, including by clearing his browsing history, recent applications access list, recent search lists, and many emails.

47.     Despite Mr. Kaithamana's representations at his exit interview and when he executed his Checklist for HWT Departing Employees, he downloaded and transferred files containing information about Apple's proprietary and trade secret SoC designs to an external USB storage drive.

b.     **Ricky Wen**

48.     Apple employed Individual Defendant Ricky Wen for nearly 14 years, from April 2008 until August 2021.  During his tenure with Apple, Mr. Wen was a CPU design engineer, with responsibilities for developing the architecture of Apple's SoCs.  Mr. Wen was responsible for, among other things, designing and developing proprietary and trade secret architectures for carrying out critical functions in Apple's ARM-based SoCs.

49.     As a condition of his employment, Mr. Wen executed an Apple IPA on April 22, 2008, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple[.]"  He further agreed that "[u]pon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

50.     Mr. Wen's position at Rivos is "Principal Member of Technical Staff" with a focus generally on "Hardware Engineering," which suggests he is performing a similar job function as

he did at Apple (particularly in view of Rivos's goal of designing a SoC with custom RISC-V CPU cores).

51.   Mr. Wen was approached by Rivos about leaving Apple to join Rivos in or about June or July 2021.  On or about July 23, 2021, Mr. Wen accepted Rivos's offer of employment.

52.   Between July 26, 2021 and July 29, 2021, Mr. Wen transferred approximately 390 gigabytes from his Apple-issued computer to a personal external hard drive.  Among the data transferred are confidential Apple documents describing Apple trade secrets, including aspects of the microarchitecture for Apple's past, current, and unreleased SoCs.  As of his termination, his Apple-issued computer included over 400 gigabytes of Apple confidential information.  It also stored approximately 200 gigabytes of photos and movies that Apple presumes are personal in nature but could account for only a fraction of the data transferred.

53.   On or about August 2, 2021, Mr. Wen tendered his resignation to Apple.  On or about August 5, 2021, Mr. Wen conducted his exit interview and, among other things, executed a Checklist for HWT Departing Employees, acknowledging that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession. Mr. Wen's Apple employment was terminated on August 6, 2021.

54.   On the day that he executed his Checklist for HWT Departing Employees, he deleted at least one account from his Apple-issued computers.  Mr. Wen also deleted his internet browsing, iMessage, and iChat histories on his Apple-issued computers and numerous folders and files in online and cloud storage drives immediately prior to his termination from Apple.

55.   Mr. Wen accessed still more highly confidential Apple information as late as on or about August 5, 2021, the day before he left Apple.  Just before an external hard drive was connected, Mr. Wen accessed numerous Apple proprietary and trade secret SoC designs, including files related to Apple's unreleased SoC designs, from his Apple-issued computer.

56.   Mr. Wen also transferred gigabytes of files to his personal Google Drive, in violation of Apple's policies, including architectural diagrams depicting Apple trade secret SoC designs and folders and nearly 400 files associated with Apple SoC development projects.  Apple policies prohibit the use of Google Drives for storing, among other things, Apple proprietary and

trade secret information because that information can be accessed from any computer over the internet without Apple's knowledge.

57.     As of his termination on August 6, 2021, Mr. Wen retained on his Google Drive a diagram showing the architecture of an aspect of an Apple trade secret SoC design.  Similarly, although Mr. Wen moved thousands of Apple files from personal folders of his iCloud Drive to a work folder, investigation of his Apple-owned devices reveals that he retained files relating to Apple trade secret SoC designs on his iCloud Drive after his termination.

                c.     **Many Other Former Apple Employees Who Are Now at Rivos Took Apple Proprietary Information and Deleted Information From Their Apple Devices**

58.     Numerous other Apple employees who have left for Rivos have downloaded and retained Apple's proprietary documents after accepting their offers from Rivos, leaving Apple exposed to yet more trade secret theft.  Like Messrs. Wen and Kaithamana, these employees also joined Rivos in positions paralleling their roles at Apple.  And like the Individual Defendants, these employees signed Apple IPAs and agreed to protect and appropriately use Apple's trade secret information, and to return or delete that information when they left.  Although these employees also agreed not to delete information from their Apple devices when they left the company, many of them did so, again after communicating with Rivos and accepting their offers.

59.     A number of Apple employees installed encrypted communications apps, including Signal, to communicate with Rivos and amongst one another without risk of their communications being exposed.  For instance, after joining Rivos, a former Apple employee provided a then-Apple employee a link to download Signal for communicating about Rivos with Rivos's CTO Belli Kuttanna.  Another Apple employee installed Signal in the weeks before leaving for Rivos and invited another employee that also left for Rivos to communicate on the platform, noting that "there are things [that] should not be recorded through apple's interface now."  Yet another Apple employee warned a colleague against using iMessage to discuss Rivos, causing that colleague to delete messages related to the discussion.

60.     At least one employee expressed concerns about the legality of the circumstances of their exit from Apple to go to Rivos.  For example, this employee ran internet searches for

"when you lost a lawsuit what do you have to pay" and "poach[ing] people after a year leaving [a] company" and viewed webpages relating to attorneys' fees for losing parties to lawsuits.

61.     Several of these employees connected external hard drives to Apple-issued computers in the days following their hire by Rivos.  At the same time, these employees were accessing a large amount of Apple trade secret information about SoC designs in the days just before their termination.  Each executed a Checklist for HWT Departing Employees and acknowledged that they were subject to the IPA and had returned or deleted all Apple proprietary and trade secret information in their possession, including any stored on AOUs and external hard drives.  Similarly, the local archive stored on the Apple-issued laptop of at least one former employee shows that, at the time the employee disconnected their iCloud Drive, they retained access to several highly confidential proprietary and trade secret files.  Another employee kept full backups of his entire hard drive to a personal external hard drive via Time Machine, even after he turned in his resignation form Apple.

62.     The proprietary information that these former employees have retained, and continue to have access to, particularly information regarding the architecture and design of Apple's SoCs, includes some of Apple's most highly-sensitive and valuable information.  This information will provide a significant, unfair advantage to Rivos in developing advanced, high performance reduced instruction set computer-based chips.

63.     None of this information has been returned.

64.     Despite being instructed not to wipe data on their Apple-issued devices—and expressly agreeing not to do so—many of these employees did delete information after accepting their Rivos offers.  At least seven employees completely wiped their Apple-issued devices and/or reinstalled the operating systems, which results in all other data on the device being deleted. After accepting their Rivos offer, one employee did an internet search for "slack delete message history," "delete all imessages on mac," "factory reset mac," "how to clear imessage on mac," and "slack how to clear chat cache."  The employee then proceeded to delete most of those records.  Other employees similarly deleted their messages and browser history before returning

their Apple-issued computers.  As a result, the exact scope of trade secret theft and coordination in support thereof has been hidden from Apple.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract Against Individual Defendants)

65.     Apple realleges and restates all prior paragraphs as if fully restated herein.

66.     The IPAs signed by the Individual Defendants are valid and enforceable contracts. The confidentiality covenants and other provisions contained in these agreements are reasonably necessary to protect legitimate protectable interests in Apple's confidential, proprietary, and trade secret information.

67.     Apple has fully performed all of its obligations under these agreements.

68.     The Individual Defendants took and retained Apple's documents in direct violation of the provisions of their IPAs, which required them to "promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple" and included an agreement "that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."  Individual Defendants breached these agreements by, at a minimum, failing to return Apple's property and confidential, proprietary, and trade secret information at the time of their departure from Apple as they were obligated to do.

69.     In addition, despite indicating adherence to all contractually-obligated termination protocols, the Individual Defendants each deleted, scrubbed, or otherwise modified the contents of their Apple-issued devices prior to returning them.  These efforts obscured message histories, web histories, and other details relating to the employees' use of Apple trade secret information, departure from Apple, and any decision to improperly retain Apple trade secret information in violation of, at least, the IPAs.

70.     These actions by the Individual Defendants all occurred in the days before they departed Apple.  These actions also all followed the Individual Defendants receiving, and accepting, offers of employment in parallel roles for Apple's competitor, Rivos.

71.     As a result of the Individual Defendants' breach, Apple has suffered and continues to suffer monetary and non-monetary injury and harm in an amount to be proven at trial.  The

1  documents that have been improperly retained are the product of substantial research and

2  development work over a period of many years.

3      72.    Moreover, as a result of the Individual Defendants' breach, Apple has been injured

4  and faces irreparable injury.  Apple is threatened with losing its competitive advantage, trade

5  secrets, customers, and technology goodwill in amounts that would be impossible to fully

6  compensate Apple unless the Individual Defendants are enjoined and restrained by order of this

7  Court.

8                          **SECOND CLAIM FOR RELIEF**

9      **(Misappropriation of Trade Secrets, Defend Trade Secrets Act, 18 USC § 1832(a)(1)**

10                    **Against Rivos and Individual Defendants)**

11     73.    Apple realleges and restates all prior paragraphs as if fully restated herein.

12     74.    As set forth above, Defendants improperly acquired and retained confidential and

13  proprietary information of Apple constituting "trade secrets" as defined by 18 U.S.C. § 1839(3),

14  including but not limited to design files, drawings, manufacturing information, device packaging

15  information, sales and customer information, financial and business development information,

16  invention disclosures, and drafts of patent applications.  These trade secrets pertain to Apple's

17  personal computer and mobile device SoCs, including SoC designs, component designs,

18  customized ISA instructions, and other Apple-developed know how gained from years of

19  developing advanced SoCs.  These trade secrets have been used in and/or were intended for use in

20  interstate and/or foreign commerce.

21     75.    Apple's trade secrets derive independent economic value from not being generally

22  known to, and not being readily ascertainable by proper means by, another person who can obtain

23  economic value from their disclosure or use of the information.  These trade secrets are also the

24  product of years of research and development at substantial cost to Apple.  These trade secrets

25  form the foundation of Apple's competitive advantages in the SoC market.

26     76.    Apple has undertaken efforts that are reasonable under the circumstances to

27  maintain the secrecy of the trade secrets at issue.  These efforts include, but are not limited to: the

28  use of passwords and encryption to protect data on its computers, servers, and repositories; the

COMPLAINT
CASE NO. 5:22-cv-2637

16

limited distribution of confidential information only to key Apple employees and executives and on a need-to-know basis; the maintenance of written policies and procedures that emphasize employees' duties to maintain the secrecy of Apple's confidential information; and the use of confidentiality agreements and non-disclosure agreements to require vendors, customers, partners, contractors, and employees to maintain the secrecy of Apple's confidential information.

77.     Defendants misappropriated trade secrets at least by acquiring trade secrets by improper means.  At least by virtue of the IPAs and exit checklists they signed, the Individual Defendants were well aware that the Apple files that were misappropriated are confidential and trade secret, and could not properly be retained, disclosed, or used by them.  Nevertheless, each Individual Defendant executed a Checklist for HWT Departing Employees in which they confirmed and acknowledged that they had returned all Apple proprietary and trade secret information.

78.     The trade secret information that the Individual Defendants and other former employees now at Rivos have retained is embodied in Apple's documents and other information that was taken upon the Individual Defendants' and other former employees' departures from Apple.  The trade secret information includes at least chip specifications and designs for Apple's SoCs for the A14, M1, and future (unreleased) SoCs.  The trade secrets also include chip specifications and designs for related components (including, CPU cores, GPU cores, and cache memories), chip development roadmaps, summaries of technical analyses of chip characteristics and parameters, and status reports.

79.     On July 9, 2021, shortly after Rivos began hiring Apple's former employees, Apple sent a letter to Rivos informing Rivos of the obligations of those former employees to maintain the confidentiality of Apple's trade secrets and confidential information, and specifically informing Rivos of the provisions of the IPA.  Apple further informed Rivos that, to the extent those former employees had retained Apple's trade secret and confidential information, that information had to be returned immediately.  Rivos never responded to that letter.

80.     The information regarding the use and disclosure of this information at Rivos is uniquely within the possession of the Individual Defendants and Rivos, and Defendants have

taken actions to conceal evidence regarding their conduct. However, based on the number of engineers that Rivos targeted and hired—and continues to target and hire even today—to perform the same type of work they were performing at Apple, the fact that Apple notified Rivos of its former employees' obligations and received no response, the large amount of these employees who have taken and retained Apple confidential information after communicating with Rivos or accepting their offers with Rivos, the volume of information taken, the nature of the information taken, the number of departing employees who deleted information and tried to cover their tracks after accepting offers with Rivos, and Rivos's own efforts to conceal its communications with these former Apple employees, Apple believes that Rivos knew, or at a minimum should have known, that these employees improperly retained Apple confidential and trade secret information and were likely to make use of it in the course of their employment at Rivos. Apple believes that further discovery will likely show that Apple's trade secret information has been improperly disclosed to Rivos and used by Rivos and the Individual Defendants.

81.     Defendants' improper acquisition and/or unauthorized use or disclosure, actual or threatened, violates the Defend Trade Secrets Act ("DTSA").

82.     As a direct and proximate result of Defendants' conduct, Apple has been injured, and is threatened with further injury, in an amount that will be proven at trial. Apple has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Defendants' misappropriation. As a further proximate result of the misappropriation and use of Apple's trade secrets, Defendants have been unjustly enriched.

83.     Defendants' conduct has been willful and malicious, justifying an award of exemplary damages. As described in detail above, after receiving employment offers from Rivos and resigning from Apple, the Individual Defendants took and retained hundreds of gigabytes of Apple trade secret information regarding SoC designs, functions, and implementation. This trade secret information includes some of the most competitively sensitive and confidential information that Apple possesses about its SoC designs, and much of it was accessed and transferred during the final days of the Individual Defendants' employment. Again after accepting their employment offers from Rivos, the Individual Defendants, and many other former Apple

1   employees who are now at Rivos, took steps to cover up the evidence of their actions, including,

2   in some cases, wiping their entire devices.  The Individual Defendants and other former Apple

3   employees now at Rivos falsely represented to Apple that they had returned all of Apple's

4   confidential information and had not deleted the information from their devices.

5        84.     Defendants' conduct constitutes transgressions of a continuing nature for which

6   Apple has no adequate remedy at law.  Unless and until enjoined and restrained by order of this

7   Court, Defendants may continue to retain and use Apple's trade secret information to enrich

8   themselves and divert business from Apple to Rivos.  Apple is entitled to a preliminary and

9   permanent injunction against Defendants' actual and threatened potential violation of the DTSA.

10   **<u>PRAYER FOR RELIEF</u>**

11        NOW, THEREFORE, Plaintiff Apple prays for judgment and relief against Defendants as

12   follows:

13        a.     Judgment in Apple's favor and against Defendants on all causes of action

14        alleged herein;

15        b.     Damages sufficient to compensate for the actual loss caused by

16        Defendants' trade secret misappropriation;

17        c.     A further award of monetary recovery for any unjust enrichment caused by

18        Defendants' misappropriation of the trade secrets;

19        d.     In lieu of damages measured by any other methods, a reasonable royalty

20        for Defendants' misappropriation of trade secrets;

21        e.     Exemplary damages, based on Defendants' willful and malicious

22        appropriation of trade secrets;

23        f.     For the entry of a Preliminary and Permanent Injunction against

24        Defendants to prevent the actual or threatened misappropriation of Apple's

25        trade secrets;

26        g.     For an Order directing Defendants to return all of Apple's property in their

27        possession, custody, or control and cease any access to or use of Apple's

28        trade secrets;

h.   For prejudgment and post-judgment interest at the maximum legal rate as applicable, as an element of damages that Apple has suffered as a result of Defendants' wrongful and unlawful acts;

i.   For reasonable attorneys' fees and costs incurred herein as allowed under the Defend Trade Secrets Act; and

j.   For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Apple hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Dated:   April 29, 2022                           MORRISON & FOERSTER LLP


                                                  By   */s/ Bryan Wilson*
                                                       BRYAN WILSON

                                                  Attorneys for Plaintiff
                                                  APPLE INC.