1  BRYAN WILSON (CA SBN 138842)
   BWilson@mofo.com
2  KENNETH A. KUWAYTI (CA SBN 145384)
   KKuwayti@mofo.com
3  MORRISON & FOERSTER LLP
   755 Page Mill Road
4  Palo Alto, California 94304-1018
   Telephone: 650.813.5600
5  Facsimile:  650.494.0792

6  ARTURO J. GONZALEZ (CA SBN 121490)
   AGonzalez@mofo.com
7  DIEK O. VAN NORT (CA SBN 273823)
   DVanNort@mofo.com
8  MORRISON & FOERSTER LLP
   425 Market Street
9  San Francisco, California 94105-2482
   Telephone: 415.268.7000
10 Facsimile:  415.268.7522

11 MARY PRENDERGAST (CA SBN 272737)
   MPrendergast@mofo.com
12 MORRISON & FOERSTER LLP
   2100 L Street, NW, Suite 900
13 Washington, District of Columbia 20037
   Telephone: 202.887.1500
14 Facsimile:  202.887.0763

15 Attorneys for Plaintiff
   APPLE INC.
16

17                 UNITED STATES DISTRICT COURT

18              NORTHERN DISTRICT OF CALIFORNIA

19                      SAN JOSE DIVISION

20 APPLE INC., a California corporation,          Case No.   5:22-CV-2637-EJD

21                  Plaintiff,                    **APPLE'S MEMORANDUM OF
                                                  POINTS AND AUTHORITIES IN
22        v.                                      SUPPORT OF *EX PARTE* MOTION
                                                  FOR TEMPORARY RESTRAINING
23 RIVOS, INC., a Delaware corporation; WEN       ORDER, EXPEDITED DISCOVERY,
   SHIH-CHIEH a/k/a RICKY WEN, and BHASI          AND ORDER TO SHOW CAUSE**
24 KAITHAMANA,
                                                  Date:  **
25                  Defendants.                   Time:  **
                                                  Courtroom:  4, 5th Floor
26                                                Judge:  Hon. Edward J. Davila

27                                                Action Filed:  April 29, 2022

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 2

    A.    Apple's Proprietary and Trade Secret SoC Designs Are Key to Apple's Competitive Edge in Personal and Mobile Computing .......................... 2

    B.    Apple Diligently Protects Its Trade Secret SoC Designs ......................................... 3

    C.    The Individual Defendants and Other Former Apple Employees Violated Their Obligations to Apple When They Took and Retained Apple's Trade Secrets After Accepting Rivos's Job Offers .......................................................... 5

        1.    Ricky Wen .......................................................................................... 6

        2.    Bhasi Kaithamana ............................................................................. 7

        3.    Other Apple Employees Departing for Rivos Retained Apple Information and Wiped Their Apple Devices To Cover Their Tracks ........................................................................................................ 8

    D.    Apple Informed Rivos and Apple's Former Employees of Their Obligations and Sought Return of Its Trade Secrets Before Filing This Motion ................................................................................................................. 9

III.   LEGAL STANDARD ......................................................................................... 12

IV.  ARGUMENT ....................................................................................................... 12

    A.    A Temporary Restraining Order Is Needed To Enjoin Defendant Wen from Using or Disseminating Apple's Trade Secrets ........................................ 12

        1.    Apple Is Likely To Succeed on Its DTSA and Breach of Contract Claims Against Wen ........................................................... 12

            a.    Apple's SoC Designs Are Trade Secrets ............................. 14

            b.    Wen Misappropriated Apple's Trade Secrets .......................... 15

            c.    Wen Breached his Contract with Apple ...................................... 16

        2.    Apple Will Suffer Imminent and Irreparable Harm Unless the Court Issues Immediate Injunctive Relief ............................................. 17

        3.    The Balance of Hardships Strongly Favors Apple .................................. 20

        4.    The Relief Apple Seeks Supports the Public's Strong Interest in Protecting Trade Secrets .......................................................... 21

    B.    Expedited Discovery Is Needed To Uncover the Full Extent of the Misappropriation and To Prevent Further Misuse of Apple's Trade Secrets ....... 21

V.    CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado v. Gaynor*,
   513 F. Supp. 3d 1253 (S.D. Cal. 2021) ....................................................................12

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011).................................................................................12

*Am. LegalNet, Inc. v. Davis*,
   673 F. Supp. 2d 1063 (C.D. Cal. 2009) ..................................................................22

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
   28 F. Supp. 3d 1006 (C.D. Cal. 2013) ....................................................................12

*Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*,
   19-4162 SBA, 2021 WL 1186335 (N.D. Cal. Mar. 1, 2021)............................17, 21

*Comet Techs. USA Inc. v. Beuerman*,
   No. 1:18-cv-01441-LHK, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018)....................... *passim*

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
   444 F. Supp. 3d 1198 (E.D. Cal. 2020) ..............................................................16, 18

*eHealthinsurance Servs., Inc. v. Healthpilot Techs. LLC*,
   No. 21-CV-4061-YGR, 2021 WL 3052918 (N.D. Cal. July 20, 2021) ....................22

*Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*,
   No. 2:13-cv-00784-MCE-DAD, 2013 WL 2151553 (E.D. Cal. May 16, 2013) ...............13, 20

*Henry Schein, Inc. v. Cook*,
   191 F. Supp. 3d 1072 (N.D. Cal. 2016) ..................................................................16

*Miloedu, Inc. v. James*,
   No. 21-CV-09261-JST, 2021 WL 6072821 (N.D. Cal. Dec. 23, 2021) ...............16, 19, 21, 24

*Oculus Innovative Scis., Inc. v. Nofil Corp.*,
   No. C 06-1686-SI, 2007 WL 4044867 (N.D. Cal. Nov. 15, 2007)...........................17

*Penson & Co., LLC v. Cloudstyle Store*,
   No. 20-cv-05174-JST, 2020 WL 11885744 (N.D. Cal. Aug. 27, 2020)....................23

*Posdata Co. v. Kim*,
   No. C-07-02504 RMW, 2007 WL 1848661 (N.D. Cal. June 27, 2007)............................15, 17

*Pyro Spectaculars N., Inc. v. Souza*,
   861 F. Supp. 2d 1079 (E.D. Cal. 2012)................................................................15, 20, 21, 24

*Reichert v. Gen. Ins. Co.*,
    68 Cal. 2d 822 (1968) ...................................................................................16

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
    208 F.R.D. 273 (N.D. Cal. 2002) .................................................................21

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
    739 F.2d 1415 (9th Cir. 1984) ......................................................................12

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ........................................................................12

*Trulite Glass & Aluminim Sols., LLC v. Smith*,
    No. 21-601798, 2016 WL 8738432 (E.D. Cal. Aug. 10, 2016) ...................21

*Waymo LLC v. Uber Techs., Inc.*,
    No. 17-00939-WHA, 2017 WL 2123560 (N.D. Cal. May 15, 2017) ...............18, 20

*WeRide Corp. v. Huang*,
    379 F. Supp. 3d 834 (N.D. Cal. 2019) ...............................................19, 24, 25

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) .........................................................................................12

**Statutes and Other Authorities**

18 U.S.C.
    § 1836(b)(3)(A) ............................................................................................12
    § 1839(3) ...............................................................................................13, 14
    § 1839(5) ......................................................................................................13
    § 1839(6) ......................................................................................................13

Fed. R. Civ. P. 26(d)(1)...........................................................................................25

1

## I.    INTRODUCTION

2      Apple brings this motion to prevent its ex-employees from exploiting Apple's most

3  sensitive and valuable trade secrets at their new employer, competing startup Rivos.  Apple has

4  attempted to reach agreement with counsel for Defendants Ricky Wen and Rivos on the

5  reasonable measures it requests in this motion, but counsel has responded with only generalized

6  denials and no specific information.

7      For decades, Apple has spent billions on research and development to support its industry-

8  leading advances in the field of systems-on-chips ("SoCs").  Those investments have resulted in

9  Apple's most advanced, cutting-edge SoCs, including the A15 mobile computing SoC at the heart

10  of Apple's iPhone products and the M1 family of personal computing SoCs.  Rivos, a start-up in

11  self-described "stealth mode," intends to build competing SoCs, and has specifically targeted

12  Apple engineers with access to Apple's most valuable trade secrets to do it.  In July 2021, just

13  after Rivos began its coordinated campaign to target these employees, Apple promptly sent Rivos

14  a letter informing Rivos of the confidentiality obligations of Apple's former employees, but Rivos

15  never responded.  Since then, Rivos has continued to recruit from Apple, wooing away more than

16  40 employees, with the most recent departures occurring in May 2022.

17      Apple's forensic investigation has revealed that after receiving his offer from Rivos,

18  Defendant Ricky Wen took hundreds of sensitive SoC documents related to both Apple's existing

19  and unreleased SoCs.  This was not an isolated incident—over a dozen others, including

20  Defendant Bhasi Kaithamana (collectively with Mr. Wen, "Individual Defendants"), either wiped

21  their computers or saved Apple confidential information in places beyond Apple's reach just

22  before leaving for Rivos.  Some used multiple USB storage drives to offload material to personal

23  devices, accessed proprietary specifications stored within collaboration applications, and used

24  AirDrop to wirelessly transfer files to personal devices.  Others saved voluminous presentations

25  on existing and unreleased Apple SoCs—marked Apple Proprietary and Confidential—to their

26  personal cloud storage drives.  And several of the employees deleted information or wiped their

27  Apple devices entirely to try to cover their tracks, while falsely representing to Apple that they

28

had not done so.  These employees' actions were in breach of their agreements with Apple and amount to repeated and ongoing violations of the Defend Trade Secrets Act (DTSA).

After performing a forensic analysis, Apple sent letters to Rivos, the Individual Defendants, and the other former-Apple-turned-Rivos employees on April 29, 2022 reminding them of their obligations and asking them to return Apple's confidential information.  Defendant Kaithamana—who is no longer at Rivos and is separately represented—has agreed to a court order requiring the return of any Apple confidential information in his possession, to stop using any such information, and to allow a third-party forensic search of any devices potentially containing such information.  (*See* ECF. No. 19.)  Apple asked for the same limited discovery from Mr. Wen and Rivos, offering to enter into a mutually agreeable discovery protocol, but their counsel refused.  In addition, counsel for Rivos has effectively blocked Apple from attempting to resolve its concerns directly with the 42 other former Apple employees, as Rivos's counsel refuses to confirm whether or not they directly represent those employees or even whether they are searching the devices the employees used to store or transmit Apple confidential information.

Without further discovery into Rivos's and Mr. Wen's actions, Apple has no way of knowing whether its most sensitive trade secrets are being used by Rivos to develop competing products.  Apple therefore has no choice but to seek a temporary restraining order against Mr. Wen requiring him to stop using and to return any Apple confidential information in his position, along with narrowly-tailored expedited discovery from Mr. Wen and Rivos.

## II.     STATEMENT OF FACTS

### A.     Apple's Proprietary and Trade Secret SoC Designs Are Key to Apple's Competitive Edge in Personal and Mobile Computing

Apple is a world-renowned technology company and global leader in consumer electronics, mobile communications, and computing.  It designs, manufactures, and markets smartphones, personal computers, tablets, wearables, and accessories.  (Declaration of Daniel Murray ("Murray Dec.") ¶ 2.)  One key aspect of Apple's newest cutting-edge products—and its competitive edge in the marketplace—is its use of highly advanced SoCs, which Apple custom designs.  (*Id.* ¶ 3.)  For over a decade, Apple has been making substantial investments totaling

billions of dollars into designing its own SoCs and other chips that are at the heart of its iPhone, iPad, Watch, and Mac product lines.  (*Id.* ¶ 2.)  The SoCs consist of interconnected component designs that include high performance application processors (CPU cores), graphics processors (GPU cores), security processors, memories, and/or artificial intelligence accelerators.  (*Id.*)

Apple's chip-related investments have resulted in products that consistently outperform its competitors' products by significant margins.  By custom designing its SoCs and related components, Apple tunes its SoCs to achieve tighter integration among components, which reduces chip area, provides extreme performance, and lowers power consumption.  (*Id.* ¶ 3.)  Apple further customizes its SoCs to provide the best performance possible when used in its products (e.g., iPhone, iPad, Mac, Watch, etc.).  (*Id.*)  Apple's first ARM-based SoCs for laptop and desktop computers, the M1 chip family, was released in November 2020 and has now expanded to include the M1 Pro, M1 Max, and M1 Ultra chips.  (*Id.*)

The trade secret information that the Individual Defendants and other former employees now at Rivos have retained is embodied in Apple's documents and other information that was taken upon their departures from Apple.  These documents are described in more detail in the declaration of Daniel Murray, a VP in Apple's Silicon Engineering Group, which has been filed under seal.  (*See id.* ¶ 8.)  The trade secret information includes chip specifications and designs for Apple's SoCs for the A14, M1, and future (unreleased) SoCs.  (*Id.*; *see* Declaration of Dan Roffman ("Roffman Dec.") Appendix B (identification of Apple files retained by Wen).)  The trade secrets also include chip specifications and designs for related components (e.g. CPU cores, GPU cores, and cache memories), chip development roadmaps, summaries of technical analyses of chip characteristics and parameters, and status reports.  (Murray Dec. ¶¶ 8-15.)  Many of these documents contain Apple's most valuable core trade secrets.  (*Id.* ¶¶ 1, 11.)

**B.  Apple Diligently Protects Its Trade Secret SoC Designs**

Apple diligently protects its proprietary and trade secret designs and investments in research and development.  (*See* Declaration of Donna Cerny ("Cerny Dec.") ¶ 2.)  As a condition of employment, Apple employees, including the Individual Defendants, are required to sign Apple's Intellectual Property Agreement ("IPA").  (*Id.*; Murray Dec. ¶ 7.)  Individual Defendants

Wen and Kaithamana executed an IPA when they joined Apple.  (Cerny Dec. Exs. A-B.)  The IPA requires employees to hold Apple's information in confidence both during and after employment, and to return all Apple information upon their departure.  (*Id.* Ex. A, § 2.0a.)  Specifically, employees agree that

> employment by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple.

(*Id.*)  Upon termination, employees agree to

> promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper, magnetic or optical media, or any other medium, containing any Proprietary Information.

(*Id.*)

Employees with access to certain particularly-sensitive trade secrets, including certain Hardware Technologies ("HWT"), are subject to additional protective measures.  (*Id.* ¶ 5.)  For instance, during employee exit interviews for these employees, including the Individual Defendants, Apple provides a "Checklist for HWT Departing Employees" to "help employees leaving Apple understand their responsibility to preserve confidentiality of intellectual property."  (*Id.* Exs. C-D.)  Both Individual Defendants signed this checklist and acknowledged that they "signed an Intellectual Property Agreement (IPA) that does not expire" upon leaving Apple.  (*Id.*)

By signing the checklist, Wen and Kaithamana also acknowledged that the IPA says they "will not use or share Apple confidential information while you are an Apple employee and after you leave Apple.  Everything you worked on at Apple stays here."  (*Id.*)  They also acknowledged that "[a]ll employees must return all Apple confidential information prior to leaving Apple[.]"  Wen and Kaithamana then "[c]onfirm[ed] that [they] have done a diligent search of spaces [they] could have stored Apple property," including "[p]ersonal computer(s) or laptop(s)," "[f]lash drive(s)," "[p]ersonal email," and "[e]xternal hard drive(s)."  (*Id.*)  They also confirmed that they "returned or destroyed all Apple confidential information prior to leaving Apple" and that they

"returned all Apple Owned Devices (AOU) and [had] not wiped any AOU." (*Id.*)

Apple also provides HWT employees with rules and guidelines on how to preserve the confidentiality of Apple's proprietary information. (Cerny Dec. ¶ 8.) These materials specifically forbid distribution of Apple's confidential information to others except on a need-to-know basis. (*Id.*) Apple further protects its most valuable SoC designs and specifications by using internal code names and limiting access to its Confluence and Perforce databases to only those projects that an employee is currently working on and authorized to view. (Murray Dec. ¶¶ 5-7.) Confluence and Perforce are collaborative information management tools that allow Apple SoC engineers and designers to share and store their work on Apple's trade secret SoC designs. Engineers require login credentials to access these tools, and the level of access is limited to what a particular engineer's job responsibilities require. (*Id.* ¶ 6.)

**C.    The Individual Defendants and Other Former Apple Employees Violated Their Obligations to Apple When They Took and Retained Apple's Trade Secrets After Accepting Rivos's Job Offers**

Rivos was founded in or around May 2021 to design a computing solution based on custom-designed reduced instruction set computer-based SoCs that will compete with Apple's ARM SoCs. (*See* Declaration of Bryan Wilson ("Wilson Dec.") ¶ 3, Ex. A.) Since June 2021, over 40 former Apple employees have joined Rivos. (*See* Cerny Dec. ¶ 10.) Rivos continues to target Apple engineers with substantial expertise in Apple SoCs and access to Apple's key SoC trade secrets, with more departures occurring in April 2022, and the most recent resignation occurring in early May. (*Id.*) A majority of these former Apple employees were design engineers, developing Apple's cutting-edge proprietary and trade secret SoC designs. (Murray Dec. ¶ 15.) These designs represent the culmination of substantial research and development costs and could be used by a competitor to significantly accelerate development of a custom SoC. (*Id.* ¶¶ 2-3, 17-18.)

Following their interviews with Rivos and accepting offers for employment, but before leaving Apple, Defendants Bhasi Kaithamana and Ricky Wen accessed and downloaded Apple's proprietary and trade secret information regarding the design and operation of Apple's most advanced SoCs. (*See* Roffman Dec. ¶¶ 5-24.) Mr. Wen spent his last days at Apple compiling

and downloading to personal devices or cloud storage locations large volumes of key Apple information regarding SoC design—the very thing he was hired by Rivos to do.  These actions are in direct violation of Mr. Wen's IPA and represent ongoing trade secret misappropriation.  In addition, as discussed below, this was not an isolated incident, as over a dozen other former Apple employees now at Rivos took substantial Apple confidential information with them upon their departure, and/or wiped their computers to prevent Apple from learning of their actions.

### 1.    Ricky Wen

Ricky Wen was originally hired by Apple in April 2008 to work as a CPU design engineer.  (Cerny Dec. ¶ 12.)  On August 6, 2021, he left Apple to take on a similar role for Rivos.  (*Id.*)  Wen accepted his employment offer from Rivos on July 23, 2021.  (*Id.*)

Over the next three days, Wen transferred approximately 390 gigabytes from his Apple-issued computer to a personal external hard drive.  (Roffman Dec. ¶¶ 16-17.)  Among the data transferred are confidential Apple documents describing Apple trade secrets, including aspects of the microarchitecture for Apple's past, current, and unreleased SoCs.  (Murray Dec. ¶¶ 13-14.)  As of his termination, Wen's Apple-issued computer included over 400 gigabytes of Apple confidential information.  (Roffman Dec. ¶ 16.)  It also stored approximately 200 gigabytes of photos and movies that Apple presumes are personal in nature but could account for only a fraction of the data transferred.  (*Id.*)  While at Apple, Wen also transferred files to his personal Google Drive, in violation of Apple's policies (*see* Cerny Dec. ¶ 9), including architectural diagrams depicting Apple trade secret SoC designs and other files associated with Apple SoC development projects.  (Roffman Dec. ¶ 24.)

On August 3, 2021, after transferring all of this data, Wen tendered his resignation to Apple.  (Cerny Dec. ¶ 12.)  Nevertheless, until the day before he left, he continued to access Apple proprietary information, including files related to Apple's unreleased SoC designs, from his Apple-issued computer while an external hard drive was attached.  (Roffman Dec. ¶¶ 22-23.)

In his last two days before leaving Apple, Wen conducted his exit interview and signed an exit checklist acknowledging that he was subject to the IPA and had returned or deleted all Apple proprietary and trade secret information in his possession.  (Cerny Dec. ¶ 12; Ex. C.)  Wen also

deleted recent iMessage and iChat histories on his Apple-issued computers as well as numerous folders and files in online and cloud storage drives immediately prior to his termination from Apple.  (Roffman Dec. ¶¶ 14.)  Because of Wen's false representations to Apple and his efforts to cover his tracks, Apple cannot know the full extent of Wen's access to and use of Apple's trade secrets since he began working at Rivos.

### 2.     Bhasi Kaithamana

Bhasi Kaithamana was hired by Apple in September 2013 to work as a CPU implementation engineer.  (Cerny Dec. ¶ 11.)  In August 2021, he left Apple to take on a nearly identical role, CPU implementation lead, for Rivos.  (*See* Wilson Dec. ¶ 6, Ex. E.)  Kaithamana accepted his employment offer from Rivos in early August 2021.  (Cerny Dec. ¶ 11.)  Shortly thereafter, on August 10, he took a vacation day.  (*Id*.)

Apple's forensic investigation revealed that beginning August 10 and continuing through August 16, Kaithamana copied nearly two thousand Apple documents containing proprietary and trade secret information to a folder he created entitled "APPLE_WORK_DOCS."  (Roffman Dec. ¶¶ 6-7.)  Many of the files Kaithamana copied related to Apple's proprietary SoC designs, including those for unreleased projects.  (*See id*. ¶ 7.)  Kaithamana also connected a USB drive seven times between the evening of August 14, 2021, and afternoon of August 15, 2021.  (*Id*.  ¶¶ 8-13.)  In the same time period, he opened untitled Excel, Keynote, and Numbers documents on the USB drive that correspond to documents on his computer marked Apple Proprietary & Confidential.  (*Id*. ¶¶ 9-10.)  He then viewed file listings for folders containing Apple files with proprietary and trade secret information, repeatedly opened documents, and then cleared the list of recently opened documents.  (*Id*. ¶¶ 10-11.)  Kaithamana also cleared his browsing history, recent applications access list, and recent search lists.  (*Id*. ¶¶ 13.)  Kaithamana represented on his exit checklist that he had returned or deleted all such information and that he had not wiped data from his Apple-issued devices.  (Cerny Dec. Ex. D.)

Kaithamana has now entered into a stipulated order agreeing to return any Apple confidential information in his possession, to make available for forensic inspection any devices that were used to store or transmit Apple information, and to refrain from making use of Apple

confidential information.  (*See* ECF Nos. 14, 19.)

### 3. Other Apple Employees Departing for Rivos Retained Apple Information and Wiped Their Apple Devices To Cover Their Tracks

Numerous other Apple employees who left Apple for Rivos downloaded and retained Apple's trade secret and confidential information after accepting their offers from Rivos, leaving Apple exposed to yet more trade secret theft.  (Roffman Dec. ¶¶ 25-36.)  One employee kept full backups of his entire Apple hard drive—with all of its Apple confidential information—on a personal external hard drive via Time Machine, even after he resigned from Apple.  (*Id.* ¶ 27.)  The local archive stored on the Apple-issued laptop of another former employee shows that, at the time the employee disconnected their iCloud Drive, they retained access to several highly confidential proprietary and trade secret files.  (*Id.* ¶ 32.)  Another employee copied confidential Apple information to a USB flash drive the day before his Apple departure.  (*Id.* ¶¶ 35-36.)  At least five other employees connected external hard drives to Apple-issued computers in the days following their hire by Rivos.  (*Id.* ¶¶ 28-34.)

In addition, several employees took steps to conceal or delete information that would have tipped Apple off to their improper activities.  (*See id.*  ¶¶ 25-26.)  A number of Apple employees installed encrypted communications apps, including Signal, to communicate with Rivos and amongst one another without risk of their communications being exposed.  (*See* Wilson Dec. ¶¶ 18-19.)  For instance, after joining Rivos, a former Apple employee provided a then-Apple employee a link to download Signal for communicating about Rivos with Rivos's CTO Belli Kuttanna.  (*Id.* ¶ 18, Ex. O.)  In the weeks before leaving Apple for Rivos, that same employee installed Signal and invited another employee that also left for Rivos to communicate on the platform, noting that "there are things [that] should not be recorded through apple's interface now."  (*Id.* ¶ 19, Ex. P.)  Yet another Apple employee warned a colleague against using iMessage to discuss Rivos, causing that colleague to delete messages related to the discussion.  (*Id.* ¶ 20, Ex. Q.)  Some of these employees demonstrated their own concerns about their behavior through the searching and deletions conducted in their last days at Apple.  One employee ran internet searches for "when you lost a lawsuit what do you have to pay" and viewed webpages relating to

1    attorneys' fees for losing parties to lawsuits.  (Roffman Dec. ¶ 30.)

2          Despite being told not to, at least nine employees completely wiped their Apple-issued

3    devices and/or reinstalled the operating systems, which results in all other data on the device

4    being deleted.  (*Id*. ¶¶ 25-26.)  In at least five cases, these employees wiped multiple devices

5    before returning them.  (*Id*. ¶ 25.)  As a result, Apple's forensic expert has been unable to analyze

6    the contents of these employees' computers, understand whether USB drives or cloud storage

7    were used, or determine if the employee exfiltrated data through other means.  (*Id*. ¶ 26.)  And

8    while Apple's investigation into the most recent set of departures to Rivos is ongoing, initial

9    findings show that at least one of the employees who departed in April 2022 completely wiped

10   his Apple device before returning it.  (*Id*. ¶¶ 25-26.)

11         The sheer number of former Apple employees who have (1) copied and retained hundreds

12   of gigabytes of Apple confidential information in external or cloud storage in their last days at

13   Apple; (2) wiped their computers to deny Apple the ability to investigate; (3) communicated with

14   Rivos through encrypted messaging; and (4) took positions at Rivos doing precisely what they

15   were doing for Apple, gives Apple reason to believe its trade secret information is being used by

16   Rivos to improperly advance Rivos's own SoC design program.

17         **D.    Apple Informed Rivos and Apple's Former Employees of Their Obligations
             and Sought Return of Its Trade Secrets Before Filing This Motion**

18
19         When Apple became aware of Rivos's coordinated targeting of Apple employees with

20   access to its most sensitive SoC information, Apple promptly sent Rivos a letter on July 9, 2021.

21   (Wilson Dec. ¶ 4, Ex. B.)  Apple never received a response to that letter, (*id*.), and Rivos

     continued to hire away Apple engineers.  (Cerny Dec. ¶ 10.)

22
23         After conducting a detailed forensic investigation, Apple filed its complaint on April 29,

24   2022.  (ECF No. 1.)  On the same day, Apple sent letters to the 42 employees who had departed

25   for Rivos as of that time, and to Rivos, informing them of Apple employees' obligations to return,

26   and not misuse, Apple's trade secret information.  (*See* Wilson Dec. ¶ 8, Ex. F.)  In these letters,

27   Apple sought to cooperatively resolve this dispute by seeking (1) return of any Apple trade secret

     and confidential information, (2) third party forensic examination of devices containing such

28

information, and (3) an explanation from its former employees regarding their false statements and attempts to wipe information from their Apple-owned devices.  (*See id*.)

On May 4, 2022, Apple was contacted by counsel for Bhasi Kaithamana, who informed Apple that Kaithamana left his position at Rivos on April 27, 2022, before Apple filed its Complaint.  (*Id.* ¶ 7.)  Apple and Kaithamana have filed, and the Court has entered, a stipulated order requiring return of any Apple trade secret and confidential information in his possession and a forensic search of any devices on which such information may be stored.  (ECF No. 19.)

Apple has not been able to have this same discussion with the other former employees. Apple received an initial response from one former employee on April 29, who confirmed that he had synced desktop and downloads folders containing Apple files to his personal iCloud before leaving Apple, and that those files remain in his iCloud.  (Wilson Dec. ¶ 9, Ex. G.)  Apple responded asking that he return the information, but the employee responded that all further communication should be directed to Rivos's in-house counsel.  (*Id.*)

On May 4, Apple received an email from Brian Wallenfelt, internal counsel at Rivos, who provided "an initial response from Rivos and each of the employees of Rivos to whom [Apple] sent letters." (*Id.* ¶ 11, Ex I.)  Mr. Wallenfelt also informed Apple that Rivos was retaining counsel and would respond to the letters more fully in due course.  (*Id.*)

On May 6, 2022, Apple received a response from Quinn Emanuel, counsel for Rivos and Ricky Wen.  (*Id.* ¶ 12, Ex. J.)  In that letter, Rivos's counsel said they would undertake to provide "adequate assurances" that no misappropriation occurred, but requested information regarding Apple's own investigation before they would investigate.  (*Id.* Ex. J ("as soon as we receive that information, we will diligently investigate Apple's claims.")  Apple responded on May 9, 2022 and pointed out that Rivos already had all of the information provided in Apple's complaint and the letters to each of the former Apple employees, which contained more than enough detail for Rivos to begin an investigation.  (*Id.* Ex. K.)  Apple asked again that Rivos agree to a third-party forensic investigation, using a protocol agreed-upon by both parties.  (*Id.*)  Finally, Apple asked counsel to confirm whether or not they represent the other former Apple employees.  (*Id.*)

On May 11, counsel for Rivos and Mr. Wen stated they could not consider a neutral

forensic investigation without first completing their own investigation, and again demanded information from Apple about its own pre-suit forensic investigation.  While counsel did state that Wen "has not used or disclosed any Apple proprietary or trade secret information in connection with his employment at Rivos," they provided no basis for this statement.  (*Id.* Ex. L.)

On May 13, Apple responded and asked, given counsel's statement regarding Mr. Wen, that Wen stipulate to a court order requiring return of any Apple information and that he submit to the same discovery (including forensic inspection of any devices potentially containing Apple information) agreed to by Kaithamana.  (*Id.* Ex. M.)  Apple reiterated its request that Rivos agree to a forensic examination.  (*Id.*)  In response to counsel's request regarding what Apple would consider "a proper forensic investigation," Apple stated its willingness to provide search terms and also said a proper investigation would require examination of the former employees' devices and cloud storage as identified in Apple's letters.  (*Id.*)  In a further attempt to compromise, Apple stated that, if Rivos would not agree to a forensic search, Apple would accept in the alternative a commitment from Rivos to limited expedited discovery.  (*Id.*)  Finally, Apple *again* asked counsel whether or not they represent the other former Apple employees, as counsel's silence had rendered Apple unable to contact those employees or seek return of their devices.  (*Id.*)

Rivos's counsel provided a brief reply on May 17, but refused to address, much less agree to, any third-party forensic investigation or expedited discovery.  (*Id.* Ex. N.)  Counsel also ignored Apple's request regarding Mr. Wen and refused to say whether or not they represent the other former Apple employees now at Rivos.  (*Id.*)  This refusal, along with Rivos's refusal to confirm whether they are searching those employees' devices for Apple information, has frustrated Apple's efforts to seek return of these devices and the Apple information they contain. Counsel also ignored Apple's offer to provide search terms to facilitate a forensic inspection.

In short, Defendants Rivos and Wen continue to demand further information from Apple while refusing to answer reasonable questions about their own investigation or agree to any discovery or third-party investigation.  Apple has offered multiple paths to resolution outside of seeking relief from the Court, but Rivos and Wen have refused all of Apple's suggestions.  This leaves Apple with no choice but to file this motion.  On May 20, Apple notified Rivos of its

1   intention to move for a temporary restraining order and expedited discovery.  (*Id.* ¶ 17.)

2   **III.    LEGAL STANDARD**

3       The legal standards for a temporary restraining order and preliminary injunction are the

4   same.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

5   In both instances, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a

6   likelihood of irreparable harm absent a preliminary injunction; (3) that the balance of equities tips

7   in favor of issuing an injunction; and (4) that an injunction is in the public's interest.  *Winter v.*

8   *Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  In the Ninth Circuit, "'serious questions going to

9   the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an

10  injunction, assuming the other two elements of the *Winter* test are also met."  *All. for the Wild*

11  *Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011); *Al Otro Lado v. Gaynor*, 513 F. Supp.

12  3d 1253, 1260  (S.D. Cal. 2021) (issuing TRO under "serious questions" standard).  A "serious

13  question" is one on which the movant has a "fair chance of success on the merits."  *Sierra*

14  *On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

15      The Defend Trade Secrets Act ("DTSA") specifically authorizes the granting of injunctive

16  relief "to prevent any actual or threatened misappropriation… on such terms as the court deems

17  reasonable."  18 U.S.C. § 1836(b)(3)(A).  The DTSA also provides that an injunction may

18  "require[] affirmative actions to be taken to protect the trade secret."  *Id.*  California law also

19  permits injunctive relief for breach of contract claims.  *See Blizzard Ent. Inc. v. Ceiling Fan*

20  *Software LLC*, 28 F. Supp. 3d 1006, 1018-19 (C.D. Cal. 2013) (injunction for breach of EULA).

21  **IV.    ARGUMENT**

22          **A.    A Temporary Restraining Order Is Needed To Enjoin Defendant Wen from
                    Using or Disseminating Apple's Trade Secrets**

23

24              **1.    Apple Is Likely To Succeed on Its DTSA and Breach of Contract
                        Claims Against Wen**

25      On his last days at Apple before departing for competitor Rivos, and in spite of his

26  agreement with Apple to protect, return, and delete Apple confidential information upon his

27  departure, Ricky Wen selected and copied to his personal devices hundreds of highly sensitive

28  documents related to Apple's crown-jewel SoC projects.  (*See* Roffman Dec. Appx. B

(documents retained by Wen); Murray Dec. ¶¶ 8-15 (describing documents).)  Wen deleted key information to cover his tracks, then falsely confirmed to Apple that he no longer had any Apple confidential information, leaving him free to take Apple's trade secrets to Rivos where he works on developing competing SoCs.  In doing so, Wen breached (and continues to breach) his agreement with Apple and committed a clear violation of the DTSA.

To prevail on a DTSA claim, a plaintiff must show that the information at issue is a "trade secret" and that defendant "misappropriated" the information.  *Comet Techs. USA Inc. v. Beuerman*, No. 1:18-cv-01441-LHK, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018).  Trade secrets include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes" where "the owner thereof has taken reasonable measures to keep such information secret."  18 U.S.C. § 1839(3).  A trade secret must "derive independent economic value" from not being generally known or readily ascertainable to "another person who can obtain economic value" from it.  *Id.*

Misappropriation of a trade secret is defined as (a) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"; or (b) "disclosure or use of a trade secret of another without express or implied consent by a person who … used improper means to acquire knowledge of the trade secret[.]"  18 U.S.C. § 1839(5).  "[I]mproper means" includes "theft," "misrepresentation," or "breach of a duty to maintain secrecy."  18 U.S.C. § 1839(6).

"In moving for a preliminary injunction, Plaintiffs are not required to prove that misappropriation actually has occurred – Plaintiffs need only make a clear showing that misappropriation *likely* occurred."  *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, No. 2:13-cv-00784-MCE-DAD, 2013 WL 2151553, at *10-11 (E.D. Cal. May 16, 2013) (emphasis in original) (granting preliminary injunction where defendants downloaded massive amounts of confidential information in a span of several days, demonstrating that "Defendants likely attempted to misappropriate" plaintiff's data).

### a.     Apple's SoC Designs Are Trade Secrets

The documents taken by Defendant Wen—Apple's proprietary SoC designs, specifications, chip development roadmaps, technical analyses and status reports, among other documents related to Apple's SoCs—fall squarely within the DTSA's definition of trade secrets. *See* 18 U.S.C. § 1839(3); Roffman Dec. ¶¶ 14-24, Appx. B; Murray Dec. ¶¶ 8-15.  For example, Mr. Wen transferred a specification that describes the overall compute architecture for an unreleased Apple product.  (Murray Dec. ¶ 8.)  It includes detailed information through tables, diagrams, schematics, and other descriptions of the micro-architecture for both performant and energy-efficient CPU cores in the SoC.  (Murray Dec. ¶ 8.)  The other documents Wen took, including results of engineering simulations, development roadmaps and status, and register transfer level (RTL) design files, disclose highly confidential information that would be invaluable to chip designers looking to copy or compete with Apple's SoCs.  (*Id.* ¶¶ 11-14; *see* Roffman Dec. Appx. B.)

These documents, and any documents containing similar information, are not made available to the public, nor is their content ascertainable by those merely purchasing products that contain Apple's SoCs, and the information contained therein derives its value to Apple from not being generally known.  (Murray Dec. ¶ 8); *see Comet Techs.*, 2018 WL 1990226, at *3 ("A collection of data that allows the holder to recreate one of Plaintiff's top technologies derives its value from not being generally known, because Plaintiff's competitive edge would evaporate if the public and its competitors could easily recreate its products.").  Indeed, several of these documents relate to SoCs that have not been announced or released by Apple and that are only known to those engineers working on these projects within Apple.  (Murray Dec. ¶¶ 5, 8, 13-14.)

Given its huge investments in their development, Apple has in place substantial measures to protect its SoC designs and related documents from public disclosure and dissemination, including contractual confidentiality obligations and access restrictions.  (*See* Cerny Dec. ¶¶ 2-9.) All Apple employees with access to Apple's proprietary information execute IPAs that specifically forbid misuse and retention of that information.  (Cerny Dec. ¶ 2.)  Apple also restricts access using passwords and encryption to protect repositories where such information is

1   stored and limiting distribution to key employees to a need-to-know basis.  (Murray Dec. ¶¶ 5-7.)

2   When it must be disclosed to third parties during the ordinary course of Apple's business, Apple

3   provides written policies and procedures, confidentiality agreements, and non-disclosure

4   agreements to further protect its proprietary information.  (Cerny Dec. ¶ 8.)

5          These reasonable measures are more than adequate to protect Apple's trade secrets under

6   the DTSA.  *See, e.g., Comet Techs.*, 2018 WL 1990226, at *3 (finding information was a trade

7   secret where plaintiff took steps "including requiring employees to sign non-disclosure

8   agreements, conducting exit interviews that stress departing employees' confidentiality

9   obligations, limiting access to Confluence files based on seniority and access need, and

10  establishing internal policies that prohibit using third party data storage for company

11  information"); *Posdata Co. v. Kim*, No. C-07-02504 RMW, 2007 WL 1848661, at *4-5 (N.D.

12  Cal. June 27, 2007) (finding, for TRO purposes, that plaintiff's use of confidentiality agreements

13  and internal security measures constituted reasonable measures to protect trade secrets); *Pyro*

14  *Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1090-91 (E.D. Cal. 2012) (finding

15  reasonable measures based on use of confidentiality agreements, secure network servers,

16  password-restricted access, and limited access by job function).

17                    **b.      Wen Misappropriated Apple's Trade Secrets**

18         Ricky Wen selected and copied to his personal devices highly sensitive documents related

19  to Apple's SoCs before leaving to take a similar job at a competitor.  He was obligated, at least by

20  the IPA he executed when he joined Apple, to protect and return Apple's confidential information

21  when his employment ended.  These obligations continued after termination.  (Cerny Dec. Ex. A,

22  § 2.0(a).)  Apple reminded Wen of this obligation during his exit interview, and he acknowledged

23  it again when executing his exit checklist.  (*Id.* ¶ 5, Ex. C.)

24         Wen nevertheless took and retained Apple trade secret SoC designs upon termination in

25  violation of his IPA and Apple procedures regarding protection of proprietary information.

26  (Roffman Dec. ¶¶ 14-24; *see Comet Techs.*, 2018 WL 1990226, at *3 (finding likelihood of

27  misappropriation where trade secret information was taken in contravention of "non-disclosure

28  agreements" and "exit interviews that stress departing employees' confidentiality obligations").)

Wen accessed files in restricted repositories and many of the documents he retained are marked as Apple proprietary and confidential information. (Roffman Dec. ¶ 20.) He then copied those files in the last few days of his employment onto personal devices that he took with him upon departing Apple. (*See id.* ¶¶ 14-21; *see Cutera, Inc. v. Lutronic Aesthetics, Inc.,* 444 F. Supp. 3d 1198, 1207-08 (E.D. Cal. 2020) (finding likelihood of success on misappropriation where forensic evidence showed information was downloaded from work devices to personal computers at the time of employees' departure).

The fact that Wen acknowledged his obligation not to sanitize his Apple-issued devices in his last days at Apple also shows he was aware he was violating his obligations under the IPA. *See Comet Techs.*, 2018 WL 1990226, at *4 (defendant's false representations during exit interviews, and plaintiff's repeated efforts to ensure confidential information was protected, demonstrated that defendants knew or had reason to know retaining the information breached their duty of secrecy). Wen also took steps to hide his activities on his Apple devices just before his departure, including clearing messaging history. (Roffman Dec. ¶ 14.) These facts demonstrate that Apple is likely to prevail on its DTSA claim against Wen. *See, e.g.*, *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (finding likelihood of success where defendant "e-mailed and downloaded, to her personal devices, confidential information from [Plaintiff] before leaving her employment to work at a competitor" despite signing confidentiality agreement); *Comet Techs.*, 2018 WL 1990226 at *3-4; *Miloedu, Inc. v. James*, No. 21-CV-09261-JST, 2021 WL 6072821, at *2 (N.D. Cal. Dec. 23, 2021) (finding likely misappropriation where forensic search results showed defendant "copied material from [plaintiff] that was subject to the proprietary information agreement").

### c.    Wen Breached his Contract with Apple

For the same reasons, there can be little doubt that Apple will succeed on its breach of contract claim against Ricky Wen. To prove breach of contract, Apple must show the existence of a contract, Apple's performance or excuse for nonperformance, defendant's breach of the contract, and resulting damages from the breach. *See Reichert v. Gen. Ins. Co.*, 68 Cal. 2d 822, 830 (1968). Confidentiality agreements similar to the one Wen signed in this case are valid and

enforceable in California,[1] and a breach of such an agreement is the appropriate subject of a breach of contract claim.  *See, e.g.*, *Oculus Innovative Scis., Inc. v. Nofil Corp.*, No. C 06-1686-SI, 2007 WL 4044867, at *3-6 (N.D. Cal. Nov. 15, 2007).

Here, Wen entered into an IPA with Apple in which he agreed to hold Apple's confidential information in confidence and to return it upon his departure.  (*See* Cerny Dec. Ex. A, § 2.0(a).)  Wen certified at the time of his departure that he had returned all such information, which was false in view of the hundreds of Apple confidential files he took with him.  Apple has been harmed by Wen's breach as the security of its most sensitive information has been threatened and may be in the hands of a competitor.  As Wen specifically acknowledged in his IPA, his ongoing breach of his agreement has and will cause Apple irreparable harm (*id.* § 5.0), making injunctive relief necessary as discussed below.

### 2.   Apple Will Suffer Imminent and Irreparable Harm Unless the Court Issues Immediate Injunctive Relief

"[C]ourts within this District have consistently reached the conclusion that a plaintiff will suffer irreparable harm if its proprietary information is misappropriated."  *Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, No. 19-4162 SBA, 2021 WL 1186335, at *10 (N.D. Cal. Mar. 1, 2021), *vacated in part on other grounds by Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, No. 4:19-cv-04162-SBA, 2022 WL 1530491 (Fed. Cir. May 16, 2022).  Indeed, the "loss of trade secrets cannot be measured in money damages ... [because] a trade secret once lost ... is lost forever."  *Id.* at *11 (citation omitted).

The actions of Mr. Wen over the last days of his employment at Apple, and his false assurances that he had returned all Apple confidential information, demonstrate his goal of benefiting his new employer by taking Apple's trade secrets with him to Rivos.  As a result of these actions, Apple legitimately fears that Wen already has used or will use and/or disclose its trade secrets for the benefit of Rivos and its goals of developing competing SoCs.  *See Posdata*, 2007 WL 1848661, at *8 ("[Plaintiff's] technology at issue has been developed with substantial

---

[1] Mr. Wen's IPA states that the "agreement will be governed by the laws of the state where you are currently or were or were most recently employed…"  Mr. Wen was employed by Apple in California.  (Cerny Dec. Ex. A § 6.0.)

1   company resources and at considerable cost, thus development by [a competitor] of this

2   technology or its dissemination may result in irreparable harm to plaintiff."); *Cutera*, 444 F.

3   Supp. 3d at 1209 (finding irreparable harm where copying of a vast amount of information just

4   before departing for competitor "gives rise to a reasonable inference that the Former Cutera

5   Employees intended to use this information to benefit their new employer."); *Waymo LLC v.*

6   *Uber Techs., Inc.*, No. 17-00939-WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017)

7   (finding irreparable harm where employee had thousands of files from former employer and

8   "[m]isuse of that treasure trove remains an ever-present danger wholly at his whim").

9        Apple attempted to resolve this issue cooperatively with Mr. Wen prior to bringing this

10   motion.  His response was to (1) refuse to discuss any neutral investigation or expedited

11   discovery until his counsel completed their own investigation, while refusing to provide any

12   details about that investigation; and (2) demand additional information about Apple's own

13   forensic investigation, the results of which are already detailed in the Complaint and the letter

14   Apple sent to Wen (with a copy to Rivos).  Without any third-party review or even a commitment

15   to discovery by Mr. Wen, Apple cannot be sure its information is not being used at Rivos to

16   create a competing product as we speak.[2]

17        Apple would be irreparably harmed by such disclosure and use by a competitor.  The

18   information Mr. Wen retained is not just a handful of isolated documents about Apple's SoC chip

19   specifications and designs; it is a vast amount of confidential information of different types across

20   a wide range of products, including Apple's current and future designs.  (Murray Dec. ¶ 23.)  The

21   documents include Apple's core trade secrets and its most highly sensitive confidential

22   information.  (*Id.*)  If a competitor were to obtain Apple's chip specifications, RTL files, and

23

---

24   [2] Rivos's counsel provided an initial response on May 20 that did not provide the results of any
investigation into former Apple employees now at Rivos.  The letter stated only that

25   counsel "have not identified any evidence that *Rivos is using* Apple proprietary or trade secret
information." (Wilson Dec. Ex. W (emphasis added).)  But among other things, the response fails

26   to address whether Rivos's counsel also is representing the former employees or searching their
devices for Apple confidential information. As Apple noted in its May 13 letter, without a

27   third-party neutral conducting a separate forensic investigation, Rivos's assurances do not
sufficiently address Apple's legitimate concerns that its confidential information remains in the
possession of and is potentially being used by its former employees in connection with their jobs

28   at Rivos.  (Wilson Dec. Ex. M.)

engineering simulations, that would effectively give them a step-by-step blueprint to follow in copying Apple's SoC designs.  (*Id.* ¶¶ 18-20.)  These documents, which go well beyond what can be determined from analyzing a completed SoC in Apple's commercial products, explain many of the design choices that Apple made and specify the components and characteristics that differentiate its chips from its competitors.  (*Id.* ¶ 20.)  Even the presence or absence of certain information in Apple's chip specifications provides critical insight into which components, connections, parameters, and other characteristics are important or unimportant.  (*Id.*)

Apple's SoCs are years and generations ahead of competitors' SoCs.  (*Id.* ¶ 17.)  The information Wen took relates to both Apple's current and future designs.  Disclosure of present designs (or even designs from preceding generations) would still be significantly more advanced than those available commercially from third-parties.  Because Apple's design process is iterative, with each generation building upon lessons learned from prior generations, information on these products is still extremely valuable and would give a competitor a significant head start in creating custom SoCs that could compete with Apple's current SoCs.  (*Id.* ¶¶ 16-17.)

Use or disclosure by a competitor of Apple's *future* designs would be even more harmful, since it would reveal Apple's newest trade secret design elements that have never been disclosed and are not even embodied in products shipping to the public.  (*Id.* ¶ 19.)  Access to these materials would give significant insight into Apple's plans for its future SoCs and products and would allow competitors to use Apple's own innovations to compete against it.  (*Id.* ¶ 19.)  And if any of Apple's sensitive SoC information were to be disclosed publicly, it would cause immense harm to Apple that would go far beyond the mere monetary value of the information that the materials include.[3]  (*Id.* ¶ 22.); *WeRide Corp. v. Huang*, 379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019) (risk of broader disclosure of trade secrets supports irreparable harm).

To achieve and maintain its competitive edge in SoC design, Apple has invested billions of dollars and the efforts of thousands of employees over more than a decade. (Murray Dec.

---

[3] Indeed, Defendant Wen agreed in his IPA that violation of his confidentiality obligations would cause Apple irreparable harm.  (Cerny Dec. Ex. A § 5.0); *see Miloedu*, 2021 WL 6072821, at *3 (crediting defendants' contractual acknowledgement of disclosure causing irreparable harm).

¶¶ 16-18.)  Apple's ability to continue to maintain, and expand, its market share is dependent on its ability to differentiate its products in a highly competitive, innovative environment.  The use of Apple's SoC information by a competitor risks undermining that differentiation and would allow its competitors to "catch up" on Apple's head start.  This could impact Apple for years to come and in future generations of its products across multiple product lines.  (*Id.* ¶¶ 16-23.)  There is no amount of money that could fully compensate Apple for the disclosure and use of this information by its competitors.  (*Id.* ¶ 23); *see Waymo*, 2017 WL 2123560, at *11 (with former employee still able to access confidential Waymo files while at competitor, "the harm that Waymo is likely to suffer as a result of such misuse cannot be unwound after the fact").

### 3.    The Balance of Hardships Strongly Favors Apple

In contrast to the enormous harm that Apple will suffer from the use or disclosure of its trade secrets, Apple's proposed injunction imposes little to no hardship on Defendant Wen. Apple seeks a limited and focused order enjoining Wen and anyone acting in concert with him from further access to or use of the Apple confidential documents he retained (*see* Roffman Dec. Appx. B) and any other Apple trade secret and confidential information in his possession, and ordering him to return all such information to Apple.  Defendant Kaithamana has already stipulated to this relief, as well as a forensic investigation.

Apple's proposed injunction merely asks Wen to return, and to refrain from using, Apple trade secret and confidential information that he has no right to continue to possess.  "Courts have found that the balance of hardships tips in favor of a plaintiff seeking an injunction which would merely prohibit [the defendant] from misappropriating the trade secrets of [the plaintiff]." *Farmers Ins. Exch.*, 2013 WL 2151553, at *14 (citations omitted); *see also, e.g.*, *Comet Techs.*, 2018 WL 1990226, at *5 (finding TRO "will result in little meaningful hardship to Defendant" because the information at issue "belongs to Plaintiff" and "Plaintiff has a very strong interest in ensuring that the information is not disclosed. On the other side, Defendant has little interest in disclosing or using the information because such disclosure or use is unauthorized."); *Pyro*, 861 F. Supp. 2d at 1092 (preliminary injunction "would not cause any significant hardship to defendant, because it would essentially only require him to abide by existing law regarding the

unauthorized use of another's trade secrets," and "whatever harm defendant may suffer by such a narrow injunction is slight when compared to the intangible harm PSI would suffer").

### 4. The Relief Apple Seeks Supports the Public's Strong Interest in Protecting Trade Secrets

"The public interest is served by the protection of trade secrets and the enforcement of contractual commitments made by an employee to his or her employer." *Carl Zeiss Meditec*, 2021 WL 1186335, at *11; *Pyro*, 861 F. Supp. 2d at 1092-93 (California "has a strong policy in favor of protecting trade secrets," and thus, "an injunction specifically focused on preventing misuse of PSI's trade secrets to solicit PSI's customers would serve the policy of protecting trade secrets while simultaneously allowing lawful competition"). Apple's requested relief is specifically focused on preventing any further dissemination or misuse of its trade secrets by Wen and anyone acting in concert with him. The public interest is served by Apple's narrow and targeted request. *See Miloedu*, 2021 WL 6072821, at *3 ("[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer.").

### B. Expedited Discovery Is Needed To Uncover the Full Extent of the Misappropriation and To Prevent Further Misuse of Apple's Trade Secrets

The information needed to fully understand the scope of Defendants' misappropriation is solely in the hands of the Defendants. Apple therefore seeks limited and reasonable expedited discovery in order to quickly determine the extent of the misappropriation and take necessary steps to prevent further misuse. One of the defendants, Bhasi Kaithamana, has already stipulated to the discovery Apple seeks in this motion. Apple asked that Rivos and Mr. Wen agree to similar targeted expedited discovery, but their counsel refused, making this motion necessary.

Expedited discovery is appropriate upon a showing of "good cause," which is found where "the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). Additionally, "courts frequently find good cause for expedited discovery in intellectual property cases and cases where a preliminary injunction is pending." *Trulite Glass & Aluminim Sols., LLC v. Smith*, No. 21-601798, 2016 WL 8738432, at

*1 (E.D. Cal. Aug. 10, 2016) (citing *Apple Inc. v. Samsung Elecs. Co.*, No. CV-01846-LHK, 2011 WL 1938154, at *2 (N.D. Cal. May 18, 2011).

"Factors commonly considered in determining the reasonableness of expedited discovery include, but are not limited to: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009) (internal quotations omitted).

All five factors weigh in favor of granting Apple's requested expedited discovery.

*First*, Apple is seeking a temporary restraining order in the present motion, and intends to seek a preliminary injunction to enjoin misuse of its trade secrets.

*Second*, the discovery Apple seeks is narrow and will result in minimal burden on Wen and Rivos. Apple is seeking limited, targeted discovery, which is focused on the documents and information that has been taken by Apple's former employees who are now at Rivos, and what use or disclosure has been made of it. The proposed discovery is attached to the Wilson Declaration as Exhibits R-V.

Apple seeks to propound a limited number of narrow interrogatories (4) and requests for production (5) on Mr. Wen (*see* Wilson Dec. Exs. R, S). These requests seek specific categories of documents and information related to the Apple SoC documents and designs that Wen took with him from Apple.[4] Apple also seeks forensic images of any device in Wen's possession, custody or control onto which Apple confidential information was transferred, or has been or is currently being stored.[5] Forensic images can be quickly and easily captured, and Apple is willing to negotiate and agree upon a protocol for third-party review of their contents. *See eHealthinsurance Servs., Inc. v. Healthpilot Techs. LLC*, No. 21-CV-4061-YGR, 2021 WL

---

[4] While no protective order has yet been entered in this case, Apple is willing to negotiate necessary protections, including production of information as "Attorneys' Eyes Only."

[5] Defendant Kaithamana has already agreed to a forensic inspection of any devices that contain or may once have contained Apple information.

3052918, at *3 (N.D. Cal. July 20, 2021) (ordering expedited discovery including handover of affected devices to third party forensic analyst for review pursuant to agreed protocol).

Apple's requests for production ask only for documents related to its highly confidential SoC projects, with which Wen clearly is familiar.  Nor should it be difficult for Wen to gather and produce his communications with Rivos or explain, in response to Apple's interrogatories, what he did with Apple's information.  Apple's requests to Rivos (4 interrogatories and 4 requests for production) are similarly narrow, seeking only production and identification of Apple confidential information brought to Rivos by former Apple employees, along with information and documents regarding the location of that information and how it got to Rivos, and the use of any encrypted messaging applications to communicate with Apple employees regarding Apple confidential information.  (*See* Wilson Dec. Exs. T, U.)

Apple additionally requests a deposition of Wen, which would focus on what Apple information he possesses, where it is stored, and what he has done with that information.  Apple also seeks a limited 30(b)(6) deposition of Rivos on only three topics (*see* Wilson Dec. Ex. V) to determine (1) the extent to which Rivos was aware of the downloading or retention of Apple confidential information by the former employees that it hired, (2) whether Rivos has possession of any of Apple's trade secret and confidential information that came from these former employees, and (3) how that information has been used, so that Apple can seek tailored relief to prevent any further misappropriation.  *See Penson & Co., LLC v. Cloudstyle Store*, No. 20-cv-05174-JST, 2020 WL 11885744, at *3 (N.D. Cal. Aug. 27, 2020) (granting expedited discovery where requested discovery was narrowly tailored to support requested injunction).  The burden of Apple's narrow requests is minimal, especially when considered in view of the risk to Apple that its trade secrets are in use by a direct competitor.  Apple asks that Defendants respond to this discovery within 14 days of the date of the Court's order, and given Rivos's claim that its own internal investigation can be completed by May 31 (*see* Wilson Dec. Exs. L, M), this time should be more than sufficient.

The second and fourth factors therefore weigh in favor of Apple.

*Third*, the purpose of these requests weighs heavily in favor of expedited discovery.  They

are tailored for the narrow purpose of allowing Apple to better craft its request for a preliminary

injunction and determine what immediate steps may be needed to prevent further

misappropriation.  *Pyro*, 861 F. Supp. 2d at 1086 (granting expedited discovery for purposes of

pursuing preliminary injunction); *WeRide*, 379 F. Supp. 3d at 854 (granting expedited discovery

as it would "help to minimize harm to WeRide's competitive position and to protect WeRide's

trade secrets from disclosure.").

The evidence is clear that a considerable amount of Apple's proprietary and trade secret

information was taken by its former employees departing for Rivos and may already be in Rivos's

possession and in use by Rivos in developing competing products.  *See Miloedu Inc.*, 2021 WL

6072821, at *4 (finding good cause for expedited discovery where the defendant "copied over a

terabyte of information from MILO before he left").  Apple, however, cannot ascertain the full

extent of the theft and nature of such use without additional discovery from Wen and Rivos.  And

because Rivos is in "stealth mode," there is little public information available from which Apple

could determine whether its SoC designs are being used by Rivos.

Rivos's refusal to confirm whether or not its counsel represents the former Apple

employees also has frustrated Apple's ability to secure the return of their devices containing

Apple information.  (*See* Wilson Dec. Exs. L, N.)  Without the devices onto which these

employees may have copied information, Apple can obtain only a limited picture into their

actions.  (Roffman Dec. ¶ 26.)  Apple cannot determine whether they continue to possess Apple's

trade secrets unlawfully, nor can Apple determine the scope of Rivos's possession through these

employees, nor the full scope of Rivos's efforts to encourage misappropriation.  (*Id.*)

Apple also cannot determine the extent of Defendants' misappropriation because many of

the former Apple employees took steps to sanitize and wipe their devices to conceal their

activities immediately prior to their termination.  (*See id.* ¶¶ 25-36.)  Moreover, additional Apple

employees with access to Apple trade secrets continue to depart for Rivos.  (*See* Cerny Dec. ¶

10.)  Without ascertaining the true extent and nature of the misappropriation, Apple cannot

determine what steps are necessary to prevent further dissemination of Apple's trade secrets and

limit harm to Apple's competitive position.  *Miloedu, Inc.*, 2021 WL 6072821, at *4 ("Quickly

1   determining what information Defendant removed from Plaintiff, and whether and how Plaintiff's
2   information is being used by Plaintiff's competitors is essential in order to minimize any harm to
3   Plaintiff's competitive position.").

4         *Finally*, expedited discovery is necessary because the parties' Rule 26(f) conference in
5   this case is not set to be conducted until July 7, and discovery will not commence until that date.
6   Fed. R. Civ. P. 26(d)(1).  Even if Apple were to seek this discovery immediately, it will take
7   months to receive responses to written requests and hold meaningful depositions of the
8   defendants.  Apple is only seeking to advance the start of discovery by six weeks (a difference
9   that will decrease by the time the Court rules on this motion).  In the meantime, if this core trade
10  secret information is used or disclosed, the harm to Apple cannot be undone.  (*See* Murray Dec.
11  ¶¶ 16-23.)  It is also possible that relevant evidence will be lost, given that several former
12  employees wiped their computers entirely before returning them to Apple and falsely claimed
13  they had not done so.  *WeRide*, 379 F. Supp. 3d at 854 (granting expedited discovery and noting
14  one defendant "has already deleted computer files on at least two relevant devices, further
15  increasing the need for early discovery.").  As employees continue to depart for Rivos with
16  potentially more Apple trade secrets, and with Rivos standing in the way of Apple's recent
17  request for return of its trade secrets from its former employees, time is of the essence for Apple
18  to determine the extent of the misappropriation and forestall any further irreparable harm.

19  **V.      CONCLUSION**

20        For the above-stated reasons, Apple respectfully requests that the Court grant Apple's
21  motion and (1) enjoin Defendant Wen and any other person or entity participating with or acting
22  for, on behalf of, or in concert, with him, from accessing, using or disclosing Apple's trade secret
23  and confidential information; and (2) order Defendant Wen to immediately return to Apple all
24  Apple trade secret and confidential information in his possession.  Apple further requests an order
25  allowing Apple to conduct limited expedited discovery as outlined in Exhibits R-V to the Wilson
26  Declaration, submitted with this motion, along with an order to show cause why a preliminary
27  injunction should not be granted.

28

1    Dated:   May 20, 2022                        Respectfully submitted,

2                                                 MORRISON & FOERSTER LLP

3

4                                                 By:    /s Bryan Wilson
                                                         Bryan Wilson
5
                                                         Attorneys for Plaintiff
6                                                        APPLE INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28