BRYAN WILSON (CA SBN 138842)
BWilson@mofo.com
KENNETH A. KUWAYTI (CA SBN 145384)
KKuwayti@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California  94304-1018
Telephone: 650.813.5600
Facsimile:  650.494.0792

ARTURO J. GONZALEZ (CA SBN 121490)
AGonzalez@mofo.com
DIEK O. VAN NORT (CA SBN 273823)
DVanNort@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile:  415.268.7522

MARY PRENDERGAST (CA SBN 272737)
MPrendergast@mofo.com
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, District of Columbia  20037
Telephone: 202.887.1500
Facsimile:  202.887.0763

Attorneys for Plaintiff
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>RIVOS INC., a Delaware corporation; WEN SHIH-CHIEH a/k/a RICKY WEN; BHASI KAITHAMANA; JIM HARDAGE; WEIDONG YE; LAURENT PINOT; PRABHU RAJAMANI; and KAI WANG,<br><br>                    Defendants. | Case No. 5:22-cv-2637-EJD<br><br>**FIRST AMENDED COMPLAINT**<br><br>**(1)   Breach of Contract**<br><br>**(2)   Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Apple Inc. ("Apple") brings this First Amended Complaint against Defendant Rivos Inc. ("Rivos"), current Rivos employees Wen Shih-Chieh a/k/a Ricky Wen, Jim Hardage, Weidong Ye, Laurent Pinot, Prabhu Rajamani, Kai Wang, and former Rivos employee Bhasi Kaithamana (together, the "Individual Defendants") (collectively, "Defendants") and alleges as follows:

**INTRODUCTION**

1.      Apple brings this action to prevent Rivos and its employees from exploiting Apple's most valuable trade secrets to compete with Apple unlawfully and unfairly.  Apple does not take lightly naming individuals in this Amended Complaint.  The limited information that Apple has received so far confirms that Apple confidential materials are in Rivos employees' possession.  Instead of cooperating with Apple to resolve this matter, Rivos has blocked Apple's communication with those employees and prevented Apple from understanding the full extent of Apple's confidential information at Rivos or with its former employees and arranging for its return.  Thus, Rivos has left Apple no alternative but to pursue legal assistance by naming additional individuals.

2.      Apple's cutting-edge, advanced system-on-chip ("SoC") designs, including its M1 laptop SoCs and A15 mobile phone SoC, have revolutionized the personal and mobile computing worlds.  Apple has devoted billions of dollars and more than a decade of effort to develop the proprietary technologies and expertise necessary to engineer these revolutionary SoC designs and become a leader in the field of semiconductor design.

3.      "Stealth mode" startup Rivos was founded to design and market its own competing SoCs.  Since its inception, it has filled out its ranks with dozens of former Apple engineers. Starting in June 2021, Rivos began a coordinated campaign to target Apple employees with access to Apple proprietary and trade secret information about Apple's SoC designs.  Apple promptly sent Rivos a letter informing Rivos of the confidentiality obligations of Apple's former employees, but Rivos never responded.

4.      After accepting their offers from Rivos, some of these employees took gigabytes of sensitive SoC specifications and design files during their last days of employment with Apple.

Some used multiple USB storage drives to offload material to personal devices, accessed Apple's most proprietary specifications stored within collaboration applications, and used AirDrop to transfer files to personal devices. Others saved voluminous presentations on existing and unreleased Apple SoCs—marked Apple Proprietary and Confidential—to their personal cloud storage drives. One even made a full Time Machine backup of his entire Apple device onto a personal external drive. Apple has reason to believe that Rivos instructed at least some of these individuals to download and install apps for encrypted communications before conducting further conversations. And at least nine of the employees wiped their Apple devices entirely to try to cover their tracks, later falsely representing to Apple that they had not done so. Even more of the employees selectively deleted information from their Apple devices.

5.     In the weeks since filing its initial complaint and individually notifying its former employees and Rivos of the Apple confidential information they improperly retained, Apple's fears have been proven justified. Apple has confirmed that four of the former employees—the only four for whom Apple has received a substantive response—improperly retained Apple confidential information and continued to possess that information even after they began working at Rivos. The two individuals named in Apple's initial complaint (Individual Defendants Wen and Kaithamana) have agreed to forensic examination of their devices and to return any Apple information in their possession. Another employee, Individual Defendant Kai Wang, responded and confirmed he had retained documents, seeking to resolve the matter "cooperatively." Mr. Wang subsequently directed Apple to Rivos's counsel, who has declined to state whether it has any information regarding Mr. Wang and has declined to provide any response on his behalf. The last of the four, Individual Defendant Laurent Pinot, who retained over a terabyte of information as a Time Machine backup of his Apple-issued computer, has admitted he still has that backup.

6.     These are not the only former Apple employees who have retained Apple confidential information and are now working at Rivos. Apple filed a declaration from a forensic expert in conjunction with its application for a Temporary Restraining Order and expedited discovery in which it provided Rivos with substantial forensic information including specific device names and serial numbers on which this information was stored. But Rivos continues

blocking Apple's attempts to recover its information from its other former employees at every turn.  Rivos demands that Apple communicate with the employees through Rivos's counsel, yet refuses to say if that counsel represents the employees.  Rivos also denies that it has control over the Apple information in the employees' possession.  Rivos has refused to confirm whether the information retained by these employees has been preserved, and has not segregated the information.  According to Rivos, it does not have custody and control over the devices Apple has identified as containing Apple confidential information.  Rivos claims that it therefore cannot return, image, or segregate them.

7.     Rivos claims, through its CEO, that it has "no interest in relying on Apple information as Rivos builds its business."  But Rivos's actions say otherwise.  Rivos has long been aware of the former Apple employees' contractual obligation to return all confidential information to Apple.  Yet Rivos is interfering with the employees' ability to do so.  In fact, Rivos's own forensic expert confirmed that Apple documents improperly retained by Defendant Ricky Wen in his iCloud drive were automatically synced to his Rivos-issued computer.  Apple has informed Rivos of multiple other former Apple employees with highly sensitive documents retained in their iCloud accounts, yet Rivos has provided no response whatsoever as to those employees, much less any information regarding whether that data ended up on Rivos-issued devices.  Even though Rivos is aware that some of its employees have retained Apple confidential information, it is not requiring that information to be returned or segregated.  And the risk to Apple continues to grow.  Indeed, Defendant Weidong Ye joined Rivos over a month *after* this lawsuit was filed, and took with him a large amount of confidential Apple source code and documents marked Apple Confidential & Proprietary.

8.     Apple welcomes and values open competition and the innovation that can result.  But that competition cannot be built on Apple's confidential information.  The sheer volume of information taken, the highly sensitive nature of that information, and the fact that these employees are now performing the same duties for a competitor with ongoing access to some of Apple's most valuable trade secrets, which Rivos refuses to curtail, leave Apple with few alternatives.  If Apple does not act to protect its most sensitive secrets now, it could lose trade

secret status over them entirely.  That outcome is untenable given Apple's extensive investments of time and resources into its SoC programs.  The full extent of the use and disclosure of Apple's trade secret information at Rivos also is uniquely within the possession of the Individual Defendants and Rivos, particularly since Defendants have taken actions to conceal evidence regarding their misconduct.  And since Apple filed its initial complaint, Rivos has done its best to block Apple from resolving its concerns with its former employees quickly and cooperatively. Apple therefore has no choice but to bring this action to recover its trade secrets, to protect them from further disclosure, and to uncover the full extent of their use to try to mitigate the harm that has occurred and will occur.

## JURISDICTION, VENUE, AND PARTIES

9.      This Court has original jurisdiction of the asserted federal law claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and under federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1357 because it is part of the same case or controversy.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c), because Apple resides in this District and Individual Defendants, all former Apple employees, have signed an Intellectual Property Agreement and "consent[ed] to personal jurisdiction of and venue in the state and federal courts within Santa Clara County, California" and agreed that any "judicial action between the parties relating to this Agreement will take place in Santa Clara County, California."[1]  Individual Defendants Ricky Wen, Weidong Ye, Laurent Pinot, and Prabhu Rajamani also committed the wrongful acts within this District.

---

[1] Ex. A, Apple Intellectual Property Agreement (executed by Ricky Wen) ("Wen IPA") § 6.0(b); Ex. B, Apple Intellectual Property Agreement (executed by Bhasi Kaithamana) ("Kaithamana IPA") § 6.0(b); Ex. C, Apple Intellectual Property Agreement (executed by Weidong Ye) ("Ye IPA") § VI.B; Ex. D, Apple Intellectual Property Agreement (executed by Laurent Pinot) ("Pinot IPA") § 6.0(b); Ex. E, Apple Intellectual Property Agreement (executed by Prabhu Rajamani) ("Rajamani IPA") § 6.0(b); Ex. F, Apple Intellectual Property Agreement (executed by Jim Hardage) ("Hardage IPA") § 6.0(b); Ex. G, Apple Intellectual Property Agreement (executed by Kai Wang) ("Wang IPA") § VI.B.  Exhibit H is a red-lined document showing the changes made to the previously filed complaint (Dkt.1).

11.     Apple is and at all times mentioned herein has been a California corporation having its principal place of business at One Apple Park Way, Cupertino, California 95014.

12.     Upon information and belief, Defendant Rivos is and at all times mentioned herein has been a Delaware corporation having its principal place of business at 2811 Mission College Blvd, 7th Floor, Santa Clara, California, 95054-1884.  Rivos currently employs each of the Individual Defendants (except Mr. Kaithamana, whom Rivos previously employed), as well as numerous other former employees of Apple, many of whom were formerly employed by Apple in this District.  At least some of these former employees perform their work for Rivos within this District.  Rivos's intended business will derive substantial revenue from sales within this District.

13.     Upon information and belief, Defendant Bhasi Kaithamana resides in Austin, Texas.  He was a "CPU Implementation Lead" at Rivos.  Before that, Mr. Kaithamana was a Senior Engineering Manager (CPU Design) employed by Apple and working at Apple's facilities in Austin, Texas, until August 16, 2021, in coordination with other Apple employees in Apple's facilities in Cupertino, California, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Kaithamana signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

14.     Upon information and belief, Defendant Ricky Wen resides in San Jose, California.  He is currently employed at Rivos as a "Principal Member of Technical Staff" with a focus generally on "Hardware Engineering."  He was a CPU design engineer employed by Apple and worked at Apple's facilities in Cupertino, California, until August 6, 2021, including when the events described in this Complaint occurred.  Like the other Individual Defendants, Mr. Wen signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

15.     Upon information and belief, Defendant Jim Hardage resides in Austin, Texas.  He is a "CPU RTL Architect" at Rivos.  He was a FE Engineer 5 employed by Apple and worked at Apple's facilities in Austin, Texas until October 21, 2021, in coordination with other Apple employees in Apple's facilities in Cupertino, California, including when facts underlying this

Complaint occurred.  Like the other Individual Defendants, Mr. Hardage signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

16.     Upon information and belief, Defendant Weidong Ye resides in San Jose, California.  He is currently employed at Rivos as a "Member of Technical Staff."  He was a Systems Power & Performance Engineer employed by Apple and worked at Apple's facilities in Cupertino, California, until June 10, 2022, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Ye signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

17.     Upon information and belief, Defendant Laurent Pinot resides in Los Gatos, California.  He works on "Physical Design" at Rivos.  He was a Physical Design Manager employed by Apple and worked at Apple's facilities in Cupertino, California, until August 23, 2021, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Pinot signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

18.     Upon information and belief, Defendant Prabhu Rajamani resides in San Jose, California.  He works as a "Hardware Engineer" at Rivos.  He was a Power Engineer 5 employed by Apple and worked at Apple's facilities in Cupertino, California, until October 19, 2021, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Rajamani signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

19.     Upon information and belief, Defendant Kai Wang resides in Austin, Texas.  He was a Performance and Modeling Engineer 3 employed by Apple and worked at Apple's facilities in Austin, Texas, until February 10, 2022, in coordination with other Apple employees in Apple's facilities in Cupertino, California, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Wang signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

**BACKGROUND**

20.     Founded in 1976, Apple is a world-renowned technology company and global leader in consumer electronics, mobile communications, and computing.  It designs, manufactures, and markets smartphones, personal computers, tablets, wearables, and accessories, and sells a variety of related services.  Apple's success and ability to compete successfully depend heavily upon its ability to ensure a continual and timely flow of competitive products, services, and technologies to the marketplace.  Apple continues to develop new technologies to enhance existing products and services, and to expand the range of its offerings through, among other avenues, its significant investments in research and development.

21.     One key aspect of Apple's newest cutting-edge products is its use of highly advanced SoCs, which Apple custom designs.  SoCs are integrated circuits that contain, in a single chip, multiple processing components, such as one or more central processing units ("CPUs"), graphics processing units ("GPUs"), cache memories, and specialized processors.  Apple custom designs its own processing components and integrates them together in SoC designs that reduce the area footprint of the chips and achieve tighter component integration compared to traditional computer systems.  Apple's SoCs allow for faster, more efficient, and more powerful computing.  Apple's unique designs and architecture are critical to its competitive edge in the marketplace.  Apple's first ARM-based SoCs for laptop and desktop computers, the M1 chip family, were released in November 2020 to great success.  The M1 family has now expanded to include the M1 Pro, M1 Max, and M1 Ultra chips.

22.     The M1 chip is the first personal computer chip built using cutting-edge 5-nanometer process technology.  It features a unified memory architecture for dramatically improved performance and efficiency.  At the time it was released, it featured among the world's fastest CPU cores in low-power silicon, best CPU performance per watt, and fastest integrated graphics in a personal computer, while boasting breakthrough machine learning performance.  The M1 Pro, Max, and Ultra chips have only extended Apple's lead in performance, custom technologies, and power efficiency.

A.    **SoC Design**

23.    SoC design is complex and challenging, and requires considerable expertise and experience.  Instruction Set Architectures ("ISAs") define processor instructions that perform various processing functions (e.g., accessing memory, comparing data, and arithmetic).  ISAs are implemented through physical processor components that execute an ISA's various instructions.  Designing SoC chips based on an ISA involves developing abstract models for these physical components that act as the interface between the SoC and the software.  Chip designers use these abstract models to design the physical structure of SoCs.

24.    Some modern ISAs utilize the popular reduced instruction set computer ("RISC") architecture design.  RISC-based ISAs focus on creating a relatively small set of simple, commonly used instructions for carrying out processor functions to run typical programs.  These simple instructions require less physical hardware to execute and can be combined to accomplish more complex functions.

25.    Arm Ltd. develops leading RISC-based architectures for SoCs.  Arm Ltd.'s proprietary "Advanced RISC Machine," or "ARM," architectures are licensed to its customers, which include Apple, and are used in some of the most advanced SoCs in the world, such as Apple's M1 SoC.

26.    The RISC-V ISA is an ISA that can be freely used to develop RISC-based SoCs.  Although the ARM and RISC-V architectures are not the same, they share many common features, and corresponding SoC designs can share many common elements.  As a result, certain foundational elements and microarchitectural designs of ARM-based SoCs are useful in designing RISC-V-based SoCs.  Thus Rivos, which develops RISC-V SoCs, can take advantage of ARM-based SoC designs to shorten its development timelines.  For example, techniques that increase computational performance in a CPU core design while reducing power consumption developed for an ARM-based SoC design can benefit a RISC-V-based SoC design.  Additionally, while such a technique might have been developed for a mobile CPU core, the technique can still be beneficial for and incorporated into designs for other types of CPU cores, such as those

1  designed for laptops or even datacenters, where energy efficiency is still an important

2  performance metric.

3  **B.      Apple's Innovative SoC Designs**

4  27.      Apple has developed a number of highly successful, groundbreaking ARM-based

5  SoCs.  Apple's SoC research, development, and manufacturing are led by teams of Apple

6  engineers.  Apple entrusts these engineers with developing, among other things, its ARM

7  technology, chip designs, and other elements of Apple's SoC business.  Apple has dedicated

8  billions of dollars to this critical work.

9  28.      Apple's SoC engineers work on some of Apple's most sensitive and critical

10  projects.  Since 2010, Apple has designed and developed more than a dozen high-performance

11  SoCs for use in Apple's flagship iPad and iPhone projects.  Recent work includes the A15 SoC at

12  the heart of Apple's latest iPhones and the M1 family of SoCs that power Apple's desktops,

13  laptops, and high-performance iPads.  Apple develops and writes source code for custom software

14  and operating systems to run on its products that incorporate its SoCs.

15  29.      As is necessary for their cutting-edge work, select Apple engineers have access to

16  some of Apple's most closely guarded proprietary and trade secret information.  These trade

17  secrets include SoC designs, component designs, customized ISA instructions, source code for

18  products incorporating Apple's SoCs, and other Apple-developed know-how gained from years

19  of developing advanced SoCs.

20  **C.      Apple Diligently Protects Its Trade Secret Chip Designs and Related
         Information**

21

22  30.      Apple diligently protects its proprietary and trade secret designs and investments

23  in research and development.  As a condition of employment, Apple employees, as was the case

24  for the Individual Defendants, are required to sign a confidentiality agreement that legally

25  obligates them to protect and not disclose to third parties confidential information acquired during

26  their employment.  This obligation continues even after the employee leaves Apple.

27  31.      One of the most critical agreements for protecting Apple's proprietary and trade

28  secret information is the Intellectual Property Agreement ("IPA").  Under the IPA, which Apple

employees, including the Individual Defendants, must execute at the start of their employment,

employees attest that:

> You understand that your employment by Apple requires you to
> keep all Proprietary Information in confidence and trust for the
> tenure of your employment and thereafter, and that you will not use
> or disclose Proprietary Information without the written consent of
> Apple, except as necessary to perform your duties as an employee
> of Apple.  Upon termination of your employment with Apple, you
> will promptly deliver to Apple all documents and materials of any
> kind pertaining to your work at Apple, and you agree that you will
> not take with you any documents, materials, or copies thereof,
> whether on paper, magnetic or optical media, or any other medium,
> containing any Proprietary Information.

32.    Apple employees, including the Individual Defendants, also agree that Apple

would be entitled to injunctive relief for any violations of the IPA.  In particular, the IPA

provides:

> A breach of the provisions of sections 1 or 2 of this Agreement
> would cause irreparable harm and significant injury to Apple, the
> quantification of which is difficult to ascertain.  Because such harm
> and injury could not be compensable by damages alone, you agree
> that Apple will have the right to enforce sections 1 and 2 of this
> Agreement by injunction, specific performance or other equitable
> relief without prejudice to any other rights and remedies available
> to Apple in the event of a breach of this Agreement.

33.    Each of the Individual Defendants executed a copy of the IPA upon commencing

employment with Apple.

34.    Apple also has certain employees, who handle Apple's highly-sensitive,

proprietary, and trade secret information relating to hardware design, function, and operation,

such as for Apple's SoCs.  These employees include those in Hardware Technologies ("HWT")

and other areas.  During employee exit interviews for these Apple employees, including the

Individual Defendants, Apple provides a "Checklist for HWT Departing Employees" or

"Checklist for Departing Employees" to "help employees leaving Apple understand their

responsibility to preserve confidentiality of intellectual property."  Each of the Individual

Defendants acknowledged that he "signed an Intellectual Property Agreement (IPA) that does not

expire" upon leaving Apple.

35.     Each departing employee signing either of the above departing employee checklists, as was the case for the Individual Defendants, acknowledges that the IPA says he or she "will not use or share Apple confidential information while you are an Apple employee and after you leave Apple.  Everything you worked on at Apple stays here."  Each departing employee, as with the Individual Defendants, acknowledges that "[a]ll employees must return all Apple confidential information prior to leaving Apple[.]"  Each employee must also "[c]onfirm that you have done a diligent search of spaces you could have stored Apple property," including "[p]ersonal computer(s) or laptop(s)," "[f]lash drive(s)," "[p]ersonal email," and "[e]xternal hard drive(s)."  Each departing employee, including the Individual Defendants, additionally must confirm that they have "returned or destroyed all Apple confidential information prior to leaving Apple" and that they have "returned all Apple Owned Devices (AOU) and [have] not wiped any AOU."

36.     Each Individual Defendant executed a copy of a checklist for departing employees during or shortly after his exit interview following resignation from Apple.

37.     Apple takes additional measures to maintain the confidentiality of its proprietary information, including the trade secrets at issue in this lawsuit.  With regard to terminated HWT and other employees, for example, Apple protects its proprietary information by requiring the return of Apple laptops, mobile devices, and other equipment and the removal of Apple and third-party files, documents, and software from the terminated employees' possession.

38.     Apple also provides HWT and other employees with rules and guidelines on how to preserve the confidentiality of Apple's proprietary information.  These materials specifically forbid distribution of Apple's confidential information to others except on a need-to-know basis.

39.     Apple further protects its most valuable SoC designs and specifications by limiting access to its Confluence and Perforce databases to only those projects that an employee is currently working on and authorized to view.  Confluence and Perforce are collaborative information management tools that allow Apple SoC engineers and designers to share and store their work on Apple's trade secret SoC designs.  Engineers require login credentials to access

these tools, and the level of access is limited to what a particular engineer's job responsibilities require.

**D.    Former Apple Employees Leaving for Rivos Retained Apple Confidential and Proprietary Trade Secrets After Accepting Offers From Rivos**

40.    Rivos was founded in or around May 2021 to design a full stack computing solution based on custom-designed reduced instruction set computer-based SoCs that will compete with Apple's ARM SoCs.

41.    Since June 2021, nearly 50 former Apple employees have joined Rivos.  Rivos continues to target Apple engineers, with more departures occurring as recently as May and June 2022.  A majority of these former Apple employees were design engineers, developing Apple's cutting-edge proprietary and trade secret SoC designs.  These designs represent the culmination of substantial research and development costs and could be used to significantly accelerate development of a custom reduced instruction set computer-based SoC.

42.    Rivos targeted and solicited Apple employees who were highly experienced engineers with both substantial expertise with SoC design and significant and extensive access to trade secrets at the core of Apple's SoC designs.  Apple has reason to believe that Rivos instructed at least some Apple employees to download and install apps for encrypted communications (e.g., the Signal app) before communicating with them further.

43.    As noted above, many of the employees who left Apple to join Rivos were trusted by Apple with its most sensitive trade secret SoC designs and technology.  Many took Apple's proprietary and trade secret information with them, while falsely representing to Apple that they had not.

44.    The Individual Defendants' certifications during their exit interviews that they had returned or deleted Apple's proprietary and trade secret information were false.  Apple's forensic analysis of the Individual Defendants' computing devices has revealed that they took and retained Apple's proprietary and trade secret information when they departed from Apple.  This information is protected by the IPA and was falsely confirmed to have been returned or deleted

1  when the Individual Defendants executed their Checklist for HWT Departing Employees or

2  Checklist for Departing Employees.

3      45.    Following interviews with Rivos and accepting offers for employment, but before

4  leaving Apple, each Individual Defendant accessed and downloaded Apple's proprietary and

5  trade secret information regarding the design and operation of Apple's most advanced SoCs.

6  These actions are in direct violation of the IPA that each Individual Defendant executed as a

7  condition of his employment with Apple.  The Individual Defendants have each retained Apple

8  proprietary and trade secret information, giving Apple reason to believe that it is being used by

9  Rivos to improperly advance Rivos's own SoC design program.

10                    **1.    Bhasi Kaithamana**

11      46.    Apple employed Individual Defendant Bhasi Kaithamana for nearly 8 years, from

12  September 2013 until August 2021.  During his tenure with Apple, Mr. Kaithamana was a CPU

13  implementation engineer, responsible for managing CPU design for Apple's SoCs.  Mr.

14  Kaithamana was responsible for, among other things, designing and developing proprietary and

15  trade secret physical structures for carrying out critical functions in Apple's ARM-based SoCs.

16      47.    In August 2021, Mr. Kaithamana left Apple to take on a nearly identical role at

17  Rivos ("CPU Implementation Lead").

18      48.    As a condition of his employment with Apple, Mr. Kaithamana executed an Apple

19  IPA on August 26, 2013, agreeing, among other things, to "keep all [Apple] Proprietary

20  Information in confidence and trust for the tenure of your employment and thereafter, and that

21  you will not use or disclose Proprietary Information without the written consent of Apple[.]"  He

22  further agreed that "[u]pon termination of your employment with Apple, you will promptly

23  deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and

24  you agree that you will not take with you any documents, materials, or copies thereof . . .

25  containing any Proprietary Information."

26      49.    Mr. Kaithamana decided to accept Rivos's offer of employment sometime between

27  July 20, 2021 and August 9, 2021.  On or about August 9, 2021, Mr. Kaithamana asked Apple for

28  August 10 as a vacation day.

50.     During his day off on August 10, 2021, Mr. Kaithamana created a new folder on his Apple-issued computer and began copying over Apple documents containing proprietary and trade secret information.  He worked to continue amassing a collection of Apple's proprietary and trade secret SoC files until the day before he left Apple, on August 16, 2021.  Many of the files Mr. Kaithamana copied related to Apple's proprietary and trade secret SoC designs, including those for unreleased projects.

51.     On August 13, 2021, after Mr. Kaithamana was accessing Apple's sensitive, proprietary information, Mr. Kaithamana resigned from his position at Apple.

52.     On Saturday, August 14, 2021, Mr. Kaithamana renamed his new folder "APPLE_WORK_DOCS" and continued adding Apple documents to it through the weekend.  Mr. Kaithamana also connected a USB drive seven times between Saturday evening, August 14, 2021, and Sunday afternoon, August 15, 2021.  In the same time period, he opened untitled Excel, Keynote, and Numbers documents on the USB drive.  Some of these document file names correspond to documents on Mr. Kaithamana's computer that contain Apple confidential information, at least some of which were marked Apple Proprietary & Confidential.  He then proceeded to view file listings for folders containing Apple files with proprietary and trade secret information.  While viewing these file listings, Mr. Kaithamana repeatedly opened documents, while clearing the list of recently opened documents to conceal which documents he accessed.

53.     By Monday, August 16, 2021, Mr. Kaithamana's last day at Apple, his APPLE_WORK_DOCS folder contained thousands of Apple documents.  Mr. Kaithamana copied files to his USB drive over the weekend.  His last recorded moving and copying of files before turning in his computer to Apple was to that same USB drive.

54.     On August 16, 2021, Mr. Kaithamana conducted his exit interview.  On August 18, 2021, he executed a Checklist for HWT Departing Employees, acknowledging that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession and had not wiped his Apple-issued devices.  Mr. Kaithamana nevertheless had attempted to hide his activity, including by clearing his browsing history, recent applications access list, recent search lists, and many emails.

55.     Despite Mr. Kaithamana's representations at his exit interview and when he executed his Checklist for HWT Departing Employees, he downloaded and transferred files containing information about Apple's proprietary and trade secret SoC designs to an external USB storage drive.

56.     Mr. Kaithamana no longer works at Rivos.  On May 17, 2022, Apple and Mr. Kaithamana entered into a stipulated order.  (ECF No. 19.)  Mr. Kaithamana has agreed to return any Apple confidential information in his possession, to make available for forensic inspection any devices that were used to store or transmit Apple information, and to refrain from making use of Apple confidential information.

**2.     Ricky Wen**

57.     Apple employed Individual Defendant Ricky Wen for over 13 years, from April 2008 until August 2021.  During his tenure with Apple, Mr. Wen was a CPU design engineer, with responsibilities for developing the architecture of Apple's SoCs.  Mr. Wen was responsible for, among other things, designing and developing proprietary and trade secret architectures for carrying out critical functions in Apple's ARM-based SoCs.

58.     As a condition of his employment, Mr. Wen executed an Apple IPA on April 22, 2008, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple[.]"  He further agreed that "[u]pon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

59.     Mr. Wen's position at Rivos is "Principal Member of Technical Staff" with a focus generally on "Hardware Engineering," which suggests that he is performing a similar job function as he did at Apple (particularly in view of Rivos's goal of designing an SoC with custom RISC-V CPU cores).

60.     Mr. Wen was approached by Rivos about leaving Apple to join Rivos in or about June or July 2021.  On or about July 23, 2021, Mr. Wen accepted Rivos's offer of employment.

61.     However, after accepting his offer from Rivos, Mr. Wen took hundreds of sensitive Apple SoC documents related to both Apple's existing and unreleased SoCs.  Between July 26, 2021 and July 29, 2021, Mr. Wen transferred approximately 390 gigabytes of data from his Apple-issued computer to a personal external hard drive.  Among the data transferred are confidential Apple documents containing Apple trade secrets, including aspects of the microarchitecture for Apple's past, current, and unreleased SoCs.  As of his termination, his Apple-issued computer included over 400 gigabytes of Apple confidential information.  It also stored approximately 200 gigabytes of photos and movies that Apple presumes are personal in nature, but could account for only a fraction of the data transferred.

62.     On or about August 3, 2021, Mr. Wen tendered his resignation to Apple.  On or about August 5, 2021, Mr. Wen conducted his exit interview and, among other things, executed a Checklist for HWT Departing Employees, acknowledging that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession.

63.     On the day that he executed his Checklist for HWT Departing Employees, he deleted at least one account from his Apple-issued computers.  Mr. Wen also deleted his internet browsing, iMessage, and iChat histories on his Apple-issued computers and numerous folders and files in online and cloud storage drives immediately prior to his termination from Apple.

64.     Mr. Wen accessed still more highly confidential Apple information as late as on or about August 5, 2021, the day before he left Apple.  Just before an external hard drive was connected, Mr. Wen accessed numerous Apple proprietary and trade secret SoC designs, including files related to Apple's unreleased SoC designs, from his Apple-issued computer.  Mr. Wen, in the days before he left Apple, copied hundreds of gigabytes of data from his Apple-issued computer to the external hard drive.

65.     Mr. Wen also transferred gigabytes of files to his personal Google Drive, in violation of Apple's policies, including architectural diagrams depicting Apple trade secret SoC designs and folders and nearly 400 files associated with Apple SoC development projects.  Apple

policies prohibit the use of Google Drives for storing, among other things, Apple proprietary and trade secret information because that information can be accessed from any computer over the internet without Apple's knowledge, including, for instance, after the employee terminates his employment with Apple.

66.     Mr. Wen's Apple employment was terminated on August 6, 2021.  As of his termination, Mr. Wen retained on his Google Drive a diagram showing the architecture of an aspect of an Apple trade secret SoC design.  Similarly, although Mr. Wen moved thousands of Apple files from personal folders of his iCloud Drive to a work folder, investigation of his Apple-issued devices reveals that he retained over 400 gigabytes of Apple confidential information on his Apple-issued computer, and there were files relating to Apple trade secret SoC designs on his iCloud Drive after his termination.  These include hundreds of documents referencing the code names of highly confidential Apple SoC projects.

67.     On June 3, 2022, Rivos and Mr. Wen admitted that Mr. Wen has "retained some Apple information."  (ECF No. 40.)  Mr. Wen's counsel has stated he "may have" even more, but has yet to confirm what those documents may be.  Rivos's forensic expert submitted a declaration acknowledging that Mr. Wen's hard drive "contains multiple files identified in Appendix B" to the declaration of Apple's forensic expert (ECF No. 46-6) but, conspicuously did not identify any other than a handful that were favorable to Mr. Wen.  After Apple filed a motion for a Temporary Restraining Order, Mr. Wen agreed just before the Temporary Restraining Order hearing to return any Apple confidential information in his possession, to make available for forensic inspection any devices that were used to store or transmit Apple information, and to refrain from making use of Apple confidential information.

68.     On June 17, 2022, Apple and Mr. Wen entered into a stipulated order.  (ECF No. 54.)  Mr. Wen has agreed to return any Apple confidential information in his possession, to make available for forensic inspection any devices that were used to store or transmit Apple information, and to refrain from making use of Apple confidential information.

3.     **Jim Hardage**

69.     Apple employed Individual Defendant Jim Hardage for nearly 9 years, from April 2013 until October 2021.  During his tenure with Apple, Mr. Hardage was a CPU architect, responsible for developing the architecture of processing cores for Apple's SoCs.  Mr. Hardage was responsible for, among other things, designing and developing proprietary and trade secret architectures for carrying out critical functions in Apple's ARM-based SoCs.

70.     As a condition of his employment, Mr. Hardage executed an Apple IPA, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . . Upon termination of your employment with Apple, you will promptly delivery to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

71.     Mr. Hardage is now employed by Rivos.  He holds a nearly identical position at Rivos:  CPU RTL Architect, which indicates that the tasks he performs for Rivos are parallel to those he formerly performed for Apple.

72.     On October 18, 2021, Mr. Hardage resigned from Apple.  That same day, Mr. Hardage executed a Checklist for HWT Departing Employees, and acknowledged that he was subject to the IPA and that he had returned all Apple proprietary and trade secret information in his possession.  Apple conducted Mr. Hardage's exit interview on October 21, 2021, the same day his employment with Apple was terminated.

73.     Between October 17, 2021, and October 18, 2021, however, Mr. Hardage connected two USB flash drives to his Apple-issued computer.  On October 18, Mr. Hardage also ran various internet searches, including how to "Clear iMessage Chat History in Mac OS X" and "removing imessage cache on macbook."

74.     Between October 17, 2021 and October 18, 2021, Mr. Hardage also removed approximately 37 gigabytes of data containing Apple confidential files from his Apple-issued computer.  Part of the data that Mr. Hardage copied to the external drives includes at least nine

directories named with specific confidential Apple SoC project names.  In addition, Mr. Hardage copied the "Home" directory from his laptop.

75.     Rivos has been aware of this information, including file path information and serial numbers, for over six weeks, when Apple provided it as part of a forensic declaration in support of its Motion for Temporary Restraining Order, Expedited Discovery, and Order to Show Cause (ECF No. 23).  Rivos has remained silent and offered nothing on the return of these devices and documents.  In order for Apple to determine all of the files Mr. Hardage transferred from his Apple-issued computer to these USB flash drives, a forensic examination of both USB drives themselves would need to be conducted, because the information stored on Mr. Hardage's Apple-issued computer provides limited visibility into the potential data that Mr. Hardage transferred.   Apple cannot do that if neither Mr. Hardage nor Rivos provides access to those drives.

76.     On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Hardage a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information.  Apple has never received a response from Mr. Hardage.  Rivos's counsel has never confirmed whether or not they also represent Mr. Hardage.  Apple provided Rivos and Mr. Hardage detailed information about what Mr. Hardage retained through a forensic expert declaration on May 20, 2022.  Still, Rivos and Mr. Hardage have never responded to Apple.  Apple therefore has no way of knowing whether the Apple confidential information in Mr. Hardage's possession has been preserved or segregated. Nor has Mr. Hardage or Rivos offered to return the information or image the devices at issue. They simply have not responded at all, effectively blocking Apple from cooperatively obtaining the return of its information.

### 4.     Weidong Ye

77.     Individual Defendant Weidong Ye began working at Apple in December 2017. During his tenure at Apple, Mr. Ye initially worked as a Systems Power & Performance Engineer.  Throughout his time at Apple, Mr. Ye worked cross-functionally with architecture, platform design, SOC architects, and software teams.

78.     As a condition of his employment, Mr. Ye executed an Apple IPA, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . . Upon termination of your employment with Apple, you will promptly delivery to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

79.     Mr. Ye now works for Rivos.  Mr. Ye's position at Rivos is "Member of Technical Staff," which suggests he is performing a similar job function as he did at Apple when he worked as a Systems Power & Performance Engineer.

80.     On January 11, 2022, Mr. Ye visited a "Virtual Open House" held by Rivos.  At that time, he also began searching for various job opportunities available at Rivos and ran internet searches on Rivos's leadership and Rivos's CEO.

81.     Between March 22, 2022, and April 23, 2022, Mr. Ye made at least 26 Time Machine backups of his Apple-issued devices.  Mr. Ye made multiple backups of his Apple-issued MacBook Pro onto an external hard drive, along with backups of other Apple-issued devices.  Forensic investigation has revealed that these backups contain Apple documents marked "Apple Confidential & Proprietary."

82.     While Mr. Ye was making these backups, he was also doing his own research on Rivos.  He looked into the following full-time positions at Rivos: "System Hardware;" "Silicon Electrical Analysis Engineer;" "Silicon Power;" "Silicon Architecture;" "Silicon Performance Modeling;" and "Confidential Compute Systems Engineer". These are all positions similar to the one he had at Apple: Systems Power & Performance Engineer.

83.     In April 2022, Rivos invited Mr. Ye to interview with them.  To prepare, Mr. Ye used Google and LinkedIn to find out more about Rivos and Rivos staff.  In early May 2022 he also searched the internet for information about the lawsuit between Rivos and Apple.

84.     Throughout May 2022, Mr. Ye met with Rivos multiple times to discuss a position at Rivos.  On May 30, 2022, Mr. Ye signed Rivos's employment offer, and subsequently provided Apple with his notice of resignation.

85.     On June 3, 2022, Mr. Ye executed the Checklist for Departing Employees, and acknowledged that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession.  At that time, Mr. Ye continued conducting internet searches for how to delete files on MacOS, and how to disconnect his iCloud account.

86.     Mr. Ye also saved multiple highly-confidential Apple source code repositories for unannounced, in development products in his iCloud drive.  Mr. Ye continues to have access to these repositories.  Apple confidential files were also found in the Downloads folder of his Apple-issued computer when he returned it upon his departure.  These Apple confidential files likely would have been part of the Time Machine backups he took with him when he left Apple.

### 5.     Laurent Pinot

87.     Apple employed Individual Defendant Laurent Pinot for nearly 12 years, from October 2009 until August 2021.  During his tenure with Apple, Mr. Pinot rose to the position of Application-specific Integrated Circuit ("ASIC") Design Engineering Manager 3, with responsibilities over the physical design of Apple's SoCs.  Mr. Pinot was responsible for, among other things, designing and developing proprietary and trade secret physical structures for carrying out critical functions in Apple's ARM-based SoCs.

88.     As a condition of his employment, Mr. Pinot executed an Apple IPA on September 11, 2009, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . . Upon termination of your employment with Apple, you will promptly delivery to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

89.   Mr. Pinot is now employed by Rivos.  He holds a nearly identical position at Rivos as his previous position at Apple, Physical Design, which suggests that he performs parallel tasks at Rivos to those he formerly performed for Apple.

90.   Rivos approached Mr. Pinot about leaving Apple to join Rivos in or about June and July 2021 and encouraged him to use an encrypted communication app called Signal to discuss employment opportunities.  These types of applications allow parties to communicate with end-to-end encryption, meaning there is no record of the communications or means to verify what the parties discussed.

91.   On or about July 18, 2021, Mr. Pinot interviewed with Rivos for a position, including with Rivos's founder and CTO Belli Kuttanna.  On or about August 18, 2021, Mr. Pinot accepted Rivos's offer of employment.  At Mr. Pinot's exit interview, he stated words to the effect of "I was not looking, they found me."

92.   Mr. Pinot tendered his resignation to Apple on or about August 20, 2021.  On August 24, 2021, Apple conducted Mr. Pinot's exit interview.  Among other things, he executed a Checklist for HWT Departing Employees and acknowledged that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession.  Mr. Pinot's Apple employment was terminated on August 24, 2021.

93.   Mr. Pinot maintained local folders on his Apple-issued laptop for more than a dozen Apple trade secret SoC design projects.  These folders included highly sensitive and proprietary information regarding the design and operation of Apple's SoCs.

94.   Mr. Pinot began weekly Time Machine backups to a personal AirPort Time Capsule in December 2020.  These backups were stored unencrypted at his home, in violation of Apple's policies, which forbids such unencrypted backups.  In fact, Mr. Pinot received a warning that the backup he made was unencrypted.  The AirPort Time Capsule stores a local copy of Time Machine backups.  These Time Machine backups include all of the files on Mr. Pinot's Apple-issued laptop's hard drive at the time of backup.  These Time Machine backups are not remotely accessible to Apple and provided a repository for storing data beyond Apple's knowledge and control.  Despite resigning on August 20, 2021, and knowing his last day at Apple would be

1   shortly after August 23, Mr. Pinot allowed his Time Machine backups to continue in this

2   timeframe.

3         95.     Among the highly confidential files Mr. Pinot wrongfully took from Apple upon

4   his departure are files pertaining to unreleased Apple SoC projects.  Also among these files are

5   highly confidential technical specifications and other details about Apple's SoC physical design.

6         96.     On or about August 24, 2021, on his last day of employment at Apple, Mr. Pinot

7   backed up his entire Apple-issued computer to an unencrypted Time Capsule.  He did this in

8   violation of Apple policy.  By this time, Mr. Pinot had made fifty-five unencrypted backups of his

9   Apple computer.

10        97.     On April 29, 2022 concurrent with filing its initial complaint, Apple sent Mr. Pinot

11  a letter (copying Rivos) asking for the return of Apple information (including the Time Machine

12  back-ups) and confirmation that he was no longer accessing or using that information.  Apple has

13  never received a response from Mr. Pinot.  Rivos's counsel has never confirmed whether or not

14  they also represent Mr. Pinot.  Apple provided Rivos and Mr. Pinot additional information about

15  what Mr. Pinot retained through a forensic expert declaration on May 20, 2022.  On June 15,

16  2022, Rivos finally responded, conceding that Mr. Pinot still had the Time Machine backup in his

17  possession when he left Apple.  It evidently had not been segregated from Mr. Pinot, as Rivos

18  stated that it was located in his daughter's bedroom.  On July 8, 2022, Judge Cousins ordered

19  Rivos to produce to Apple an image of Mr. Pinot's Time Machine.

20        **6.**    **Prabhu Rajamani**

21        98.     Individual Defendant Prabhu Rajamani was employed by Apple for nearly nine

22  years, from March 2013 until October 2021.  During his tenure with Apple, Mr. Rajamani became

23  a Power Engineer 5, responsible for optimizing power handling for Apple's mobile SoCs.  Mr.

24  Rajamani was responsible for, among other things, developing proprietary and trade secret

25  physical structures for carrying out critical power handling functions in Apple's ARM-based

26  SoCs.

27        99.     As a condition of his employment, Mr. Rajamani executed an Apple IPA on

28  February 11, 2012, agreeing, among other things, to "keep all [Apple] Proprietary Information in

confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . . Upon termination of your employment with Apple, you will promptly delivery to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

100.    Mr. Rajamani is now employed by Rivos.  He holds a nearly identical position at Rivos:  Hardware Engineer.  The tasks he performs for Rivos are parallel to those he performed for Apple.

101.    On October 19, 2021, Mr. Rajamani resigned from his position at Apple.  That same day, Mr. Rajamani executed a Checklist for HWT Departing Employees, and acknowledged that he was subject to the IPA and that he had returned all Apple proprietary and trade secret information in his possession.

102.    On October 19, 2021, he disconnected his iCloud Drive from his Apple-issued laptop after running a Google search for "sign out of icloud drive on mac," which stopped it from syncing and limited Apple's access to the files on the Drive.  Nevertheless, Mr. Rajamani's Apple-issued laptop shows that he retained Apple confidential information on his personal iCloud Drive when it was disconnected from his Apple-issued laptop.

103.    Mr. Rajamani also attempted to hide and obscure his iMessage history.  In particular, he searched for how to delete all of his iMessage conversations from his Mac computer.  Mr. Rajamani also deleted his Safari browser history.

104.    Despite Mr. Rajamani's assurances during his exit interview and on the same day that he executed his Checklist for HWT Departing Employees, he continued to download and transfer to external hard drives files on Apple's proprietary and trade secret SoC designs until his last day at Apple.

105.    On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Rajamani a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information.  Apple has never received a response from Mr. Rajamani.  Rivos's counsel has never confirmed whether or not

they also represent Mr. Rajamani.  Apple provided Rivos and Mr. Rajamani additional information about what Mr. Rajamani retained through a forensic expert declaration on May 20, 2022.  Still, Rivos and Mr. Rajamani have never responded to Apple.  Apple therefore has no way of knowing whether the Apple confidential information in Mr. Rajamani's possession has been preserved or segregated from Rivos's systems.  Nor has Mr. Rajamani or Rivos offered to return the information or image the devices at issue.  They simply have not responded at all, effectively blocking Apple from cooperatively seeking the return of its information.

### 7.    Kai Wang

106.    Individual Defendant Kai Wang has acknowledged to Apple that Apple documents were retained in his iCloud Drive.  He initially indicated to Apple that he wanted to work towards resolving the matter in a constructive manner.  When Apple sought to work with Mr. Wang, however, he stated that Rivos's corporate lawyers would handle future communication.  But Rivos's lawyers have refused to work with Apple to return Apple's documents in Mr. Wang's possession and have prevented Apple from communicating with Mr. Wang to arrange for the return of Apple's documents.  For that reason, Apple has no alternative but to name him as an Individual Defendant in this case.

107.    Mr. Wang was employed by Apple for nearly seven years, from June 2015 until February 2022.  During his tenure with Apple, Mr. Wang became a Performance and Modeling Engineer 3, responsible for optimizing performance for Apple SoCs.  Mr. Wang was responsible for, among other things, designing and modeling components for Apple's ARM-based SoCs.

108.    As a condition of his employment, Mr. Wang executed an Apple IPA on April 10, 2020, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . . Upon termination of your employment with Apple, you will promptly delivery to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

109.    Mr. Wang is now employed by Rivos.

110.   On February 9, 2022, Mr. Wang resigned from his position at Apple.  On February 10, 2022, Mr. Wang executed a Checklist for HWT Departing Employees, and acknowledged that he was subject to the IPA and that he had returned all Apple proprietary and trade secret information in his possession.

111.   Shortly before Mr. Wang's resignation from Apple, he deleted approximately 95GB of data from his Apple-issued computer.  A portion of those deletions was performed on his last day at Apple and has not been accounted for.  For instance, data remaining on his Apple-issued computer shows that Mr. Wang's personal iCloud Drive still contained Apple files at the time of his termination.

112.   On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Wang a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information.  Mr. Wang responded to Apple's letter, confirming that the desktop and documents folders in his iCloud Drive contain files from Apple because he synced those two folders on his Apple laptop.  He further indicated that he wanted to resolve the issue "in a constructive manner."  However, when Apple requested that Mr. Wang return the Apple information, he responded that all further communication should be directed to "Rivos's corporate lawyers."  Neither Rivos nor its counsel responded further on Mr. Wang's behalf.  Rivos has not returned the Apple confidential files Mr. Wang retained.  Nor has Rivos made any indication that it has segregated those files or taken steps to ensure they cannot be accessed or used.

**E.     Many Other Former Apple Employees Who Are Now at Rivos Took Apple Proprietary Information or Deleted Information from Their Apple Devices**

113.   Another Apple employee who left for Rivos retained Apple's proprietary documents after accepting their offers from Rivos, leaving Apple exposed to yet more trade secret theft.  Like the Individual Defendants, this employee also joined Rivos in a position paralleling his role at Apple.  Like the Individual Defendants, this employee signed an Apple IPA and agreed to protect and appropriately use Apple's trade secret information, and to return or delete that information when he left.

114.   Just like the Individual Defendants, although other employees also agreed not to delete information from their Apple devices when they left the company, many of them did so, wiping their Apple devices to cover their tracks or copying over proprietary and confidential information to personal and other non-Apple devices.  Like the Individual Defendants, they did this after communicating with Rivos and accepting Rivos's offers of employment.  Since Apple filed its initial complaint, Rivos itself has acknowledged it found that at least some of its employees still retain Apple's confidential and proprietary files.

115.   Several of these employees connected external hard drives and network attached storage devices to Apple-issued computers in the days following their hire by Rivos.  At the same time, these employees were accessing a large amount of Apple trade secret information about SoC designs in the days just before their termination.  Each executed a Checklist for HWT Departing Employees and acknowledged that they were subject to the IPA and had returned or deleted all Apple proprietary and trade secret information in their possession, including any stored on AOUs and external hard drives.  One employee even printed a Checklist for HWT Departing Employees while the employee was connecting external hard drives to an Apple-issued computer.  Similarly, the local archive stored on the Apple-issued laptop of at least one former employee shows that, at the time the employee disconnected their iCloud Drive, they retained access to several highly-confidential, proprietary, and trade secret files.

116.   Other employees stopped syncing their iCloud Drives and maintained local backups as of their departure from Apple.  At least one of these iCloud Drives—and the local backup—contained presentations and spreadsheets related to Apple's highly-confidential, proprietary, and trade secret SOCs.

117.   In addition, several employees took additional steps to conceal or delete information that would have tipped Apple off to their improper activities.  A number of Apple employees installed encrypted communications apps, including Signal, to communicate with Rivos and amongst one another without risk of their communications being exposed.  For instance, after joining Rivos, a former Apple employee provided a then-Apple employee a link to download Signal for communicating about Rivos with Rivos's CTO Belli Kuttanna.  In the weeks

before leaving Apple for Rivos, that same employee invited another employee that also left for Rivos to communicate on the platform, noting that "there are things [that] should not be recorded through apple's interface now."  Yet another Apple employee warned a colleague against using iMessage to discuss Rivos, causing that colleague to delete messages related to the discussion.

118.    Some employees expressed concerns about the legality of their searching and deletions conducted in their last days at Apple, right before they left for Rivos.  One employee ran internet searches for "when you lost a lawsuit what do you have to pay" and "poach[ing] people after a year leaving [a] company," and viewed webpages relating to attorneys' fees for losing parties to lawsuits.

119.    The proprietary information that former employees have retained, and continue to have access to, particularly information regarding the architecture and design of Apple's SoCs, includes some of Apple's most highly-sensitive and valuable information.  These are not a mere handful of isolated documents about Apple's SoC chip specifications and designs, but contain a vast amount of confidential information of different types across a wide range of products, including Apple's current and future designs.  This information will provide a significant, unfair advantage to Rivos in developing advanced, high-performance reduced instruction set computer-based chips.

120.    None of this information has been returned.

121.    Despite being instructed not to wipe data on their Apple-issued devices—and expressly agreeing not to do so—many of these employees did delete information after accepting their Rivos offers.  Despite these concerns, at least nine employees completely wiped their Apple-issued devices and/or reinstalled the operating systems, which deletes all data on the devices.  In several cases, including as recently as April 2022, these employees wiped multiple devices before returning them.  After accepting their Rivos offer, one employee did an internet search for "slack delete message history," "delete all imessages on mac," "factory reset mac," "how to clear imessage on mac," and "slack how to clear chat cache."  The employee then proceeded to delete most of those records.  Other employees similarly deleted their messages and browser history

before returning their Apple-issued computers.  As a result, the exact scope of trade secret theft and coordination in support thereof has been hidden from Apple.

### F.   Rivos Advised Apple Employees Regarding the Handling of Apple Confidential Information While Those Employees Were Still at Apple

122.    Rivos knew or should have known that former Apple employees retained confidential Apple information and that they may use that information in performing similar jobs for Rivos.  Rivos began advising the former Apple employees, while they were still employed by Apple, about departure procedures that they should follow when leaving Apple.  This advice covered subject matter such as transferring personal information, and how to handle information that may have been synced to personal drives.  Rivos also advised the former Apple employees, while they were still employed by Apple, about what to say in conversations with their Apple managers.  Rivos's CEO personally participated in such conversations with employees of Apple before those employees had even told Apple they were leaving.

123.    Rivos's CEO claims that he has advised Apple employees, prior to their resignation from Apple, not to retain Apple confidential information when they depart Apple for Rivos.  But these alleged efforts make even more striking the number of former Apple employees now at Rivos that *did* retain Apple confidential information, along with the number who wiped or otherwise sanitized the records on their Apple devices.  Rivos's conduct since Apple's initial complaint—blocking access to its employees, its shifting sands account of its purported investigation—only raises more concerns that former Apple employees at Rivos deliberately retained Apple's confidential and trade secret information and that Rivos's supposed instructions against retaining Apple confidential information are manifestly ineffective.  For instance, even armed with the "understanding" that former Apple employees may have Apple confidential information stored in their iCloud Drives, Rivos acknowledges that those folders are automatically synced with Rivos-owned devices.  Despite submitting a declaration on these issues, Rivos's CEO pointedly provided no information about Rivos's practices and policies once an employee is found to have retained Apple confidential information, as Rivos is now aware is the case.  As discussed below, Rivos's apparent practice has been one of turning a blind eye as it

has not returned Apple's confidential information nor segregated or returned all such information in its employees' possession.

### G. Rivos Has Refused for Over Two Months to Return or Safeguard Apple Confidential Information in Its Employees' Possession and Has Blocked Apple from Securing the Return of Its Information Itself

124.    When Apple became aware of Rivos's coordinated targeting of Apple employees with access to its most sensitive SoC information, Apple promptly sent Rivos a letter on July 9, 2021.  Rivos never responded to that letter and continued to hire away Apple engineers.

125.    After conducting a detailed forensic investigation, Apple filed its initial complaint on April 29, 2022 (ECF No. 1).  That same day, Apple sent letters to the forty-two former Apple employees who had left for Rivos by that time, and to Rivos itself, informing them of all Apple employees' obligations to return, and not misuse, Apple's trade secret information.  In these letters, Apple sought to resolve cooperatively this dispute by seeking (1) return of any Apple trade secret and confidential information, (2) third-party forensic examination of devices containing such information, and (3) an explanation from its former employees regarding their false statements and attempts to wipe information from their Apple-issued devices.  Rivos told Apple they anticipated "being able to respond to the requests Apple made regarding each employee by May 31."

126.    On May 4, 2022, Rivos's internal counsel provided "an initial response from Rivos and each of the employees of Rivos to whom [Apple] sent letters."  Since then, all correspondence from Rivos has come from outside counsel for Rivos and Ricky Wen.  Rivos has refused to turn over any of the Apple confidential information that Apple's former employees have retained (apart from information in the possession of Mr. Wen, which it only agreed to provide after Apple filed a motion for a Temporary Restraining Order), and has instructed Apple to not contact any of Rivos's employees to try to get its information back.

127.    It has been more than two months since Apple filed suit.  Apple has presented forensic discovery that, in addition to Defendants Kaithamana and Wen, eight former Apple employees now at Rivos transferred and retained information on devices or cloud accounts shortly before leaving Apple, and nine others wiped their devices.  Despite acknowledging that it

advised these employees before they left Apple and subsequently interviewed them after joining

Rivos, Rivos has responded only as to one of these seventeen employees—Laurent Pinot.

Defendant Pinot retained a Time Machine backup of his entire Apple-issued MacBook Pro.

Rivos confirmed that Mr. Pinot still possesses Apple's information, and claims only that he did

not access it.  Rivos never voluntarily offered to return the information Mr. Pinot possesses.

128.    Rivos never responded regarding the other sixteen employees identified by Apple

as having taken Apple information when they left for Rivos or wiped their devices.  Rivos has not

disputed that it has Apple's information.  Rivos has not returned or segregated this information.

Rivos has instructed Apple not to contact those employees, leaving Apple with no way to recover

its information.

129.    Rivos has confirmed, through its CEO, that it has interviewed each of the former

Apple employees now employed at Rivos.  But Rivos has not confirmed whether it collected their

devices, whether it has preserved their information, or whether it has segregated that information.

130.    While refusing to provide Apple with any information about what it has learned

from the former Apple employees, Rivos's CEO has confirmed that Rivos has found at least some

relevant information in their possession, since Rivos acknowledges that it is collecting documents

and other information from a subset of employees for further analysis and review.  Rivos has not

identified that subset, nor has Rivos provided information for why and how that subset was

selected.  Rivos has not provided information about what, if any, documents were found to be

retained.  Rivos has failed to confirm that the documents were not used or shared.  Rivos has not

provided confirmation that any documents they have found have been segregated.  Rivos claims

that its internal investigation is ongoing.  But Rivos's outside counsel has not yet shared any

meaningful details about the results of their investigation, nor have they returned information

employees have already acknowledged as being in their possession.

131.    For the four employees from whom Apple has received a response (Messrs. Wen,

Kaithamana, Wang, and Pinot), Apple was correct:  These employees did retain Apple

confidential information after leaving Apple.

132.    Rivos also is aware that several former Apple employees have retained Apple confidential information in their iCloud drives, and that those iCloud drives have synced or may automatically sync with the employees' Rivos work computers.  For example, Mr. Wen's iCloud synced with his Rivos-issued computer, which resulted in some Apple files being stored on the Rivos-issued computer.

133.    On June 16, 2022, the parties appeared before Judge Davila for a hearing on Apple's Motion for a Temporary Restraining Order, Expedited Discovery, and Order to Show Cause.  At this hearing, Rivos stated that it would update Apple after interviewing the former Apple employees now at Rivos.  Apple has received no such update.  However, Rivos has acknowledged that it has found Apple files while searching through drives in Mr. Wen's possession.  Rivos has not turned over any of those images or files it found to Apple.

134.    Despite multiple requests, Rivos has refused to state whether the devices Apple has identified as potentially containing Apple confidential and trade secret files have been imaged or segregated from Rivos or Rivos employees.

135.    This information is available to Rivos, but Rivos has refused to provide it.

## **FIRST CLAIM FOR RELIEF**

### **(Breach of Contract Against Individual Defendants)**

136.    Apple realleges and restates all prior paragraphs as if fully restated herein.

137.    The IPAs signed by the Individual Defendants are valid and enforceable contracts. The confidentiality covenants and other provisions contained in these agreements are reasonably necessary to protect legitimate protectable interests in Apple's confidential, proprietary, and trade secret information.

138.    Apple has fully performed all of its obligations under these agreements.  Apple has also attempted to obtain the return of its confidential information from Jim Hardage, Laurent Pinot, Kai Wang, and Prabhu Rajamani without the need to file a lawsuit.  As discussed above, however, Rivos has blocked Apple's attempts to communicate directly with these employees and has refused to communicate with Apple on their behalf.

139.    The Individual Defendants took and retained Apple's documents in direct violation of the provisions of their IPAs, which required them to "promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple" and included an agreement "that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."  Individual Defendants breached these agreements by, at a minimum, failing to return Apple's property and confidential, proprietary, and trade secret information at the time of their departure from Apple as they were obligated to do.  The documents that have been improperly retained are described in more detail in the declarations of forensic expert Daniel Roffman and Appendix B to that declaration (ECF Nos. 22-4 and 22-5), and the declaration of Daniel Murray (ECF No. 22-3), which identify specific files and folders that were taken..

140.    In addition, despite indicating adherence to all contractually-obligated termination protocols, the Individual Defendants each deleted, scrubbed, or otherwise modified the contents of their Apple-issued devices prior to returning them.  These efforts obscured message histories, web histories, and other details relating to the employees' use of Apple trade secret information, departure from Apple, and any decision to improperly retain Apple trade secret information in violation of, at least, the IPAs.

141.    These actions by the Individual Defendants all occurred in the days before they departed Apple.  These actions also all followed the Individual Defendants receiving, and accepting, offers of employment in parallel roles for Apple's competitor, Rivos.

142.    As a result of the Individual Defendants' breach, Apple has suffered and continues to suffer monetary and non-monetary injury and harm in an amount to be proven at trial.  The documents that have been improperly retained are the product of substantial research and development work over a period of many years.

143.    Moreover, as a result of the Individual Defendants' breach, Apple has been injured and faces irreparable harm.  At a minimum, the Individual Defendants each signed IPAs acknowledging that a breach of that agreement would cause irreparable harm and significant injury to Apple.  Apple is also threatened with losing its competitive advantage, trade secrets,

1  customers, and technology goodwill in amounts that would be impossible to fully compensate

2  Apple unless the Individual Defendants are enjoined and restrained by order of this Court.

3  **SECOND CLAIM FOR RELIEF**

4  **(Misappropriation of Trade Secrets, Defend Trade Secrets Act, 18 USC § 1832(a)(1)**

5  **Against Rivos and Individual Defendants Excluding Kai Wang)**

6  144.   Apple realleges and restates all prior paragraphs as if fully restated herein.

7  145.   As set forth above, Individual Defendants excluding Kai Wang (the "TS

8  Individuals Defendants") and Rivos (collectively with TS Individual Defendants, the "TS

9  Defendants") improperly acquired and retained confidential and proprietary information of Apple

10  constituting "trade secrets" as defined by 18 U.S.C. § 1839(3), including, but not limited to,

11  design files, drawings, manufacturing information, device packaging information, sales and

12  customer information, financial and business development information, invention disclosures, and

13  drafts of patent applications.  These trade secrets pertain to Apple's personal computer and

14  mobile device SoCs, including SoC designs, component designs, customized ISA instructions,

15  source code for Apple products based on its SoCs, and other Apple-developed know-how gained

16  from years of developing advanced SoCs.  Apple has identified these trade secrets with

17  particularity, down to file names and file paths.  These trade secrets have been used in and/or

18  were intended for use in interstate and/or foreign commerce.

19  146.   Apple's trade secrets derive independent economic value from not being generally

20  known to, and not being readily ascertainable by proper means by, another person who can obtain

21  economic value from their disclosure or use of the information.  These trade secrets are also the

22  product of years of research and development at substantial cost to Apple.  These trade secrets

23  form the foundation of Apple's competitive advantages in the SoC market.

24  147.   Apple has undertaken efforts that are reasonable under the circumstances to

25  maintain the secrecy of the trade secrets at issue.  These efforts include, but are not limited to:  the

26  use of passwords and encryption to protect data on its computers, servers, and repositories; the

27  limited distribution of confidential information only to key Apple employees and executives and

28  on a need-to-know basis; the maintenance of written policies and procedures that emphasize

employees' duties to maintain the secrecy of Apple's confidential information; and the use of confidentiality agreements and non-disclosure agreements to require vendors, customers, partners, contractors, and employees to maintain the secrecy of Apple's confidential information.

148.    TS Defendants misappropriated trade secrets at least by acquiring trade secrets by improper means.  At least by virtue of the IPAs and exit checklists they signed, the TS Individual Defendants were well aware that the Apple files that were misappropriated are confidential and trade secret, and could not properly be retained, disclosed, or used by them.  Nevertheless, each TS Individual Defendant executed a Checklist for HWT Departing Employees or Checklist for Departing Employees in which they confirmed and acknowledged that they had returned all Apple proprietary and trade secret information.

149.    The trade secret information that the TS Individual Defendants and other former employees now at Rivos have retained is embodied in Apple's documents and other information that was taken upon the TS Individual Defendants' and other former employees' departures from Apple.  The trade secret information includes at least chip specifications and designs for Apple's SoCs for the A14, M1, and future (unreleased) SoCs.  The trade secrets also include chip specifications and designs for related components (including CPU cores, GPU cores, and cache memories), chip development roadmaps, summaries of technical analyses of chip characteristics and parameters, status reports, and source code defining the operation of hardware devices incorporating Apple's SoCs.  The trade secrets that have been taken are described in more detail in the declarations of forensic expert Daniel Roffman and Appendix B to that declaration (ECF Nos. 22-4 and 22-5), and the declaration of Daniel Murray (ECF No. 22-3), which identify specific files and folders that were taken.

150.    On July 9, 2021, shortly after Rivos began hiring Apple's former employees, Apple sent a letter to Rivos informing Rivos of the obligations of those former employees to maintain the confidentiality of Apple's trade secrets and confidential information, and specifically informing Rivos of the provisions of the IPA.  Apple further informed Rivos that, to the extent those former employees had retained Apple's trade secret and confidential information, that information had to be returned immediately.  Rivos never responded to that letter.

151.    Rivos admits that it has instructed Apple employees, prior to their resignation to joint Rivos, regarding how to conduct their exit procedures.  These instructions purportedly included a warning against retaining confidential information upon departure.  Nevertheless, many of these former Apple employees took Apple confidential information before departing for Rivos and retained it after leaving Apple.

152.    Defendant Ricky Wen has admitted to taking Apple trade secrets.  Specifically, through counsel, Mr. Wen has admitted to retaining after his departure from Apple at least some of the confidential and proprietary files Apple identified.  This admission comes after Mr. Wen signed a valid agreement with Apple requiring him to return Apple's confidential information when he left, after Mr. Wen signed an agreement with Rivos stating that he would not bring third party confidential information with him to Rivos, and after Mr. Wen certified that he had returned all Apple confidential documents.  Mr. Wen also does not dispute that he falsely confirmed he had returned all Apple confidential information during his Apple exit interview.  Moreover, Rivos admitted that Mr. Wen synced his iCloud Drive containing Apple confidential files with his Rivos-issued device, which transferred the contents of that iCloud Drive to his Rivos-issued device.

153.    Defendant Laurent Pinot has acknowledged through Rivos's counsel that he retained multiple unencrypted Time Machine backups of all files on his Apple-issued laptop's hard drive, including in the days before his resignation.  These unencrypted backups are located, at least, on a network attached device that is unsecured in Mr. Pinot's home.  Among the highly confidential files Mr. Pinot retained after leaving Apple, including for more than a dozen Apple trade secret SoC design projects, are files pertaining to unreleased Apple SoC projects, highly confidential technical specifications, and other details about Apple's SoC physical design.

154.    Defendant Jim Hardage, on the day he resigned, and just days before his termination, copied 37 gigabytes of data containing Apple confidential files from his Apple-issued device to external flash drives.  This data includes at least nine directories named for confidential Apple SoC projects.

155.   Defendant Prabhu Rajamani, on the same day he executed his Checklist for HWT Departing Employees confirming he had not retained any Apple confidential and proprietary information, accessed Apple's Confluence technical database before attempting to obscure records of his access and browsing history.  On the same day, he disconnected his iCloud Drive from his Apple-issued laptop, retaining Apple confidential information that was previously synced to the iCloud Drive.

156.   Defendant Weidong Ye made more than 25 Time Machine backups of his Apple-issued devices that he retained upon leaving Apple.  Among the hundreds of gigabytes of Time Machine backups Mr. Ye retained, including on an external hard drive, are Apple confidential files that are branded "Apple Confidential & Proprietary."  Moreover, Mr. Ye saved multiple Apple source code repositories to his iCloud Drive, including after departing from Apple, and he maintains access to these repositories even today.

157.   Rivos has engaged its own forensic consultant to image and dig into former Apple employees' devices.  Rivos has admitted to finding that some of their current employees still possess Apple confidential, proprietary, and trade secret information.  Rivos has not returned any of it.  Nor has Rivos segregated Apple's confidential information.  At least Mr. Wen actually transferred iCloud Drive data containing Apple confidential information to Rivos's systems.  Instead, Rivos has obstructed Apple's efforts to seek the return of its information from these employees, including by blocking Apple's access to these employees while refusing to provide any information about what Rivos's investigation identified.

158.   The information regarding the use and disclosure of this information at Rivos is uniquely within the possession of the TS Individual Defendants and Rivos, and TS Defendants have taken actions to conceal evidence regarding their conduct.  However, based on (i) the number of engineers that Rivos targeted and hired—and continues to target and hire even today— to perform the same type of work they were performing at Apple, (ii) the fact that Apple notified Rivos of its former employees' obligations and received no response, (iii) the large amount of these employees who have taken and retained Apple confidential information after communicating with Rivos or accepting their offers with Rivos, (iv) the volume of information

taken, (v) the nature of the information taken, (vi) the number of departing employees who deleted information and tried to cover their tracks after accepting offers with Rivos, (vii) Rivos's own efforts to conceal its communications with these former Apple employees, (viii) Rivos's admission that it was advising Apple's former employees regarding the retention of confidential information during the time they were still at Apple, and (ix) Rivos's refusal to cooperate with returning or segregating trade secret documents to Apple that it knows are in its current employees' possession while at the same time blocking Apple from retrieving this information itself, Rivos knew, or at a minimum should have known, that these employees improperly retained Apple confidential and trade secret information and were likely to make use of it in the course of their employment at Rivos. Further discovery will likely show that Apple's trade secret information has been improperly disclosed to Rivos and used by Rivos and the TS Individual Defendants.

159.    TS Defendants' improper acquisition and/or unauthorized use or disclosure, actual or threatened, violates the Defend Trade Secrets Act ("DTSA").

160.    TS Defendants have admitted to Apple and the Court that they possess Apple's confidential trade secrets, but they have not provided any details as to when and how they will return them. Each day that passes is another day whereby Apple's competitive edge continues to lie in the hands of its competitor. Each day is another day where Apple cannot know where that information may go, or how Rivos or the other TS Defendants may exploit it to build SoC products that directly compete with Apple's own SoCs. Once Apple's trade secrets have been embedded into such products, discovering and mitigating the impacts of that misappropriation becomes increasingly difficult, if not impossible.

161.    As a direct and proximate result of TS Defendants' conduct, Apple has been injured, and is threatened with further injury, in an amount that will be proven at trial. Apple has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of TS Defendants' misappropriation. As a further proximate result of the misappropriation and use of Apple's trade secrets, TS Defendants have been unjustly enriched.

162.    TS Defendants' conduct has been willful and malicious, justifying an award of exemplary damages.  As described in detail above, after receiving employment offers from Rivos and resigning from Apple, the TS Individual Defendants took and retained hundreds of gigabytes of Apple trade secret information regarding SoC designs, functions, and implementation.  This trade secret information includes some of the most competitively sensitive and confidential information that Apple possesses about its SoC designs, and much of it was accessed and transferred during the final days of the TS Individual Defendants' employment.  Again, after accepting their employment offers from Rivos, the TS Individual Defendants, and many other former Apple employees who are now at Rivos, took steps to cover up the evidence of their actions, including, in some cases, wiping their entire devices.  The TS Individual Defendants and other former Apple employees now at Rivos falsely represented to Apple that they had returned all of Apple's confidential information and had not deleted the information from their devices.

163.    Because Rivos has undertaken some of its own forensic investigation and interviewed former Apple employees now at Rivos, Rivos now knows that many of its employees have devices that Apple has identified as containing Apple confidential information, but Rivos has done nothing to sequester those devices or preserve that data, and also has failed to demonstrate they are doing anything to stop those employees from using the information in their jobs.  In fact, Rivos has confirmed on the record that it has not collected a number of the devices Apple identified; it therefore concedes it has not been able to safeguard their contents or ensure they have been segregated from Rivos devices.  Rivos has rejected Apple's repeated requests to return this information.

164.    Employees have been leaving Apple for Rivos as recently as June 2022; some have taken with them downloaded content, while others continue to maintain access to Apple information.  TS Defendants' conduct constitutes transgressions of a continuing nature for which Apple has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, TS Defendants may continue to retain and use Apple's trade secret information to enrich themselves and divert business from Apple to Rivos.  Apple is entitled to a preliminary and

permanent injunction against TS Defendants' actual and threatened potential violation of the DTSA.

## **PRAYER FOR RELIEF**

NOW, THEREFORE, Plaintiff Apple prays for judgment and relief against Defendants as follows:

    a. Judgment in Apple's favor and against Defendants on all causes of action alleged herein;

    b. Damages sufficient to compensate for the actual loss caused by TS Defendants' trade secret misappropriation;

    c. A further award of monetary recovery for any unjust enrichment caused by TS Defendants' misappropriation of the trade secrets;

    d. In lieu of damages measured by any other methods, a reasonable royalty for TS Defendants' misappropriation of trade secrets;

    e. Exemplary damages, based on TS Defendants' willful and malicious appropriation of trade secrets;

    f. For the entry of a Preliminary and Permanent Injunction against Defendants to prevent the actual or threatened misappropriation of Apple's trade secrets;

    g. For an Order directing Defendants to return all of Apple's property in their possession, custody, or control and cease any access to or use of Apple's trade secrets;

    h. For prejudgment and post-judgment interest at the maximum legal rate as applicable, as an element of damages that Apple has suffered as a result of Defendants' wrongful and unlawful acts;

    i. For reasonable attorneys' fees and costs incurred herein as allowed under the Defend Trade Secrets Act; and

    j. For such other and further relief as the Court deems just and proper.

1

## **DEMAND FOR JURY TRIAL**

2      Apple hereby demands trial by jury for all causes of action, claims, or issues in this action

3   that are triable as a matter of right to a jury.

4

5   Dated:  July 14, 2022                                 MORRISON & FOERSTER LLP

6

7                                                                    By   */s/ Bryan Wilson*
                                                                            BRYAN WILSON

8                                                                    Attorneys for Plaintiff
                                                                     APPLE INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28