# WILSON DECL.

# EXHIBIT 10

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

```
APPLE INC., a California     )
corporation,                  )
                              )
            Plaintiff,        )
vs.                           ) Case No. 5:22-cv-02637-EJD
                              )
RIVOS INC., a Delaware        )
corporation; WEN SHIH-CHIEH   )
a/k/a RICKY WEN; BHASI        )
KAITHAMANA; JIM HARDAGE;      )
WEIDONG YE; LAURENT PINOT;    )
PRABHU RAJAMANI; and KAI      )
WANG,                         )
                              )
            Defendants.       )
_____)
```

VOLUME 2

Videotaped Deposition of PUNEET KUMAR

Wednesday, November 2, 2022

1:04 p.m.


Held at:
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive
Fifth Floor
Redwood Shores, California


Job No.: 469610

Pages: 108 - 201

Reported by: Susan DiFilippantonio,

RPR, CCR No. B-2125

Page 137

1  Q.     And you mentioned the one experiment regarding
2  timestamps.  Is there anything else ongoing to your
3  knowledge?
4  A.     Yes.
5  Q.     What -- what is ongoing?
6  A.     The investigations of any data related to any of
7  the letters that were sent to Rivos' employees.
8  Q.     Has the investigation to date identified any
9  Apple information that was retained by any former Apple
10 employees who are now working at Rivos?
11            MR. EISEMAN:  Objection as to form.
12            THE WITNESS:  I have to answer that with
13 an explanation if you will allow me to.
14 BY MR. WILSON:
15 Q.     Sure.
16 A.     I'm not aware of any Apple information; however,
17 I do believe that the investigation has.  Based on
18 search terms that we used, they have located four files
19 in our systems that there -- that are under further
20 investigation.
21 Q.     What are those four files?
22 A.     I don't know.
23 Q.     Do you know when they were located?
24 A.     I don't know the exact date.
25 Q.     What's the approximate date?

1    A.        Sometime between May and August.
2    Q.        Do you know where they were located?
3    A.        On our file system.
4    Q.        Do you know if they were associated with any
5    specific individual?
6    A.        No.
7    Q.        Do you know the general subject matter?
8    A.        No.
9    Q.        Do you know the size of the files?
10   A.        No.
11   Q.        Do you know what types of files they are?
12   A.        No.
13   Q.        Do you have any other information about those
14   files?
15   A.        All I know is that they matched the terms, and
16   they are being investigated.
17   Q.        Are the terms that you referred to the terms
18   that were provided by Apple, do you know?  Or some other
19   search terms?
20   A.        No, I believe it was Quinn Emanuel's search
21   terms.
22   Q.        Have those files been removed from the servers?
23   A.        I don't know that.  I can offer, though, that
24   they have been what is called isolated, however, I don't
25   know if that has been done.

1   has the word "confidential" in it and also has the word
2   "Apple" in it.
3   Q.      Are you aware of any other terms that were used?
4   A.      No.
5   Q.      Has Rivos investigated whether any of its -- the
6   former Apple employees have synched their iCloud
7   accounts to Rivos-issued devices, other than Mr. Wen who
8   we've already talked about?
9   A.      I'm not aware of any specific investigation;
10  however, I would like to add something here, which, is
11  since, in the last two months, we have asked all
12  employees to stop using any personal accounts, but to
13  just now use Rivos' e-mail based iCloud accounts should
14  they choose to use iCloud.  We discourage the use of
15  iCloud, but should they want to, we do allow that so all
16  employees going forward are requested to do that and all
17  existing employees are asked to do that.
18  Q.      Are they required to do that or just asked to do
19  that?
20  A.      Strongly suggest that they must.
21  Q.      So is it fair to say it's a suggestion but not a
22  requirement?
23  A.      We expect all our employees to take things
24  seriously and -- all do.
25  Q.      Has Rivos checked to see if the employees have

1  done this?
2  A.     No, we can't enforce that because people use
3  different laptops to access Rivos' information.
4  Q.     Why do they do that?
5         MR. EISEMAN:  Objection as to form.
6         THE WITNESS:  People use the computers to
7  access anything in the cloud.
8  BY MR. WILSON:
9  Q.     Why did you do this in the last two months?
10 A.     To ensure that after we were made aware of such
11 a possibility, we were trying to close that hole and any
12 outside information creeping into our systems.
13 Q.     Whose idea was it to make this change?
14 A.     I can't tell you specifically the name.  It's
15 collectively.
16 Q.     How were people informed of this change?
17 A.     There was an e-mail sent out to the entire
18 company.
19 Q.     Who sent the e-mail?
20 A.     Brian Wallenfelt.
21 Q.     Did it go to everybody in the company?
22 A.     Yes.
23 Q.     Mr. Wallenfelt sent it.  Was he also the author?
24 A.     Yes.
25 Q.     And just so I am clear, in other words, he --

```
                                                         Page 145
 1                MR. EISEMAN:  Object as to form.
 2                THE WITNESS:  I believe they have done
 3       investigations for a lot of the employees.
 4   BY MR. WILSON:
 5   Q.      Do you know which employees?
 6   A.      So it depends on what you mean by
 7   "investigation."
 8   Q.      Has Rivos investigated whether Mr. Hardage
 9   synched his iCloud accounts to any Rivos-issued devices?
10   A.      I don't know.
11   Q.      Has Rivos investigated whether Mr. Rajamani
12   synched his iCloud or any iCloud devices to Rivos-issued
13   devices?
14   A.      I don't know.
15   Q.      And the same question for Mr. Ye.
16   A.      Mr?
17   Q.      Well, let me ask a complete question.  Has Rivos
18   done any investigation of whether Weidong Ye or Laurent
19   Pinot have synched any iCloud accounts to Rivos-issued
20   devices?
21   A.      I don't know.
22   Q.      Do you know, has Rivos done any investigation
23   about whether Kai Wang has synched any iCloud accounts
24   to Rivos-issued devices?
25   A.      I don't know.
```

1   Q.      ==Has Setec done any such investigation of whether==
2   ==any of those individuals -- Mr. Hardage, Mr. Ye,==
3   ==Mr. Pinot, Mr. Wang or Mr. Rajamani -- have synched any==
4   ==iCloud accounts to any Rivos-issued devices?==
5   ==A.      I don't know.==
6   Q.      Have you -- do you know Weidong Ye?  It sounds
7   like you do.
8   A.      I know him now.
9   Q.      And what is his position at Rivos?
10  A.      He is in engineering, in the design team.
11  Q.      Have you spoken with him about whether he has
12  any Apple information?
13  A.      No.  But I would like to clarify.
14  Q.      Sure.
15  A.      The only topic that I've spoken to him about is
16  the fact that he -- he has told me that the information
17  that Apple claims that he has put on a disk, he said his
18  manager actually asked him to do that, and he submitted
19  that disk before he left Apple.  So that's since, yes, I
20  talked to him about -- so the periphery of what you guys
21  are alleging, but I haven't specifically asked him about
22  any files.
23  Q.      When did you have that conversation with him?
24  A.      I don't know the specific date.  If I were to
25  guess, it would be the month of August.

```
 1   Q.    So after the lawsuit was filed?
 2   A.    Oh, yeah.
 3   Q.    Did you speak with --
 4   A.    Against him.
 5   Q.    Against him?
 6   A.    (Witness moves head up and down.)
 7   Q.    Did you speak with Mr. Ye before he joined
 8   Rivos?
 9   A.    Not to the best of my knowledge.
10   Q.    Are you aware of any information that Mr. Ye has
11   on his iCloud drive?
12   A.    No.
13   Q.    So you're not aware of any source code, for
14   example, that he may have on his iCloud drive?
15               MR. EISEMAN:  Objection as to form.
16               THE WITNESS:  No.
17   BY MR. WILSON:
18   Q.    What, if anything, has Rivos done to investigate
19   whether any Apple information that Mr. Ye had has made
20   its way on to Rivos computers or devices or systems?
21   A.    This is an ongoing investigation, so it has not
22   been concluded yet.
23   Q.    Do you have any information about the status of
24   the investigation?
25   A.    Other than the fact that it's ongoing, no.
```

Page 148

1  Q.     Do you have any understanding of whether there
2  have been any conclusions reached to date in the
3  investigation?
4              MR. EISEMAN:  With respect to Mr. Ye?
5              MR. WILSON:  With respect to Mr. Ye.
6              THE WITNESS:  No, I don't.
7  BY MR. WILSON:
8  Q.     Does Rivos know where Mr. Ye's devices are at
9  this point?
10 A.     I can't speak on everybody at Rivos -- on behalf
11 of everybody at Rivos.  You would have to ask Quinn
12 Emanuel on that.  I don't know the answer to that one.
13 Q.     Does Setec have them, do you know?
14 A.     I don't know.
15 Q.     Do you know if Mr. Ye surrendered any of his, or
16 has given any of his devices, to Setec?
17 A.     I don't know.
18 Q.     Do you know if Rivos -- do you know if Mr. Ye
19 has any continuing access to Apple source code?
20             MR. EISEMAN:  Objection as to form.
21             THE WITNESS:  No, I don't.
22 BY MR. WILSON:
23 Q.     Does it matter to you one way or the other?
24 A.     If he --
25             MR. EISEMAN:  Objection as to form.

Page 154

1  at, is whether there is any Apple information on Rivos'
2  internal document system. My question to you is: Do
3  you know one way or the other if there is any Apple
4  information on Rivos' internal document system?
5  A.      No.
6  Q.      You mentioned the four files earlier. Are
7  you -- are -- are those files on Rivos' internal
8  document system?
9  A.      Internal storage systems.
10 Q.      What -- does -- what's the difference between an
11 internal -- Rivos' internal storage system and Rivos'
12 internal document system?
13 A.      Our documents are mostly written using Google
14 Docs and so most documents, if not all, reside in Google
15 Cloud storage. Our other files that employees generate
16 are stored in a storage system.
17 Q.      What's the structure of the storage system?
18              MR. EISEMAN: Objection as to form.
19              THE WITNESS: It's a standard NFS file
20      system.
21 BY MR. WILSON:
22 Q.      A standard NFS office, you said?
23 A.      File system.
24 Q.      Who administers the NFS system?
25 A.      The IT group.

```
                                                              Page 169
 1   A.       The weekend of the lawsuit -- during the lawsuit
 2   filed.
 3   Q.       Did you speak with Mr. Pinot before he came to
 4   Apple -- sorry, did you speak with Mr. Pinot before he
 5   came to Rivos?
 6   A.       Yes.
 7   Q.       And did you speak with him about -- or what did
 8   you speak with him about?
 9   A.       Again, general things about what he may or may
10   not be doing, what the company is trying to build, those
11   kinds of things.
12   Q.       Did you discuss with him anything that he should
13   do or not do with any Apple confidential information he
14   may have?
15   A.       No.
16   Q.       When did you first learn that Mr. Pinot may have
17   retained Apple information after he left Apple?
18   A.       Only after Apple sent the letter.
19   Q.       What, if anything, has Rivos done to investigate
20   whether Apple information that Mr. Pinot may have had
21   has made its way on to Rivos' internal storage systems?
22   A.       I don't know.
23   Q.       Did Rivos ever have access to Mr. Pinot's time
24   capsule?
25                MR. EISEMAN:  Objection as to form.
```

```
                                                          Page 174
 1                 MR. EISEMAN:  Objection as to form.
 2                 THE WITNESS:  Only based on the e-mail
 3       exchange.
 4   BY MR. WILSON:
 5   Q.      Do you know if any of these files were synched
 6   to his Rivos laptop?
 7   A.      No, I don't.
 8   Q.      What are you aware of Rivos doing, if anything,
 9   to investigate whether Apple information that Mr. Wang
10   may have had has made its way on to Rivos' internal
11   document storage systems?
12   A.      I'm relying on the investigation that counsel is
13   proceeding with.
14   Q.      And the same goes for Mr. Rajamani?
15   A.      Yes.
16   Q.      And the same goes for Mr. Pinot?
17   A.      Yes.
18   Q.      Other than the defendants we've talked about, so
19   the five that we've talked about -- Mr. Hardage,
20   Mr. Pinot, Mr. Rajamani and Mr. Wang and Mr. Ye -- have
21   you spoken with any other former -- former Apple
22   employees who are now at Rivos about anything relating
23   to Apple confidential information?
24                 MR. EISEMAN:  Well, you've also -- you
25       also asked Dr. Kumar about Mr. Wen, so.
```

1    Q.      I have a few questions about the searches that
2    were done either by Setec or by Rivos' IT people.  Do
3    you know if the people who did the searching searched
4    for Apple source -- Apple source code on Rivos'
5    internal -- well, anywhere.  Do you know if -- if anyone
6    searched for Apple source code on any Rivos' systems?
7    A.      I don't.
8    Q.      Do you know if anyone searched for Apple
9    schematics on any Rivos' systems?
10   A.      I don't know.
11   Q.      Do you know if anyone searched for Apple chip
12   specifications on any Rivos' systems?
13   A.      I don't know.
14   Q.      Do you know if anybody searched for Apple
15   product information or road maps on Rivos -- on any
16   Rivos' systems?
17   A.      I don't know.
18   Q.      Do you know if anyone searched for Apple turn --
19   for files with Apple internal code names on any Rivos'
20   systems?
21   A.      I don't know.
22   Q.      Has Rivos done anything to try to segregate the
23   files or documents that may have been retained by formal
24   Apple -- former Apple employees after they left Apple?
25           MR. EISEMAN:  Objection as to form.

Page 182

1  last day at Apple.
2  Q.      Do you have any other details about that?
3  A.      No.  I mean, I know that it existed in his other
4  bedroom and he had forgotten about it.
5  Q.      Do you know if any of the former Apple employees
6  retained Apple information on their personal devices?
7              MR. EISEMAN:  Objection as to form.
8              THE WITNESS:  I don't know anything about
9     anybody's personal devices.
10 BY MR. WILSON:
11 Q.      Has Rivos taken any steps to segregate those
12 personal devices from the employees' work that they are
13 doing at Rivos?
14             MR. EISEMAN:  Objection as to form.
15             THE WITNESS:  I don't know.
16 BY MR. WILSON:
17 Q.      Do you have any reason -- do you know if Setec
18 has any -- taken any steps to make sure that former
19 Apple employees don't use personal devices -- personal
20 devices that may still contain Apple information in the
21 course of their work for Rivos?
22             MR. EISEMAN:  Objection as to form.
23             THE WITNESS:  You would have to repeat
24    the question.
25 BY MR. WILSON:

Page 183

```
1    Q.      Yeah.  Do you know if -- has Rivos taken any
2    steps to prevent former Apple employees from using their
3    personal devices for work at Rivos?
4    A.      I don't know.
5    Q.      In cases where Apple -- former Apple employees
6    may be using their personal devices for work at Rivos,
7    has Rivos taken any steps to ensure that those devices
8    don't include any Apple information?
9                    MR. EISEMAN:  Objection as to form.
10                   THE WITNESS:  I don't know.
11   BY MR. WILSON:
12   Q.      Has Rivos asked any of the former Apple
13   employees whether they have personal devices with
14   confidential Apple information on them?
15   A.      So I can only answer for myself.  I have not
16   asked.
17   Q.      And you're not aware of anybody else asking
18   that?
19   A.      If it has happened with legal counsel, then you
20   would have to consult legal counsel.
21   Q.      As the CEO of Rivos, is that something you would
22   want to know, whether Apple employees are using personal
23   devices for their work at Rivos that has confidential
24   Apple information on it?
25                   MR. EISEMAN:  Objection as to form.
```

Page 186

1  few moments ago, do you -- that's Mr. -- I think that's
2  Mr. Pinot, Mr. Wen and -- let me ask you more generally.
3         You mentioned Mr. Pinot's time capsule.  You
4  mentioned Mr. Wen's drives.  Other than that, are you
5  aware of any devices belonging to any former Apple
6  employees who are now at Rivos being sequestered or
7  isolated in any way?
8  A.     Yes, I'm -- I'm aware of Mr. Hardage's device
9  that is listed in the claim against him to have been
10 submitted.
11 Q.     And what was done with that device?
12 A.     I believe it was submitted for investigation.
13 Q.     How do you know that?
14 A.     Through Brian Wallenfelt, my counsel.
15 Q.     Do you know if Mr. Hardage has access -- do you
16 know if it had original -- let me rephrase that.
17        Do you know if the original or an image of the
18 device has been submitted for inspection?
19 A.     I -- I don't know.
20 Q.     As far as you know, Mr. Hardage may still have
21 the original?
22                MR. EISEMAN:  Objection as to form.
23                THE WITNESS:  I don't know.
24 BY MR. WILSON:
25 Q.     Other than Mr. Pinot, Mr. Hardage and Mr. Wen,

1  are you aware of any other individuals, former Apple
2  employees who now work at Rivos, whose personal devices
3  were isolated or sequestered?
4  A.     I don't -- I don't know.  I just want to be
5  truthful in the sense that if there's one more -- I'm
6  trying to go through the names, but I don't know the
7  right answer.
8  Q.     Did you consider at some point issuing an
9  instruction or request that the former employees stop
10 using their personal devices in the course of any work
11 for Rivos?
12            MR. EISEMAN:  Objection as to form.
13            THE WITNESS:  No.
14 BY MR. WILSON:
15 Q.     Why not?
16 A.     I'm going with the assumption that employees
17 don't have access to third-party information, and they
18 also are not -- they have agreed not to bring
19 third-party information into the company.
20 Q.     What have you done to verify that assumption?
21 A.     That's the ongoing investigation.
22 Q.     Is there anything else?
23            MR. EISEMAN:  Objection as to form.
24            THE WITNESS:  Well, sorry, could you
25      repeat the question again, please?