1             UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Nathanael M. Cousins, Magistrate Judge

4

5  APPLE, INC.,           )
                       )

6        Plaintiff,   )
                       )

7  vs.                 )  Case No. C 22-02637-EJD
                       )

8  RIVOS, INC.,           )
                       )

9        Defendant.   )
  _____)

10

11                        San Jose, California
                        Monday, April 3, 2023

12

13  <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
    RECORDING 11:06 - 11:19 and 11:56 - 12:40 = 57 MINUTES</u>

14

<u>APPEARANCES</u>:

15

For Plaintiff:

16                    Morrison& Foerster
                    755 Page Mill Road

17                    Palo Alto, California 94304
                    (650) 813-5600

18            BY:  BRYAN WILSON, ESQ.

19                    Morrison & Foerster
                    425 Market Street

20                    San Francisco, California
                      94105

21                    (415) 268-7000
            BY:  MEREDITH ANGUEIRA, ESQ.

22

            BY:  RYAN MALLORY, ESQ.

23

24

25         (APPEARANCES CONTINUED ON NEXT PAGE)

2

APPEARANCES:  (Cont'd.)

For Defendants:

                        Quinn Emanuel Urquhart
                          & Sullivan, LLP
                        50 California Street
                        22nd Floor
                        San Francisco, California
                          94111
                        (415) 875-6600
                    BY:  DAVID EISEMAN, ESQ.
                    BY:  ELLE WANG, ESQ.

                        Quinn Emanuel Urquhart
                          & Sullivan, LLP
                        555 Twin Dolphin Drive
                        5th Floor
                        Redwood City, California
                          94065
                    BY:  SARA POLLOCK, ESQ.

Transcribed by:         Echo Reporting, Inc.
                        Contracted Court Reporter/
                        Transcriber
                        echoreporting@yahoo.com

3

1  <u>Monday, April 3, 2023</u>                                    <u>11:06 a.m.</u>

2                          P-R-O-C-E-E-D-I-N-G-S

3                                --oOo--

4           THE CLERK:  Calling civil 22-2637, Apple,

5  Incorporated versus Rivos.

6      Counsel, please state your appearances for the record.

7           MR. WILSON:  Brian Wilson for Apple.  With me is

8  Ryan Mallory and Meredith Angueira.  And then we also have

9  Nicole Ong (phonetic) from our office back with Diek van

10 Nort from Apple, as you may recall.

11          THE COURT:  I do.  Welcome home.  Thank you.

12          MR. EISEMAN:  Good morning, your Honor.  David

13 Eiseman from Quinn Emanuel on behalf of the Defendant.  With

14 me is Sara Pollock and Elle Wang.

15          THE COURT:  Thank you all for being here, and

16 please be seated.  Be comfortable.  We are making a

17 recording of our discovery hearing.  The underlying joint

18 discovery report is at Docket 164, 63-pager with Judge

19 Klahanie's opinion attached to it as Exhibit A.  And, at my

20 request, the parties filed proposed orders on Friday.  Both

21 are in the record referencing Docket 164.

22          This weekend, Apple filed a motion for sanctions.

23 That's set for Judge Davila in August.  That's not before

24 the Court today, but I take note of that just to the extent

25 I reviewed it to make sure I was aware of any overlap

4

1  between that motion and the issues presented today.  That,

2  of course, has not been responded to yet.  That's to come.

3      So, that's our procedural posture of what we're doing

4  today, and this is a referral from Judge Davila.  So, anyone

5  may object within 14 days.

6      Let me start on the Defense side procedurally as to the

7  motion for sanctions filed this weekend.  Does that preempt

8  or disturb or have any impact procedurally on the discovery

9  issues presented from your perspective?

10          MR. EISEMAN:  No, your Honor.  We will vigorously

11  oppose it when the time comes, but I don't believe that it

12  affects any issues before the Court today.

13          THE COURT:  All right.  So, in other words, I

14  don't need to ask you to respond to it before taking up the

15  other issues.  From your point of view, it doesn't become

16  something that needs to be resolved before the other

17  discovery?

18          MR. EISEMAN:  I agree with that statement.

19          THE COURT:  All right.  And let me get Apple's

20  perspective on the -- on the motion for sanctions.  Same

21  question.  Does that --

22          MR. WILSON:  We agree.  Does not affect it.

23          THE COURT:  All right.  So, I -- I take note of

24  that filing, but it will not impact my ruling on any of the

25  discovery issues presented.

1      All right.  Thank you for that clarification.

2      There are many issues presented in the joint discovery

3 report.  Some of them might be more important than others.

4 Some it's been asserted that should be resolved or were

5 resolved in part by the conversation, and it may be that I

6 want there to be some more meet and confer if there's been

7 no resolution.

8      But let me start with kind of stage setting, agenda

9 setting from each side to see from your perspective how I

10 can best help you today.

11          MR. WILSON:  Thank you, your Honor.  First of all,

12 I'm happy to report we did arrive here early, and we met and

13 conferred, and we've narrowed the issues I think in some --

14 some ways that are significant.

15          THE COURT:  I appreciate that.  And both -- and

16 tell me -- tell me how.

17          MR. WILSON:  I'll get to that in a moment.

18          THE COURT:  Yeah.

19          MR. WILSON:  It may be easiest to go issue by

20 issue, but I'll look to my colleagues to help with that too.

21          THE COURT:  Yeah.  Whichever.  I've got before me

22 the proposed orders and also the report.  So, I'll look at

23 those as helpful to go along with you.

24          MR. WILSON:  Several issues are clearly moot.

25 Some are not.

1          THE COURT:  Okay.

2          MR. WILSON:  But I did want to explain and I guess

3   apologize to some extent for the lengthy submissions.  But,

4   without getting into any lengthy discussion of it, what's

5   gone on in this case and the reason these disputes have come

6   up and the reason it's such -- such an important issue for

7   us is that, as the Court will recall, when this all started

8   out, what we heard over and over again was there's nothing

9   here, we have no basis for bringing the suit, we don't have

10  a Rule 11 basis, we're making it all up, we're just trying

11  to harass employees and prevent them from going to Rivos and

12  so on and so forth.  And we pushed, and we pushed, and we

13  pushed to try to get discovery.

14      Now -- now we're in a different position.  Now what we

15  know, we were -- we thought we had an adequate basis before,

16  but here's what we know, which is completely undisputed and

17  I think accounts for why we've been able to make progress on

18  some of these issues.

19      We know for sure that the former Apple employees kept

20  information when they went to Rivos.  That's not disputed.

21  We know for sure that they continued to have -- that several

22  of them -- and we listed them in the statement -- continue

23  to have access.  That can't be disputed.  What they're doing

24  with it, whether they are taking advantage of it, all that

25  kind of stuff, that's disputed, but it's not disputed that

7

1  the Apple confirmation is on devices these people are using

2  for their work for Rivos.

3      We also know of two people who have referred to the

4  Apple confidential information in the course of doing work

5  for Rivos.  Now, again, there will be dispute about what

6  they did with it and so on, but it's not disputed, I don't

7  think it can be disputed, that they -- they referred to it,

8  and one thing that happened after we took this statement was

9  we took another deposition of Mr. Rajamani (phonetic), and

10 what he told us was he acknowledged that he has some source

11 code that he wrote when he was at Apple.  He took it with

12 him.  He referred to it in the course of doing work for

13 Rivos on -- and that closes the loop.  Apple confidential

14 information, he took it.  He went to Rivos.  He used it at

15 Rivos.  We'll have a fight about whether it's confidential.

16 I don't know that that's a big fight.  We'll have a fight

17 about whether it's a trade secret, all that kind of stuff,

18 but he took the information, and he used it in the course of

19 his Rivos.  That's undisputed, and we think once you

20 understand those facts, a lot of these other issues start to

21 fall into place.

22      So, that -- that's our background.

23          THE COURT:  All right.  I see a different

24 perspective, but go ahead.

25          MR. EISEMAN:  Your Honor, asked --

8

1          THE COURT:  Yeah.

2          MR. EISEMAN:  -- Mr. Wilson to say whether we've

3   reached any compromises, and then he launches into something

4   about the merits, which we dispute.  We dispute that people

5   currently have access to Apple confidential documents, and

6   we dispute that the documents actually are trade secrets of

7   Apple or have been used.  But I thought we were supposed to

8   talk about compromises, and that's what we're here to do.

9          THE COURT:  All right.  Well, I do want to get the

10  agenda.  That was my question.  All right.  So, I allowed

11  some opening argument.  Go ahead.

12          MR. WILSON:  Let me tell you the issues that I

13  think are off the table, and counsel can correct me or my

14  team could correct me if -- if I'm wrong, but I think the

15  issues that we have resolved are Apple, our issue number

16  three, which is a request for Rivos information of various

17  sorts.  That's response to I think it's four RFP's.  The

18  resolution to that is somewhat complicated.  I will recite

19  that for the record when we get to that.

20          THE COURT:  Well, when it comes to complicated, I

21  mean, do you all know what the terms are?

22          MR. WILSON:  We do.  We do, yes.

23          THE COURT:  All right.

24          MR. WILSON:  Yes.  Basically -- basically the

25  terms are I think they have asked -- it interrelates with

9

1  another request.  That's why it --

2          THE COURT:  Okay.

3          MR. WILSON:  -- gets a little bit complicated, but

4  they've asked that we provide certain information, and then

5  they'll produce the documents in response to this request.

6  We've agreed to do that, and I think we have an agreement on

7  that.

8      Of their issues, issue number two, which is the

9  interrogatory responses, is mooted because we've served

10  those.  Issue number three, which they've identified as

11  arbitration agreements, but it's really employment related

12  documents, we've agreed to produce those and actually have

13  for the most part produced them.  So, that's mooted.

14      Issue -- their issue number four is supplemental Rule

15  26 disclosures.  We did serve those.  I should -- this is

16  very very minor, but we said in our proposed order we served

17  them on March 31st, due to an oversight, which I take

18  responsibility for, they didn't actually go out on Friday,

19  but we sent them yesterday.  So, that's moot.  And their

20  issue number seven, Rivos issue number seven, which is

21  variously described as identification of trade secrets or

22  document production issues, I think we have agreement on

23  that, and that agreement is the one that moots our issue

24  number three.

25          THE COURT:  That ties in with that whole number

10

1 three?

2          MR. WILSON:  It ties into Apple number three,

3 that's right.  That's a better way to -- to put it.  So, I

4 -- I think that all of those are resolved, and we still have

5 disputes to -- to one extent or another on -- on the others

6 I believe.

7          THE COURT:  All right.  Let me get the

8 confirmation and also if there's any -- if there is any

9 disagreement, then we can figure --

10          MR. EISEMAN:  No, I think that's a -- that's

11 generally accurate.  I mean, they served supplemental

12 responses.  I don't think by taking that off the table today

13 means that we're satisfied with the supplemental responses,

14 but I don't think we need to take that up today.  We just

15 have to meet and confer.  But in terms of the outline that

16 Mr. Wilson gave to your Honor, that's consistent with our

17 view.

18          THE COURT:  And, as to the things that you -- and

19 this is your -- your request two, three, four, and seven.

20 Those are areas where you asked for more information.

21 You've gotten some more information, and you're evaluating

22 it.  What time period, fairly, would -- will you be

23 completed with that evaluation?  In other words, if you do

24 have a beef about those materials, when were you -- when

25 will you know about it?

1          MR. EISEMAN:  I'm sure that we will be in a

2   position to meet and confer with Apple within the next week

3   to 10 days.

4          THE COURT:  All right.  Very good.  All right.

5   So, thank you for that.

6       Now, as to the agreements you've reached, unless

7   there's any ambiguity in your agreement and you're not sure

8   that you know what you've agreed to, I don't need you to

9   state on the record what the agreement is as long as you are

10  comfortable that you have an agreement, and I'll record that

11  you have reached an agreement.

12         MR. WILSON:  I think just to -- to avoid any

13  possible ambiguity about Rivos' issue number seven --

14         THE COURT:  Um-hmm.

15         MR. WILSON:  -- which is their trade

16  secret/document production issue, Mr. Sheppard (phonetic) on

17  their team -- I think that's his last name -- Mr. Sheppard

18  sent us an email yesterday making three points essentially

19  outlining a process by which we will identify documents for

20  them by I think it's a hash ID.  If there are any documents,

21  that will allow them to locate it in their own productions.

22  If they can't find it, they'll let us know, and we'll

23  produce those.  Then we will also identify by Bates number

24  documents that we say reflect our -- our trade secrets, and

25  then -- then the only -- so, we're agreeing to what they

1 proposed in their email.  The one addition to that which I

2 think we have agreement on is that if we find additional

3 information later on, we can supplement it.  So, in other

4 words, it's not frozen in time as of yesterday, and I think

5 that's the agreement on number seven.

6        MR. EISEMAN:  It generally is.  I would say that

7 the first part of what Mr. Wilson just told you actually

8 came from an email that MR. KUWAITI (phonetic) sent us on

9 Friday, March 31st, and then we countered with a proposal

10 from Mr. Sheppard last night, and I think taking those two

11 emails together is the basis for our agreement.

12        THE COURT:  All right.  Here's my suggestion, and

13 I very much appreciate that you continue to confer.  The 63

14 pages of -- of disputes was a little bit discouraging to me,

15 but I'd like you to -- maybe you need to cut and paste some

16 emails or confer just to make sure there's no remaining

17 issues, get into written form, and it might just be an email

18 between you saying what these agreements are, but get that

19 finalized so that there's not coming back in a week and say

20 we thought the deal was something different than what the

21 other side said.

22    And you can confer about that and work it out here

23 right now.  That's the advantage of being here in person

24 together.  And I'll come back in maybe half an hour to hear

25 if there's some remaining beef about that, but I'm expecting

1  that that's more than enough time.

2      In the same breath, I'm going to be able to now focus

3  on the remaining disputes that you do have, and -- and are

4  we ready to tackle the remaining issues, which are

5  substantial themselves?

6      (No response.)

7          THE COURT:  All right.  So, and half an hour time,

8  that might be more than you need, but you can confer about

9  other issues that you still have in dispute, but task one is

10 to make sure that you've got written down what the

11 agreements are as to these ones that you agreed to.

12     That work for you?

13         MR. WILSON:  Sure.

14         MR. EISEMAN:  Yeah.  I mean, I do actually think

15 the two emails together are exactly our agreement other than

16 that we would have the opportunity to supplement.

17         THE COURT:  So, you can -- you can nail it -- nail

18 that down and spend some time on the others, and then we'll

19 rejoin at let's say 11:45.  The good news is we don't have a

20 criminal -- no one's been arrested in this jurisdiction

21 today.  So, we don't have any criminal calendar coming up.

22 So, it will give us a little more time to work on -- settle

23 discovery.

24     So, see you at 11:45.  Thank you.

25         ALL:  Thank you, your Honor.

14

1      (Proceedings recessed briefly.)

2            THE CLERK:  Go ahead.

3            MR. WILSON:  I think we've resolved some more

4   issues, your Honor, and I think Ms. Angueira is going to

5   speak on both --

6      (Pause.)

7            MS. ANGUEIRA:  Okay.  Good morning.  I'm sure

8   counsel can hop in, but we've agreed to this language.  So,

9   Apple -- in order to resolve Apple issues numbers -- number

10   three and Rivos issues numbers six and seven, there's seven

11   parts to this agreement.  So, I'll walk through them.

12      The first one is Apple will provide Defendants with the

13   hash values and file names for all the documents cited in

14   Mr. Daniel Roffman's declarations.

15      Defendants will then run those hash values and file

16   names through their production vet and have their vendor

17   determine which of the documents have already been produced.

18   Then Defendants will produce to Apple a list of the hash

19   values or filenames that are not already contained -- excuse

20   me -- of hash values and filenames that are not already

21   contained in Defendant's production set, and Apple will

22   produce those to Rivos.

23      To the extent Apple is claiming files other than those

24   cited by Mr. Roffman in his declarations are trade secrets

25   and those documents have been produced by Defendants, Apple

1 will agree to identify those documents by Bates numbers.

2 And to the extent Apple is claiming files other than those

3 cited by Mr. Roffman and not produced by Defendants are

4 trade secrets, Apple will produce those.

5     There's a few more parts.  Within 10 days of Apple

6 providing hash values and filenames for all the documents

7 cited in Mr. Roffman's declaration and identifying by Bates

8 number from Defendant's production or producing any

9 additional documents, Rivos will produce responsive -- will

10 produce documents responsive to Apple's request for

11 production 31 through 34.

12     The parties agree that Apple may identify additional

13 trade secrets as discovery is ongoing.

14     Defendants agree to identify the documents that have

15 been remediated along with sufficient information for Apple

16 to be able to identify the source of the devices or where

17 the documents were stored at the time of remediation.

18     The parties --

19          THE COURT:  Keep on.

20          MS. ANGUEIRA:  Yeah -- for Rivos issues six and

21 eight, and Apple issue number two, the parties have agreed

22 that Mr. Daniel Roffman and CTAC (phonetic) can be deposed

23 on their declarations or any discovery responses or

24 documents and that this moots those issues for now.

25          THE COURT:  All right.  Can I just pause there?

1          MS. ANGUEIRA:  Yes.

2          THE COURT:  That was as -- that part was just as

3  to Rivos issues six and eight?

4          MS. ANGUEIRA:  And Apple issue number two.

5          THE COURT:  And Apple issue number two.  All

6  right.

7          MS. ANGUEIRA:  Defendants have also agreed to

8  produce any corrupted images or hard drives to CRA within

9  seven days of Apple sending Rivos instructions for how to

10 deliver the images or devices to CRA.

11         THE COURT:  All right.  And are you done?

12         MS. ANGUEIRA:  Yes.

13         THE COURT:  And I think you were reading from

14 something.  Is that something that --

15         MS. ANGUEIRA:  Yes.

16         THE COURT:  -- both sides have --

17         MS. ANGUEIRA:  We've exchanged.

18         THE COURT:  -- exchanged?  Very good.  Thank you.

19 And does that entirely resolve the issues in Apple two and

20 Defense six and eight or are there still some parts of it

21 that are unresolved?

22         MS. ANGUEIRA:  Our position is those are resolved

23 for now.

24         THE COURT:  All right.

25         MR. EISEMAN:  And we agree with that, your Honor.

1          THE COURT:  All right.  Well, thank you very much

2  for working out those details.  I heard some temporal things

3  in there as far as when things would occur within 10 days or

4  something else, but there weren't -- I might have missed it.

5  That's why I'm asking -- any firm dates as far as, you know,

6  something's going to occur by April 7th or by April 14th.

7  It's within connection to something else.

8          MS. ANGUEIRA:  Correct.  They seem to be

9  triggering deadline when -- and that could trigger another.

10          THE COURT:  Okay.  All right.  I didn't miss

11  something that you -- that you said.

12          MR. EISEMAN:  I actually think based on these

13  agreements we'll be able to work together and make sure that

14  this keeps moving at a good pace.

15          THE COURT:  All right.  I just wanted to make sure

16  I didn't -- that you said one and I missed -- missed it.

17      All right.  Very good.  All right.  So, that resolves,

18  and thank you for working that out and recounting it, Apple

19  two and Defense six and eight.  So, by my score card still

20  remaining for discussion are Apple one and four and Defense

21  one and five, correct?

22          UNIDENTIFIED SPEAKER:  (Indiscernible.)

23          THE COURT:  All right.  And, given the continuing

24  progress, do you want to keep talking about those with each

25  other?  Have you exhausted the meet and confer as to the

1   remaining issues?  How can I help you on the remaining

2   issues?

3           MS. ANGUEIRA:  I think we've exhausted meeting and

4   conferring at this point.  I'm going to invite up my

5   colleagues to handle Apple's issue one and four.  So, we're

6   going to swap basically.

7           THE COURT:  All right.  I actually want to start

8   -- and I'll hear that.  I want to start with the Defense one

9   and five because they're freshest in my mind, if you're

10  ready to take those up, and then I'll, of course, hear from

11  Apple second on -- on those.

12          MR. EISEMAN:  Ms. Pollock's going to handle those

13  issues, your Honor.

14          THE COURT:  Outstanding.

15          MS. POLLOCK:  Good morning, your Honor.  And I'll

16  apologize in advance.  I'm battling terrible allergies here.

17  So --

18          THE COURT:  That is a community affliction at the

19  moment, but at least the rain got some positive things for

20  us too.

21      All right.  Go ahead.

22          MS. POLLOCK:  Thank you, your Honor.  Defendant's

23  issue number one is perhaps the most important that we're

24  going to talk about here.  It's also probably the shortest,

25  but Apple has not meaningfully engaged in the discovery

19

process and its manners are particular problematic with
respect to document production.  Until a few hours before
the joint statement, Apple had produced a total of 700 pages
of documents.  They've been dripping them out, you know, it
seems like just a little bit, just enough to avoid an
adverse ruling.  At this point, with discovery closing three
months away, we've got to get some deadlines in here.  There
have to be --

THE COURT:  What did you get, even if it was a few
hours before the deadline?  Update me as to what you have
received.  This is just foundational.  If you want me to
order more stuff, give me an update.

MS. POLLOCK:  A few hours before the deadline, we
got 3600 pages of documents that were related to the Bossy
(phonetic) settlement and communications, and then on the --
the evening of the 31st, we got another set of documents
that relates to communications relating to former Apple
employees leaving Apple, like resignation letters, farewell
emails, that sort of thing.

THE COURT:  All right.  Thank you.

MS. POLLOCK:  And, so, what we are really asking
for today is deadlines in place for substantial meaningful
production, and we also need transparency into the search
terms Apple's running, the custodial -- or the custodians
that are being searched, as well as the noncustodial

20

1   sources.  And, again, you know, we think that three months

2   before the discovery cutoff, this is not only entirely

3   reasonable but absolutely critical.  So, we can start

4   getting depositions underway.

5           THE COURT:  And in between -- and I understand

6   those orders ask for substantial completion within 30 days

7   of this order.

8       What can I do to help you -- let's assume I'm going to

9   grant that request.  What can I do, if anything, to help you

10  and them meet that order?  Are there steps along the way

11  that would be helpful or if I just say that that's the

12  expectation, you'll work it -- work it out then between now

13  and then?

14          MS. POLLOCK:  I think that deadline would be huge.

15  I think if you could also put in that you expect to see some

16  transparency as to the search terms, custodians and

17  noncustodial databases so the parties can meet and confer

18  and make sure meaningful searches are actually being run,

19  that would also be incredibly helpful.

20          THE COURT:  All right.  Thank you.

21          MS. POLLOCK:  Thank you.

22          THE COURT:  And how about as to issue five?

23          MS. POLLOCK:  Issue five is actually related.  We

24  now have dates for two of the three deponents.  We're still

25  waiting on a -- a deposition date for Mr. Shree Santhenam

21

1  (phonetic).  We understand that Apple will soon be providing

2  one, but we're a little concerned given how long this has

3  dragged on.  But, again, the big ask here is we really do

4  need these custodial productions to be coming before we can

5  take these depositions so that we're not going to have to

6  come back again in front of you and say we thought we took

7  the deposition, then we got thousands of their documents, so

8  we need this to come back.

9           THE COURT:  And I know that these -- the documents

10  and the depositions are connected with each other.  But,

11  ideally, when do you want to take the Searny (phonetic) and

12  Santhenam depositions?

13           MS. POLLOCK:  The second half of April would be

14  great.

15           THE COURT:  All right.  So, you're not asking for

16  the depositions to be this week?

17           MS. POLLOCK:  No, your Honor.  We just need some

18  real dates.

19           THE COURT:  All right.  And are there any other

20  events that need to take place from your perspective before

21  those depositions other than the documents.  Is it

22  contingent upon something else happening first?

23           MS. POLLOCK:  No, your Honor.

24           THE COURT:  So, from your perspective, you could

25  get those scheduled today?

1          MS. POLLOCK:  That's correct.

2          THE COURT:  All right.  Thank you very much.

3 Anything else that you're seeking that's not in the proposed

4 orders that you haven't specified here?

5          MS. POLLOCK:  That's all, your Honor.

6          THE COURT:  Very good.  Thank you.

7          MS. POLLOCK:  Thank you very much, your Honor.

8          THE COURT:  All right.  Let me get Apple's

9 perspective on those two, and then we'll come back around to

10 Apple's request.

11          MS. ANGUEIRA:  Unless your Honor prefers we start

12 with Rivos issue five, I'll start with Rivos issue one.

13          THE COURT:  Let's go back to issue -- issue one.

14 Go ahead.

15          MS. ANGUEIRA:  Okay.  Apple's position is that

16 Rivos should be denied any relief on this issue and would

17 like to start off by noting the updated volume of Apple's

18 productions to date, which is over -- just over 1300

19 documents and just over 6700 pages.

20     But more importantly is that Rivos' page-for-page

21 comparison of the parties' production is misleading.  Rivos'

22 production to date consists almost entirely of documents

23 that were generated in response to searches for Apple

24 confidential documents that were taken by Defendants.  And,

25 as your Honor remembers, we had to move to compel those

1 documents to be produced.

2     In addition to those, there's less than a dozen unique

3 documents that Defendants have produced, which include seven

4 offer letters, an organizational chart, and 236 versions of

5 a Rivos new-hire document.

6     Apple's production in comparison is substantively more

7 comprehensive.  You heard about a couple of categories of

8 documents that Apple has produced thus far, but there are

9 others that are important to note.

10     Apple has produced offer letters and known employment

11 agreements between Apple and the named Defendants, departing

12 employee checklists that were signed by named Defendants

13 during the exit interviews, documents and communications

14 relating to the forensic investigation of Mr. Kaithamana and

15 his settlement from this action, communications that former

16 employees had regarding Rivos, documents and communications

17 evidencing former Apple employees' use of encrypted

18 communication platforms to communicate with and about Rivos,

19 documents and communications that refer to individuals'

20 retention of Apple confidential documents, documents and

21 communications related to Apple's efforts to retain

22 individuals interested in departing to Rivos, and various

23 Apple policies regarding Apple's information security,

24 employees' use of electronic systems and communications,

25 policies regarding workplace searches for confidentiality

1 and employee use of electronic devices and communications,

2 and documents and communication related to former employees'

3 departure to Rivos and their exiting of Rivos.

4     Since the filing of this joint statement, Defendants

5 have also accepted Apple -- Apple's offer to produce

6 forensic images of devices that were collected from 42

7 former Apple employees who went to Rivos under terms that

8 Defendants would pay for the cost of the analysis, and they

9 actually intend to analyze those devices.

10     Apple has also agreed to produce the employee

11 agreements and offer letters for other individuals who

12 received a letter from Morrison and Foerster at the start of

13 this suit, and we intend to do so.  There --

14          THE COURT:  And -- and when -- you know, they've

15 asked for a 30-day deadline for substantial completion.  So,

16 helpful for me to know is if you're committing to certain

17 things, is it going to be within that 30-day period?  Is it

18 something you can't do within 30 days?

19          MS. ANGUEIRA:  It's our intention because we -- we

20 made an agreement with the parties about those to produce

21 those within 10 days --

22          THE COURT:  Thank you.

23          MS. ANGUEIRA:  -- of today.  It's also important

24 to note that there are several glaring issues with

25 Defendant's production to date that call into question this

25

1   document-for-document comparison.

2          THE COURT:  Well, I'm not making a document-for-

3   document comparison.  So, you can help me by telling me why

4   can't and why shouldn't I order Apple to -- to do what

5   they're asking for, and maybe it's got two parts.  One is

6   the -- the three-day period to share more about custodians

7   and search terms and a 30-day period for substantial

8   completion.  Why shouldn't I order that?

9          MS. ANGUEIRA:  We think to the extent your Honor

10  does order a date for substantial completion, it should be

11  mutual, which Defendants have already indicated to us that

12  they don't want to agree to.

13     Apple has been operating in good faith to produce

14  responsive documents as promptly as possible, and we don't

15  think that setting a substantial completion deadline at this

16  point is necessary.

17     With respect to search terms, the parties are meeting

18  and conferring over an ESI protocol and intend to, you know,

19  continue moving that forward.  So, at this point, we don't

20  see a need for the Court to intervene there as well.

21          THE COURT:  Well, you've got a June 30th discovery

22  cutoff of everything.  So, seems like we're getting in the

23  period where substantial completion of document production,

24  it's time if you're going to have some more discovery

25  default on that, and this is in both directions, of course,

26

1  to complete the depositions and to figure out what follow

2  ups on the documents you need to make.  We'd be getting to

3  that phase very -- very soon.  That's just an observation.

4       All right.  Thank you.

5       And, turning to issue five, what's -- what should we

6  wait on in setting those depositions?

7            MS. ANGUEIRA:  So, Mr. Murray's deposition has

8  been set.  Ms. Searny's deposition, we've offered now four

9  full days and two half days, and we're waiting to hear from

10  counsel about which dates that they'll accept.  With respect

11  to Mr. Santhenam, we're working on securing his date for the

12  deposition.  He's a very high ranking executive.  He's one

13  step removed from reporting to Mr. Cook, and his schedule is

14  just difficult, and we're doing everything we can.  We are

15  intending to produce him for deposition as soon as possible

16  and report back with a date.

17       On the issue of custodial documents, we are working to

18  produce those.  We also refute that they have made custodial

19  document -- completed custodial document productions within

20  a week of the deposition, from Mr. Rajamani's deposition

21  that just happened.  Tens of thousands of documents were

22  produced a weekend before his deposition, which was on a

23  Tuesday.  Nonetheless, we're working in good faith to

24  produce those documents promptly so as not to delay those

25  depositions if they are trying to wait for those documents

27

1  to be produced to take them.

2         THE COURT:  All right.  Coming back one topic or

3  two topics, you've told me you're working on ESI protocol.

4  So, I know you're working on ESI protocol.  When will that

5  negotiation be completed?  Is that going to be within the

6  next week, in the next three days, the next 24 hours?  What

7  -- where are you in that process to say that's going to

8  be --

9         MS. ANGUEIRA:  I think the parties would need at

10  least a week.

11         THE COURT:  All right.  Thank you.  Anything else

12  that you wanted to say on those issues?

13         MS. ANGUEIRA:  I think that's it, your Honor.

14         THE COURT:  All right.  The part which I'm going

15  to defer for a moment is because of my interest in

16  reciprocity on document production and substantial

17  completion and ESI.  I want to hear about the Apple issues

18  going the other direction before I rule on Rivos' issues,

19  but my tentative view is that I am going to set deadlines

20  for these events, but I want to be mindful of it being fair

21  in both directions.  So, I'll do that at the end after I've

22  heard about Apple's request.

23      All right.  Thank you.

24      And let's flip over to Apple's request numbers one and

25  four.

1          MR. WILSON:  I'll be addressing our request number

2 four, our issue number four, and the good news is that I

3 think the parameters to the -- that are still in dispute

4 have been narrowed substantially.

5          THE COURT:  Okay.

6          MR. WILSON:  The issue I think that's left with

7 our -- our issue number one is whether Rivos will produce --

8 Rivos and the Defendants will produce images for all of the

9 devices that were collected by CTAC or whether they'll only

10 produce images for the devices on which they -- they say

11 that Apple information was found.  And our belief is that we

12 should be able to see all the (audio glitch) FTI, should

13 have access to all the images that were collected by CTAC,

14 because we'd like FTI to do some analysis of last access

15 dates, potential deletions, that sort of forensic analysis

16 that we otherwise wouldn't get if we're only provided with

17 the images for devices on which Apple information was found

18 according to their searches, and I think that's probably the

19 simplest way to state the dispute.

20     The only other point I'd make here is there's no real

21 burden here.  There's, I guess, a bit of a logistical

22 burden, but the images have been collected.  They're in

23 existence apparently.  So, we're not asking them to go out

24 and do an additional collection or creation of images or

25 anything like that.  We're asking for things that CTAC

1 already has, at least according to what we've been told.

2         THE COURT:  All right.  And is there a timing

3 aspect of what you're asking for, Mr. Wilson?

4         MR. WILSON:  As with everything, you know, the

5 sooner the better, but we don't have a critical specific

6 date.

7         THE COURT:  All right.  And, just to back up to

8 relevance and proportionality, you know, why is Apple

9 entitled to this information?

10         MR. WILSON:  Well, it's because of what I said at

11 the very beginning, which is that every time we look at

12 something, we're finding more evidence that Apple

13 information was retained and used, and, in fact, in several

14 instances we know that -- that Apple information was

15 deleted, and we'd like to be able to have a forensic

16 analysis done to see if, in fact, information (a) was

17 deleted and (b) if it was, whether it can be retrieved.

18 That's really the primary thing.  It's the -- it's the

19 forensics investigation that can reveal new information

20 because, as I said, we've found -- when we've looked, we've

21 found things.

22         THE COURT:  I'll hear from them in a moment, but

23 assuming that they contest what you've said at the beginning

24 and now, how do I resolve that?

25         MR. WILSON:  I think you order it to be produced

1  -- order this information to be produced to FTI, which is

2  the neutral consultant.

3          THE COURT:  All right.  Thank you very much.

4          MR. WILSON:  And on issue number four --

5          THE COURT:  Yeah.

6          MR. WILSON:  -- if you want to move on to that

7  one --

8          THE COURT:  I would like to hear both of them.

9          MR. WILSON:  -- Mr. Mallory will address that one.

10         THE COURT:  Thank you.

11         MR. MALLORY:  Good afternoon, your Honor.  Before

12 I begin, if I could, I'd like to go back to the issue of a

13 date for substantial completion.

14         THE COURT:  Go right ahead.

15         MR. MALLORY:  And we're willing to offer one of --

16 of May 19, if it's mutual.  We think, as you noted, there --

17 the fact that discovery cutoff is at the end of June and a

18 mutual date for substantial completion makes sense for both

19 parties.  So, we would propose May 19, and -- and I just

20 talked to an Apple representative.  We can meet that.

21         THE COURT:  Thank you for that suggestion.  And if

22 I did impose a May 19th substantial completion date in both

23 directions, any interim things that would help you to --

24 collectively to get to that guidepost?

25         MR. MALLORY:  The one thing I would say is that

1  we're not going to sandbag.  It's not our intention to --

2  just to delay production until May 19.  We are making

3  rolling productions.  So, we -- that's what I would say.

4  And I hope that Defendants would agree to the same.

5        THE COURT:  All right.  Thank you.  I'll get their

6  reply on that suggested date in a moment.

7     Go ahead with Apple issue four.

8        MR. WILSON:  Okay.  Apple issue four is really in

9  two buckets.  The first bucket has to do with subpoenas, and

10 these are subpoenas to -- that we served on 13 former Apple

11 employees.  We've made some progress with Defendants, but

12 there's still some issues here.  So, I'll explain what

13 progress we've made, but first I'll give some context if

14 that's okay.

15       THE COURT:  Um-hmm.

16       MR. WILSON:  The context here is back in April

17 2022, we sent these 13 employees letters, and we asked, Do

18 you have any Apple confidential information still?  And, if

19 you do, could you please return it, and could you let us

20 know what it is?  And none of them responded.  So, that --

21 that's why we served the subpoenas, because we didn't get

22 any response to those letters.

23    And, so, we also served the subpoenas because our

24 forensic expert did an investigation of these 13 employees

25 and found that they either had taken Apple confidential

1  information with them when they left Apple and/or they had

2  wiped their Apple devices before leaving Apple.  And Apple

3  has a departing employee checklist that says you cannot wipe

4  your Apple device before leaving Apple, and they all checked

5  the box that said we didn't do that, and then they signed

6  that checklist.

7      So -- so, that's why we subpoenaed these individuals.

8  Quinn says in the discovery report that this is a fishing

9  expedition, but what they don't say in the discovery report

10 is that these individuals don't have confidential documents.

11 So, Quinn represents them.  So, Quinn surely knows at this

12 point whether these 13 individuals have any Apple

13 confidential documents, but they don't say that -- they

14 don't say that employees don't in the discovery report.  So,

15 I think it's fair to presume that they do, in fact, have

16 Apple confidential documents.

17     So -- so, as to the progress I alluded to earlier,

18 Defendants have agreed to produce documents that hit on

19 Apple's search terms for these individuals.

20          THE COURT:  For all the 13 individuals?

21          MR. WILSON:  Yes.  So, the main dispute here is

22 that we would like the -- the images of these individuals'

23 devices produced here.  So, there's at least three reasons

24 for that.

25          THE COURT:  And how many devices are we talking

1  about?

2          MR. WILSON:  We don't know.  So, we know there's

3  13 employees, but we don't know how many devices.

4      The reasons that Apple's requesting that, there's at

5  least three.  One is -- is a metadata concern.  The issue

6  here is that in past productions of devices -- of documents

7  from other employees, the documents don't have last accessed

8  metadata.  So, they -- Quinn is unable to produce this or

9  unwilling to produce it.  So, the images would provide that

10 information.

11         THE COURT:  Well, go -- define for me what devices

12 that you're seeking to get images of.

13         MR. WILSON:  All the devices that they collected.

14         THE COURT:  That they collected?

15         MR. WILSON:  Yes.

16         THE COURT:  All right.  Thank you.  Keep going.

17         MR. WILSON:  So -- so, the issue is that a lot of

18 these devices are Mac devices, and Quinn tells us that

19 they're not able to produce metadata from Mac devices.  So,

20 one -- the most important field that we're missing is the

21 last accessed date, and that's obviously very critical here

22 because we want to know when these employees last accessed

23 the Apple confidential information date, because that's

24 evidence that they're using it at Rivos.

25      So, to -- to blunt that metadata issue, we -- we just

34

1  would like the images to be produced.

2      There's a second reason we would like images to be

3  produced.  Quinn has told us that they're only going to

4  produce documents if they hit on Apple search terms, but

5  there may be documents that don't hit on Apple search terms.

6  So, we -- we did our -- our best effort in making the search

7  terms, but, you know, we don't think that every single Apple

8  confidential document is going to hit on an Apple search

9  term.

10      So, yesterday I asked, I sent an email to Quinn and

11  said -- and asked, Well, if you know of an Apple

12  confidential document that's on an employee's device and it

13  doesn't hit on a search term, would you produce it?  And I

14  got no response.  So, that's another reason we'd like the

15  images, just to search for confidential documents that don't

16  hit on search terms.

17      And then a third reason that we want the images is to

18  look for files that the employees deleted.  So, we'd like to

19  search the blank space of the devices or the images of the

20  devices or documents that they deleted before turning them

21  in to CTAC.

22          THE COURT:  All right.

23          MR. WILSON:  There's a second bucket of issues

24  that's not related to the subpoenas.  It's related to Rivos

25  discovery.  So, the issue here is that Rivos is not agreeing

1 to search its own systems, its own network drive, personal

2 drives for the Rivos employees or their personal laptops

3 unless they're named Defendants.

4      So, for example, with respect to the 13 individuals we

5 subpoenaed, they're not -- Rivos is not agreeing to produce

6 -- to search for any documents for those 13 employees or any

7 other departed employees or to produce documents that they

8 find, and we think that that's within the scope of a

9 reasonable good faith investigation that Rivos should be

10 performing.

11          THE COURT:  All right.  So, bucket one is

12 subpoenas to the individual, 13 former employees.  Bucket

13 two is just Rivos itself searching for information about

14 those 13 employees?

15          MR. WILSON:  We'd actually ask that Rivos search

16 for all former Apple employees, including the 13 employees

17 we submitted.

18          THE COURT:  How many is that?

19          MR. WILSON:  It's -- it's dozens.  I don't have

20 the exact number.  And the reason we think this is

21 reasonable is that for every single employee that we've

22 received discovery from so far, they've all had Apple

23 confidential documents, every single one.  That's not

24 disputed.  And, with respect to these 13 employees we

25 subpoenaed, as I noted, there's no mention in the discovery

1 report that they don't have Apple confidential documents,

2 and I think it's fair to presume at this point that they do,

3 so that there's a pattern of these employees taking Apple

4 confidential documents, and it's not unusual for Rivos to

5 search its systems for all of them.

6          THE COURT:  All right.  Thank you.  Anything else?

7          MR. WILSON:  That's all, your Honor.

8          THE COURT:  All right.  Thank you.

9     Let me hear from Rivos on issues one and four.

10         MS. WANG:  Thank you, your Honor.  Maybe if it's

11 okay with you, I can start with Rivos issue number four

12 since it's top of mind.

13         THE COURT:  It is.  Go right ahead.

14         UNIDENTIFIED SPEAKER:  You know, since we're

15 giving some context, the context is that Apple sent those

16 letters to the employees on the very same day they initiated

17 a federal lawsuit against the employer.  I think the same

18 goes, you can't call something a war and be surprised when

19 people act as warriors.  So, it was Apple's decision not to

20 engage in informal discussions before they sued.  So, it's

21 really not evidence of any, you know, bad acts by anyone,

22 the fact that Apple has had to go through counsel to talk to

23 Rivos employees.

24     Second, Apple has represented that because they offered

25 evidence that some of these 13 employees deleted things,

1 that's somehow evidence of misappropriation.  I'm looking at

2 a checklist right now, and it -- that Apple uses in exit

3 interviews, and it says "Confirm you have returned or

4 destroyed all Apple confidential information."  So, the fact

5 that there may have been some deletion is hardly evidence of

6 misappropriation.

7      The third is this all feels moot because it is buried

8 in there that these individuals have already agreed to run

9 Apple's search terms.  They've already agreed to do that.

10 So, if there's Apple confidential information on their

11 devices, it's going to be turned over to Apple.

12      The issue is whether Apple should also have unfettered

13 access to the entirety of their devices, and there's simply

14 no reason that they should.  It is far outside the scope of

15 Apple's trade secrets and even to general standards of

16 relevancy.  The accusations that we haven't provided

17 metadata, false.  We provided all standard metadata.  Apple

18 came back and asked for more metadata that was specific --

19           THE COURT:  When you say "We provided," the

20 employees?

21           UNIDENTIFIED SPEAKER:  I apologize.  They were

22 talking about Rivos prior productions that didn't have all

23 the metadata.  Rivos has -- productions have 42 fields of

24 standard metadata.  The same cannot be said for Apple, but I

25 will refrain.  And when they've asked for more, we said FTI

1  can look for more.  So, that's --

2       THE COURT:  For the production to come of agreed

3  search terms, when will that -- for these 13 employees, when

4  will that production be made?

5       UNIDENTIFIED SPEAKER:  We're -- we're making

6  rolling production.  And, so, as Apple said, we're not

7  trying to sandbag anyone, as I think is evidenced by the 1.1

8  million pages of documents that we've already produced.  So,

9  those are on an ongoing basis.  But there's just no reason

10 to produce the entirety of the images which indisputably

11 contain private information that has no relevant information

12 to nonparties in this case.

13      THE COURT:  All right.  If I set a substantial

14 completion deadline that Defendants have requested of May

15 3rd or some other date, I would be inclined to set one going

16 in the other direction.  So, if I use May 3rd, will this

17 production be completed before then?  If not, should I make

18 it May 19th or some other date?

19      MS. POLLOCK:  Your Honor, May 3rd, May 19th, both

20 are fine.  I will say that we invited both parties to

21 discuss a substantial completion deadline.  Apple wasn't

22 interested.  To the extent they are now, fantastic.  They

23 can absolutely be mutual.  And, you know, either date would

24 work for Defendants.

25      THE COURT:  All right.  Speak to the second

1  bucket, which is broader than just the 13 employees.  You

2  described it as dozens, and this is now targeted to Rivos to

3  produce information about those former employees.

4       MS. ANGUEIRA:  Sure.  First, we really don't feel

5  like this issue is teed up.  The issue was about subpoenas

6  to Apple's former employees.  It was not about any discovery

7  propounded on Rivos.  If Defendants think that some specific

8  request was not responded to fully and completely, they can

9  raise that.  We can meet and confer and come to you if

10  there's any issues, but that's not what happened here.  And,

11  as this Court already ruled back in I think it was July, we

12  don't have custody and possession and control of every

13  device that our current employees use.  So, you know, the

14  subpoenas were directed at third parties.  It doesn't

15  implicate Rivos.  We don't think it's appropriate for Rivos

16  to be responding to them.

17       The other thing I will say is back in July, the Court

18  invited -- ordered Apple to produce its forensic information

19  related to former Apple employees who Apple believes

20  misappropriated something.

21       Apple produced as to six individual -- the six

22  individual Defendants and two former employees that Rivos

23  has agreed to provide discovery on.  The scores of other

24  employees are not part of this case, and Apple should not be

25  able to use the federal judiciary as its ad hac HR

40

1  department.  So, we think it highly inappropriate to be

2  expanding the scope of discovery in this case to people

3  where there's just been no evidence of any wrongdoing.

4          THE COURT:  All right.  Thank you.  Anything else

5  on issue four?

6          MS. ANGUEIRA:  Not on issue four.  Thank you.

7          THE COURT:  All right.  Then let's go back up to

8  issue one.

9          MS. POLLOCK:  On issue one, you know, we have

10 offered to provide to FTI images of all devices that were

11 used to store or transmit Apple confidential information.

12 There is no basis for any order that goes further than that.

13 Apple has never articulated why devices that were not used

14 to store or transmit Apple confidential information could be

15 relevant, and we just think that's the end of the inquiry.

16 Apple has given us a very broad set of search terms that we

17 have used throughout discovery to identify Apple

18 confidential information.  I would say that we strongly

19 dispute that documents that hit on those search terms are

20 necessarily Apple confidential information.  But,

21 nonetheless, we've been using them and reviewing every

22 single hit.  So, you know, there's no -- there's just no

23 reason that Apple should be able go to through devices that

24 have no connection to Apple information.

25     Apple has said, Oh, well, we need to look at last

1   access dates, deletion dates.  Because of what?  If they
2   never had Apple information on them, what are we looking
3   for?  You know, they had no right to look for deletions if
4   they can't connect to Apple information in the first
5   instance.
6        So, we would -- we believe that issue number one is
7   properly mooted by the agreement -- or by the offer that
8   Defendants have already provided.
9            THE COURT:  All right.  Thank you.  Anything else?
10           MR. WILSON:  Your Honor, can I respond to --
11           THE COURT:  You may.
12           MR. WILSON:  I'd like to respond on our issue
13   number four to several things that she just mentioned.  One
14   is that they told you that they're producing standard
15   metadata, but it's simply not standard metadata for Apple
16   computers.  It is missing fields that tell us last accessed,
17   and they've told us -- Quinn has told us in the past that
18   they will produce it, but they never have.  So, we've been
19   in multiple depositions where we have incomplete metadata
20   which they say is standard but doesn't have the absolutely
21   most important metadata of all, which is when the files were
22   last accessed.  So, it's clear that they are unwilling or
23   unable to produce this, and that is a very fundamental
24   reason that we need the images and not just files.
25       You asked I heard about an H -- HWT checklist, and I

42

1  have it here.  I don't know if it would help if I -- if I

2  provide it as an exhibit, but I can read to you what it

3  says.  It says:

4                     "Confirm you have returned all

5             Apple owned devices and have not wiped

6             any AOU."

7       And AOU is Apple owned devices.  So, every employee

8  that we subpoenaed checked a box that says, I have not wiped

9  any AOU, and then they signed --

10            THE COURT:  Is it AOU or AOD?

11            MR. WILSON:  It's AOU is what it says here.  And

12  if it would help, I can provide this.  Just let me know.

13            THE COURT:  I think I've already got more than

14  enough paperwork.  So, no thanks.

15            MR. WILSON:  Understood.  So -- so, there is

16  reason to believe that -- there is reason for suspicion, and

17  what you didn't hear -- again, I prompted this.  I said they

18  could come up here and tell you that these 13 employees

19  don't have Apple confidential information, and you didn't

20  hear that.  So, again, I think it's safe to presume that --

21  that they all do.

22       You also heard that with respect to bucket two, that

23  this issue is not teed up.  I can -- I don't know how -- I

24  don't know how counsel could possibly say that.  On page 25

25  of the discovery report, we say:

43

1          "Apple asks further that Rivos be

2          required to search the Rivos issued

3          laptops and personal directories on the

4          Rivos network of Apple's former

5          employees."

6     Before this hearing, I showed that to counsel for

7 Quinn, and, nonetheless, she came in and said that this was

8 not teed up.

9     Also page 28 -- not page 28 -- page 27, same thing.  In

10 addition, Apple asked that Rivos be required to search for

11 and produce responsive documents that are within its

12 possession, custody or control from all the former Apple

13 employees.

14     So, this notion that bucket number two wasn't part of

15 the discovery report is just not true.

16     Also, on the date for substantial completion, you heard

17 a misstatement that all along Defendants have been proposing

18 a date for substantial completion and we wouldn't agree.  It

19 was actually me personally on a meet and confer who

20 suggested a mutual date for substantial completion, and it's

21 actually Defendants who never agreed.

22          THE COURT:  All right.  Thank you.

23     Picking up where you left off, substantial completion

24 and having a date for that, I'm going to set a mutual date

25 of May 12th.  That's between your dates, a little closer to

1  May 19, May 12th for a substantial completion date.  To get

2  there, I know you've been talking about ESI protocols.

3  Seems like getting that resolved is going to be an important

4  next step, and I think I'm preaching to the choir on that,

5  but I want to make sure that gets done, because if we get to

6  May 11th and you still don't have an ESI protocol, then it

7  makes the likelihood of having completion by May 12th

8  extremely unlikely in my experience.

9       So, I'd like you to keep working on the ESI protocol

10 until -- I have in mind just to have you let me know a week

11 from now that that's done or if you aren't done with it,

12 what the hangup is so I can help you if you need help.  I'm

13 hoping you won't need help, but I want to make sure that

14 part gets completed so you're moving along.

15      So, the date I have in mind is for you to complete your

16 ESI protocol by April 10th, and you're working on other

17 things.  I'm not trying to make work for you, but what I'm

18 thinking is we set a further discovery conference for April

19 17th.  That's two weeks from today, 11:00 a.m., same place.

20 And you report to me by the 14th at noon, which is Friday,

21 if you have things to discuss, kind of what your status is,

22 what the agenda would be for April 17th or if you tell me

23 everything's resolved and you're on track, then we can

24 vacate the 17th and just know that you're progressing on.

25      And I don't want 63 more pages.  I'll cap you at 10

1  pages total for your discovery update on the 14th.  But let

2  me check to see if you think that will be more helpful or

3  harmful as far as giving you more work to do with the

4  intention of just keeping you on schedule to -- to the

5  completion date.

6          MR. WILSON:  We think it would be very helpful,

7  and we appreciate the Court's effort on this.

8          THE COURT:  All right.  Thank you.

9          MR. EISEMAN:  It's fine by us, your Honor.  And,

10 just so we clarify, 10 pages total from the two parties?

11         THE COURT:  By my quack math, that will be five

12 pages -- five pages per side but 10 pages total for the

13 update.

14     And -- all right.  So, I'm going to resolve the others

15 in writing, and I'll do that today so you won't be -- it

16 won't be any mysterious question about it, but the date I

17 will set for substantial completion as May 12th and April

18 14th at noon for the update, and April 10th for you to

19 conclude the (indiscernible) part.

20         MR. EISEMAN:  Ms. Pollock just asked me a very

21 good question.

22         THE COURT:  Yeah.

23         MR. EISEMAN:  On the reports we put in, are those

24 new issues or are we supposed to be reporting on what we've

25 been addressing?

46

1          THE COURT:  Well, you don't need to report on
2   anything -- I mean, the resolved issues, no.  I don't care
3   about the past, but if you have new issues unresolved,
4   that's where I want to focus.  You know, anything I can help
5   you with, tell me how I can help you.  And, as you did here,
6   getting it issue by issue is very helpful so that I can
7   track along what your disputes are.
8        Very good.  Thank you for your time today, and I'll
9   have a written order coming on the few disputed ones, and
10  thank you again for the many issues you were able to work
11  out.  Have a great day.  We're in recess.
12        (Proceedings concluded at 12:40 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

47

CERTIFICATE OF TRANSCRIBER

1

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties to the action

11   in which this hearing was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15

16            Echo Reporting, Inc., Transcriber

17                 Friday, April 7, 2023

18

19

20

21

22

23

24

25