1  BRYAN WILSON (CA SBN 138842)
   BWilson@mofo.com
2  KENNETH A. KUWAYTI (CA SBN 145384)
   KKuwayti@mofo.com
3  MORRISON & FOERSTER LLP
   755 Page Mill Road
4  Palo Alto, California 94304-1018
   Telephone: 650.813.5600
5  Facsimile: 650.494.0792

6  ARTURO J. GONZALEZ (CA SBN 121490)
   AGonzalez@mofo.com
7  MEREDITH L. ANGUEIRA (CA SBN 333222)
   MAngueira@mofo.com
8  MORRISON & FOERSTER LLP
   425 Market Street
9  San Francisco, California 94105-2482
   Telephone: 415.268.7000
10 Facsimile: 415.268.7522

11 MARY PRENDERGAST (CA SBN 272737)
   MPrendergast@mofo.com
12 MORRISON & FOERSTER LLP
   2100 L Street, NW, Suite 900
13 Washington, District of Columbia 20037
   Telephone: 202.887.1500
14 Facsimile: 202.887.0763

15 Attorneys for Plaintiff
   APPLE INC.

16

17                UNITED STATES DISTRICT COURT

18               NORTHERN DISTRICT OF CALIFORNIA

19                     SAN JOSE DIVISION

20

21 APPLE INC., a California corporation,         Case No. 5:22-cv-2637-PCP-NMC

22              Plaintiff,                        **THIRD AMENDED COMPLAINT**

23       v.                                       **(1)   Breach of Contract**

24 RIVOS INC., a Delaware corporation; WEN        **(2)   Violation of the Defend Trade Secrets
   SHIH-CHIEH a/k/a RICKY WEN; JIM                       Act (18 U.S.C. § 1836 *et seq.*)**
25 HARDAGE; WEIDONG YE; LAURENT
   PINOT; PRABHU RAJAMANI; and KAI               **DEMAND FOR JURY TRIAL**
26 WANG,

27              Defendants.

28

Plaintiff Apple Inc. ("Apple") brings this Third Amended Complaint against Defendant Rivos Inc. ("Rivos") and current Rivos employees Wen Shih-Chieh a/k/a Ricky Wen, Jim Hardage, Weidong Ye, Laurent Pinot, Prabhu Rajamani, and Kai Wang (together, the "Individual Defendants") (collectively, "Defendants") and alleges as follows:

**INTRODUCTION**

1.     Apple brings this action to stop Rivos and its employees from exploiting Apple's most valuable trade secrets to compete with Apple unlawfully and unfairly.  When Apple filed its original Complaint on April 29, 2022, forensic evidence from former Apple employees' Apple-issued computers already made clear that former Apple employees retained substantial volumes of Apple's trade secret information when they joined Rivos.  Now, preliminary discovery has confirmed that Apple's trade secret information has found its way in substantial volumes into Rivos's systems and devices.  Apple's trade secrets have also been used by Rivos's employees in connection with their Rivos work designing systems-on-chips ("SoCs").  And they have been left accessible to Rivos's employees for months or even over a year since their departure from Apple, and for many months after this lawsuit was filed.  Rivos employees talk openly about Apple SoCs during the course of their work at Rivos, and one employee admitted that it was "not taboo" to do so, even after this lawsuit was filed.  The extent of misappropriation by Rivos and its employees is alarming.

2.     Apple's cutting-edge SoC designs, including its M-Series and A-Series SoCs, have revolutionized the personal and mobile computing worlds.  Apple has devoted billions of dollars and more than a decade of effort to develop the proprietary technologies and expertise necessary to engineer these revolutionary SoC designs and become a leader in the field of semiconductor design.

3.     "Stealth mode" startup Rivos was founded to design and market its own competing SoCs.  Rivos claims, through its CEO, that it has "no interest in relying on Apple information as Rivos builds its business."  But Rivos's actions say otherwise.  Since its inception, it has filled out its ranks with over 50 former Apple engineers.   Starting in June 2021, Rivos began a coordinated campaign to target Apple employees with access to Apple proprietary and trade secret

1    information about Apple's SoC designs.  This campaign has resulted in at least eleven different

2    employees retaining Apple's confidential and trade secret information when leaving Apple, on

3    contravention of their employment agreements.  In many cases, the information was placed onto

4    Rivos-issued devices and Rivos systems and/or used for their Rivos work.

5         4.    After accepting their offers from Rivos, some employees took gigabytes of

6    sensitive SoC specifications and design files during their last days of employment with Apple.

7    Some used multiple USB storage drives to offload material to personal devices, accessed Apple's

8    most proprietary specifications stored within collaboration applications, and used AirDrop to

9    transfer files to personal devices.  Others saved many presentations on existing and unreleased

10   Apple SoCs—marked "Apple Proprietary and Confidential"—to their personal cloud storage

11   drives.  Some even made full backups of their entire Apple devices onto personal external drives.

12   And at least nine of the employees wiped their Apple devices entirely.  Even more of the

13   employees selectively deleted information from their Apple devices.

14        5.    Ricky Wen intentionally identified and retained thousands of sensitive Apple SoC

15   documents, including highly confidential chip specifications and source code before leaving

16   Apple.  He did so by deliberately connecting multiple external hard drives to download numerous

17   Apple proprietary and trade secret SoC design files and copying hundreds of gigabytes of data

18   onto at least one of the drives, knowing full well that it included sensitive Apple information.

19   Mr. Wen understood that his retention of these documents after leaving Apple was improper, as

20   evidenced by the fact that he apparently tried to delete some of the sensitive files.  Mr. Wen also

21   placed Apple's confidential information onto Rivos systems, including his Rivos-issued laptop,

22   his Rivos email account, and his directory on Rivos's internal network.  He also kept hundreds of

23   confidential Apple documents in folders on his Rivos-laptop and the Rivos internal network that

24   he titled "AAPL" and "Rivos_Work."  Mr. Wen knew that he had retained Apple confidential

25   information and deleted a folder containing many of those files after the lawsuit was filed,

26   destroying metadata that would have shown whether the Apple files were transferred or accessed.

27        6.    Jim Hardage specifically identified and retained 37 gigabytes of data on two USB

28   drives taken from, among other places, an internal Apple engineering system provided for his

work on SoC design.  At the time he retained the data, Mr. Hardage was aware of the substantial

likelihood that he had retained Apple confidential information regarding SoC design.  In fact,

Mr. Hardage retained many highly sensitive files describing the function and design of Apple

SoCs, including source code.  After joining Rivos, Mr. Hardage repeatedly accessed the USB

drives, including to transfer information onto his Rivos-issued devices and storage.  He also

discussed proprietary and confidential features of Apple SoCs with other Rivos employees in

connection with his work at Rivos and brazenly told another former Apple employee that ██

██████████████████████████████████████████████████████████████.

7.      Weidong Ye saved multiple Apple source code repositories to his iCloud Drive, to

which he retained access for much of his employment at Rivos.  The code that Mr. Ye improperly

retained, in violation of his employment agreements with Apple, made its way onto Mr. Ye's

personal devices, including his MacBook, iPhone, and iCloud Drive, all of which he could access

while working at Rivos.

8.      Laurent Pinot kept hundreds of sensitive Apple SoC documents on his personal

laptop, many of which were clearly marked "Apple Proprietary & Confidential."  In at least one

instance, Mr. Pinot intentionally retained a copy of an Apple document ███████████████

██████████████████████████████████████████.  And after

joining Rivos, he did, in fact, review that document multiple times.  He also accessed multiple

other Apple SoC documents while a Rivos employee.  In addition, Mr. Pinot kept personal

backups of his Apple-issued computer and other files that he deliberately retained on a Time

Capsule external storage device.  Even though he knew that this was improper, he did not return

the device before leaving Apple; instead, he backed up his Apple laptop one more time on his last

day.

9.      Prabhu Rajamani, shortly before leaving Apple, accessed Apple's internal

technical database before attempting to obscure records of his access and browsing history.  On

the same day, he disconnected his iCloud Drive from his Apple-issued laptop, retaining Apple

confidential information that was previously synced to the iCloud Drive.  He also connected a

USB drive to his Apple-issued laptop and used AirDrop to copy at least four code files to himself.

1   Mr. Rajamani admits that ███████████████████████████████████████████
2   ███████████████.   After joining Rivos, Mr. Rajamani ███████████████████
3   ███████████████████████████████████████████████████████████████████
4   ██████████████████████.

10.     Kai Wang retained Apple confidential documents on his personal iCloud Drive, to which he maintained access after leaving Apple.  These retained files included numerous screenshots of sensitive Apple information, ranging from portions of source code to specification documents clearly stamped "Apple Registered Confidential – Do Not Distribute."  Many of the other files he retained on the iCloud Drive also included or described trade secret and confidential components of Apple projects.

11.     Each of the Individual Defendants and Rivos had multiple opportunities to explain their actions to Apple and to return the documents they had taken.  They did not do so, and instead continued to conceal their actions.  It is clear that the above Rivos employees have each, in violation of their employment agreements with Apple, retained, accessed, or used Apple's SoC trade secrets and/or confidential information.

12.     Rivos has long been aware of former Apple employees' contractual obligation to return all confidential information to Apple.  Yet Rivos has interfered with the employees' ability to do so.  There has been steadily growing evidence that Apple's confidential information has been used for the design of Rivos SoCs and was transferred to employees' Rivos laptops and Rivos's internal systems, in addition to proliferating throughout employees' personal devices and drives.  In most cases, this was due to knowing and intentional steps taken by Rivos's employees.  Nevertheless, Rivos has sought to block Apple from learning the full extent of its and its employees' misappropriation.  Meanwhile, those same employees continued to have access to the Apple confidential information they improperly retained, in some cases for nearly a year after this lawsuit was filed and Apple asked for its return.

13.     In fact, Rivos employees have openly discussed, considered, and used Apple's trade secret information in the course of their Rivos work designing SoCs.  For example, Rivos employees have used confidential information relating to Apple SoCs and referenced specific

Apple SoC projects by code name in the course of designing Rivos SoCs.  They have also relied on Apple's proprietary CAD design environment when implementing their own design environment, ███████████████████████████████████████████████████████████ ████████████████████████.  And they have incorporated Apple's trade secrets into Rivos SoCs. Indeed, Rivos's ████████████████████████ suggests that it has been making use of Apple's trade secrets and confidential information.

## JURISDICTION, VENUE, AND PARTIES

14.     This Court has original jurisdiction of the asserted federal law claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and under federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1357 because it is part of the same case or controversy.

15.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c), because Apple resides in this District and Individual Defendants, all former Apple employees, have signed an Intellectual Property Agreement, "consent[ed] to personal jurisdiction of and venue in the state and federal courts within Santa Clara County, California" and agreed that any "judicial action between the parties relating to this Agreement will take place in Santa Clara County, California."[1] Individual Defendants Ricky Wen, Weidong Ye, Laurent Pinot, and Prabhu Rajamani also committed the wrongful acts within this District.

16.     Apple is and at all times mentioned herein has been a California corporation, having its principal place of business at One Apple Park Way, Cupertino, California 95014.

17.     Defendant Rivos is and at all times mentioned herein has been a Delaware corporation, having its principal place of business at 2811 Mission College Blvd, 7th Floor, Santa Clara, California, 95054-1884.  Rivos currently employs each of the Individual Defendants, as

---

[1] Ex. A, Apple Intellectual Property Agreement (executed by Ricky Wen) ("Wen IPA") § 6.0(b); Ex. B, Apple Intellectual Property Agreement (executed by Weidong Ye) ("Ye IPA") § VI.B; Ex. C, Apple Intellectual Property Agreement (executed by Laurent Pinot) ("Pinot IPA") § 6.0(b); Ex. D, Apple Intellectual Property Agreement (executed by Prabhu Rajamani) ("Rajamani IPA") § 6.0(b); Ex. E, Apple Intellectual Property Agreement (executed by Jim Hardage) ("Hardage IPA") § 6.0(b); Ex. F, Apple Intellectual Property Agreement (executed by Kai Wang) ("Wang IPA") § VI.B.

well as numerous other former employees of Apple, many of whom were formerly employed by Apple in this District.  At least some of these former employees perform their work for Rivos within this District.  Rivos's intended business will derive substantial revenue from sales within this District.

18.     Defendant Ricky Wen resides in San Jose, California.  He is currently employed at Rivos as a "Principal Member of Technical Staff," with a focus generally on "Hardware Engineering."  He was a CPU design engineer employed by Apple and worked at Apple's facilities in Cupertino, California, until August 6, 2021, including when the events described in this Complaint occurred.  Like the other Individual Defendants, Mr. Wen signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

19.     Defendant Jim Hardage resides in Austin, Texas.  He is a "CPU RTL Architect" at Rivos.  He was a FE Engineer 5 employed by Apple and worked at Apple's facilities in Austin, Texas until October 21, 2021, in coordination with other Apple employees, in Apple's facilities in Cupertino, California, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Hardage signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

20.     Defendant Weidong Ye resides in San Jose, California.  He is currently employed at Rivos as a "Member of Technical Staff."  He was a Systems Power & Performance Engineer employed by Apple and worked at Apple's facilities in Cupertino, California, until June 10, 2022, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Ye signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

21.     Defendant Laurent Pinot resides in Los Gatos, California.  He works on "Physical Design" at Rivos.  He was a Physical Design Manager employed by Apple and worked at Apple's facilities in Cupertino, California, until August 23, 2021, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Pinot signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

22. Defendant Prabhu Rajamani resides in San Jose, California.  He works as a "Hardware Engineer" at Rivos.  He was a Power Engineer 5 employed by Apple and worked at Apple's facilities in Cupertino, California, until October 19, 2021, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Rajamani signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

23. Defendant Kai Wang resides in Austin, Texas.  He was a Performance and Modeling Engineer 3 employed by Apple and worked at Apple's facilities in Austin, Texas, until February 10, 2022, in coordination with other Apple employees, in Apple's facilities in Cupertino, California, including when facts underlying this Complaint occurred.  Like the other Individual Defendants, Mr. Wang signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

**BACKGROUND**

24. Founded in 1976, Apple is a world-renowned technology company and global leader in consumer electronics, mobile communications, and computing.  It designs, manufactures, and markets smartphones, personal computers, tablets, wearables, and accessories, and sells a variety of related services.  Apple's success and ability to compete successfully depend heavily upon its ability to ensure a continual and timely flow of competitive products, services, and technologies to the marketplace.  Apple continues to develop new technologies to enhance existing products and services, and to expand the range of its offerings through, among other avenues, its significant investments in research and development.

25. One key aspect of Apple's newest cutting-edge products is its use of highly advanced SoCs, which Apple custom designs.  SoCs are integrated circuits that contain, in a single chip, multiple processing components, such as one or more central processing units (CPUs), graphics processing units (GPUs), cache memories, and specialized processors.  Apple custom designs its own processing components and integrates them together in SoC designs that reduce the area footprint of the chips and achieve tighter component integration compared to traditional computer systems.  Apple's SoCs allow for faster, more efficient, and more powerful

computing.  Apple's unique designs and architecture are critical to its competitive edge in the marketplace.  Apple's first ARM-based SoCs for laptop and desktop computers, the M1 chip family, were released in November 2020 to great success.  The M1 family has now expanded to include the M1 Pro, M1 Max, and M1 Ultra chips.

26.     The M1 chip is the first personal computer chip built using cutting-edge 5-nanometer process technology.  It features a unified memory architecture for dramatically improved performance and efficiency.  At the time it was released, it featured among the world's fastest CPU cores in low-power silicon, best CPU performance per watt, and fastest integrated graphics in a personal computer, while boasting breakthrough machine learning performance.  The M1 Pro, Max, and Ultra chips have only extended Apple's lead in performance, custom technologies, and power efficiency.

**A.     SoC Design**

27.     SoC design is complex and challenging, and requires considerable expertise and experience.  Instruction Set Architectures (ISAs) define processor instructions that perform various processing functions (e.g., accessing memory, comparing data, and arithmetic).  ISAs are implemented through physical processor components that execute an ISA's various instructions.  Designing SoC chips based on an ISA involves developing abstract models for these physical components that act as the interface between the SoC and the software.  Chip designers use these abstract models to design the physical structure of SoCs.

28.     Some modern ISAs utilize the popular reduced instruction set computer (RISC) architecture design.  RISC-based ISAs focus on creating a relatively small set of simple, commonly used instructions for carrying out processor functions to run typical programs.  These simple instructions require less physical hardware to execute and can be combined to accomplish more complex functions.

29.     Arm Ltd. develops leading RISC-based architectures for SoCs.  Arm Ltd.'s proprietary "Advanced RISC Machine," or "ARM," architectures are licensed to its customers, which include Apple, and are used in some of the most advanced SoCs in the world, such as Apple's M1 SoC.

### B.     Apple's Innovative SoC Designs

30.     Apple has developed a number of highly successful, groundbreaking ARM-based SoCs.  Apple's SoC research, development, and manufacturing are led by teams of Apple engineers.  In particular, Apple's Silicon Engineering Group (SEG), made up of hundreds of engineers, works with Apple's hardware division to develop, among other things, its ARM technology, chip designs, and other elements of Apple's SoC business.  A final SoC chip specification often results from the coordinated efforts of Apple's SEG engineers over several years.  During that time, Apple's SEG engineers produce and utilize Apple's most closely guarded proprietary and trade secret SoC information, including SoC designs, component designs, chip specifications, materials describing the development and testing of SoCs, customized ISA instructions, source code for products incorporating Apple's SoCs, and other Apple-developed know-how gained from years of developing advanced SoCs.

31.     The iterative nature of Apple's SoC design process contributes substantially to the value of its technology.  Because each successive SoC generation builds on what Apple engineers learned from developing previous generations of SoCs, the past design information is extremely valuable.  Apple dedicates billions of dollars each year to this critical work.  Apple's SoCs are thus some of the company's most sensitive and critical projects.

32.     Since 2010, Apple has designed and developed more than a dozen high-performance SoCs for use in Apple's flagship iPad and iPhone projects.  Recent work includes the A15 SoC at the heart of Apple's latest iPhones and the M1 family of SoCs that power Apple's desktops, laptops, and high-performance iPads.  Apple develops and writes source code for custom software and operating systems to run on its products that incorporate its SoCs.

33.     The cutting-edge Apple technology at issue also includes Apple's unreleased or unannounced SoC projects.  Apple's proprietary and confidential information relating to these projects may be the most sensitive of all, because it concerns new features and developmental approaches into which Apple has invested time and resources, and even the existence of which has yet to be revealed to the public.  These projects thus not only embody some of Apple's most valuable and sensitive technology, but also its highly confidential business plans.

### C.     The Value of Apple's Trade Secret SoC Information to Competitors

34.     As noted above, Apple's trade secret SoC information reflects the cumulative work of hundreds of engineers over more than a decade—work that has continued to build on itself to ensure that Apple's SoC designs and implementation remain well ahead of the rest of the market.  Apple's SoCs are years and generations ahead of those of competitors.  Therefore, were it to obtain access to even part of Apple's trade secret SoC information, a competitor would get a significant head start in creating custom SoCs and more quickly compete with Apple's current SoCs.  Information about current designs and even designs several years old are thus extremely valuable to Apple.

35.     Competitors like Rivos, a recent startup with no institutional intellectual property and faced with building SoCs from the ground up, especially stand to gain from Apple's trade secret SoC information.  Rivos was founded in or around May 2021 to design a full stack computing solution based on custom-designed reduced instruction set computer-based SoCs that will compete with Apple's ARM SoCs.

36.     While it has no product in the market, Rivos has said that it is developing server SoCs that use the RISC-V architecture.  As both ARM and RISC-V ISAs implement RISC architectures, they share numerous common elements, compatible and transferable features and techniques, and design considerations.  For example, know-how for enhancing computational performance and reducing power consumption that were developed for ARM-based SoCs can be effectively leveraged to optimize RISC-V based SoCs.  Apple's trade secret information includes sophisticated prefetching designs that intelligently anticipate and fetch memory locations to accelerate performance, as well as advanced power-saving techniques, all of which could be used to enhance the performance and power management of Rivos's RISC-V chips, including in server-related applications.  These considerations are important, and Apple's proprietary solutions beneficial, regardless of the purported application of Rivos's SoCs.  For example, Apple's SoCs include proprietary, high-performance CPU cores using Apple trade secrets.  An SoC using many of these CPU cores could be used to develop chips that meets server and datacenter processing requirements.

**D.** **Apple Diligently Protects Its Trade Secret Chip Designs and Related Information**

37.     Apple diligently protects its proprietary and trade secret designs and investments in research and development.  As a condition of employment, Apple employees, as was the case for the Individual Defendants, are required to sign a confidentiality agreement that legally obligates them to protect and not disclose to third parties confidential information acquired during their employment.  This obligation continues even after the employee leaves Apple.

38.     One of the most critical agreements for protecting Apple's proprietary and trade secret information is the Intellectual Property Agreement (IPA).  Under the IPA, which Apple employees, including the Individual Defendants, must execute at the start of their employment, employees attest to the following:

> You understand that your employment by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple.  Upon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper, magnetic or optical media, or any other medium, containing any Proprietary Information.

39.     Apple employees, including the Individual Defendants, also agree that Apple would be entitled to injunctive relief for any violations of the IPA.  In particular, the IPA provides:

> A breach of the provisions of sections 1 or 2 of this Agreement would cause irreparable harm and significant injury to Apple, the quantification of which is difficult to ascertain.  Because such harm and injury could not be compensable by damages alone, you agree that Apple will have the right to enforce sections 1 and 2 of this Agreement by injunction, specific performance or other equitable relief without prejudice to any other rights and remedies available to Apple in the event of a breach of this Agreement.

40.     Each of the Individual Defendants executed a copy of the IPA upon commencing employment with Apple.

41.     Apple also has certain employees who handle Apple's highly sensitive, proprietary, and trade secret information relating to hardware design, function, and operation,

such as for Apple's SoCs.  These employees include those in Hardware Technologies ("HWT") and other areas.  During employee exit interviews for these Apple employees, including the Individual Defendants, Apple provides a "Checklist for HWT Departing Employees" or "Checklist for Departing Employees" to "help employees leaving Apple understand their responsibility to preserve confidentiality of intellectual property."  Each of the Individual Defendants acknowledged that he "signed an Intellectual Property Agreement (IPA) that does not expire" upon his leaving Apple.

42.     Each departing employee signing either of the above departing employee checklists, as was the case for the Individual Defendants, acknowledges that the IPA says he or she "will not use or share Apple confidential information while you are an Apple employee and after you leave Apple.  Everything you worked on at Apple stays here."  Each departing employee, as with the Individual Defendants, acknowledges that "[a]ll employees must return all Apple confidential information prior to leaving Apple[.]"  Each employee must also "[c]onfirm that you have done a diligent search of spaces you could have stored Apple property," including "[p]ersonal computer(s) or laptop(s)," "[f]lash drive(s)," "[p]ersonal email," and "[e]xternal hard drive(s)."  Each departing employee, including the Individual Defendants, additionally must confirm that they have "returned or destroyed all Apple confidential information prior to leaving Apple" and that they have "returned all Apple Owned Devices (AOU) and [have] not wiped any AOU."

43.     Each Individual Defendant executed a copy of a checklist for departing employees during or shortly after their exit interview following resignation from Apple.

44.     Apple takes additional measures to maintain the confidentiality of its proprietary information, including the trade secrets at issue in this lawsuit.  With regard to terminated HWT and other employees, for example, Apple protects its proprietary information by requiring the return of Apple laptops, mobile devices, and other equipment and the removal of Apple and third-party files, documents, and software from the terminated employees' possession.

45.     Apple also provides HWT and other employees with rules and guidelines on how to preserve the confidentiality of Apple's proprietary information.  These materials specifically

forbid distribution of Apple's confidential information to others except on a need-to-know basis. To further secure its proprietary information from public dissemination, Apple also requires its vendors, customers, partners, and contractors to sign confidentiality agreements and non-disclosure agreements when confidential information must be disclosed to them during the ordinary course of Apple's business.

46.     Apple further protects its most valuable SoC designs and specifications by limiting access to its Confluence and Perforce databases to only those projects that an employee is currently working on and authorized to view.  Confluence and Perforce are collaborative information management tools that allow Apple SoC engineers and designers to share and store their work on Apple's trade secret SoC designs.  Engineers require login credentials to access these tools, and the level of access is limited to what a particular engineer's job responsibilities require.

### E.     Former Apple Employees Leaving for Rivos Retained Apple Confidential and Proprietary Trade Secrets After Accepting Offers from Rivos

47.     Since June 2021, over 50 former Apple employees have joined Rivos.  Departures from Apple to Rivos have continued to occur while this suit has been pending.  Rivos has been targeting and soliciting Apple employees—mostly design engineers—with substantial expertise with Apple's SoC designs and significant and extensive access to trade secrets at the core of those designs.  As explained above, Apple's SoC designs are the culmination of substantial research and development costs and could be used by others to significantly accelerate development of a custom RISC-based SoC.

48.     Many of the employees who left Apple for Rivos took Apple's proprietary and trade secret information with them, while falsely representing to Apple that they had not.

49.     One former Apple employee, for example, worked at Apple for nearly eight years as a CPU implementation engineer, responsible for managing CPU design for Apple's SoCs.  His work at Apple included designing and developing proprietary and trade secret physical structures for carrying out critical functions in Apple's ARM-based SoCs.  When he joined Apple, he had executed an Apple IPA on August 26, 2013, agreeing to, among other things, "keep all [Apple]

Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple[.]" He further agreed that "[u]pon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

50.     In August 2021, this employee left Apple to take on a nearly identical role at Rivos ("CPU Implementation Lead").

51.     On August 14 and August 15, the employee connected a USB drive to his Apple-issued computer at least seven times. In the same period, he specifically identified Apple confidential documents that could be useful in his new role at Rivos and copied portions of those documents to untitled Excel, Keynote, and Numbers documents on the USB drive. Some of the documents he copied were marked "Apple Proprietary & Confidential." He also viewed file listings for folders containing Apple files with proprietary and trade secret information. While viewing these file listings, the employee repeatedly opened documents, while clearing the list of recently opened documents to conceal what he accessed. This employee kept at least some of the documents he retained with the intention of referring to them after leaving Apple.

52.     On August 16, 2021, the employee conducted his exit interview. On August 18, 2021, he executed a Checklist for HWT Departing Employees, acknowledging that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession and had not wiped his Apple-issued devices.

53.     Apple initially named this employee (who no longer works at Rivos) as a Defendant to this suit. On May 17, 2022, he and Apple entered into a stipulated order (ECF No. 19), under which he agreed to return any Apple confidential information in his possession, to make available for forensic inspection any devices that were used to store or transmit Apple information, and to refrain from making use of Apple confidential information. He has since been dismissed from the case.

54.     This employee's taking of Apple trade secret information just before departing for Rivos was not an outlier.  Along similar lines, the Individual Defendants' certifications during their exit interviews with Apple that they had returned or deleted Apple's proprietary and trade secret information were false.  Apple's forensic analysis of the Individual Defendants' Apple-issued computing devices has revealed that they took and retained Apple's proprietary and trade secret information when they departed from Apple.  This information is protected by the IPA and was falsely confirmed to have been returned or deleted when the Individual Defendants executed their Checklist for HWT Departing Employees or Checklist for Departing Employees.

55.     Each Individual Defendant accessed, downloaded, and/or improperly retained Apple's proprietary and trade secret information regarding the design and operation of Apple's most advanced SoCs when leaving for Rivos.  These actions are in direct violation of the IPA that each Individual Defendant executed as a condition of his employment with Apple.  Furthermore, as detailed further below, several of the Individual Defendants have, in fact, used improperly retained Apple information in connection with their work on Rivos SoCs.

### 1.     Ricky Wen

56.     Apple employed Individual Defendant Ricky Wen for over 13 years, from April 2008 until August 2021.  During his tenure with Apple, Mr. Wen was a CPU design engineer, with responsibilities for developing the architecture of Apple's SoCs.  Mr. Wen was responsible for, among other things, designing and developing proprietary and trade secret architectures for carrying out critical functions in Apple's ARM-based SoCs, including functions relating to power management.  The value of such information would be applicable to RISC-V SoCs, which must also be designed to optimize power consumption and distribution.

57.     As a condition of his employment, Mr. Wen executed an Apple IPA on April 22, 2008, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple[.]"  He further agreed that "[u]pon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take

with you any documents, materials, or copies thereof . . . containing any Proprietary

Information."

58.     Mr. Wen's position at Rivos is "Principal Member of Technical Staff," with a focus generally on "Hardware Engineering."  Mr. Wen accepted an offer of employment from Rivos on or about July 23, 2021.

59.     However, after accepting his offer from Rivos, Mr. Wen took thousands of sensitive Apple documents relating to both Apple's existing and unreleased SoCs.  Between July 26, 2021 and July 29, 2021, Mr. Wen transferred approximately 390 gigabytes of data from his Apple-issued computer to a personal external hard drive.  Among the data transferred are confidential Apple documents containing Apple trade secrets, including aspects of the microarchitectures for Apple's past, current, and unreleased SoCs.  As of his termination, Mr. Wen's Apple-issued computer included over 400 gigabytes of Apple confidential information.  Although the computer also stored approximately 200 gigabytes of photos and movies that Apple presumes are personal in nature, these could account for only a fraction of the data transferred.

60.     On or about August 3, 2021, Mr. Wen tendered his resignation to Apple.  On or about August 5, 2021, Mr. Wen conducted his exit interview and, among other things, executed a Checklist for HWT Departing Employees, acknowledging that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession.  This exit interview was not cursory; Mr. Wen spent approximately three hours with his manager, reviewing the HWT checklist in detail and discussing his responsibilities under the IPA.

61.     On the day that he executed his Checklist for HWT Departing Employees, Mr. Wen deleted at least one account from his Apple-issued computers.  He also deleted his internet browsing, iMessage, and iChat histories on his Apple-issued computers and numerous folders and files in online and cloud storage drives immediately prior to his termination from Apple.

62.     Mr. Wen accessed still more highly confidential Apple information during the week before his departure, including as late as August 5, 2021, the day before he left Apple.  Forensic evidence shows that just before he connected an external hard drive, Mr. Wen accessed

numerous Apple proprietary and trade secret SoC designs, including files related to Apple's unreleased SoC designs, from his Apple-issued computer. It also shows that Mr. Wen copied hundreds of gigabytes of data from his Apple-issued computer to the external hard drive. Mr. Wen also downloaded documents to two additional external hard drives in the days leading up to his departure from Apple.

63.    Mr. Wen also transferred gigabytes of files to his personal Google Drive, in violation of Apple's policies, including architectural diagrams depicting Apple trade secret SoC designs, as well as folders and nearly 400 files associated with Apple SoC development projects. Apple policies prohibit the use of Google Drives for storing, among other things, Apple proprietary and trade secret information because that information can be accessed from any computer over the internet without Apple's knowledge, including, for instance, after the employee terminates his employment with Apple.

64.    Mr. Wen's downloading and transferring of Apple's trade secret and confidential information was knowing and intentional. For example, he made no effort to exclude Apple files when downloading the Desktop and Downloads folders from his Apple-issued computer, even though he knew—and was reminded through Apple's exit process—that they contained Apple's confidential information, and that he was prohibited from taking such information when leaving Apple. Mr. Wen was well aware that he had Apple confidential files but did not return them. He admits that he deleted a folder containing hundreds of Apple files from his Rivos laptop, as described below, because he "hated" himself for copying even more than he wanted.

65.    Mr. Wen's Apple employment was terminated on August 6, 2021. As of his termination, Mr. Wen's Google Drive contained, for example, a diagram showing the architecture of an aspect of an Apple trade secret SoC design. Similarly, although Mr. Wen moved thousands of Apple files from personal folders of his iCloud Drive to a work folder, investigation of his Apple-issued devices reveals that he retained over 400 gigabytes of Apple confidential information on his Apple-issued computer. There were also files relating to Apple trade secret SoC designs on his iCloud Drive after his termination, including hundreds of documents referencing the code names of highly confidential Apple SoC projects.

66.     On June 3, 2022, Rivos and Mr. Wen admitted that Mr. Wen has "retained some Apple information." (ECF No. 40.) Rivos's forensic expert submitted a declaration acknowledging that Mr. Wen's hard drive "contains multiple files identified in Appendix B" to the declaration of Apple's forensic expert. (ECF No. 46-6.) After Apple filed a motion for a Temporary Restraining Order, Mr. Wen agreed just before the hearing on the motion to return any Apple confidential information in his possession, to make available for forensic inspection any devices that were used to store or transmit Apple information, and to refrain from making use of Apple confidential information. This agreement was the basis of a stipulated order that Apple and Mr. Wen entered into on June 17, 2022 (ECF No. 54), and which remains in effect.

67.     Apple and Mr. Wen entered into a subsequent stipulated order on June 30, 2022, appointing a neutral third-party forensic vendor, and identifying an initial set of devices to be surrendered for inspection: a 1 TB Seagate FreeAgent FW portable hard drive, 3 TB Seagate Backup + Desk portable hard drive, 5 TB Seagate One Touch portable hard drive, 4 GB generic flash drive, and any other device or storage device that had been connected to any of the above. (ECF No. 67.) The protocol was not limited to these devices, but expressly included "any other devices which have ever been used to store or transmit Apple confidential information." Mr. Wen also agreed in the protocol to provide to the neutral vendor access to certain personal iCloud Drive and Google Drive accounts, which contained Apple's information.

68.     Among the documents that Mr. Wen retained were over a thousand files containing Apple's sensitive information. These included documents with clear confidentiality markings like "Apple Proprietary & Confidential," and went beyond just documents identified in the declaration of forensic expert Daniel Roffman and Appendix B to that declaration (ECF Nos. 22-4 and 22-5). These files contain highly sensitive information as described in the declaration of Daniel Murray, the Vice President of Apple's Silicon Engineering Group (ECF No. 22-3).

69.     For example, Mr. Wen's cloud drives and devices contained copies of microarchitecture specifications, which are highly sensitive documents that disclose comprehensive details about Apple's proprietary chip designs. These specifications are typically labeled as such, along with a proprietary code name for the relevant Apple SoC, in the filename,

1   title page, and header of the document.  For example, Mr. Wen had retained

2   "███████████," a specification that contains detailed descriptions of how one of

3   Apple's SoCs manages power consumption and distribution, one of the most critical

4   considerations in chip design.  The Murray Declaration explains that documents like these contain

5   the "crown jewels" of Apple's SoC design.  (*Id.* ¶¶ 8-11.)  Like many of the other Apple

6   documents found on Mr. Wen's drives and devices, the microarchitecture specifications retained

7   by Mr. Wen were clearly branded with the name "Apple" and the word "Confidential" on every

8   page, and use non-public, internal-only code names for Apple's SoC projects.

9         70.    Mr. Wen's drives and devices also contained copies of Verilog files.  As explained

10  in the Murray Declaration, Verilog is the hardware description language used to encode register

11  transfer level, or RTL, designs.  (*Id.* ¶ 12.)  Apple's Verilog files for its SoCs are a type of source

12  code that can be used to synthesize the physical design of Apple's chips.  (*Id.* ¶ 4.)  They are

13  "highly sensitive" files that "are stored securely in Apple's Perforce repository, and are not

14  disseminated outside of Apple."  (ECF No. 22-3 ¶¶ 4, 6, 12, 22.)  Among the Verilog files

15  Mr. Wen retained when leaving Apple were files named "████████," "██████████,"

16  "████████," and "████████████."  The term "███" is an Apple proprietary abbreviation

17  meaning "█████████████," while the term "███" is another Apple proprietary

18  abbreviation meaning "████████████."  Both terms appear prominently in the names

19  of the Verilog files that Mr. Wen retained, their underlying code, or both.  Each of these files also

20  begins with a clear header marking the code as "trade secrets and confidential information which

21  are proprietary to Apple Inc."  Together, these files span hundreds of pages of source code.

22        71.    Apple documents taken by Mr. Wen were also found on Rivos systems and

23  devices, including Mr. Wen's Rivos-issued laptop and in Mr. Wen's individually-accessible home

24  directory on the Rivos network file system (NFS), confirming that he placed Apple's confidential

25  and trade secret information on Rivos's systems.  For example, the Verilog files described above

26  were found on Mr. Wen's Rivos-issued computer and on the Rivos network, as was a PDF

27  presentation that contains data regarding SoC performance and is branded "Apple Confidential,"

28

and source code files that explicitly reference internal Apple SoC project names, including in their filenames.

72.     In February 2023, Mr. Wen disclosed for the first time the existence of additional devices and drives in his possession containing confidential information belonging to Apple, including an iPhone, iMac, Mac Mini, thumb drive, Gmail account, and Google Drive account. Mr. Wen had access to all of these repositories of Apple confidential information throughout his employment at Rivos, and even used at least some of the devices in connection with his Rivos work, notwithstanding the June 30, 2022 court-ordered protocol requiring him to surrender them.

73.     In March 2023, Mr. Wen disclosed that in May 2022, a month after Apple named him as a defendant in this case, he had deleted a .tar file (a type of archive file used in Unix-based systems for collecting multiple files, akin to a .zip file) containing hundreds of Apple confidential documents from his Rivos-issued laptop.  Among the documents included in the deleted file were highly sensitive Verilog code files marked as Apple's "trade secrets and confidential."  Mr. Wen placed the documents in this .tar file on his personal Google Drive prior to leaving Apple. Mr. Wen copied and retained these files intentionally.  After he joined Rivos, he again intentionally transferred the .tar file from his Google Drive not only to his Rivos-issued laptop, but also to his Rivos email account and his individual home directory on the Rivos NFS.  (ECF No. 170-1 at 16.)  Mr. Wen kept both the .tar file and individual documents that he extracted from the .tar file (including Apple's Verilog files) in folders called "AAPL" and "Rivos_Work."

74.     When he intentionally deleted the .tar file from his Rivos-issued laptop in May 2022, Mr. Wen still had a copy on a separate thumb drive.  He had placed the .tar file on that thumb drive from his home iMac—yet another device on which he stored this Apple confidential information.  Allegedly out of guilt from destroying evidence, but also because he knew that forensic traces of the deletion would look suspicious, Mr. Wen attempted to restore the copy of the .tar file on his laptop using the thumb drive.  The metadata for the original copy on the laptop, however, is likely permanently lost or overwritten.  The lost metadata would have further demonstrated the extent of Mr. Wen's access and use of Apple's confidential information.  Apple is seeking an appropriate adverse inference from the Court.  (ECF No. 169-3 at 17-20.)

1

####        2.        Jim Hardage

2         75.        Apple employed Individual Defendant Jim Hardage for nearly nine years, from

3   April 2013 until October 2021.  During his tenure with Apple, Mr. Hardage was a CPU architect,

4   responsible for developing the architecture of processing cores for Apple's SoCs.  Mr. Hardage

5   was responsible for, among other things, designing and developing proprietary and trade secret

6   architectures for carrying out critical functions in Apple's ARM-based SoCs.

7         76.        As a condition of his employment, Mr. Hardage executed an Apple IPA, among

8   other things, agreeing to "keep all [Apple] Proprietary Information in confidence and trust for the

9   tenure of your employment and thereafter, and that you will not use or disclose Proprietary

10  Information without the written consent of Apple. . . .  Upon termination of your employment

11  with Apple, you will promptly delivery to Apple all documents and materials of any kind

12  pertaining to your work at Apple, and you agree that you will not take with you any documents,

13  materials, or copies thereof . . . containing any Proprietary Information."

14        77.        Mr. Hardage is now employed by Rivos.  He holds a nearly identical position at

15  Rivos, CPU RTL Architect, which indicates that the tasks he performs for Rivos are parallel to

16  those he formerly performed for Apple.

17        78.        On October 18, 2021, Mr. Hardage resigned from Apple.  That same day,

18  Mr. Hardage executed a Checklist for HWT Departing Employees, and acknowledged that he was

19  subject to the IPA and that he had returned all Apple proprietary and trade secret information in

20  his possession.  Apple conducted Mr. Hardage's exit interview on October 21, 2021, the same day

21  his employment with Apple was terminated.

22        79.        Between October 17, 2021, and October 18, 2021, however, Mr. Hardage

23  connected two USB flash drives to his Apple-issued computer.  On October 18, Mr. Hardage also

24  ran various internet searches, including how to "Clear iMessage Chat History in Mac OS X" and

25  "removing imessage cache on macbook."

26        80.        Between October 17, 2021 and October 18, 2021, Mr. Hardage also removed

27  approximately 37 gigabytes of data containing Apple confidential files from his Apple-issued

28  computer.  Mr. Hardage knew that the directories he specifically identified and took included

many Apple confidential documents.  For example, the data that Mr. Hardage copied to his external drives includes at least nine directories named with specific confidential Apple SoC project names.  In addition, Mr. Hardage copied the "Home" directory from his laptop. Mr. Hardage was selective in copying directories from his MacBook Pro personal directory: he selected folders with Apple project names that clearly contained Apple documents and left some folders that were personal in nature behind.  Mr. Hardage obtained much of the data he retained through a Linux virtual machine operating on Apple's internal network.  He had special access to this virtual machine as part of his employment at Apple, and used it to access, review, modify, and create Verilog files, among other things.  Apple keeps Verilog and other sensitive files in its Perforce repository, but Mr. Hardage could "check out" select files to the Linux virtual machine. Mr. Hardage removed Verilog files that he obtained through this method onto the external USB drives that he retained when he left Apple.

81.     Mr. Hardage knowingly and intentionally retained Apple confidential information that he knew he should not keep.  When he signed his Checklist for HWT Departing Employees, and thus certified that he had returned all Apple confidential information in his possession, he knew that in the preceding days he had downloaded a large amount of that information to his USB drives.  Nevertheless, he concealed this from Apple, and kept his drives and the Apple data on them when he left for Rivos, knowing that the data was confidential and he should not have retained it.

82.     On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Hardage a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information.

83.     Substantial Apple confidential and trade secret information retained by Mr. Hardage has been found on his two personal USB flash drives, personal iPhone, iPad, MacBook, and iMac, and personal iCloud account.  Mr. Hardage and his counsel purport to have remediated Apple information from these devices, but the alleged remediation used a small set of narrow search terms that would have failed to capture many Apple confidential files, including many

Verilog files that Mr. Hardage retained.  Thus, Mr. Hardage had possession of and unrestricted access to Apple confidential information on these devices even after the supposed remediation.

84.     Mr. Hardage's devices contained extensive volumes of Apple's confidential and trade secret information, including dozens of Verilog files that he had stored under a folder called "████████," an internal Apple SoC project code name.  This folder contained confidential Apple files relating to the architecture and function of Apple SoCs, as well as the simulation of their operation, including Verilog and supporting files and data.  As explained in the Murray Declaration, Verilog is the hardware description language used to encode register transfer level, or RTL, designs.  (*Id.* ¶ 12.)  Apple's Verilog files for its SoCs are a type of highly sensitive source code that can be used to synthesize the physical design of Apple's chips.  (*Id.* ¶ 4.)  These files begin with a clear header marking the code as "trade secrets and confidential information which are proprietary to Apple Inc."  Together, they span well over a hundred pages of source code.  Nor was the information Mr. Hardage retained limited to the ██████ project; he also retained information about Apple's past, current, and future, unreleased SoCs developed under the ████████████████████████████████████████████ project names, among others.

85.     When he left Apple, Mr. Hardage knew that he had an obligation not to use or disclose Apple information, and that he was required to return any Apple information.  He admits that ████████████████████████████████████████████ ████████████.

86.     As Mr. Hardage confirmed under oath, ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████.

87.     Furthermore, Mr. Hardage has discussed components and features of Apple's SoCs with other Rivos employees, including by reference to internal Apple project code names. In one such discussion, ███████████████████████████████████████████. This was the same ███████ project from which Mr. Hardage retained extensive information when leaving Apple, as discussed above.

88.     According to Mr. Hardage, his responsibilities at Rivos involve ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

### 3.     Weidong Ye

89.     Individual Defendant Weidong Ye began working at Apple in December 2017. During his tenure at Apple, Mr. Ye initially worked as a Systems Power & Performance Engineer.  Throughout his time at Apple, Mr. Ye worked cross-functionally with architecture, platform design, SOC architects, and software teams.

90.     As a condition of his employment, Mr. Ye executed an Apple IPA, among other things, agreeing to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . . Upon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

91.     Mr. Ye now works for Rivos.  Mr. Ye's position at Rivos is "Member of Technical Staff," which suggests he is performing a similar job function as he did at Apple when he worked as a Systems Power & Performance Engineer.

92.     On January 11, 2022, Mr. Ye visited a "Virtual Open House" held by Rivos.  At that time, he also began searching for various job opportunities available at Rivos and ran internet searches on Rivos's leadership and Rivos's CEO.

93.     Between March and April of 2022, Mr. Ye was researching Rivos.  He looked into the following full-time positions at Rivos: "System Hardware"; "Silicon Electrical Analysis Engineer"; "Silicon Power"; "Silicon Architecture"; "Silicon Performance Modeling"; and "Confidential Compute Systems Engineer."  These are all positions similar to the one he had at Apple: Systems Power & Performance Engineer.

94.     In April 2022, Rivos invited Mr. Ye to interview with Rivos.  To prepare, Mr. Ye used Google and LinkedIn to find out more about Rivos and Rivos staff.  In early May 2022 he also searched the internet for information about the lawsuit between Rivos and Apple.

95.     Throughout May 2022, Mr. Ye met with Rivos multiple times to discuss a position at Rivos.  On May 30, 2022, Mr. Ye signed Rivos's employment offer, and subsequently provided Apple with his notice of resignation.

96.     In the days leading up to his departure from Apple, Mr. Ye deleted at least the messages database on his laptop.

97.     On June 3, 2022, Mr. Ye executed the Checklist for Departing Employees, and acknowledged that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession.  Mr. Ye's manager, who met with him to conduct the exit interview, confirmed that Mr. Ye understood each of the items on the Checklist.  That same day, however, Mr. Ye was still searching the internet for how to delete files on MacOS, and how to disconnect his iCloud account.

98.     Mr. Ye also saved multiple highly confidential Apple source code repositories for unannounced, in-development products in his iCloud drive.  These repositories were stored outside of the designated folder for files related to his Apple work.  Apple confidential files were also found in the Downloads folder of his Apple-issued computer when he returned it upon his departure.

99.     Mr. Ye began his employment at Rivos on July 11, 2022.

100.    Mr. Ye accessed and downloaded highly confidential source code repositories before leaving Apple, including repositories clearly marked with internal Apple code names in the directory title.  He retained this Apple confidential and trade secret information on his personal devices after leaving Apple and joining Rivos.  The repositories contained firmware and software relating to experiments that Mr. Ye and others at Apple conducted to evaluate and improve performance and power.  Many of the source code files that Mr. Ye retained include a prominent header labeling the document as "confidential and proprietary" Apple property.  Mr. Ye also retained Apple confidential and trade secret information relating to Apple's ███████ SoC projects.  Due to Mr. Ye's and Rivos's mishandling of information, they may have destroyed evidence of additional Apple material that Mr. Ye retained.

101.    Mr. Ye's practice at Apple was to ████████████████████████████████████████████████████████████████████████████████████████.  This code, along with other Apple confidential information, made its way onto Mr. Ye's personal MacBook, iPhone, and iCloud Drive, to which he retained access while an employee of Rivos.

102.    Mr. Ye did not return the information when he was asked to do so on April 29, 2022.  Instead, Mr. Ye retained access to his iCloud Drive until at least March 24, 2023.  Based on information provided by Defendants, he has still not been segregated from his iPhone.

### 4.    Laurent Pinot

103.    Apple employed Individual Defendant Laurent Pinot for nearly 12 years, from October 2009 until August 2021.  During his tenure with Apple, Mr. Pinot rose to the position of Application-specific Integrated Circuit (ASIC) Design Engineering Manager 3, with responsibilities over the physical design of Apple's SoCs.  Mr. Pinot was responsible for, among other things, designing and developing proprietary and trade secret physical structures for carrying out critical functions in Apple's ARM-based SoCs.

104.    As a condition of his employment, Mr. Pinot executed an Apple IPA on September 11, 2009, agreeing, among other things, to "keep all [Apple] Proprietary Information in

confidence and trust for the tenure of your employment and thereafter, and that you will not use

or disclose Proprietary Information without the written consent of Apple. . . .  Upon termination

of your employment with Apple, you will promptly deliver to Apple all documents and materials

of any kind pertaining to your work at Apple, and you agree that you will not take with you any

documents, materials, or copies thereof . . . containing any Proprietary Information."

105.    Mr. Pinot is now employed by Rivos as an █████████████████████. He thus holds a nearly identical

position at Rivos as his previous position at Apple, █████████████████████████████████████████████████████████████████████. He

thus performs parallel tasks at Rivos to those he formerly performed for Apple.

106.    ███████████████ approached Mr. Pinot about leaving Apple to join

Rivos in or about July 2021.  Rivos encouraged him to use an encrypted communication app

called Signal to discuss employment opportunities.  These types of applications allow parties to

communicate with end-to-end encryption, meaning there is no record of the communications or

means to verify what the parties discussed.

107.    On or about July 2021, Mr. Pinot ███████████████████████████████████████. On or about August 18, 2021, Mr. Pinot accepted Rivos's offer of

employment.  At Mr. Pinot's exit interview, he stated words to the effect of "I was not looking,

they found me."

108.    Mr. Pinot tendered his resignation to Apple on or about August 20, 2021.  On

August 24, 2021, Apple conducted Mr. Pinot's exit interview.  Among other things, he executed a

Checklist for HWT Departing Employees and acknowledged that he was subject to the IPA and

that he had searched for and returned or deleted all Apple proprietary and trade secret information

in his possession.  The exit interview involved going through the HWT checklist and IPA in

detail, including walking through the key points of the IPA and Mr. Pinot's obligations under that

agreement.  Mr. Pinot's Apple employment was terminated on August 24, 2021.

109.   Before leaving Apple, Mr. Pinot stored hundreds of Apple confidential and trade secret documents relating to SoCs on personal devices that remained in his possession and custody while he was working at Rivos.  Mr. Pinot kept at least some of these files knowing that they comprised Apple's confidential information, and with the intention of using them for non-Apple work in the future.

110.   For example, Mr. Pinot retained on his personal laptop a document providing a set of steps relating to the execution of a physical design process for SoCs.  He also retained a power grid specification document relating to several Apple SoCs and proposals for future designs.  The 56-page power grid specification document provides details of Apple's SoC power grids, including past, present, and future power grid techniques and a step-by-step process for power grid synthesis.  This document was used across numerous Apple SoC development teams, including the ███████████████████████████ as part of the ███████████████████ for the SoC.  Mr. Pinot ████████████████████████████████████████████ ████████████████████████████████████████████ ████████.  In fact, Mr. Pinot specifically targeted the power grid specification when he was leaving Apple.  He reviewed it on August 17, 2021, just three days before he informed Apple that he was resigning, and seven days before his last day.  As noted above, ██████████████████ ████████████████████████████████ ████████.

111.   Mr. Pinot also retained on his personal laptop hundreds of Keynote presentations containing sensitive information about Apple's SoC projects.  Many of these presentations included an internal Apple SoC project code name in its title and were clearly marked "Apple Proprietary & Confidential."  For example, Mr. Pinot retained a Keynote presentation with an Apple SoC code name in its title.  The cover slide of this document makes clear that it was a document used for a product development team meeting on November 13, 2020.  The document contains confidential and trade secret information about Apple SoCs and includes schematics, chip floorplans, design specifications, and development schedules—all highly sensitive.  Indeed,

1    many of the hundreds of Apple confidential and trade secret documents that Mr. Pinot retained

2    These files also fall into the categories of highly sensitive information described in the declaration

3    of Daniel Murray, the Vice President of Apple's Silicon Engineering Group (ECF No. 22-3).

4         112.   In addition, Mr. Pinot retained backups of his Apple-issued computer on a

5    personal AirPort Time Capsule device.  He began weekly Time Machine backups to this device in

6    December 2020.  The Time Capsule was stored unencrypted at his home, in violation of Apple's

7    policies, which forbids such unencrypted backups.  These backups, which were not and are not

8    remotely accessible to Apple, provided a repository for storing data beyond Apple's knowledge

9    and control.  Despite resigning on August 20, 2021, and knowing his last day at Apple would be

10   shortly after August 23, Mr. Pinot allowed his Time Machine backups to continue in this

11   timeframe.

12        113.   On or about August 24, 2021, on his last day of employment at Apple, Mr. Pinot

13   made a final backup of his entire Apple-issued computer to an unencrypted Time Capsule.  This

14   was in violation of Apple policy.  By this time, Mr. Pinot had made 55 unencrypted backups of

15   his Apple computer.  Mr. Pinot did not attempt to filter out Apple confidential information when

16   making these backups.  The Time Capsule, which contained 1.4 TB of data as of the night before

17   Mr. Pinot's last backup of his Apple work computer, was in his possession and accessible to him

18   during his employment at Rivos at least until July 8, 2022, when the Court ordered Rivos to

19   produce an image of the Time Capsule.

20        114.   Mr. Pinot's Time Capsule backups included all of the files on his Apple-issued

21   laptop's hard drive at the time of backup.  Mr. Pinot kept local folders on his Apple-issued laptop

22   for more than a dozen Apple trade secret SoC design projects.  Thus, the highly sensitive

23   information regarding the design and operation of Apple's SoCs in those folders was downloaded

24   to the Time Capsule.

25        115.   In the days leading up to his departure from Apple, Mr. Pinot also deleted several

26   confidential Apple documents from his Apple-issued laptop and deleted several email accounts.

27

28

116.    On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Pinot a letter (copying Rivos) asking for the return of Apple information (including the Time Machine back-ups) and confirmation that he was no longer accessing or using that information.

117.    Hundreds of Apple confidential and trade secret documents have been found on additional devices beyond Mr. Pinot's Time Capsule, including his personal laptop, iPhone, iPad, and iCloud drive.  Mr. Pinot and his counsel purport to have remediated Apple information from these devices, but any such remediation was performed without Apple's knowledge or consulting with Apple.  Even after this alleged unilateral remediation, Mr. Pinot's devices continued to contain Apple confidential information on them when they were returned to Mr. Pinot.

118.    As noted above, Mr. Pinot did not merely retain these files; he kept at least some of them intentionally.  In fact, he accessed and reviewed Apple confidential information while working for Rivos.  The information he reviewed included the power grid specification, which he knew contained Apple's proprietary information and which bears the label "CONFIDENTIAL – APPLE, INC." on every page.  Other Apple confidential and trade secret documents Mr. Pinot accessed while working for Rivos include ███████████████████████ ██████████.  According to Mr. Pinot, he cannot recall whether the number of these documents he accessed while at Rivos could be ████████.  Furthermore, due to Mr. Pinot's and Rivos's mishandling of information, they may have destroyed evidence of additional Apple material that Mr. Pinot retained and/or accessed after leaving Apple.

### 5.    Prabhu Rajamani

119.    Individual Defendant Prabhu Rajamani was employed by Apple for nearly nine years, from March 2013 until October 2021.  During his tenure with Apple, Mr. Rajamani became a Power Engineer 5, responsible for optimizing power handling for Apple's mobile SoCs. Mr. Rajamani was responsible for, among other things, developing proprietary and trade secret physical structures for carrying out critical power handling functions in Apple's ARM-based SoCs.

120.    As a condition of his employment, Mr. Rajamani executed an Apple IPA on February 11, 2012, agreeing, among other things, to "keep all [Apple] Proprietary Information in

confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . . Upon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

121.    Mr. Rajamani is now employed by Rivos.  He holds a nearly identical position at Rivos: Hardware Engineer.  The tasks he performs for Rivos are parallel to those he performed for Apple.

122.    On October 19, 2021, Mr. Rajamani resigned from his position at Apple.  That same day, Mr. Rajamani executed a Checklist for HWT Departing Employees and acknowledged that he was subject to the IPA and that he had returned all Apple proprietary and trade secret information in his possession.

123.    Shortly before his resignation, Mr. Rajamani connected a USB drive to his Apple-issued MacBook Pro and used Apple's AirDrop feature to transfer four code files to himself.  Mr. Rajamani also used ████████████████████████████████.

124.    On October 19, 2021, he disconnected his iCloud Drive from his Apple-issued laptop after running a Google search for "sign out of icloud drive on mac," which stopped it from syncing and limited Apple's access to the files on the Drive.  Nevertheless, Mr. Rajamani's Apple-issued laptop shows that he retained Apple confidential information on his personal iCloud Drive when it was disconnected from his Apple-issued laptop.  After he joined Rivos, Mr. Rajamani synced this personal iCloud Drive to his Rivos-issued laptop and accessed files on that Drive.

125.    Mr. Rajamani also attempted to hide and obscure his iMessage history.  In particular, he searched for how to delete all of his iMessage conversations from his Mac computer.  Mr. Rajamani also deleted his Safari browser history.

126.    Despite Mr. Rajamani's assurances during his exit interview and on the same day that he executed his Checklist for HWT Departing Employees, he continued to download and

transfer to external hard drives files on Apple's proprietary and trade secret SoC designs until his last day at Apple.

127.    On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Rajamani a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information.

128.    Apple confidential documents that Mr. Rajamani retained were placed on Rivos's systems.  For example, four Apple code files were found on Mr. Rajamani's directory on Rivos's internal Network File System.  Three of these documents matched information on the computer that Mr. Rajamani had used for his Apple work and that he had returned before leaving for Rivos, including a code file Mr. Rajamani wrote at Apple as part of his work on SoCs.

129.    Apple confidential and trade secret information was also located on Mr. Rajamani's personal MacBook, iCloud Drive, and iPhone.  For example, Mr. Rajamani's personal laptop contained a power specification for an Apple SoC.  The document contains the internal Apple codename for the SoC, ███, in its title, and is marked "Confidential" on every page.  The document describes "████████████████████" and provides extensive detail about ████████████.  As the Murray Declaration explains, controlling power consumption is a key part of SoC design, making the contents of documents like this power specification highly sensitive trade secret information.

130.    The documents exfiltrated by Mr. Rajamani also included numerous Python code files created by Mr. Rajamani or other Apple employees.  One such file was ████████ ██████████████████████████████████████ ████████████████████████████████████ ████████████████████████████.  Another Apple Python code file Mr. Rajamani improperly retained was ████████████ ████████████████████████████████████ ████████████.  "███" is the code name of another Apple SoC project.  Mr.

Rajamani also used at Rivos ████████████████████ that he wrote for his work purposes at Apple.

131.    Mr. Rajamani's devices also contained numerous Apple confidential presentations; to describe just a few, these included: █████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████. Other documents found on Mr. Rajamani's devices included spreadsheets, data files, and JSON files with confidential information relating to Apple's SoCs.

132.    Mr. Rajamani kept each of these documents on his iCloud drive, his personal MacBook, his personal email account, and/or another device, even though he knew that they were proprietary and confidential to Apple.  He does not dispute that ████████████████████
████████████████████████████████████████
██████████████████████████.

133.    Mr. Rajamani retained possession of his personal laptop and had access to his personal iCloud account and all materials stored on it, including the Apple materials that he took, until at least March 2023.  He also retained possession of an iPhone that was not disclosed to Apple before March 2023 and not collected from Mr. Rajamani until April 2023.

134.    Further evidence of additional documents that Mr. Rajamani improperly retained may have been lost because Mr. Rajamani instructed a third-party company to destroy the USB drive that he had connected to this Apple-issued computer and onto which he had transferred code files, as described above.  And due to Mr. Rajamani's and Rivos's mishandling of information, they may have destroyed evidence of additional Apple material that Mr. Rajamani retained and/or accessed after leaving Apple.

**6.     Kai Wang**

135.     Individual Defendant Kai Wang has acknowledged to Apple that Apple documents were retained in his iCloud Drive.  He initially indicated to Apple that he wanted to work towards resolving the matter in a constructive manner.  When Apple sought to work with Mr. Wang, however, he stated that Rivos's corporate lawyers would handle future communication.  But Rivos's lawyers refused to work with Apple to return Apple's documents in Mr. Wang's possession and prevented Apple from communicating with Mr. Wang to arrange for the return of Apple's documents.  For that reason, Apple had no alternative but to name him as an Individual Defendant in this case.

136.     Mr. Wang was employed by Apple for over a year, from August 2020 until February 2022.  During his tenure with Apple, Mr. Wang worked on improving the performance of Apple's GPUs, which are components of Apple's SoCs.

137.     As a condition of his employment, Mr. Wang executed an Apple IPA on April 10, 2020, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . .  Upon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

138.     Mr. Wang is now employed by Rivos.

139.     On February 9, 2022, Mr. Wang resigned from his position at Apple.  On February 10, 2022, Mr. Wang executed a Checklist for HWT Departing Employees, and acknowledged that he was subject to the IPA and that he had returned all Apple proprietary and trade secret information in his possession.  As part of this exit process, Mr. Wang's manager reminded him that he was not to take Apple information with him when departing.

140.     Shortly before Mr. Wang's resignation from Apple, he deleted approximately 95 GB of data from his Apple-issued computer.  A portion of those deletions were performed on his last day at Apple and have not been accounted for.  For instance, data remaining on his Apple-

issued computer shows that Mr. Wang's personal iCloud Drive still contained Apple files at the time of his termination.  These retained files included numerous screenshots of sensitive Apple information, ranging from portions of source code to specification documents clearly stamped "Apple Registered Confidential – Do Not Distribute."  These retained files included screenshots with excerpts of a GPU component microarchitecture specification with the footer "Apple Registered Confidential – Do Not Distribute."  Many of the other files he retained on his personal iCloud Drive include or describe trade secret and confidential components of Apple projects.

141.    On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Wang a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information.

142.    Mr. Wang did not return the information to Apple as he was asked to do.  Mr. Wang admits that he ████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████ which Mr. Wang understood to be ███████ ████████████████████████████████████, and which he had used as part of his work at Apple.

**F.    Other Former Apple Employees Who Are Now at Rivos Took Apple Proprietary Information or Deleted Information from Their Apple Devices**

143.    Other former Apple employees who are now employed by Rivos also took Apple's confidential information.  Like the Individual Defendants, these employees joined Rivos in positions paralleling their roles at Apple.  And like the Individual Defendants, they each signed an Apple IPA and agreed to protect and appropriately use Apple's trade secret information and to return or delete that information when they left.

144.    Further forensic records have shown that, despite agreeing not to delete information from their Apple devices when they left the company, many former Apple employees now at Rivos did so, wiping their Apple devices or copying over proprietary and confidential information to personal and other non-Apple devices.  Like the Individual Defendants, they did this after communicating with Rivos and accepting Rivos's offers of employment.

145.     Several of these employees connected external hard drives and network attached storage devices to Apple-issued computers in the days following their hire by Rivos.  At the same time, these employees were accessing a large amount of Apple trade secret information about SoC designs in the days just before their termination.  Each executed a Checklist for HWT Departing Employees and acknowledged that they were subject to the IPA and had returned or deleted all Apple proprietary and trade secret information in their possession, including any stored on AOUs and external hard drives.  One employee even printed a Checklist for HWT Departing Employees in the middle of connecting external hard drives to an Apple-issued computer.  Similarly, the local archive stored on the Apple-issued laptop of at least one former employee shows that, at the time the employee disconnected their iCloud Drive, they retained access to several highly confidential, proprietary, and trade secret files.

146.     Other employees stopped syncing their iCloud Drives and maintained local backups as of their departure from Apple.  At least one of these iCloud Drives—and the local backup—contained presentations and spreadsheets related to Apple's highly confidential, proprietary, and trade secret SOCs.

147.     Despite being instructed not to wipe data on their Apple-issued devices—and expressly agreeing not to do so—many of these employees did delete information after accepting their Rivos offers.  At least nine employees completely wiped their Apple-issued devices and/or reinstalled the operating systems, which deletes all data on the devices.  In several cases, these employees wiped multiple devices before returning them.  After accepting their Rivos offer, one employee did an internet search for "slack delete message history," "delete all imessages on mac," "factory reset mac," "how to clear imessage on mac," and "slack how to clear chat cache." The employee then proceeded to delete most of those records.  Other employees similarly deleted their messages and browser history before returning their Apple-issued computers.  A number of employees also installed encrypted communications apps, including Signal, to communicate with Rivos and amongst one another without risk of their communications being exposed.  For instance, after joining Rivos, a former Apple employee provided a then-Apple employee a link to download Signal for communicating about Rivos with Rivos's CTO.  In the weeks before leaving

Apple for Rivos, that same employee invited another employee who also left for Rivos to communicate on the platform, noting that "there are things [that] should not be recorded through apple's interface now." Yet another Apple employee warned a colleague against using iMessage to discuss Rivos, causing that colleague to delete messages related to the discussion. As a result of the deletion of information and use of encrypted communications, the exact scope of trade secret theft and coordination in support thereof has been hidden from Apple.

148.   Furthermore, some employees expressed concerns about the legality of their searching and deletions conducted in their last days at Apple, right before they left for Rivos. One employee ran internet searches for "when you lost a lawsuit what do you have to pay" and "poach[ing] people after a year leaving [a] company," and viewed webpages relating to attorneys' fees for losing parties to lawsuits.

149.   Many non-Defendant individuals retained, and had access to, Apple confidential information all this time while working for Rivos. In fact, two of the individuals have had such extensive volumes of Apple's information—including full backups of their Apple-issued devices with responsive documents numbering over 100,000—that they have had to send their entire external hard drives to a neutral forensic vendor in order to respond to Apple's discovery requests. Thousands of documents found on devices that non-Defendant individuals retained after leaving Apple relate directly to Apple's SoC technology, with various Apple SoC project names appearing in both filenames and document bodies.

150.   The proprietary information that these former employees have retained and may continue to have access to, particularly information regarding the architecture and design of Apple's SoCs, includes some of Apple's most highly sensitive and valuable information. These are not a mere handful of isolated documents about Apple's SoC chip specifications and designs but contain a vast amount of confidential information of different types across a wide range of products, including Apple's current and future designs. This information will provide a significant, unfair advantage to Rivos in developing advanced, high-performance RISC-based chips.

151.    Rivos knew or should have known that former Apple employees retained confidential Apple information and that they may use that information in performing similar jobs for Rivos.  Rivos claims that it began advising the former Apple employees, while they were still employed by Apple, about departure procedures that they should follow when leaving Apple.  This advice allegedly covered subject matter such as transferring personal information and how to handle information that may have been synced to personal drives.  Rivos also claims to have advised the former Apple employees, while they were still employed by Apple, about what to say in conversations with their Apple managers.  Rivos's CEO claims to have personally participated in such conversations with employees of Apple before those employees had even told Apple they were leaving.  But the Individual Defendants have contradicted this claim.  At least some Rivos employees ███████████████████████████████████████.

152.    Moreover, these alleged efforts would make even more striking the number of former Apple employees now at Rivos who *did* retain Apple confidential information, along with the number who wiped or otherwise sanitized the records on their Apple devices.  And as explained further below, Rivos's conduct since Apple's initial complaint—blocking access to its employees, offering shifting accounts of its purported investigation—only raises more concerns that former Apple employees at Rivos deliberately retained Apple's confidential and trade secret information and that Rivos's supposed instructions against retaining Apple confidential information have been manifestly ineffective.  For instance, even armed with the "understanding" that former Apple employees may have Apple confidential information stored in their iCloud Drives, Rivos acknowledges that those folders are automatically synced with Rivos-owned devices.  Apple has now demonstrated that this "syncing" resulted in multiple Apple confidential documents being transferred to Individual Defendants' Rivos-owned devices.  Despite submitting a declaration on these issues, Rivos's CEO pointedly provided no information about Rivos's practices and policies once an employee is found to have retained Apple confidential information, as Rivos is now aware is the case.  As discussed below, Rivos's apparent practice has been one of turning a blind eye, as it has failed to return all of Apple's confidential information and segregate all such information in its employees' possession.

1

**G.      Rivos Is Using Apple Trade Secret Information in Its Chip Development**

2

153.      Former Apple and current Rivos employees have not just retained vast amounts of

3

documents reflecting Apple's trade secrets.  They are also using Apple trade secret information in

4

Rivos SoCs.  Each instance of use of an Apple trade secret described above is an example of trade

5

secret misappropriation by Rivos, as Rivos employs each of these individuals, and the

6

misappropriation by these individuals of Apple's SoC trade secrets occurred within the scope of

7

their employment at Rivos and directly benefited Rivos at Apple's expense.  In addition to the

8

examples described above, Rivos and its employees have used Apple's trade secrets through the

9

following:

10

154.      Former Apple employees now employed by Rivos openly discuss Apple SoCs on

11

which they worked in their development of Rivos SoCs.  In fact, a Rivos employee even admitted

12

that it is "not taboo" to discuss Apple's SoC projects in the course of Rivos work.

13

155.      For example, Mr. Hardage expressed to another Rivos employee his desire to

14

15

.

16

156.      Other Apple SoC features and technologies that Rivos employees have discussed

17

include Apple's

18

19

.  Rivos employees have also relied

20

on Apple's design methodologies when defining how to manage source code for multi-CPU

21

SoCs.  And Rivos employees have considered Apple's timelines for developing SoCs

22

.

23

157.      Rivos employees have also used and discussed Apple's trade secret workflows

24

.  For example, a Rivos document that

25

26

is a proprietary tool built by Apple for managing and

27

coordinating its chip design process, making that process faster and more efficient.  This tool is

28

kept confidential at Apple and is not disclosed outside of Apple.

158.     Rivos has relied on and incorporated Apple's trade secret SoC technology in designing its SoCs and SoC components, including CPU cores.  Rivos's incorporation of Apple's trade secrets is consistent with its ████████████████████████, which would be implausible for a brand new startup that is building SoCs from the ground up without making use of Apple's trade secrets and confidential information.

159.     As described above with respect to its SoCs more generally, Apple has taken reasonable measures to keep secret these technologies used and incorporated by Rivos in its SoCs and SoC development process.  These technologies each derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

**H.      Rivos Repeatedly Frustrated Apple's Efforts to Recover and Secure Apple's Confidential Information and Failed to Adequately Investigate Its Employees' Misappropriation**

160.     When Apple became aware of Rivos's coordinated targeting of Apple employees with access to its most sensitive SoC information, Apple promptly sent Rivos a letter on July 9, 2021.  Rivos never responded to that letter and continued to hire away Apple engineers.

161.     After conducting a detailed forensic investigation, Apple filed its initial complaint on April 29, 2022 (ECF No. 1).  That same day, Apple sent letters to the 42 former Apple employees who had left for Rivos by that time, and to Rivos itself, informing them of all Apple employees' obligations to return, and not misuse, Apple's confidential information.  In these letters, Apple sought to resolve this dispute cooperatively by seeking (1) return of any Apple confidential information, (2) third-party forensic examination of devices containing such information, and (3) an explanation from its former employees regarding their false statements and attempts to wipe information from their Apple-issued devices.

162.     Rivos frustrated Apple's attempts to have former employees return Apple's confidential and proprietary information.  Only one former employee responded to the letters Apple sent on April 29, 2022: Defendant Wang.  Mr. Wang responded to Apple's letter, confirming that he had retained Apple files on his iCloud Drive and indicating that he wanted to

resolve the issue "in a constructive manner." Subsequently, however, Rivos stepped in and prevented Mr. Wang from cooperating with Apple directly. And for months, Rivos refused to turn over any of the Apple confidential information that its employees had retained except as specifically required by stipulated court orders. At the same time, Rivos instructed Apple not to contact any of Rivos's employees to try to get its information back, forcing Apple to name additional individual defendants to this lawsuit and to serve subpoenas on other employees.

163. Meanwhile, Rivos sought to deceive Apple and the Court by claiming that it had segregated all of the documents containing Apple's confidential information. For nearly a year after this suit was first filed, Rivos repeatedly assured Apple and the Court that it had taken steps to preserve and segregate potential repositories of Apple information in Rivos's or its employees' possession. It refused, however, to explain precisely what had been done to preserve and segregate, and has since disclosed that it did not in fact segregate the information as it claimed and that information has been destroyed.

164. Rivos did not adequately investigate and segregate devices in its and its employees' possession containing Apple information. For example, in February 2023, eight months after Rivos's claim that its counsel thoroughly interviewed the relevant employees, Mr. Wen disclosed for the first time four devices and two cloud drives containing Apple information. These devices and drives were accessible to Mr. Wen at least until February 2023, and Mr. Wen even regularly used some of them. Another month after that, Rivos was still revealing the existence of additional repositories of Apple confidential information to which Rivos employees had access, including: Mr. Wen's personal directory on Rivos's NFS system and Google Drive, Mr. Pinot's personal laptop, Mr. Ye's personal iCloud account, and Mr. Rajamani's personal iCloud account. In addition, some subpoenaed individuals likewise identified repositories of Apple information that have been in their possession all this time. And after the unilateral "remediation" by Rivos and the Individual Defendants of Apple information from their devices (discussed further below), the "remediated" devices that were returned to the Individual Defendants in some cases still held Apple trade secret and confidential information.

165.    Rivos thus failed to identify the existence of these repositories to Apple and segregate them properly for nearly a year after the time it claims to have first investigated them. The existence of these devices and drives should have been discovered, and all potential access to Apple confidential information cut off, at that time.  Instead, Rivos knowingly allowed its employees to retain access to these repositories, contending that the employees needed them to perform their Rivos work.

166.    Rivos's representations of preservation likewise were false.  For example, in May 2022 Mr. Wen deleted a .tar file containing many Apple documents, including highly sensitive Verilog files.  Mr. Wen informed Rivos by email on June 2, 2022 of what he had done.  But instead of notifying Apple, the next day Rivos submitted a brief to the Court falsely representing that Mr. Wen was complying with his document preservation obligations.  Rivos's brief further represented that Mr. Wen had not accessed, used, transferred, or copied any Apple information from his Google Drive account, even though Mr. Wen had transferred the .tar file to his Rivos-issued laptop and other Rivos repositories from that Google Drive.  Counsel for Rivos repeated these false representations at a hearing two weeks later.  Apple was only notified about Mr. Wen's destruction of evidence nine months after the deletion.

167.    In addition, as noted above, Rivos, the Individual Defendants, and their forensic vendor have been "remediating" documents without Apple's knowledge or input.  This alleged "remediation" has caused the permanent deletion of documents and associated metadata.  Further contradicting Rivos's representations of complying with its preservation obligations, some of the forensic images that its vendor created have ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████

1  ██████. Rivos and the Individual Defendants withheld the fact of these failures to preserve from

2  Apple until June 22, 2023.

3  168.   Rivos also concealed direct evidence of the accessing and intermingling of Apple's

4  trade secret information in Rivos's work product and systems.  For instance, Apple only learned

5  in February 2023 that Mr. Pinot had accessed the Apple power grid specification and additional

6  Apple confidential documents while working for Rivos, even though Mr. Pinot had informed

7  Rivos of his access almost a year before.  Rivos also knew that its own internal network contained

8  ████████████████████████████████████ but did not disclose this until Apple

9  asked its CEO at his deposition.  And Rivos knew that Verilog and other sensitive files containing

10 Apple's confidential and trade secret information were located on Mr. Wen's Rivos-issued

11 computer and his directory on Rivos's network, because Mr. Wen had alerted Rivos after deleting

12 the evidence from his computer and then trying to restore it to the same computer.

13 169.   Indeed, every Individual Defendant was in possession of Apple's confidential and

14 trade secret information, several of them in very large volumes, while working for Rivos, despite

15 knowing of their obligations to return any such information at the end of their Apple employment.

16 Rivos knew or should have known all of this long before it was disclosed to Apple.

17 170.   Rivos has also repeatedly frustrated Apple's efforts in recovering its trade secret

18 documents by non-Defendant individuals and identifying their unauthorized proliferation and use.

19 For example, Rivos has long known that several former Apple employees retained Apple

20 confidential information in their iCloud drives, and that those iCloud drives synced or may have

21 automatically synced with the employees' Rivos work computers.  Rivos has also long known

22 that at least four of its non-Defendant employees—each of whom had an obligation under their

23 IPAs to return to Apple any Apple confidential information—were in possession of Apple

24 confidential information while working for Rivos.

**FIRST CLAIM FOR RELIEF**

**(Breach of Contract Against Individual Defendants)**

27 171.   Apple realleges and restates all prior paragraphs as if fully restated herein.

172.    The IPAs signed by the Individual Defendants are valid and enforceable contracts. The confidentiality covenants and other provisions contained in these agreements are reasonably necessary to protect legitimate protectable interests in Apple's confidential, proprietary, and trade secret information.

173.    Apple has fully performed all of its obligations under these agreements.  Apple has also attempted to obtain the return of its confidential information from Jim Hardage, Laurent Pinot, Kai Wang, Ricky Wen, Weidong Ye, and Prabhu Rajamani without the need to file a lawsuit.  As discussed above, however, Rivos has blocked Apple's attempts to communicate directly with these employees.

174.    The Individual Defendants took and retained Apple's documents in direct violation of the provisions of their IPAs, which required them to "promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple" and included an agreement "that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."  The Individual Defendants breached these agreements by, at a minimum, failing to return Apple's property and confidential, proprietary, and trade secret information at the time of their departure from Apple, as they were obligated to do.  The documents that have been improperly retained are described in more detail above with respect to each Individual Defendant, in the declaration of forensic expert Daniel Roffman and Appendix B to that declaration (ECF Nos. 22-4 and 22-5), and in the declaration of Daniel Murray (ECF No. 22-3), which identify specific files and folders that were taken.  The Individual Defendants have yet to return all of the improperly retained Apple documents to Apple in accordance with their IPAs.

175.    In addition, despite indicating adherence to all contractually obligated termination protocols, many of the Individual Defendants deleted, scrubbed, or otherwise modified the contents of their Apple-issued devices prior to returning them as set forth above.  These efforts obscured message histories, web histories, and other details relating to the employees' use of Apple trade secret information, their departures from Apple, and any decisions to improperly retain Apple trade secret information in violation of, at least, the IPAs.

176.     These actions by the Individual Defendants were intentional.  Many occurred in the days before the Individual Defendants departed Apple, and followed the Individual Defendants receiving, and accepting, offers of employment in parallel roles for Apple's competitor, Rivos.  And each action involved deliberate steps that the Individual Defendant knew he should not have taken.  These actions have been described in detail above for each individual. To give just a few examples: Mr. Wen went out of his way to connect numerous external drives to his Apple-issued laptop and retained over 390 GB of data, including a .tar file he knew contained Apple's confidential information and that he later attempted to delete, purportedly out of regret (although in an explanation to counsel he stated it was also because he believed ███████████████ ████████████████████████).  Mr. Hardage likewise retained information he knew was proprietary to Apple and subject to his IPA by connecting USB flash drives to his Apple-issued computer just before leaving Apple.  Mr. Ye's searches for how to delete files from his Apple devices and how to disconnect his iCloud account (on which he kept entire Apple source code repositories) had no plausible purpose other than to actually delete files and disconnect his iCloud account.  Mr. Pinot admitted that he kept Apple confidential information with the express purpose of using them in the future.  Mr. Rajamani deliberately connected USB drives to his Apple-issued laptop and used AirDrop to transfer specific code files to himself.  And Mr. Wang intentionally deleted 95 GB of data from his Apple-issued computer.

177.     As a result of the Individual Defendants' breach, Apple has suffered and continues to suffer monetary and non-monetary injury and harm in an amount to be proven at trial.  The documents that have been improperly retained are the products of substantial research and development work over a period of many years.  As described in the Declaration of Dan Murray, if a competitor had possession of these documents, it would cause substantial harm to Apple because the competitor would improperly gain a headstart in designing competing SoCs, avoiding potentially years of research and development.

178.     Moreover, as a result of the Individual Defendants' breach, Apple has been injured and faces irreparable harm.  At a minimum, the Individual Defendants each signed IPAs acknowledging that a breach of that agreement would cause irreparable harm and significant

injury to Apple. Apple is also threatened with losing its competitive advantage, trade secrets, customers, and technology goodwill in amounts for which it would be impossible to fully compensate unless the Individual Defendants are enjoined and restrained by order of this Court.

**SECOND CLAIM FOR RELIEF**

**(Misappropriation of Trade Secrets, Defend Trade Secrets Act, 18 USC § 1832(a)(1)**

**Against Rivos, Ricky Wen, Jim Hardage, Laurent Pinot, and Prabhu Rajamani)**

179.    Apple realleges and restates all prior paragraphs as if fully restated herein.

180.    As set forth above, Individual Defendants Ricky Wen, Jim Hardage, Laurent Pinot, and Prabhu Rajamani (the "TS Individuals Defendants") and Rivos (collectively with TS Individual Defendants, the "TS Defendants") improperly acquired and retained confidential and proprietary information of Apple constituting "trade secrets" as defined by 18 U.S.C. § 1839(3), including, but not limited to, design files, drawings, manufacturing information, device packaging information, sales and customer information, and financial and business development information. These trade secrets pertain to Apple's personal computer and mobile device SoCs, including SoC specifications, SoC designs, component designs (including for CPU cores, GPU cores, and cache memories), customized ISA instructions, source code for Apple products based on its SoCs, SoC development roadmaps, summaries of technical analyses of SoC characteristics and parameters, status reports, and other Apple-developed know-how gained from years of developing advanced SoCs.

181.    Apple has identified these trade secrets with particularity, down to file names and file paths. Apple has also described in detail above trade secrets that were misappropriated by the Individual Defendants and accessed or used during the course of their work at Rivos. In terms of broader categories, these trade secrets include ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1

2

3

4

5

6

7

8

9 . These trade secrets have been

10 used in and/or were intended for use in interstate and/or foreign commerce.

11 182.    The trade secrets that have been taken by the TS Defendants are further described

12 in the paragraphs above and in the confidential declarations of forensic expert Daniel Roffman

13 (including Appendix B) (ECF Nos. 22-4 and 22-5) and Daniel Murray (ECF No. 22-3), which

14 identify specific files and folders that were taken.

15 183.    Apple's trade secrets derive independent economic value from not being generally

16 known to, and not being readily ascertainable through proper means by, another person who can

17 obtain economic value from their disclosure or use of the information.  These trade secrets are

18 also the product of years of research and development at substantial cost to Apple.  These trade

19 secrets form the foundation of Apple's competitive advantages in the SoC market.

20 184.    Apple has undertaken efforts that are reasonable under the circumstances to

21 maintain the secrecy of the trade secrets at issue.  These efforts include, but are not limited to: the

22 use of passwords and encryption to protect data on its computers, servers, and repositories; the

23 limited distribution of confidential information only to key Apple employees and executives and

24 on a need-to-know basis; the maintenance of written policies and procedures that emphasize

25 employees' duties to maintain the secrecy of Apple's confidential information; and the use of

26 confidentiality agreements and non-disclosure agreements to require vendors, customers,

27 partners, contractors, and employees to maintain the secrecy of Apple's confidential information.

28

185.    Each TS Individual Defendant misappropriated Apple's trade secrets at least by acquiring them by improper means.  From reviewing their IPAs and Checklists for HWT Departing Employees as part of their exit process, the TS Individual Defendants knew that the Apple files they had recently downloaded or were otherwise still in their possession were confidential and trade secret information that they should not have been retaining.  Nevertheless, each TS Individual Defendant falsely certified that they had returned all Apple proprietary and trade secret information.  To the extent that they were unaware at the time they left Apple of some of the Apple trade secret information in their possession, each TS Defendant became aware of it later, and chose not to return it to Apple.

186.    For example, Mr. Wen knew that his .tar folder contained much more Apple trade secret and confidential information than he admits he intended to retain.  But instead of informing Apple, he tried to destroy the evidence of his wrongful retention.  Mr. Hardage, too, knew that he was in possession of Apple confidential information after leaving Apple, because he deliberately downloaded it onto personal USB drives.  But he concealed this from Apple and had possession of the drives while working at Rivos.  Mr. Pinot was aware at least of the Apple confidential documents that he retained intentionally, and even accessed them while at Rivos.  And Mr. Rajamani knowingly transferred scripts that he used for his work at Apple as he was leaving for Rivos.

187.    On July 9, 2021, shortly after Rivos began hiring Apple's former employees, Apple sent a letter to Rivos informing Rivos of the obligations of those former employees to maintain the confidentiality of Apple's trade secrets and confidential information, and specifically informing Rivos of the provisions of the IPA.  Apple further informed Rivos that, to the extent those former employees had retained Apple's trade secret and confidential information, that information had to be returned immediately.  Apple also sent similar letters to the employees, including each TS Individual Defendant.

188.    The Apple trade secret information that each TS Individual Defendant misappropriated was extensive.  Defendant Ricky Wen intentionally retained thousands of sensitive Apple SoC documents, including microarchitecture specifications and Verilog code, in

violation of his Apple IPA.  He did so by deliberately connecting multiple external hard drives to download numerous Apple proprietary and trade secret SoC design files and copying hundreds of gigabytes of data onto at least one of the drives, knowing full well this data included sensitive Apple information.  Mr. Wen understood that his retention of these documents after leaving Apple was improper, as evidenced by the fact that he tried to delete some of the sensitive files he took, allegedly out of a sense of guilt.  Mr. Wen also signed a valid agreement with Apple requiring him to return Apple's confidential information when he left, signed an agreement with Rivos stating that he would not bring third-party confidential information with him to Rivos, and afterward falsely certified that he had returned all Apple confidential documents, in each instance acknowledging that any retention would have been improper.  The documents that Mr. Wen took from Apple are relevant to his work at Rivos.  Mr. Wen intermingled Apple's confidential information with Rivos systems, including by maintaining a .tar file containing Apple confidential documents on his Rivos-issued laptop, his Rivos email account, and his directory on Rivos's internal network.  He kept individual documents he extracted from the .tar file in folders on these repositories that he called "AAPL" and "Rivos_Work."  Although metadata potentially showing Mr. Wen's use of these documents has been destroyed because of his deliberate spoliation, it can be inferred from Mr. Wen's actions that he intended to, and likely did, use them to advance Rivos's SoC development, in turn harming Apple.

189.    Defendant Jim Hardage intentionally removed 37 gigabytes of data, which he has admitted contained many Apple confidential documents, from his Apple-issued computer in the days leading up to his departure from Apple.  In fact, the documents that Mr. Hardage retained included extensive Verilog and supporting code files for various top secret Apple SoC projects.  After deliberately placing these documents onto personal USB drives, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Hardage has also considered components and features of Apple SoCs in developing Rivos

products, and discussed them with other Rivos employees, going so far as to express his desire to ████████████████████ ██████████████████████████████.

190.    Defendant Laurent Pinot kept hundreds of sensitive Apple SoC documents on his personal laptop, many of which were clearly marked "Apple Proprietary & Confidential."  In at least one instance, Mr. Pinot intentionally kept a copy of an Apple power grid specification with the specific purpose of using it to help him create similar documents in the future, after leaving Apple.  And after joining Rivos, he did, in fact, access that document multiple times.  He also accessed numerous other Apple SoC documents while a Rivos employee, and could not even say whether he had accessed more or less than one hundred.  Like the other TS Individual Defendants, he signed an IPA with Apple and certified that he had returned all Apple proprietary information at the time he left the company.  The documents Mr. Pinot retained and accessed relate closely to ██████████████████████████████ SoC physical design. Mr. Pinot's actions have thus benefited Rivos and harmed Apple.  Mr. Pinot also kept personal Time Machine backups of his Apple-issued computer and other files that he deliberately retained, despite knowing that this was improper.  He did not return his Time Capsule containing his backups and even created a final backup on his last day at Apple.

191.    Defendant Prabhu Rajamani, on the same day he executed his Checklist for HWT Departing Employees confirming he had not retained any Apple confidential and proprietary information, accessed Apple's Confluence technical database before attempting to obscure records of his access and browsing history.  On the same day, he disconnected his iCloud Drive from his Apple-issued laptop, retaining Apple confidential information that was previously synced to the iCloud Drive.  He also connected a USB drive to his Apple-issued laptop and used AirDrop to copy four code files to himself.  After joining Rivos, Mr. Rajamani █████████ ████████████████████████████████████████████. For example, Mr. Rajamani used code that he wrote at Apple to ██████████████████ ██████████████████████████████.  Mr. Rajamani thus intentionally, and in knowing violation of his IPA, used Apple's proprietary and confidential SoC-related information to develop Rivos SoCs.

192.    Neither the TS Individual Defendants' intentional, systematic, and improper acquisitions of Apple's trade secret information nor their use of that information at Rivos were isolated incidents.  They occurred as part of Rivos's campaign to hire away over 50 Apple engineers who had extensive access to Apple's most sensitive SoC information.  That campaign resulted in thousands of Apple's confidential and trade secret documents in the possession of at least eleven Rivos employees—not just the TS Individual Defendants, but also Mr. Ye, Mr. Wang, at least four non-defendants, and the above-mentioned employee who was originally a defendant to this suit but has since been dismissed.  At least some of these Rivos employees, such as Mr. Pinot, kept Apple trade secret information because they believed it would be useful for their Rivos work.

193.    Rivos's campaign of targeting Apple's SoC engineers also resulted in Rivos employees using Apple information as part of their normal Rivos work responsibilities to develop Rivos's own SoCs.  The use of Apple trade secrets at Rivos is widespread and in plain view.  For example, Rivos employees have openly discussed features and technologies of Apple SoCs on which they had worked and compared them with the technology they were developing at Rivos.  They have also considered Apple's improved Verilog design methodology for multi-CPU SoCs.  Rivos employees have discussed Apple's timelines for developing SoCs ███████████████████████, and discussed Apple's trade secret workflows ████████████████ ████████.  And Rivos employees have incorporated Apple trade secret SoC component designs into Rivos's chips, as detailed above.

194.    These instances of use by the TS Individual Defendants and other Rivos employees exemplify trade secret misappropriation by Rivos.  Rivos employs each of these individuals, and the misappropriation by these individuals of Apple's SoC trade secrets occurred within the scope of their employment at Rivos and directly benefited Rivos at Apple's expense.

195.    Rivos also ratified the TS Individual Defendants' misappropriation by: frustrating Apple's attempts to obtain the return of its information; failing to segregate Apple's confidential information that it was informed were in the possession of Apple's former employees and allowing them to continue to have access to it; and misrepresenting repeatedly that the documents

had been segregated and that no documents had found their way on to Rivos laptops or the Rivos system.  As detailed above, Rivos prohibited its employees from working directly with Apple to return the information they had improperly retained, while simultaneously refusing for months to provide discovery about those employees' retention of Apple materials.  Rivos also falsely represented to the Court that all evidence had been preserved, when in fact it was aware that Mr. Wen had deleted data, and Rivos's alleged unilateral attempts at "remediating" Apple's information destroyed metadata.  Rivos further falsely represented that it had segregated all relevant devices and drives, even though numerous repositories containing Apple's trade secrets remained in the possession of and/or accessible to Rivos employees and even on the Rivos network, in some cases for nearly a year after this suit began.  And Rivos concealed evidence of its employees' intermingling of Apple information with Rivos systems.

196.    From the start, Rivos has uniquely had possession of or access to the most relevant and probative information regarding the use and disclosure of Apple's trade secrets at Rivos.  But instead of cooperating with Apple to provide that information and purge its systems, IP, and work product of Apple's information, Rivos withheld the information in the hopes that the Court would dismiss the case and the evidence of its and its employees' misappropriation would never see the light of day.  Rivos has not only knowingly failed to disclose such evidence, but also effectively turned a blind eye to potential misappropriation by former-Apple, now-Rivos employees whom Apple has not named as defendants to this suit.  Rivos's actions amount to ratification of and acquiescence to its employees' misappropriation of Apple's trade secrets.

197.    Furthermore, in addition to all that has been alleged above, in view of (i) the number of engineers that Rivos targeted and hired—and continues to target and hire—to perform the same type of work they were performing at Apple, (ii) the fact that Apple notified Rivos of its former employees' obligations and received no response, (iii) the large number of these employees who have taken and retained Apple confidential information after communicating with Rivos or accepting their offers from Rivos, (iv) the volume of information taken, (v) the nature of the information taken, (vi) the number of departing employees who deleted information and tried to cover their tracks after accepting offers from Rivos, (vii) Rivos's own efforts to conceal its

communications with these former Apple employees, (viii) Rivos's claim that it was advising Apple's former employees how not to retain confidential information learned during the time they were still at Apple, which has now repeatedly been contradicted by the Individual Defendants, (ix) Rivos's refusal to cooperate with returning or segregating trade secret documents to Apple that it knows are in its current employees' possession while at the same time blocking Apple from retrieving this information itself, and (x) ███████████████████████ ██████████████████ without the benefit of substantial pre-existing knowledge, like that embodied in Apple's trade secrets, which would not have been available to a brand new startup— Rivos knew that its employees improperly retained Apple confidential and trade secret information and were making use of it in the course of their employment at Rivos.

198.    Further discovery will likely provide additional evidence that Apple's trade secret information has been improperly disclosed to Rivos and used by Rivos and the TS Individual Defendants.

199.    The TS Defendants' improper acquisition and/or unauthorized use or disclosure, actual or threatened, violates the Defend Trade Secrets Act (DTSA).

200.    It is clear that the TS Defendants improperly retained and used Apple's confidential trade secrets in their work at Rivos.  It is also clear that the TS Defendants have yet to investigate adequately to ensure that they are not continuing to retain and use Apple's confidential trade secrets.  Each day that passes is another day whereby Apple's competitive edge continues to lie in the hands of its competitor.  Each day is another day where Apple cannot know where that information may go, or how Rivos or the other TS Defendants may exploit it to build SoC products that directly compete with Apple's own SoCs.  Once Apple's trade secrets have been embedded into such products, discovering and mitigating the impacts of that misappropriation becomes increasingly difficult, if not impossible.

201.    As a direct and proximate result of TS Defendants' conduct, Apple has been injured, and is threatened with further injury, in an amount that will be proven at trial.  Apple has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of TS Defendants' misappropriation.  As a further proximate result of

the misappropriation and use of Apple's trade secrets, TS Defendants have been unjustly enriched.

202.   TS Defendants' conduct has been willful and malicious, justifying an award of exemplary damages.  As described in detail above, after receiving employment offers from Rivos and resigning from Apple, the TS Individual Defendants took and retained hundreds of gigabytes of Apple trade secret information regarding SoC designs, functions, and implementation.  This trade secret information includes some of the most competitively sensitive and confidential information that Apple possesses about its SoC designs, and much of this information was accessed and transferred during the final days of the TS Individual Defendants' employment. Again, after accepting their employment offers from Rivos, the TS Individual Defendants, and many other former Apple employees who are now at Rivos, took steps to cover up the evidence of their actions, including, in some cases, wiping their entire devices.  The TS Individual Defendants and other former Apple employees now at Rivos falsely represented to Apple that they had returned all of Apple's confidential information and had not deleted the information from their devices.

203.   Employees have been leaving Apple for Rivos as recently as June 2022; some have used Apple's trade secret information; others have at least taken such information with them; and yet others likely continue to maintain access to Apple information because of Rivos's blocking of discovery.  TS Defendants' conduct constitutes transgressions of a continuing nature for which Apple has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, TS Defendants may continue to retain and use Apple's trade secret information to enrich themselves and divert business from Apple to Rivos.  Apple is entitled to a preliminary and permanent injunction against TS Defendants' actual and threatened potential violation of the DTSA.

## PRAYER FOR RELIEF

NOW, THEREFORE, Plaintiff Apple prays for judgment and relief against Defendants as follows:

a.  Judgment in Apple's favor and against Defendants on all causes of action alleged herein;

b.  Damages sufficient to compensate for the actual loss caused by TS Defendants' trade secret misappropriation;

c.  A further award of monetary recovery for any unjust enrichment caused by TS Defendants' misappropriation of the trade secrets;

d.  In lieu of damages measured by any other methods, a reasonable royalty for TS Defendants' misappropriation of trade secrets;

e.  Exemplary damages, based on TS Defendants' willful and malicious appropriation of trade secrets;

f.  For the entry of a Preliminary and Permanent Injunction against Defendants to prevent the actual or threatened misappropriation of Apple's trade secrets;

g.  For an Order directing Defendants to return all of Apple's property in their possession, custody, or control and cease any access to or use of Apple's trade secrets;

h.  For prejudgment and post-judgment interest at the maximum legal rate as applicable, as an element of damages that Apple has suffered as a result of Defendants' wrongful and unlawful acts;

i.  For reasonable attorneys' fees and costs incurred herein as allowed under the Defend Trade Secrets Act; and

j.  For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Apple hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Dated:   August 29, 2023                              MORRISON & FOERSTER LLP

                                        By   */s/ Bryan Wilson*
                                                  BRYAN WILSON

                                        Attorneys for Plaintiff
                                        APPLE INC.