1   BRYAN WILSON (CA SBN 138842)
    BWilson@mofo.com
2   KENNETH A. KUWAYTI (CA SBN 145384)
    KKuwayti@mofo.com
3   MORRISON & FOERSTER LLP
    755 Page Mill Road
4   Palo Alto, California 94304-1018
    Telephone: 650.813.5600
5   Facsimile:  650.494.0792

6   ARTURO J. GONZALEZ (CA SBN 121490)
    AGonzalez@mofo.com
7   ~~DIEK O. VAN NORT~~MEREDITH L. ANGUEIRA (CA SBN
    ~~273823~~333222)
8   ~~DVanNort~~MAngueira@mofo.com
    MORRISON & FOERSTER LLP
9   425 Market Street
    San Francisco, California 94105-2482
10  Telephone: 415.268.7000
    Facsimile:  415.268.7522
11
    MARY PRENDERGAST (CA SBN 272737)
12  MPrendergast@mofo.com
    MORRISON & FOERSTER LLP
13  2100 L Street, NW, Suite 900
    Washington, District of Columbia 20037
14  Telephone: 202.887.1500
    Facsimile:  202.887.0763
15
    Attorneys for Plaintiff
16  APPLE INC.

17                    UNITED STATES DISTRICT COURT

18                   NORTHERN DISTRICT OF CALIFORNIA

19                          SAN JOSE DIVISION

20

21  APPLE INC., a California corporation,        Case No. 5:22-cv-2637-~~EJD~~PCP-NMC

22                    Plaintiff,                 ~~SECOND~~THIRD AMENDED

23        v.                                     COMPLAINT

24                                               **(1)  Breach of Contract**
    RIVOS INC., a Delaware corporation; WEN
25  SHIH-CHIEH a/k/a RICKY WEN; ~~BHASI~~          **(2)  Violation of the Defend Trade Secrets
    ~~KAITHAMANA;~~ JIM HARDAGE;                         Act (18 U.S.C. § 1836 *et seq.*)**
26  WEIDONG YE; LAURENT PINOT;
    PRABHU RAJAMANI; and KAI WANG,              **DEMAND FOR JURY TRIAL**
27
                      Defendants.
28

Plaintiff Apple Inc. ("Apple") brings this ~~Second~~Third Amended Complaint against Defendant Rivos Inc. ("Rivos")~~,~~ and current Rivos employees Wen Shih-Chieh a/k/a Ricky Wen, Jim Hardage, Weidong Ye, Laurent Pinot, Prabhu Rajamani, and Kai Wang~~, and former Rivos employee Bhasi Kaithamana~~ (together, the "Individual Defendants") (collectively, "Defendants") and alleges as follows:

**INTRODUCTION**

**I.** ~~1.~~ Apple brings this action to ~~prevent~~stop Rivos and its employees from exploiting Apple's most valuable trade secrets to compete with Apple unlawfully and unfairly.  When Apple ~~does not take lightly naming individuals in this Amended Complaint.  The limited information that Apple has received so far confirms that Apple confidential materials are in Rivos employees' possession.  Instead of cooperating with Apple to resolve this matter, Rivos has blocked Apple's communication with those employees and prevented Apple from understanding the full extent of Apple's confidential information at Rivos or with its former employees and arranging for its return.  Thus, Rivos has left Apple no alternative but to pursue legal assistance by naming additional individuals.~~filed its original Complaint on April 29, 2022, forensic evidence from former Apple employees' Apple-issued computers already made clear that former Apple employees retained substantial volumes of Apple's trade secret information when they joined Rivos.  Now, preliminary discovery has confirmed that Apple's trade secret information has found its way in substantial volumes into Rivos's systems and devices.  Apple's trade secrets have also been used by Rivos's employees in connection with their Rivos work designing systems-on-chips ("SoCs").  And they have been left accessible to Rivos's employees for months or even over a year since their departure from Apple, and for many months after this lawsuit was filed.  Rivos employees talk openly about Apple SoCs during the course of their work at Rivos, and one employee admitted that it was "not taboo" to do so, even after this lawsuit was filed.  The extent of misappropriation by Rivos and its employees is alarming.

**II.**~~2.~~ Apple's cutting-edge~~, advanced system-on-chip (" SoC")~~ designs, including its ~~M1 laptop~~M-Series and A-Series SoCs ~~and A15 mobile phone SoC~~, have revolutionized the personal

and mobile computing worlds.  Apple has devoted billions of dollars and more than a decade of effort to develop the proprietary technologies and expertise necessary to engineer these revolutionary SoC designs and become a leader in the field of semiconductor design.

**III.** ~~3.~~ "Stealth mode" startup Rivos was founded to design and market its own competing SoCs.  Rivos claims, through its CEO, that it has "no interest in relying on Apple information as Rivos builds its business."  But Rivos's actions say otherwise.  Since its inception, it has filled out its ranks with ~~dozens of~~ over 50 former Apple engineers.   Starting in June 2021, Rivos began a coordinated campaign to target Apple employees with access to Apple proprietary and trade secret information about Apple's SoC designs.  ~~Apple promptly sent Rivos a letter informing Rivos of the confidentiality obligations of Apple's former employees, but Rivos never responded.~~This campaign has resulted in at least eleven different employees retaining Apple's confidential and trade secret information when leaving Apple, on contravention of their employment agreements.  In many cases, the information was placed onto Rivos-issued devices and Rivos systems and/or used for their Rivos work.

**IV.** ~~4.~~ After accepting their offers from Rivos, some ~~of these~~ employees took gigabytes of sensitive SoC specifications and design files during their last days of employment with Apple.  Some used multiple USB storage drives to offload material to personal devices, accessed Apple's most proprietary specifications stored within collaboration applications, and used AirDrop to transfer files to personal devices.  Others saved ~~voluminous~~many presentations on existing and unreleased Apple SoCs—marked "Apple Proprietary and Confidential"—to their personal cloud storage drives.  ~~One~~Some even made ~~a~~ full ~~Time Machine backup of his~~backups of their entire Apple ~~device~~devices onto ~~a~~ personal external ~~drive.  Apple has reason to believe that Rivos instructed at least some of these individuals to download and install apps for encrypted communications before conducting further conversations~~drives.  And at least nine of the employees wiped their Apple devices entirely ~~to try to cover their tracks, later falsely representing to Apple that they had not done so~~.  Even more of the employees selectively deleted information from their Apple devices.

1    5. In the weeks since filing its initial complaint and individually notifying its former

2   employees and Rivos of the Apple confidential information they improperly retained, Apple's

3   fears have been proven justified.  Apple has confirmed that four of the former employees—the

4   only four for whom Apple has received a substantive response—improperly retained Apple

5   confidential information and continued to possess that information even after they began working

6   at Rivos.  The two individuals named in Apple's initial complaint (Individual Defendants Wen

7   and Kaithamana) have agreed to forensic examination of their devices and to return any Apple

8   information in their possession.  Another employee, Individual Defendant Kai Wang, responded

9   and confirmed he had retained documents, seeking to resolve the matter "cooperatively."  Mr.

10  Wang subsequently directed Apple to Rivos's counsel, who has declined to state whether it has

11  any information regarding Mr. Wang and has declined to provide any response on his behalf.

12  The last of the four, Individual Defendant Laurent Pinot, who retained over a terabyte of

13  information as a Time Machine backup of his Apple-issued computer, has admitted he still has

14  that backup.

15    6. These are not the only former Apple employees who have retained Apple confidential

16  information and are now working at Rivos.  Apple filed a declaration from a forensic expert in

17  conjunction with its application for a Temporary Restraining Order and expedited discovery in

18  which it provided Rivos with substantial forensic information including specific device names

19  and serial numbers on which this information was stored.  But Rivos continues blocking Apple's

20  attempts to recover its information from its other former employees at every turn.  Rivos demands

21  that Apple communicate with the employees through Rivos's counsel, yet refuses to say if that

22  counsel represents the employees.  Rivos also denies that it has control over the Apple

23  information in the employees' possession.  Rivos has refused to confirm whether the information

24  retained by these employees has been preserved, and has not segregated the information.

25  According to Rivos, it does not have custody and control over the devices Apple has identified as

26  containing Apple confidential information.  Rivos claims that it therefore cannot return, image, or

27  segregate them.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**V.** Ricky Wen intentionally identified and retained thousands of sensitive Apple SoC documents, including highly confidential chip specifications and source code before leaving Apple.  He did so by deliberately connecting multiple external hard drives to download numerous Apple proprietary and trade secret SoC design files and copying hundreds of gigabytes of data onto at least one of the drives, knowing full well that it included sensitive Apple information.  Mr. Wen understood that his retention of these documents after leaving Apple was improper, as evidenced by the fact that he apparently tried to delete some of the sensitive files.  Mr. Wen also placed Apple's confidential information onto Rivos systems, including his Rivos-issued laptop, his Rivos email account, and his directory on Rivos's internal network.  He also kept hundreds of confidential Apple documents in folders on his Rivos-laptop and the Rivos internal network that he titled "AAPL" and "Rivos_Work."  Mr. Wen knew that he had retained Apple confidential information and deleted a folder containing many of those files after the lawsuit was filed, destroying metadata that would have shown whether the Apple files were transferred or accessed.

**VI.** Jim Hardage specifically identified and retained 37 gigabytes of data on two USB drives taken from, among other places, an internal Apple engineering system provided for his work on SoC design.  At the time he retained the data, Mr. Hardage was aware of the substantial likelihood that he had retained Apple confidential information regarding SoC design.  In fact, Mr. Hardage retained many highly sensitive files describing the function and design of Apple SoCs, including source code.  After joining Rivos, Mr. Hardage repeatedly accessed the USB drives, including to transfer information onto his Rivos-issued devices and storage.  He also discussed proprietary and confidential features of Apple SoCs with other Rivos employees in connection with his work at Rivos and brazenly told another former Apple employee that █████ ██████████████████████████████████████████████████████████.

**VII.** Weidong Ye saved multiple Apple source code repositories to his iCloud Drive, to which he retained access for much of his employment at Rivos.  The code that Mr. Ye improperly retained, in violation of his employment agreements with Apple, made its way onto Mr. Ye's

4

1   personal devices, including his MacBook, iPhone, and iCloud Drive, all of which he could access

2   while working at Rivos.

3       **VIII.** Laurent Pinot kept hundreds of sensitive Apple SoC documents on his personal

4   laptop, many of which were clearly marked "Apple Proprietary & Confidential."  In at least one

5   instance, Mr. Pinot intentionally retained a copy of an Apple document ████████████████████

6   ████████████████████████████████████████████████████.  And after

7   joining Rivos, he did, in fact, review that document multiple times.  He also accessed multiple

8   other Apple SoC documents while a Rivos employee.  In addition, Mr. Pinot kept personal

9   backups of his Apple-issued computer and other files that he deliberately retained on a Time

10  Capsule external storage device.  Even though he knew that this was improper, he did not return

11  the device before leaving Apple; instead, he backed up his Apple laptop one more time on his last

12  day.

13      **IX.** Prabhu Rajamani, shortly before leaving Apple, accessed Apple's internal technical

14  database before attempting to obscure records of his access and browsing history.  On the same

15  day, he disconnected his iCloud Drive from his Apple-issued laptop, retaining Apple confidential

16  information that was previously synced to the iCloud Drive.  He also connected a USB drive to

17  his Apple-issued laptop and used AirDrop to copy at least four code files to himself.  Mr.

18  Rajamani admits that ████████████████████████████████████████████

19  ████████████████.  After joining Rivos, Mr. Rajamani ████████████████

20  ███████████████████████████████████████████████████████████

21  ████████████████████████████████████.

22      **X.** Kai Wang retained Apple confidential documents on his personal iCloud Drive, to

23  which he maintained access after leaving Apple.  These retained files included numerous

24  screenshots of sensitive Apple information, ranging from portions of source code to specification

25  documents clearly stamped "Apple Registered Confidential – Do Not Distribute."  Many of the

26  other files he retained on the iCloud Drive also included or described trade secret and confidential

27  components of Apple projects.

28

1

    **XI.**Each of the Individual Defendants and Rivos had multiple opportunities to explain

2

their actions to Apple and to return the documents they had taken.  They did not do so, and

3

instead continued to conceal their actions.  It is clear that the above Rivos employees have each,

4

in violation of their employment agreements with Apple, retained, accessed, or used Apple's SoC

5

trade secrets and/or confidential information.

6

    **XII.**7. Rivos claims, through its CEO, that it has "no interest in relying on Apple

7

information as Rivos builds its business."  But Rivos's actions say otherwise.  Rivos has long

8

been aware of the former Apple employees' contractual obligation to return all confidential

9

information to Apple.  Yet Rivos is interferinghas interfered with the employees' ability to do so.

10

In fact, Rivos's own forensic expert confirmed that Apple documents improperly retained by

11

Defendant Ricky Wen in his iCloud drive were automatically synced to his Rivos-issued

12

computer.  Apple has informed Rivos of multiple other former Apple employees with highly

13

sensitive documents retained in their iCloud accounts, yet Rivos has provided no response

14

whatsoever as to those employees, much less any information regarding whether that data ended

15

up on Rivos-issued devices.  Even though Rivos is aware that some of its employees have

16

retainedThere has been steadily growing evidence that Apple's confidential information has been

17

used for the design of Rivos SoCs and was transferred to employees' Rivos laptops and Rivos's

18

internal systems, in addition to proliferating throughout employees' personal devices and drives.

19

In most cases, this was due to knowing and intentional steps taken by Rivos's employees.

20

Nevertheless, Rivos has sought to block Apple from learning the full extent of its and its

21

employees' misappropriation.  Meanwhile, those same employees continued to have access to the

22

Apple confidential information, it is not requiring that information to be returned or segregated.

23

And the risk to Apple continues to grow.  Indeed, Defendant Weidong Ye joined Rivos over a

24

month they improperly retained, in some cases for nearly a year after this lawsuit was filed, and

25

took with him a large amount of confidential Apple source code and documents marked Apple

26

Confidential & ProprietaryApple asked for its return.

27

28

1   8. Apple welcomes and values open competition and the innovation that can result.  But

2   that competition cannot be built on Apple's confidential information.  The sheer volume of

3   information taken, the highly sensitive nature of that information, and the fact that these

4   employees are now performing the same duties for a competitor with ongoing access to some of

5   Apple's most valuable trade secrets, which Rivos refuses to curtail, leave Apple with few

6   alternatives.  If Apple does not act to protect its most sensitive secrets now, it could lose trade

7   secret status over them entirely.  That outcome is untenable given Apple's extensive investments

8   of time and resources into its SoC programs.  The full extent of the use and disclosure of Apple's

9   trade secret information at Rivos also is uniquely within the possession of the Individual

10  Defendants and Rivos, particularly since Defendants have taken actions to conceal evidence

11  regarding their misconduct.  And since Apple filed its initial complaint, Rivos has done its best to

12  block Apple from resolving its concerns with its former employees quickly and cooperatively.

13  Apple therefore has no choice but to bring this action to recover its trade secrets, to protect them

14  from further disclosure, and to uncover the full extent of their use to try to mitigate the harm that

15  has occurred and will occur.

16  **XIII.** In fact, Rivos employees have openly discussed, considered, and used Apple's trade

17  secret information in the course of their Rivos work designing SoCs.  For example, Rivos

18  employees have used confidential information relating to Apple SoCs and referenced specific

19  Apple SoC projects by code name in the course of designing Rivos SoCs.  They have also relied

20  on Apple's proprietary CAD design environment when implementing their own design

21  environment, ███████████████████████████████████

22  ████████████████.  And they have incorporated Apple's trade secrets into Rivos SoCs.

23  Indeed, Rivos's ████████████████████ suggests that it has been making use of

24  Apple's trade secrets and confidential information.

25              **JURISDICTION, VENUE, AND PARTIES**

26  **XIV.** 9. This Court has original jurisdiction of the asserted federal law claims under the

27  Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and under federal question jurisdiction pursuant

28

to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1357 because it is part of the same case or controversy.

**XV.** 10. Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c), because Apple resides in this District and Individual Defendants, all former Apple employees, have signed an Intellectual Property Agreement and, "consent[ed] to personal jurisdiction of and venue in the state and federal courts within Santa Clara County, California" and agreed that any "judicial action between the parties relating to this Agreement will take place in Santa Clara County, California."[1]  Individual Defendants Ricky Wen, Weidong Ye, Laurent Pinot, and Prabhu Rajamani also committed the wrongful acts within this District.

**XVI.** 11. Apple is and at all times mentioned herein has been a California corporation, having its principal place of business at One Apple Park Way, Cupertino, California 95014.

**XVII.** 12. Upon information and belief, Defendant Rivos is and at all times mentioned herein has been a Delaware corporation, having its principal place of business at 2811 Mission College Blvd, 7th Floor, Santa Clara, California, 95054-1884.  Rivos currently employs each of the Individual Defendants (except Mr. Kaithamana, whom Rivos previously employed), as well as numerous other former employees of Apple, many of whom were formerly employed by Apple in this District.  At least some of these former employees perform their work for Rivos within this District.  Rivos's intended business will derive substantial revenue from sales within this District.

13. Upon information and belief, Defendant Bhasi Kaithamana resides in Austin, Texas. He was a "CPU Implementation Lead" at Rivos.  Before that, Mr. Kaithamana was a Senior Engineering Manager (CPU Design) employed by Apple and working at Apple's facilities in Austin, Texas, until August 16, 2021, in coordination with other Apple employees in Apple's

---

[1] Ex. A, Apple Intellectual Property Agreement (executed by Ricky Wen) ("Wen IPA") § 6.0(b); Ex. B, Apple Intellectual Property Agreement (executed by Bhasi Kaithamana) ("Kaithamana IPA") § 6.0(b); Ex. C, Apple Intellectual Property Agreement (executed by Weidong Ye) ("Ye IPA") § VI.B; Ex. DC, Apple Intellectual Property Agreement (executed by Laurent Pinot) ("Pinot IPA") § 6.0(b); Ex. ED, Apple Intellectual Property Agreement (executed by Prabhu Rajamani) ("Rajamani IPA") § 6.0(b); Ex. FE, Apple Intellectual Property Agreement (executed by Jim Hardage) ("Hardage IPA") § 6.0(b); Ex. GF, Apple Intellectual Property Agreement (executed by Kai Wang) ("Wang IPA") § VI.B.  Exhibit H is a red-lined document showing the changes made to the previously filed complaint (Dkt.1).

1   ~~facilities in Cupertino, California, including when facts underlying this Complaint occurred.  Like~~

2   ~~the other Individual Defendants, Mr. Kaithamana signed the Intellectual Property Agreement~~

3   ~~agreeing to jurisdiction in California and venue in Santa Clara County.~~

4       **XVIII.**~~14. Upon information and belief,~~ Defendant Ricky Wen resides in San Jose,

5   California.  He is currently employed at Rivos as a "Principal Member of Technical Staff," with a

6   focus generally on "Hardware Engineering."  He was a CPU design engineer employed by Apple

7   and worked at Apple's facilities in Cupertino, California, until August 6, 2021, including when

8   the events described in this Complaint occurred.  Like the other Individual Defendants, Mr. Wen

9   signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in

10  Santa Clara County.

11      **XIX.**~~15. Upon information and belief,~~ Defendant Jim Hardage resides in Austin, Texas.

12  He is a "CPU RTL Architect" at Rivos.  He was a FE Engineer 5 employed by Apple and worked

13  at Apple's facilities in Austin, Texas until October 21, 2021, in coordination with other Apple

14  employees, in Apple's facilities in Cupertino, California, including when facts underlying this

15  Complaint occurred.  Like the other Individual Defendants, Mr. Hardage signed the Intellectual

16  Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

17      **XX.**~~16. Upon information and belief,~~ Defendant Weidong Ye resides in San Jose,

18  California.  He is currently employed at Rivos as a "Member of Technical Staff."  He was a

19  Systems Power & Performance Engineer employed by Apple and worked at Apple's facilities in

20  Cupertino, California, until June 10, 2022, including when facts underlying this Complaint

21  occurred.  Like the other Individual Defendants, Mr. Ye signed the Intellectual Property

22  Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

23      **XXI.**~~17. Upon information and belief,~~ Defendant Laurent Pinot resides in Los Gatos,

24  California.  He works on "Physical Design" at Rivos.  He was a Physical Design Manager

25  employed by Apple and worked at Apple's facilities in Cupertino, California, until August 23,

26  2021, including when facts underlying this Complaint occurred.  Like the other Individual

27

28

Defendants, Mr. Pinot signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

**XXII.**18. Upon information and belief, Defendant Prabhu Rajamani resides in San Jose, California. He works as a "Hardware Engineer" at Rivos. He was a Power Engineer 5 employed by Apple and worked at Apple's facilities in Cupertino, California, until October 19, 2021, including when facts underlying this Complaint occurred. Like the other Individual Defendants, Mr. Rajamani signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

**XXIII.**19. Upon information and belief, Defendant Kai Wang resides in Austin, Texas. He was a Performance and Modeling Engineer 3 employed by Apple and worked at Apple's facilities in Austin, Texas, until February 10, 2022, in coordination with other Apple employees, in Apple's facilities in Cupertino, California, including when facts underlying this Complaint occurred. Like the other Individual Defendants, Mr. Wang signed the Intellectual Property Agreement agreeing to jurisdiction in California and venue in Santa Clara County.

## **BACKGROUND**

**XXIV.**20. Founded in 1976, Apple is a world-renowned technology company and global leader in consumer electronics, mobile communications, and computing. It designs, manufactures, and markets smartphones, personal computers, tablets, wearables, and accessories, and sells a variety of related services. Apple's success and ability to compete successfully depend heavily upon its ability to ensure a continual and timely flow of competitive products, services, and technologies to the marketplace. Apple continues to develop new technologies to enhance existing products and services, and to expand the range of its offerings through, among other avenues, its significant investments in research and development.

**XXV.**21. One key aspect of Apple's newest cutting-edge products is its use of highly advanced SoCs, which Apple custom designs. SoCs are integrated circuits that contain, in a single chip, multiple processing components, such as one or more central processing units ("CPUs"), graphics processing units ("GPUs"), cache memories, and specialized processors.

Apple custom designs its own processing components and integrates them together in SoC designs that reduce the area footprint of the chips and achieve tighter component integration compared to traditional computer systems.  Apple's SoCs allow for faster, more efficient, and more powerful computing.  Apple's unique designs and architecture are critical to its competitive edge in the marketplace.  Apple's first ARM-based SoCs for laptop and desktop computers, the M1 chip family, were released in November 2020 to great success.  The M1 family has now expanded to include the M1 Pro, M1 Max, and M1 Ultra chips.

**XXVI.**22. The M1 chip is the first personal computer chip built using cutting-edge 5-nanometer process technology.  It features a unified memory architecture for dramatically improved performance and efficiency.  At the time it was released, it featured among the world's fastest CPU cores in low-power silicon, best CPU performance per watt, and fastest integrated graphics in a personal computer, while boasting breakthrough machine learning performance.  The M1 Pro, Max, and Ultra chips have only extended Apple's lead in performance, custom technologies, and power efficiency.

A.      SoC Design

**XXVII.**23. SoC design is complex and challenging, and requires considerable expertise and experience.  Instruction Set Architectures ("ISAs") define processor instructions that perform various processing functions (e.g., accessing memory, comparing data, and arithmetic).  ISAs are implemented through physical processor components that execute an ISA's various instructions.  Designing SoC chips based on an ISA involves developing abstract models for these physical components that act as the interface between the SoC and the software.  Chip designers use these abstract models to design the physical structure of SoCs.

**XXVIII.**24. Some modern ISAs utilize the popular reduced instruction set computer ("RISC") architecture design.  RISC-based ISAs focus on creating a relatively small set of simple, commonly used instructions for carrying out processor functions to run typical programs.  These simple instructions require less physical hardware to execute and can be combined to accomplish more complex functions.

1

**XXIX.**25. Arm Ltd. develops leading RISC-based architectures for SoCs.  Arm Ltd.'s

2

proprietary "Advanced RISC Machine," or "ARM," architectures are licensed to its customers,

3

which include Apple, and are used in some of the most advanced SoCs in the world, such as

4

Apple's M1 SoC.

5

26. The RISC-V ISA is an ISA that can be freely used to develop RISC-based SoCs.

6

Although the ARM and RISC-V architectures are not the same, they share many common

7

features, and corresponding SoC designs can share many common elements.  As a result, certain

8

foundational elements and microarchitectural designs of ARM-based SoCs are useful in

9

designing RISC-V based SoCs.  Thus Rivos, which develops RISC-V SoCs, can take advantage

10

of ARM-based SoC designs to shorten its development timelines.  For example, techniques that

11

increase computational performance in a CPU core design while reducing power consumption

12

developed for an ARM-based SoC design can benefit a RISC-V based SoC design.  Additionally,

13

while such a technique might have been developed for a mobile CPU core, the technique can still

14

be beneficial for and incorporated into designs for other types of CPU cores, such as those

15

designed for laptops or even datacenters, where energy efficiency is still an important

16

performance metric.

17

**A.** **B.** Apple's Innovative SoC Designs

18

**XXX.** Apple has developed a number of highly successful, groundbreaking ARM-based

19

SoCs.  Apple's SoC research, development, and manufacturing are led by teams of Apple

20

engineers.  Apple entrusts these engineers with developingIn particular, Apple's Silicon

21

Engineering Group (SEG), made up of hundreds of engineers, works with Apple's hardware

22

division to develop, among other things, its ARM technology, chip designs, and other elements of

23

Apple's SoC business.  A final SoC chip specification often results from the coordinated efforts

24

of Apple's SEG engineers over several years.  During that time, Apple's SEG engineers produce

25

and utilize Apple's most closely guarded proprietary and trade secret SoC information, including

26

SoC designs, component designs, chip specifications, materials describing the development and

27

28

1  testing of SoCs, customized ISA instructions, source code for products incorporating Apple's
2  SoCs, and other Apple-developed know-how gained from years of developing advanced SoCs.
3       **XXXI.**27.   Apple has dedicatedThe iterative nature of Apple's SoC design process
4  contributes substantially to the value of its technology.  Because each successive SoC generation
5  builds on what Apple engineers learned from developing previous generations of SoCs, the past
6  design information is extremely valuable.  Apple dedicates billions of dollars each year to this
7  critical work.
8       28.  Apple's SoC engineers work onSoCs are thus some of Apple'sthe company's most
9  sensitive and critical projects.
10      **XXXII.**Since 2010, Apple has designed and developed more than a dozen
11  high-performance SoCs for use in Apple's flagship iPad and iPhone projects.  Recent work
12  includes the A15 SoC at the heart of Apple's latest iPhones and the M1 family of SoCs that
13  power Apple's desktops, laptops, and high-performance iPads.  Apple develops and writes source
14  code for custom software and operating systems to run on its products that incorporate its SoCs.
15      29. As is necessary for their cutting-edge work, select Apple engineers have access to
16  some of Apple's most closely guarded proprietary and trade secret information.  These trade
17  secrets include SoC designs, component designs, customized ISA instructions, source code for
18  products incorporating Apple's SoCs, and other Apple-developed know-how gained from years
19  of developing advanced SoCs.
20      **XXXIII.**The cutting-edge Apple technology at issue also includes Apple's unreleased or
21  unannounced SoC projects.  Apple's proprietary and confidential information relating to these
22  projects may be the most sensitive of all, because it concerns new features and developmental
23  approaches into which Apple has invested time and resources, and even the existence of which
24  has yet to be revealed to the public.  These projects thus not only embody some of Apple's most
25  valuable and sensitive technology, but also its highly confidential business plans.
26

27

28

### A.    The Value of Apple's Trade Secret SoC Information to Competitors

**XXXIV.** As noted above, Apple's trade secret SoC information reflects the cumulative work of hundreds of engineers over more than a decade—work that has continued to build on itself to ensure that Apple's SoC designs and implementation remain well ahead of the rest of the market.  Apple's SoCs are years and generations ahead of those of competitors.  Therefore, were it to obtain access to even part of Apple's trade secret SoC information, a competitor would get a significant head start in creating custom SoCs and more quickly compete with Apple's current SoCs.  Information about current designs and even designs several years old are thus extremely valuable to Apple.

**XXXV.** Competitors like Rivos, a recent startup with no institutional intellectual property and faced with building SoCs from the ground up, especially stand to gain from Apple's trade secret SoC information.  Rivos was founded in or around May 2021 to design a full stack computing solution based on custom-designed reduced instruction set computer-based SoCs that will compete with Apple's ARM SoCs.

**XXXVI.** While it has no product in the market, Rivos has said that it is developing server SoCs that use the RISC-V architecture.  As both ARM and RISC-V ISAs implement RISC architectures, they share numerous common elements, compatible and transferable features and techniques, and design considerations.  For example, know-how for enhancing computational performance and reducing power consumption that were developed for ARM-based SoCs can be effectively leveraged to optimize RISC-V based SoCs.  Apple's trade secret information includes sophisticated prefetching designs that intelligently anticipate and fetch memory locations to accelerate performance, as well as advanced power-saving techniques, all of which could be used to enhance the performance and power management of Rivos's RISC-V chips, including in server-related applications.  These considerations are important, and Apple's proprietary solutions beneficial, regardless of the purported application of Rivos's SoCs.  For example, Apple's SoCs include proprietary, high-performance CPU cores using Apple trade secrets.  An

SoC using many of these CPU cores could be used to develop chips that meets server and datacenter processing requirements.

### A.   C. Apple Diligently Protects Its Trade Secret Chip Designs and Related Information

XXXVII.30. Apple diligently protects its proprietary and trade secret designs and investments in research and development.  As a condition of employment, Apple employees, as was the case for the Individual Defendants, are required to sign a confidentiality agreement that legally obligates them to protect and not disclose to third parties confidential information acquired during their employment.  This obligation continues even after the employee leaves Apple.

XXXVIII.31. One of the most critical agreements for protecting Apple's proprietary and trade secret information is the Intellectual Property Agreement ("IPA").  Under the IPA, which Apple employees, including the Individual Defendants, must execute at the start of their employment, employees attest thatto the following:

> You understand that your employment by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple.  Upon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper, magnetic or optical media, or any other medium, containing any Proprietary Information.

XXXIX.32. Apple employees, including the Individual Defendants, also agree that Apple would be entitled to injunctive relief for any violations of the IPA.  In particular, the IPA provides:

> A breach of the provisions of sections 1 or 2 of this Agreement would cause irreparable harm and significant injury to Apple, the quantification of which is difficult to ascertain.  Because such harm and injury could not be compensable by damages alone, you agree that Apple will have the right to enforce sections 1 and 2 of this Agreement by injunction, specific performance or other equitable relief without prejudice to any other rights and remedies available to Apple in the event of a breach of this Agreement.

**XL.**33. Each of the Individual Defendants executed a copy of the IPA upon commencing employment with Apple.

**XLI.**34. Apple also has certain employees, who handle Apple's highly sensitivehighly sensitive, proprietary, and trade secret information relating to hardware design, function, and operation, such as for Apple's SoCs.  These employees include those in Hardware Technologies ("HWT") and other areas.  During employee exit interviews for these Apple employees, including the Individual Defendants, Apple provides a "Checklist for HWT Departing Employees" or "Checklist for Departing Employees" to "help employees leaving Apple understand their responsibility to preserve confidentiality of intellectual property."  Each of the Individual Defendants acknowledged that he "signed an Intellectual Property Agreement (IPA) that does not expire" upon his leaving Apple.

**XLII.**35. Each departing employee signing either of the above departing employee checklists, as was the case for the Individual Defendants, acknowledges that the IPA says he or she "will not use or share Apple confidential information while you are an Apple employee and after you leave Apple.  Everything you worked on at Apple stays here."  Each departing employee, as with the Individual Defendants, acknowledges that "[a]ll employees must return all Apple confidential information prior to leaving Apple[.]"  Each employee must also "[c]onfirm that you have done a diligent search of spaces you could have stored Apple property," including "[p]ersonal computer(s) or laptop(s)," "[f]lash drive(s)," "[p]ersonal email," and "[e]xternal hard drive(s)."  Each departing employee, including the Individual Defendants, additionally must confirm that they have "returned or destroyed all Apple confidential information prior to leaving Apple" and that they have "returned all Apple Owned Devices (AOU) and [have] not wiped any AOU."

**XLIII.**36. Each Individual Defendant executed a copy of a checklist for departing employees during or shortly after histheir exit interview following resignation from Apple.

**XLIV.**37. Apple takes additional measures to maintain the confidentiality of its proprietary information, including the trade secrets at issue in this lawsuit.  With regard to

terminated HWT and other employees, for example, Apple protects its proprietary information by requiring the return of Apple laptops, mobile devices, and other equipment and the removal of Apple and third-party files, documents, and software from the terminated employees' possession.

**XLV.**38. Apple also provides HWT and other employees with rules and guidelines on how to preserve the confidentiality of Apple's proprietary information.  These materials specifically forbid distribution of Apple's confidential information to others except on a need-to-know basis.  To further secure its proprietary information from public dissemination, Apple also requires its vendors, customers, partners, and contractors to sign confidentiality agreements and non-disclosure agreements when confidential information must be disclosed to them during the ordinary course of Apple's business.

**XLVI.**39. Apple further protects its most valuable SoC designs and specifications by limiting access to its Confluence and Perforce databases to only those projects that an employee is currently working on and authorized to view.  Confluence and Perforce are collaborative information management tools that allow Apple SoC engineers and designers to share and store their work on Apple's trade secret SoC designs.  Engineers require login credentials to access these tools, and the level of access is limited to what a particular engineer's job responsibilities require.

**A.** ~~D.~~ **Former Apple Employees Leaving for Rivos Retained Apple Confidential and Proprietary Trade Secrets After Accepting Offers ~~From~~from Rivos**

~~40. Rivos was founded in or around May 2021 to design a full stack computing solution based on custom-designed reduced instruction set computer based SoCs that will compete with Apple's ARM SoCs.~~

**XLVII.**41. Since June 2021, ~~nearly~~over 50 former Apple employees have joined Rivos. ~~Rivos continues to target Apple engineers, with more departures occurring as recently as May and June 2022.  A majority of these former~~Departures from Apple to Rivos have continued to occur while this suit has been pending.  Rivos has been targeting and soliciting Apple employees ~~were  —~~mostly design engineers,~~ developing  —~~with substantial expertise with Apple's ~~cutting-edge proprietary and trade secret~~ SoC designs.  ~~These~~ and significant and extensive

access to trade secrets at the core of those designs represent.  As explained above, Apple's SoC designs are the culmination of substantial research and development costs and could be used by others to significantly accelerate development of a custom reduced instruction set computer-based RISC-based SoC.

42. Rivos targeted and solicited Apple employees who were highly experienced engineers with both substantial expertise with SoC design and significant and extensive access to trade secrets at the core of Apple's SoC designs.  Apple has reason to believe that Rivos instructed at least some Apple employees to download and install apps for encrypted communications (e.g., the Signal app) before communicating with them further.

XLVIII.43. As noted above, many Many of the employees who left Apple to join for Rivos were trusted by Apple with its most sensitive trade secret SoC designs and technology.  Many took Apple's proprietary and trade secret information with them, while falsely representing to Apple that they had not.

44. The Individual Defendants' certifications during their exit interviews that they had returned or deleted Apple's proprietary and trade secret information were false.  Apple's forensic analysis of the Individual Defendants' computing devices has revealed that they took and retained Apple's proprietary and trade secret information when they departed from Apple.  This information is protected by the IPA and was falsely confirmed to have been returned or deleted when the Individual Defendants executed their Checklist for HWT Departing Employees or Checklist for Departing Employees.

45. Following interviews with Rivos and accepting offers for employment, but before leaving Apple, each Individual Defendant accessed and downloaded Apple's proprietary and trade secret information regarding the design and operation of Apple's most advanced SoCs.  These actions are in direct violation of the IPA that each Individual Defendant executed as a condition of his employment with Apple.  The Individual Defendants have each retained Apple proprietary and trade secret information, giving Apple reason to believe that it is being used by Rivos to improperly advance Rivos's own SoC design program.

**1. Bhasi Kaithamana**

**XLIX.**46.  One former Apple employed Individual Defendant Bhasi Kaithamanaemployee, for example, worked at Apple for nearly 8eight years, from September 2013 until August 2021.  During his tenure with Apple, Mr. Kaithamana was as a CPU implementation engineer, responsible for managing CPU design for Apple's SoCs.  Mr. Kaithamana was responsible for, among other things,His work at Apple included designing and developing proprietary and trade secret physical structures for carrying out critical functions in Apple's ARM-based SoCs.

47.  When he joined In August 2021, Mr. Kaithamana left Apple to take on a nearly identical role at Rivos ("CPU Implementation Lead").

48. As a condition of his employment with Apple, Mr. Kaithamanahe had executed an Apple IPA on August 26, 2013, agreeing to, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple[.]"  He further agreed that "[u]pon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

49. Mr. Kaithamana decided to accept Rivos's offer of employment sometime between July 20, 2021 and August 9, 2021.  On or about August 9, 2021, Mr. Kaithamana asked Apple for August 10 as a vacation day.

50. During his day off on August 10, 2021, Mr. Kaithamana created a new folder on his Apple-issued computer and began copying over Apple documents containing proprietary and trade secret information.  He worked to continue amassing a collection of Apple's proprietary and trade secret SoC files until the day before he left Apple, on August 16, 2021.  Many of the files Mr. Kaithamana copied related to Apple's proprietary and trade secret SoC designs, including those for unreleased projects.

1

2

3

    **L.** ~~51. On~~In August ~~13,~~ 2021, ~~after Mr. Kaithamana was accessing Apple's sensitive, proprietary information, Mr. Kaithamana resigned from his position at Apple~~this employee left Apple to take on a nearly identical role at Rivos ("CPU Implementation Lead").

4

5

6

7

8

9

10

11

12

13

    **LI.** ~~52.~~ On ~~Saturday, August 14, 2021, Mr. Kaithamana renamed his new folder "APPLE_WORK_DOCS" and continued adding Apple documents to it through the weekend. Mr. Kaithamana also~~August 14 and August 15, the employee connected a USB drive to his Apple-issued computer at least seven times ~~between Saturday evening, August 14, 2021, and Sunday afternoon, August 15, 2021~~.  In the same ~~time~~ period, he ~~opened~~specifically identified Apple confidential documents that could be useful in his new role at Rivos and copied portions of those documents to untitled Excel, Keynote, and Numbers documents on the USB drive.  Some of ~~these document file names correspond to~~the documents ~~on Mr. Kaithamana's computer that contain Apple confidential information, at least some of which~~he copied were marked "Apple Proprietary & Confidential.~~"~~  He ~~then proceeded to view~~also viewed file listings for folders

14

15

16

17

18

containing Apple files with proprietary and trade secret information.  While viewing these file listings, ~~Mr. Kaithamana~~the employee repeatedly opened documents, while clearing the list of recently opened documents to conceal ~~which documents~~what he accessed.  This employee kept at least some of the documents he retained with the intention of referring to them after leaving Apple.

19

20

21

22

    ~~53. By Monday, August 16, 2021, Mr. Kaithamana's last day at Apple, his APPLE_WORK_DOCS folder contained thousands of Apple documents.  Mr. Kaithamana copied files to his USB drive over the weekend.  His last recorded moving and copying of files before turning in his computer to Apple was to that same USB drive.~~

23

24

25

26

27

    **LII.** ~~54.~~ On August 16, 2021, ~~Mr. Kaithamana~~the employee conducted his exit interview. On August 18, 2021, he executed a Checklist for HWT Departing Employees, acknowledging that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession and had not wiped his Apple-issued devices. ~~Mr.~~

28

Kaithamana nevertheless had attempted to hide his activity, including by clearing his browsing history, recent applications access list, recent search lists, and many emails.

55. Despite Mr. Kaithamana's representations at his exit interview and when he executed his Checklist for HWT Departing Employees, he downloaded and transferred files containing information about Apple's proprietary and trade secret SoC designs to an external USB storage drive.

LIII.56. Mr. KaithamanaApple initially named this employee (who no longer works at Rivos) as a Defendant to this suit.  On May 17, 2022, he and Apple and Mr. Kaithamana entered into a stipulated order. (ECF No. 19.) Mr. Kaithamana has, under which he agreed to return any Apple confidential information in his possession, to make available for forensic inspection any devices that were used to store or transmit Apple information, and to refrain from making use of Apple confidential information.  He has since been dismissed from the case.

LIV.This employee's taking of Apple trade secret information just before departing for Rivos was not an outlier.  Along similar lines, the Individual Defendants' certifications during their exit interviews with Apple that they had returned or deleted Apple's proprietary and trade secret information were false.  Apple's forensic analysis of the Individual Defendants' Apple-issued computing devices has revealed that they took and retained Apple's proprietary and trade secret information when they departed from Apple.  This information is protected by the IPA and was falsely confirmed to have been returned or deleted when the Individual Defendants executed their Checklist for HWT Departing Employees or Checklist for Departing Employees.

LV.Each Individual Defendant accessed, downloaded, and/or improperly retained Apple's proprietary and trade secret information regarding the design and operation of Apple's most advanced SoCs when leaving for Rivos.  These actions are in direct violation of the IPA that each Individual Defendant executed as a condition of his employment with Apple.  Furthermore, as detailed further below, several of the Individual Defendants have, in fact, used improperly retained Apple information in connection with their work on Rivos SoCs.

**1.**   ~~2.~~ **Ricky Wen**

**LVI.**~~57.~~ Apple employed Individual Defendant Ricky Wen for over 13 years, from April 2008 until August 2021.  During his tenure with Apple, Mr. Wen was a CPU design engineer, with responsibilities for developing the architecture of Apple's SoCs.  Mr. Wen was responsible for, among other things, designing and developing proprietary and trade secret architectures for carrying out critical functions in Apple's ARM-based SoCs~~.~~, including functions relating to power management.  The value of such information would be applicable to RISC-V SoCs, which must also be designed to optimize power consumption and distribution.

**LVII.**~~58.~~ As a condition of his employment, Mr. Wen executed an Apple IPA on April 22, 2008, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple[.]"  He further agreed that "[u]pon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

**LVIII.**~~59.~~ Mr. Wen's position at Rivos is "Principal Member of Technical Staff," with a focus generally on "Hardware Engineering~~," which suggests that he is performing a similar job function as he did at Apple (particularly in view of Rivos's goal of designing an SoC with custom RISC-V CPU cores).~~"  Mr. Wen accepted an offer of employment from Rivos on or about July 23, 2021.

~~60. Mr. Wen was approached by Rivos about leaving Apple to join Rivos in or about June or July 2021.  On or about July 23, 2021, Mr. Wen accepted Rivos's offer of employment.~~

**LIX.**~~61.~~ However, after accepting his offer from Rivos, Mr. Wen took ~~hundreds~~thousands of sensitive Apple ~~SoC~~ documents ~~related~~relating to both Apple's existing and unreleased SoCs.  Between July 26, 2021 and July 29, 2021, Mr. Wen transferred approximately 390 gigabytes of data from his Apple-issued computer to a personal external hard drive.  Among the data

transferred are confidential Apple documents containing Apple trade secrets, including aspects of the ~~microarchitecture~~microarchitectures for Apple's past, current, and unreleased SoCs.  As of his termination, ~~his~~Mr. Wen's Apple-issued computer included over 400 gigabytes of Apple confidential information.  ~~It~~Although the computer also stored approximately 200 gigabytes of photos and movies that Apple presumes are personal in nature, ~~but~~these could account for only a fraction of the data transferred.

LX.~~62.~~ On or about August 3, 2021, Mr. Wen tendered his resignation to Apple.  On or about August 5, 2021, Mr. Wen conducted his exit interview and, among other things, executed a Checklist for HWT Departing Employees, acknowledging that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession.  This exit interview was not cursory; Mr. Wen spent approximately three hours with his manager, reviewing the HWT checklist in detail and discussing his responsibilities under the IPA.

LXI.~~63.~~ On the day that he executed his Checklist for HWT Departing Employees, ~~he~~Mr. Wen deleted at least one account from his Apple-issued computers.  ~~Mr. Wen~~He also deleted his internet browsing, iMessage, and iChat histories on his Apple-issued computers and numerous folders and files in online and cloud storage drives immediately prior to his termination from Apple.

LXII.~~64.~~ Mr. Wen accessed still more highly confidential Apple information during the week before his departure, including as late as ~~on or about~~ August 5, 2021, the day before he left Apple.  ~~Just~~Forensic evidence shows that just before he connected an external hard drive ~~was connected~~, Mr. Wen accessed numerous Apple proprietary and trade secret SoC designs, including files related to Apple's unreleased SoC designs, from his Apple-issued computer.  It also shows that Mr. Wen~~, in the days before he left Apple,~~ copied hundreds of gigabytes of data from his Apple-issued computer to the external hard drive.  Mr. Wen also downloaded documents to two additional external hard drives in the days leading up to his departure from Apple.

LXIII.~~65.~~ Mr. Wen also transferred gigabytes of files to his personal Google Drive, in violation of Apple's policies, including architectural diagrams depicting Apple trade secret SoC

designs ~~and,~~ as well as folders and nearly 400 files associated with Apple SoC development projects.  Apple policies prohibit the use of Google Drives for storing, among other things, Apple proprietary and trade secret information because that information can be accessed from any computer over the internet without Apple's knowledge, including, for instance, after the employee terminates his employment with Apple.

**LXIV.**Mr. Wen's downloading and transferring of Apple's trade secret and confidential information was knowing and intentional.  For example, he made no effort to exclude Apple files when downloading the Desktop and Downloads folders from his Apple-issued computer, even though he knew—and was reminded through Apple's exit process—that they contained Apple's confidential information, and that he was prohibited from taking such information when leaving Apple.  Mr. Wen was well aware that he had Apple confidential files but did not return them.  He admits that he deleted a folder containing hundreds of Apple files from his Rivos laptop, as described below, because he "hated" himself for copying even more than he wanted.

**LXV.**~~66.~~Mr. Wen's Apple employment was terminated on August 6, 2021.  As of his termination, Mr. ~~Wen retained on his~~Wen's Google Drive contained, for example, a diagram showing the architecture of an aspect of an Apple trade secret SoC design.  Similarly, although Mr. Wen moved thousands of Apple files from personal folders of his iCloud Drive to a work folder, investigation of his Apple-issued devices reveals that he retained over 400 gigabytes of Apple confidential information on his Apple-issued computer~~, and there~~.  There were also files relating to Apple trade secret SoC designs on his iCloud Drive after his termination.  ~~These include~~, including hundreds of documents referencing the code names of highly confidential Apple SoC projects.

**LXVI.**~~67.~~On June 3, 2022, Rivos and Mr. Wen admitted that Mr. Wen has "retained some Apple information."  (ECF No. 40.)  ~~Mr. Wen's counsel has stated he "may have" even more, but has yet to confirm what those documents may be.~~  Rivos's forensic expert submitted a declaration acknowledging that Mr. Wen's hard drive "contains multiple files identified in Appendix B" to the declaration of Apple's forensic expert.  (ECF No. 46-6.) ~~but, conspicuously~~

did not identify any other than a handful that were favorable to Mr. Wen. After Apple filed a motion for a Temporary Restraining Order, Mr. Wen agreed just before the Temporary Restraining Order hearing on the motion to return any Apple confidential information in his possession, to make available for forensic inspection any devices that were used to store or transmit Apple information, and to refrain from making use of Apple confidential information. This agreement was the basis of a stipulated order that Apple and Mr. Wen entered into on June 17, 2022 (ECF No. 54), and which remains in effect.

68. On June 17, 2022, Apple and Mr. Wen entered into a stipulated order. (ECF No. 54.) Mr. Wen has agreed to return any Apple confidential information in his possession, to make available for forensic inspection any devices that were used to store or transmit Apple information, and to refrain from making use of Apple confidential information.

LXVII. Apple and Mr. Wen entered into a subsequent stipulated order on June 30, 2022, appointing a neutral third-party forensic vendor, and identifying an initial set of devices to be surrendered for inspection: a 1 TB Seagate FreeAgent FW portable hard drive, 3 TB Seagate Backup + Desk portable hard drive, 5 TB Seagate One Touch portable hard drive, 4 GB generic flash drive, and any other device or storage device that had been connected to any of the above. (ECF No. 67.) The protocol was not limited to these devices, but expressly included "any other devices which have ever been used to store or transmit Apple confidential information." Mr. Wen also agreed in the protocol to provide to the neutral vendor access to certain personal iCloud Drive and Google Drive accounts, which contained Apple's information.

LXVIII. Among the documents that Mr. Wen retained were over a thousand files containing Apple's sensitive information. These included documents with clear confidentiality markings like "Apple Proprietary & Confidential," and went beyond just documents identified in the declaration of forensic expert Daniel Roffman and Appendix B to that declaration (ECF Nos. 22-4 and 22-5). These files contain highly sensitive information as described in the declaration of Daniel Murray, the Vice President of Apple's Silicon Engineering Group (ECF No. 22-3).

1

LXIX. For example, Mr. Wen's cloud drives and devices contained copies of

2

microarchitecture specifications, which are highly sensitive documents that disclose

3

comprehensive details about Apple's proprietary chip designs.  These specifications are typically

4

labeled as such, along with a proprietary code name for the relevant Apple SoC, in the filename,

5

title page, and header of the document.  For example, Mr. Wen had retained

6

"█████████████████," a specification that contains detailed descriptions of how one of

7

Apple's SoCs manages power consumption and distribution, one of the most critical

8

considerations in chip design.  The Murray Declaration explains that documents like these

9

contain the "crown jewels" of Apple's SoC design.  (*Id.* ¶¶ 8-11.)  Like many of the other Apple

10

documents found on Mr. Wen's drives and devices, the microarchitecture specifications retained

11

by Mr. Wen were clearly branded with the name "Apple" and the word "Confidential" on every

12

page, and use non-public, internal-only code names for Apple's SoC projects.

13

LXX. Mr. Wen's drives and devices also contained copies of Verilog files.  As explained

14

in the Murray Declaration, Verilog is the hardware description language used to encode register

15

transfer level, or RTL, designs.  (*Id.* ¶ 12.)  Apple's Verilog files for its SoCs are a type of source

16

code that can be used to synthesize the physical design of Apple's chips.  (*Id.* ¶ 4.)  They are

17

"highly sensitive" files that "are stored securely in Apple's Perforce repository, and are not

18

disseminated outside of Apple."  (ECF No. 22-3 ¶¶ 4, 6, 12, 22.)  Among the Verilog files

19

Mr. Wen retained when leaving Apple were files named "████████," "████████,"

20

"████████," and "████████."  The term "███" is an Apple proprietary abbreviation

21

meaning "████████████," while the term "███" is another Apple proprietary

22

abbreviation meaning "████████████."  Both terms appear prominently in the names

23

of the Verilog files that Mr. Wen retained, their underlying code, or both.  Each of these files also

24

begins with a clear header marking the code as "trade secrets and confidential information which

25

are proprietary to Apple Inc."  Together, these files span hundreds of pages of source code.

26

LXXI. Apple documents taken by Mr. Wen were also found on Rivos systems and

27

devices, including Mr. Wen's Rivos-issued laptop and in Mr. Wen's individually-accessible

28

home directory on the Rivos network file system (NFS), confirming that he placed Apple's confidential and trade secret information on Rivos's systems.  For example, the Verilog files described above were found on Mr. Wen's Rivos-issued computer and on the Rivos network, as was a PDF presentation that contains data regarding SoC performance and is branded "Apple Confidential," and source code files that explicitly reference internal Apple SoC project names, including in their filenames.

LXXII. In February 2023, Mr. Wen disclosed for the first time the existence of additional devices and drives in his possession containing confidential information belonging to Apple, including an iPhone, iMac, Mac Mini, thumb drive, Gmail account, and Google Drive account. Mr. Wen had access to all of these repositories of Apple confidential information throughout his employment at Rivos, and even used at least some of the devices in connection with his Rivos work, notwithstanding the June 30, 2022 court-ordered protocol requiring him to surrender them.

LXXIII. In March 2023, Mr. Wen disclosed that in May 2022, a month after Apple named him as a defendant in this case, he had deleted a .tar file (a type of archive file used in Unix-based systems for collecting multiple files, akin to a .zip file) containing hundreds of Apple confidential documents from his Rivos-issued laptop.  Among the documents included in the deleted file were highly sensitive Verilog code files marked as Apple's "trade secrets and confidential."  Mr. Wen placed the documents in this .tar file on his personal Google Drive prior to leaving Apple. Mr. Wen copied and retained these files intentionally.  After he joined Rivos, he again intentionally transferred the .tar file from his Google Drive not only to his Rivos-issued laptop, but also to his Rivos email account and his individual home directory on the Rivos NFS.  (ECF No. 170-1 at 16.)  Mr. Wen kept both the .tar file and individual documents that he extracted from the .tar file (including Apple's Verilog files) in folders called "AAPL" and "Rivos Work."

LXXIV. When he intentionally deleted the .tar file from his Rivos-issued laptop in May 2022, Mr. Wen still had a copy on a separate thumb drive.  He had placed the .tar file on that thumb drive from his home iMac—yet another device on which he stored this Apple confidential information.  Allegedly out of guilt from destroying evidence, but also because he knew that

forensic traces of the deletion would look suspicious, Mr. Wen attempted to restore the copy of the .tar file on his laptop using the thumb drive.  The metadata for the original copy on the laptop, however, is likely permanently lost or overwritten.  The lost metadata would have further demonstrated the extent of Mr. Wen's access and use of Apple's confidential information.  Apple is seeking an appropriate adverse inference from the Court.  (ECF No. 169-3 at 17-20.)

### 1.   3. Jim Hardage

**LXXV.**69. Apple employed Individual Defendant Jim Hardage for nearly 9nine years, from April 2013 until October 2021.  During his tenure with Apple, Mr. Hardage was a CPU architect, responsible for developing the architecture of processing cores for Apple's SoCs.  Mr. Hardage was responsible for, among other things, designing and developing proprietary and trade secret architectures for carrying out critical functions in Apple's ARM-based SoCs.

**LXXVI.**70. As a condition of his employment, Mr. Hardage executed an Apple IPA, among other things, agreeing to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . .  Upon termination of your employment with Apple, you will promptly delivery to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

**LXXVII.**71. Mr. Hardage is now employed by Rivos.  He holds a nearly identical position at Rivos:, CPU RTL Architect, which indicates that the tasks he performs for Rivos are parallel to those he formerly performed for Apple.

**LXXVIII.**72. On October 18, 2021, Mr. Hardage resigned from Apple.  That same day, Mr. Hardage executed a Checklist for HWT Departing Employees, and acknowledged that he was subject to the IPA and that he had returned all Apple proprietary and trade secret information in his possession.  Apple conducted Mr. Hardage's exit interview on October 21, 2021, the same day his employment with Apple was terminated.

**LXXIX.**73. Between October 17, 2021, and October 18, 2021, however, Mr. Hardage connected two USB flash drives to his Apple-issued computer.  On October 18, Mr. Hardage also ran various internet searches, including how to "Clear iMessage Chat History in Mac OS X" and "removing imessage cache on macbook."

**LXXX.**74. Between October 17, 2021 and October 18, 2021, Mr. Hardage also removed approximately 37 gigabytes of data containing Apple confidential files from his Apple-issued computer.  Part of Mr. Hardage knew that the directories he specifically identified and took included many Apple confidential documents.  For example, the data that Mr. Hardage copied to the his external drives includes at least nine directories named with specific confidential Apple SoC project names.  In addition, Mr. Hardage copied the "Home" directory from his laptop.  Mr. Hardage was selective in copying directories from his MacBook Pro personal directory: he selected folders with Apple project names that clearly contained Apple documents and left some folders that were personal in nature behind.  Mr. Hardage obtained much of the data he retained through a Linux virtual machine operating on Apple's internal network.  He had special access to this virtual machine as part of his employment at Apple, and used it to access, review, modify, and create Verilog files, among other things.  Apple keeps Verilog and other sensitive files in its Perforce repository, but Mr. Hardage could "check out" select files to the Linux virtual machine.  Mr. Hardage removed Verilog files that he obtained through this method onto the external USB drives that he retained when he left Apple.

75. Rivos has been aware of this information, including file path information and serial numbers, for over six weeks, when Apple provided it as part of a forensic declaration in support of its Motion for Temporary Restraining Order, Expedited Discovery, and Order to Show Cause (ECF No. 23).  Rivos has remained silent and offered nothing on the return of these devices and documents.  In order for Apple to determine all of the files Mr. Hardage transferred from his Apple-issued computer to these USB flash drives, a forensic examination of both USB drives themselves would need to be conducted, because the information stored on Mr. Hardage's Apple-issued computer provides limited visibility into the potential data that Mr. Hardage

transferred.  Apple cannot do that if neither Mr. Hardage nor Rivos provides access to those drives.

76. On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Hardage a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information.  Apple has never received a response from Mr. Hardage.  Rivos's counsel has never confirmed whether or not they also represent Mr. Hardage.  Apple provided Rivos and Mr. Hardage detailed information about what Mr. Hardage retained through a forensic expert declaration on May 20, 2022.  Still, Rivos and Mr. Hardage have never responded to Apple.  Apple therefore has no way of knowing whether the Apple confidential information in Mr. Hardage's possession has been preserved or segregated.  Nor has Mr. Hardage or Rivos offered to return the information or image the devices at issue.  They simply have not responded at all, effectively blocking Apple from cooperatively obtaining the return of its information.

**LXXXI.** Mr. Hardage knowingly and intentionally retained Apple confidential information that he knew he should not keep.  When he signed his Checklist for HWT Departing Employees, and thus certified that he had returned all Apple confidential information in his possession, he knew that in the preceding days he had downloaded a large amount of that information to his USB drives.  Nevertheless, he concealed this from Apple, and kept his drives and the Apple data on them when he left for Rivos, knowing that the data was confidential and he should not have retained it.

**LXXXII.** On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Hardage a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information.

**LXXXIII.** Substantial Apple confidential and trade secret information retained by Mr. Hardage has been found on his two personal USB flash drives, personal iPhone, iPad, MacBook, and iMac, and personal iCloud account.  Mr. Hardage and his counsel purport to have remediated Apple information from these devices, but the alleged remediation used a small set of narrow

search terms that would have failed to capture many Apple confidential files, including many Verilog files that Mr. Hardage retained.  Thus, Mr. Hardage had possession of and unrestricted access to Apple confidential information on these devices even after the supposed remediation.

LXXXIV. Mr. Hardage's devices contained extensive volumes of Apple's confidential and trade secret information, including dozens of Verilog files that he had stored under a folder called "████████," an internal Apple SoC project code name.  This folder contained confidential Apple files relating to the architecture and function of Apple SoCs, as well as the simulation of their operation, including Verilog and supporting files and data.  As explained in the Murray Declaration, Verilog is the hardware description language used to encode register transfer level, or RTL, designs.  (*Id.* ¶ 12.)  Apple's Verilog files for its SoCs are a type of highly sensitive source code that can be used to synthesize the physical design of Apple's chips.  (*Id.* ¶ 4.)  These files begin with a clear header marking the code as "trade secrets and confidential information which are proprietary to Apple Inc."  Together, they span well over a hundred pages of source code.  Nor was the information Mr. Hardage retained limited to the ██████ project; he also retained information about Apple's past, current, and future, unreleased SoCs developed under the ████████████████████████████████████████████████████ ████████ project names, among others.

LXXXV. When he left Apple, Mr. Hardage knew that he had an obligation not to use or disclose Apple information, and that he was required to return any Apple information.  He admits that ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████.

LXXXVI. As Mr. Hardage confirmed under oath, ████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████

1

2 ████████████████████████████.

3      **LXXXVII.**Furthermore, Mr. Hardage has discussed components and features of Apple's

4 SoCs with other Rivos employees, including by reference to internal Apple project code names.

5 In one such discussion, ███████████████████████████████

6 ████████████████████████████████.  This was

7 the same ██████ project from which Mr. Hardage retained extensive information when leaving

8 Apple, as discussed above.

9      **LXXXVIII.**According to Mr. Hardage, his responsibilities at Rivos involve ███████

10 ████████████████████████████████████

11 ████████████████████████████████████

12 ████████████████████████████████

13 ███████████████████.

14           **1.**      ~~4.~~ Weidong Ye

15      **LXXXIX.**~~77.~~Individual Defendant Weidong Ye began working at Apple in December

16 2017.  During his tenure at Apple, Mr. Ye initially worked as a Systems Power & Performance

17 Engineer.  Throughout his time at Apple, Mr. Ye worked cross-functionally with architecture,

18 platform design, SOC architects, and software teams.

19      **XC.**~~78.~~As a condition of his employment, Mr. Ye executed an Apple IPA, among other

20 things, agreeing to "keep all [Apple] Proprietary Information in confidence and trust for the

21 tenure of your employment and thereafter, and that you will not use or disclose Proprietary

22 Information without the written consent of Apple. . . . Upon termination of your employment with

23 Apple, you will promptly ~~delivery~~deliver to Apple all documents and materials of any kind

24 pertaining to your work at Apple, and you agree that you will not take with you any documents,

25 materials, or copies thereof . . . containing any Proprietary Information."

26

27

28

XCI.79. Mr. Ye now works for Rivos.  Mr. Ye's position at Rivos is "Member of Technical Staff," which suggests he is performing a similar job function as he did at Apple when he worked as a Systems Power & Performance Engineer.

XCII.80. On January 11, 2022, Mr. Ye visited a "Virtual Open House" held by Rivos.  At that time, he also began searching for various job opportunities available at Rivos and ran internet searches on Rivos's leadership and Rivos's CEO.

XCIII.81. Between March and April of 2022, Mr. Ye was researching Rivos.  He looked into the following full-time positions at Rivos: "System Hardware;"; "Silicon Electrical Analysis Engineer;"; "Silicon Power;"; "Silicon Architecture;"; "Silicon Performance Modeling;"; and "Confidential Compute Systems Engineer"."  These are all positions similar to the one he had at Apple: Systems Power & Performance Engineer.

XCIV.82. In April 2022, Rivos invited Mr. Ye to interview with themRivos.  To prepare, Mr. Ye used Google and LinkedIn to find out more about Rivos and Rivos staff.  In early May 2022 he also searched the internet for information about the lawsuit between Rivos and Apple.

XCV.83. Throughout May 2022, Mr. Ye met with Rivos multiple times to discuss a position at Rivos.  On May 30, 2022, Mr. Ye signed Rivos's employment offer, and subsequently provided Apple with his notice of resignation.

XCVI.84. In the days leading up to his departure from Apple, Mr. Ye deleted at least the messages database on his laptop.

XCVII.85. On June 3, 2022, Mr. Ye executed the Checklist for Departing Employees, and acknowledged that he was subject to the IPA and that he had returned or deleted all Apple proprietary and trade secret information in his possession.  At that time, Mr. Ye continued conductingMr. Ye's manager, who met with him to conduct the exit interview, confirmed that Mr. Ye understood each of the items on the Checklist.  That same day, however, Mr. Ye was still searching the internet searches for how to delete files on MacOS, and how to disconnect his iCloud account.

**XCVIII.**86. Mr. Ye also saved multiple ~~highly  confidential~~highly confidential Apple source code repositories for unannounced, ~~in development~~in-development products in his iCloud drive.  These repositories were stored outside of the designated folder for files related to his Apple work.  ~~Mr. Ye continues to have access to these repositories.~~ Apple confidential files were also found in the Downloads folder of his Apple-issued computer when he returned it upon his departure.

**XCIX.** Mr. Ye began his employment at Rivos on July 11, 2022.

**C.** Mr. Ye accessed and downloaded highly confidential source code repositories before leaving Apple, including repositories clearly marked with internal Apple code names in the directory title.  He retained this Apple confidential and trade secret information on his personal devices after leaving Apple and joining Rivos.  The repositories contained firmware and software relating to experiments that Mr. Ye and others at Apple conducted to evaluate and improve performance and power.  Many of the source code files that Mr. Ye retained include a prominent header labeling the document as "confidential and proprietary" Apple property.  Mr. Ye also retained Apple confidential and trade secret information relating to Apple's ███████ ███ SoC projects.  Due to Mr. Ye's and Rivos's mishandling of information, they may have destroyed evidence of additional Apple material that Mr. Ye retained.

**CI.** Mr. Ye's practice at Apple was to ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████.  This code, along with other Apple confidential information, made its way onto Mr. Ye's personal MacBook, iPhone, and iCloud Drive, to which he retained access while an employee of Rivos.

**CII.** Mr. Ye did not return the information when he was asked to do so on April 29, 2022.  Instead, Mr. Ye retained access to his iCloud Drive until at least March 24, 2023.  Based on information provided by Defendants, he has still not been segregated from his iPhone.

1

### 1. ~~5.~~ Laurent Pinot

2

CIII.~~87.~~ Apple employed Individual Defendant Laurent Pinot for nearly 12 years, from

3

October 2009 until August 2021.  During his tenure with Apple, Mr. Pinot rose to the position of

4

Application-specific Integrated Circuit ("ASIC") Design Engineering Manager 3, with

5

responsibilities over the physical design of Apple's SoCs.  Mr. Pinot was responsible for, among

6

other things, designing and developing proprietary and trade secret physical structures for

7

carrying out critical functions in Apple's ARM-based SoCs.

8

CIV.~~88.~~ As a condition of his employment, Mr. Pinot executed an Apple IPA on

9

September 11, 2009, agreeing, among other things, to "keep all [Apple] Proprietary Information

10

in confidence and trust for the tenure of your employment and thereafter, and that you will not

11

use or disclose Proprietary Information without the written consent of Apple. . . .  Upon

12

termination of your employment with Apple, you will promptly ~~delivery~~deliver to Apple all

13

documents and materials of any kind pertaining to your work at Apple, and you agree that you

14

will not take with you any documents, materials, or copies thereof . . . containing any Proprietary

15

Information."

16

CV.~~89.~~ Mr. Pinot is now employed by Rivos as an █████████████

17

██████████████████████████.  He thus holds a nearly identical

18

position at Rivos as his previous position at Apple, ~~Physical Design, which suggests that he~~ ████

19

████████████████████████████████████████

20

████████████████████████████████████

21

███████████████████████.  He thus performs parallel tasks at Rivos to those he

22

formerly performed for Apple.

23

CVI.~~90. Rivos~~ ████████████████ approached Mr. Pinot about leaving Apple to

24

join Rivos in or about ~~June and~~ July 2021 ~~and~~.  Rivos encouraged him to use an encrypted

25

communication app called Signal to discuss employment opportunities.  These types of

26

applications allow parties to communicate with end-to-end encryption, meaning there is no record

27

of the communications or means to verify what the parties discussed.

28

**CVII.**91. On or about July 18, 2021, Mr. Pinot interviewed with Rivos for a position, including ███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████. On or about August 18, 2021, Mr. Pinot accepted Rivos's offer of employment. At Mr. Pinot's exit interview, he stated words to the effect of "I was not looking, they found me."

**CVIII.**92. Mr. Pinot tendered his resignation to Apple on or about August 20, 2021. On August 24, 2021, Apple conducted Mr. Pinot's exit interview. Among other things, he executed a Checklist for HWT Departing Employees and acknowledged that he was subject to the IPA and that he had searched for and returned or deleted all Apple proprietary and trade secret information in his possession. The exit interview involved going through the HWT checklist and IPA in detail, including walking through the key points of the IPA and Mr. Pinot's obligations under that agreement. Mr. Pinot's Apple employment was terminated on August 24, 2021.

93. In the days leading up to his departure from Apple, Mr. Pinot deleted several confidential Apple documents from his Apple-issued laptop and deleted several email accounts.

94. Mr. Pinot maintained local folders on his Apple-issued laptop for more than a dozen Apple trade secret SoC design projects. These folders included highly sensitive and proprietary information regarding the design and operation of Apple's SoCs.

**CIX.** Before leaving Apple, Mr. Pinot stored hundreds of Apple confidential and trade secret documents relating to SoCs on personal devices that remained in his possession and custody while he was working at Rivos. Mr. Pinot kept at least some of these files knowing that they comprised Apple's confidential information, and with the intention of using them for non-Apple work in the future.

**CX.** For example, Mr. Pinot retained on his personal laptop a document providing a set of steps relating to the execution of a physical design process for SoCs. He also retained a power grid specification document relating to several Apple SoCs and proposals for future designs. The 56-page power grid specification document provides details of Apple's SoC power grids, including past, present, and future power grid techniques and a step-by-step process for power

grid synthesis.  This document was used across numerous Apple SoC development teams, including the ███████████████████████████████ as part of the ████████████████████████████████ for the SoC.  Mr. Pinot ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████.  In fact, Mr. Pinot specifically targeted the power grid specification when he was leaving Apple.  He reviewed it on August 17, 2021, just three days before he informed Apple that he was resigning, and seven days before his last day.  As noted above, ████████████████████ ████████████████████████████████████████████████████████ ██████████████.

CXI. Mr. Pinot also retained on his personal laptop hundreds of Keynote presentations containing sensitive information about Apple's SoC projects.  Many of these presentations included an internal Apple SoC project code name in its title and were clearly marked "Apple Proprietary & Confidential."  For example, Mr. Pinot retained a Keynote presentation with an Apple SoC code name in its title.  The cover slide of this document makes clear that it was a document used for a product development team meeting on November 13, 2020.  The document contains confidential and trade secret information about Apple SoCs and includes schematics, chip floorplans, design specifications, and development schedules—all highly sensitive.  Indeed, many of the hundreds of Apple confidential and trade secret documents that Mr. Pinot retained These files also fall into the categories of highly sensitive information described in the declaration of Daniel Murray, the Vice President of Apple's Silicon Engineering Group (ECF No. 22-3).

CXII. 95. In addition, Mr. Pinot retained backups of his Apple-issued computer on a personal AirPort Time Capsule device.  He began weekly Time Machine backups to a personal AirPort Time Capsule this device in December 2020.  These backups were The Time Capsule was stored unencrypted at his home, in violation of Apple's policies, which forbids such unencrypted backups.  In fact, Mr. Pinot received a warning that the backup he made was unencrypted.  The

1  ~~AirPort Time Capsule stores a local copy of Time Machine backups. These Time Machine~~

2  ~~backups include all of the files on Mr. Pinot's Apple-issued laptop's hard drive at the time of~~

3  ~~backup. These Time Machine backups~~These backups, which were not ~~and~~ are not remotely

4  accessible to Apple ~~and~~, provided a repository for storing data beyond Apple's knowledge and

5  control. Despite resigning on August 20, 2021, and knowing his last day at Apple would be

6  shortly after August 23, Mr. Pinot allowed his Time Machine backups to continue in this

7  timeframe.

8  ~~96. Among the highly confidential files Mr. Pinot wrongfully took from Apple upon his~~

9  ~~departure are files pertaining to unreleased Apple SoC projects. Also among these files are~~

10 ~~highly confidential technical specifications and other details about Apple's SoC physical design.~~

11     **CXIII.**~~97.~~ On or about August 24, 2021, on his last day of employment at Apple,

12 Mr. Pinot ~~backed up~~made a final backup of his entire Apple-issued computer to an unencrypted

13 Time Capsule. ~~He did this~~This was in violation of Apple policy. By this time, Mr. Pinot had

14 made ~~fifty-five~~55 unencrypted backups of his Apple computer. Mr. Pinot did not attempt to filter

15 out Apple confidential information when making these backups. The Time Capsule, which

16 contained 1.4 TB of data as of the night before Mr. Pinot's last backup of his Apple work

17 computer, was in his possession and accessible to him during his employment at Rivos at least

18 until July 8, 2022, when the Court ordered Rivos to produce an image of the Time Capsule.

19     **CXIV.** Mr. Pinot's Time Capsule backups included all of the files on his Apple-issued

20 laptop's hard drive at the time of backup. Mr. Pinot kept local folders on his Apple-issued laptop

21 for more than a dozen Apple trade secret SoC design projects. Thus, the highly sensitive

22 information regarding the design and operation of Apple's SoCs in those folders was downloaded

23 to the Time Capsule.

24     **CXV.** In the days leading up to his departure from Apple, Mr. Pinot also deleted several

25 confidential Apple documents from his Apple-issued laptop and deleted several email accounts.

26     **CXVI.**~~98.~~ On April 29, 2022, concurrent with filing its initial complaint, Apple sent

27 Mr. Pinot a letter (copying Rivos) asking for the return of Apple information (including the Time

28

1

Machine back-ups) and confirmation that he was no longer accessing or using that information.

2

~~Apple has never received a response from Mr. Pinot.  Rivos's counsel has never confirmed~~

3

~~whether or not they also represent Mr. Pinot.  Apple provided Rivos and Mr. Pinot additional~~

4

~~information about what Mr. Pinot retained through a forensic expert declaration on May 20,~~

5

~~2022.  On June 15, 2022, Rivos finally responded, conceding that Mr. Pinot still had the Time~~

6

~~Machine backup in his possession when he left Apple.  It evidently had not been segregated from~~

7

~~Mr. Pinot, as Rivos stated that it was located in his daughter's bedroom.  On July 8, 2022, Judge~~

8

~~Cousins ordered Rivos to produce to Apple an image of Mr. Pinot's Time Machine.~~

9

**CXVII.** Hundreds of Apple confidential and trade secret documents have been found on

10

additional devices beyond Mr. Pinot's Time Capsule, including his personal laptop, iPhone, iPad,

11

and iCloud drive.  Mr. Pinot and his counsel purport to have remediated Apple information from

12

these devices, but any such remediation was performed without Apple's knowledge or consulting

13

with Apple.  Even after this alleged unilateral remediation, Mr. Pinot's devices continued to

14

contain Apple confidential information on them when they were returned to Mr. Pinot.

15

**CXVIII.** As noted above, Mr. Pinot did not merely retain these files; he kept at least some

16

of them intentionally.  In fact, he accessed and reviewed Apple confidential information while

17

working for Rivos.  The information he reviewed included the power grid specification, which he

18

knew contained Apple's proprietary information and which bears the label "CONFIDENTIAL –

19

APPLE, INC." on every page.  Other Apple confidential and trade secret documents Mr. Pinot

20

accessed while working for Rivos include ███████████████████████████████

21

███████████.  According to Mr. Pinot, he cannot recall whether the number of these

22

documents he accessed while at Rivos could be ███████.  Furthermore, due to Mr. Pinot's

23

and Rivos's mishandling of information, they may have destroyed evidence of additional Apple

24

material that Mr. Pinot retained and/or accessed after leaving Apple.

25

**1.** ~~6.~~ Prabhu Rajamani

26

**CXIX.** ~~99.~~ Individual Defendant Prabhu Rajamani was employed by Apple for nearly nine

27

years, from March 2013 until October 2021.  During his tenure with Apple, Mr. Rajamani

28

became a Power Engineer 5, responsible for optimizing power handling for Apple's mobile SoCs. Mr. Rajamani was responsible for, among other things, developing proprietary and trade secret physical structures for carrying out critical power handling functions in Apple's ARM-based SoCs.

CXX.~~100.~~ As a condition of his employment, Mr. Rajamani executed an Apple IPA on February 11, 2012, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . . Upon termination of your employment with Apple, you will promptly ~~delivery~~deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

CXXI.~~101.~~ Mr. Rajamani is now employed by Rivos.  He holds a nearly identical position at Rivos: Hardware Engineer.  The tasks he performs for Rivos are parallel to those he performed for Apple.

CXXII.~~102.~~ On October 19, 2021, Mr. Rajamani resigned from his position at Apple. That same day, Mr. Rajamani executed a Checklist for HWT Departing Employees~~,~~ and acknowledged that he was subject to the IPA and that he had returned all Apple proprietary and trade secret information in his possession.

CXXIII. Shortly before his resignation, Mr. Rajamani connected a USB drive to his Apple-issued MacBook Pro and used Apple's AirDrop feature to transfer four code files to himself.  Mr. Rajamani also used ██████████████████████████████ ██ .

CXXIV.~~103.~~ On October 19, 2021, he disconnected his iCloud Drive from his Apple-issued laptop after running a Google search for "sign out of icloud drive on mac," which stopped it from syncing and limited Apple's access to the files on the Drive.  Nevertheless, Mr. Rajamani's Apple-issued laptop shows that he retained Apple confidential information on his personal iCloud Drive when it was disconnected from his Apple-issued laptop.  After he joined

Rivos, Mr. Rajamani synced this personal iCloud Drive to his Rivos-issued laptop and accessed files on that Drive.

CXXV.104. Mr. Rajamani also attempted to hide and obscure his iMessage history.  In particular, he searched for how to delete all of his iMessage conversations from his Mac computer.  Mr. Rajamani also deleted his Safari browser history.

CXXVI.105. Despite Mr. Rajamani's assurances during his exit interview and on the same day that he executed his Checklist for HWT Departing Employees, he continued to download and transfer to external hard drives files on Apple's proprietary and trade secret SoC designs until his last day at Apple.

CXXVII.106. On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Rajamani a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information.

CXXVIII. Apple has never received a response from Mr. Rajamani.  Rivos's counsel has never confirmed whether or not they also represent Mr. Rajamani.  Apple provided Rivos and Mr. Rajamani additional information about what Mr. Rajamani retained through a forensic expert declaration on May 20, 2022.  Still, Rivos and Mr. Rajamani have never responded to Apple. Apple therefore has no way of knowing whether the Apple confidential information in Mr. Rajamani's possession has been preserved or segregated from Rivos's systems.  Nor has Mr. Rajamani or Rivos offered to return the information or image the devices at issue.  They simply have not responded at all, effectively blocking Apple from cooperatively seeking the return of its information. confidential documents that Mr. Rajamani retained were placed on Rivos's systems. For example, four Apple code files were found on Mr. Rajamani's directory on Rivos's internal Network File System.  Three of these documents matched information on the computer that Mr. Rajamani had used for his Apple work and that he had returned before leaving for Rivos, including a code file Mr. Rajamani wrote at Apple as part of his work on SoCs.

CXXIX. Apple confidential and trade secret information was also located on Mr. Rajamani's personal MacBook, iCloud Drive, and iPhone.  For example, Mr. Rajamani's

1

personal laptop contained a power specification for an Apple SoC.  The document contains the

2

internal Apple codename for the SoC, ████, in its title, and is marked "Confidential" on every

3

page.  The document describes "███████████████████████████" and provides

4

extensive detail about ████████████████████████████

5

█████████████████████.  As the Murray Declaration explains, controlling

6

power consumption is a key part of SoC design, making the contents of documents like this

7

power specification highly sensitive trade secret information.

8

  **CXXX.** The documents exfiltrated by Mr. Rajamani also included numerous Python code

9

files created by Mr. Rajamani or other Apple employees.  One such file was ██████████

10

████████████████████████████████████████

11

██████████████████████████████████████

12

██████████████████████████.  Another Apple Python

13

code file Mr. Rajamani improperly retained was ███████████████████

14

████████████████████████████████████████

15

████████████████.  "████" is the code name of another Apple SoC project.  Mr.

16

Rajamani also used at Rivos ██████████████████ that he wrote for his work

17

purposes at Apple.

18

  **CXXXI.** Mr. Rajamani's devices also contained numerous Apple confidential

19

presentations; to describe just a few, these included: ████████████████████

20

█████████████████████████████

21

████████████████████████████████████████████

22

██████████████████████████

23

████████████████████████████████████

24

████████████████████████████████████

25

████████████████████████.  Other documents found on

26

Mr. Rajamani's devices included spreadsheets, data files, and JSON files with confidential

27

information relating to Apple's SoCs.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CXXXII.** Mr. Rajamani kept each of these documents on his iCloud drive, his personal MacBook, his personal email account, and/or another device, even though he knew that they were proprietary and confidential to Apple.  He does not dispute that ██████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████.

**CXXXIII.** Mr. Rajamani retained possession of his personal laptop and had access to his personal iCloud account and all materials stored on it, including the Apple materials that he took, until at least March 2023.  He also retained possession of an iPhone that was not disclosed to Apple before March 2023 and not collected from Mr. Rajamani until April 2023.

**CXXXIV.** Further evidence of additional documents that Mr. Rajamani improperly retained may have been lost because Mr. Rajamani instructed a third-party company to destroy the USB drive that he had connected to this Apple-issued computer and onto which he had transferred code files, as described above.  And due to Mr. Rajamani's and Rivos's mishandling of information, they may have destroyed evidence of additional Apple material that Mr. Rajamani retained and/or accessed after leaving Apple.

### 1. ~~7.~~ Kai Wang

**CXXXV.**~~107.~~ Individual Defendant Kai Wang has acknowledged to Apple that Apple documents were retained in his iCloud Drive.  He initially indicated to Apple that he wanted to work towards resolving the matter in a constructive manner.  When Apple sought to work with Mr. Wang, however, he stated that Rivos's corporate lawyers would handle future communication.  But Rivos's lawyers ~~have~~ refused to work with Apple to return Apple's documents in Mr. Wang's possession and ~~have~~ prevented Apple from communicating with Mr. Wang to arrange for the return of Apple's documents.  For that reason, Apple ~~has~~had no alternative but to name him as an Individual Defendant in this case.

**CXXXVI.**~~108.~~ Mr. Wang was employed by Apple for over a year, from August 2020 until February 2022.  During his tenure with Apple, Mr. Wang worked on improving the performance of Apple's GPUs, which are components of Apple's SoCs.

**CXXXVII.**109. As a condition of his employment, Mr. Wang executed an Apple IPA on April 10, 2020, agreeing, among other things, to "keep all [Apple] Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple. . . .  Upon termination of your employment with Apple, you will promptly ~~delivery~~deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information."

**CXXXVIII.**110. Mr. Wang is now employed by Rivos.

**CXXXIX.**111. On February 9, 2022, Mr. Wang resigned from his position at Apple.  On February 10, 2022, Mr. Wang executed a Checklist for HWT Departing Employees, and acknowledged that he was subject to the IPA and that he had returned all Apple proprietary and trade secret information in his possession.  As part of this exit process, Mr. Wang's manager reminded him that he was not to take Apple information with him when departing.

**CXL.**112. Shortly before Mr. Wang's resignation from Apple, he deleted approximately ~~95GB~~95 GB of data from his Apple-issued computer.  A portion of those deletions ~~was~~were performed on his last day at Apple and ~~has~~have not been accounted for.  For instance, data remaining on his Apple-issued computer shows that Mr. Wang's personal iCloud Drive still contained Apple files at the time of his termination.  These retained files included numerous screenshots of sensitive Apple information, ranging from portions of source code to specification documents clearly stamped "Apple Registered Confidential – Do Not Distribute."  These retained files included screenshots with excerpts of a GPU component microarchitecture specification with the footer "Apple Registered Confidential – Do Not Distribute."  Many of the other files retained on his personal iCloud Drive include or describe trade secret and confidential components of Apple projects.

**CXLI.**113. On April 29, 2022, concurrent with filing its initial complaint, Apple sent Mr. Wang a letter (copying Rivos) asking for return of any Apple information in his possession and confirmation that he was no longer accessing or using the information. ~~Mr. Wang responded~~

1  to Apple's letter, confirming that the desktop and documents folders in his iCloud Drive contain

2  files from Apple because he synced those two folders on his Apple laptop.  He further indicated

3  that he wanted to resolve the issue "in a constructive manner."  However, when Apple requested

4  that Mr. Wang return the Apple information, he responded that all further communication should

5  be directed to "Rivos's corporate lawyers."  Neither Rivos nor its counsel responded further on

6  Mr. Wang's behalf.  Rivos has not returned the Apple confidential files Mr. Wang retained.  Nor

7  has Rivos made any indication that it has segregated those files or taken steps to ensure they

8  cannot be accessed or used.

9  **CXLII.** Mr. Wang did not return the information to Apple as he was asked to do.  Mr.

10  Wang admits that he ███████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████ which Mr. Wang understood to be ███████

13  ███████████████████████████████████████, and which he had used as part of his

14  work at Apple.

15  **A.** ~~E. Many~~ **Other Former Apple Employees Who Are Now at Rivos Took Apple**

16  **Proprietary Information or Deleted Information from Their Apple Devices**

17  **CXLIII.** ~~114. Another Apple employee who left for Rivos retained Apple's proprietary~~

18  ~~documents after accepting their offers from Rivos, leaving Apple exposed to yet more trade~~

19  ~~secret theft~~ Other former Apple employees who are now employed by Rivos also took Apple's

20  confidential information.  Like the Individual Defendants, ~~this employee also~~ these employees

21  joined Rivos in ~~a position~~ positions paralleling ~~his role~~ their roles at Apple.  ~~Like~~ And like the

22  Individual Defendants, ~~this employee~~ they each signed an Apple IPA and agreed to protect and

23  appropriately use Apple's trade secret information~~,~~ and to return or delete that information when

24  ~~he~~ they left.

25  **CXLIV.** ~~115. Just like the Individual Defendants, although other employees also~~

26  ~~agreed~~ Further forensic records have shown that, despite agreeing not to delete information from

27  their Apple devices when they left the company, many ~~of them~~ former Apple employees now at

28  Rivos did so, wiping their Apple devices ~~to cover their tracks~~ or copying over proprietary and

confidential information to personal and other non-Apple devices.  Like the Individual

Defendants, they did this after communicating with Rivos and accepting Rivos's offers of

employment.  ~~Since Apple filed its initial complaint, Rivos itself has acknowledged it found that~~

~~at least some of its employees still retain Apple's confidential and proprietary files.~~

**CXLV.**~~116.~~ Several of these employees connected external hard drives and network

attached storage devices to Apple-issued computers in the days following their hire by Rivos.  At

the same time, these employees were accessing a large amount of Apple trade secret information

about SoC designs in the days just before their termination.  Each executed a Checklist for HWT

Departing Employees and acknowledged that they were subject to the IPA and had returned or

deleted all Apple proprietary and trade secret information in their possession, including any

stored on AOUs and external hard drives.  One employee even printed a Checklist for HWT

Departing Employees ~~while the employee was~~in the middle of connecting external hard drives to

an Apple-issued computer.  Similarly, the local archive stored on the Apple-issued laptop of at

least one former employee shows that, at the time the employee disconnected their iCloud Drive,

they retained access to several ~~highly confidential~~highly confidential, proprietary, and trade

secret files.

**CXLVI.**~~117.~~ Other employees stopped syncing their iCloud Drives and maintained local

backups as of their departure from Apple.  At least one of these iCloud Drives—and the local

backup—contained presentations and spreadsheets related to Apple's ~~highly confidential~~highly

confidential, proprietary, and trade secret SOCs.

**CXLVII.**~~118. In addition, several employees took additional steps to conceal or~~Despite

being instructed not to wipe data on their Apple-issued devices—and expressly agreeing not to do

so—many of these employees did delete information ~~that would have tipped Apple off to their~~

~~improper activities~~after accepting their Rivos offers.  At least nine employees completely wiped

their Apple-issued devices and/or reinstalled the operating systems, which deletes all data on the

devices.  In several cases, these employees wiped multiple devices before returning them.  After

accepting their Rivos offer, one employee did an internet search for "slack delete message

history," "delete all imessages on mac," "factory reset mac," "how to clear imessage on mac," and "slack how to clear chat cache."  The employee then proceeded to delete most of those records.  Other employees similarly deleted their messages and browser history before returning their Apple-issued computers.  A number of ~~Apple~~ employees also installed encrypted communications apps, including Signal, to communicate with Rivos and amongst one another without risk of their communications being exposed.  For instance, after joining Rivos, a former Apple employee provided a then-Apple employee a link to download Signal for communicating about Rivos with Rivos's CTO ~~Belli Kuttanna~~.  In the weeks before leaving Apple for Rivos, that same employee invited another employee ~~that~~who also left for Rivos to communicate on the platform, noting that "there are things [that] should not be recorded through apple's interface now."  Yet another Apple employee warned a colleague against using iMessage to discuss Rivos, causing that colleague to delete messages related to the discussion.  As a result of the deletion of information and use of encrypted communications, the exact scope of trade secret theft and coordination in support thereof has been hidden from Apple.

**CXLVIII.**~~119. Some~~Furthermore, some employees expressed concerns about the legality of their searching and deletions conducted in their last days at Apple, right before they left for Rivos.  One employee ran internet searches for "when you lost a lawsuit what do you have to pay" and "poach[ing] people after a year leaving [a] company," and viewed webpages relating to attorneys' fees for losing parties to lawsuits.

**CXLIX.**Many non-Defendant individuals retained, and had access to, Apple confidential information all this time while working for Rivos.  In fact, two of the individuals have had such extensive volumes of Apple's information—including full backups of their Apple-issued devices with responsive documents numbering over 100,000—that they have had to send their entire external hard drives to a neutral forensic vendor in order to respond to Apple's discovery requests.  Thousands of documents found on devices that non-Defendant individuals retained after leaving Apple relate directly to Apple's SoC technology, with various Apple SoC project names appearing in both filenames and document bodies.

1   **CL.**120. The proprietary information that these former employees have retained, and may

2   continue to have access to, particularly information regarding the architecture and design of

3   Apple's SoCs, includes some of Apple's most highly sensitivehighly sensitive and valuable

4   information.  These are not a mere handful of isolated documents about Apple's SoC chip

5   specifications and designs, but contain a vast amount of confidential information of different

6   types across a wide range of products, including Apple's current and future designs.  This

7   information will provide a significant, unfair advantage to Rivos in developing advanced,

8   high-performance reduced instruction set computer-basedRISC-based chips.

9   121. None of this information has been returned.

10   122. Despite being instructed not to wipe data on their Apple-issued devices—and

11   expressly agreeing not to do so—many of these employees did delete information after accepting

12   their Rivos offers.  Despite these concerns, at least nine employees completely wiped their

13   Apple-issued devices and/or reinstalled the operating systems, which deletes all data on the

14   devices.  In several cases, including as recently as April 2022, these employees wiped multiple

15   devices before returning them.  After accepting their Rivos offer, one employee did an internet

16   search for "slack delete message history," "delete all imessages on mac," "factory reset mac,"

17   "how to clear imessage on mac," and "slack how to clear chat cache."  The employee then

18   proceeded to delete most of those records.  Other employees similarly deleted their messages and

19   browser history before returning their Apple-issued computers.  As a result, the exact scope of

20   trade secret theft and coordination in support thereof has been hidden from Apple.

21   **F. Rivos Advised Apple Employees Regarding the Handling of Apple Confidential**
22   **Information While Those Employees Were Still at Apple**

23   **CLI.**123. Rivos knew or should have known that former Apple employees retained

24   confidential Apple information and that they may use that information in performing similar jobs

25   for Rivos.  Rivos claims that it began advising the former Apple employees, while they were still

26   employed by Apple, about departure procedures that they should follow when leaving Apple.

27   This advice allegedly covered subject matter such as transferring personal information, and how

28   to handle information that may have been synced to personal drives.  Rivos also claims to have

advised the former Apple employees, while they were still employed by Apple, about what to say in conversations with their Apple managers.  Rivos's CEO claims to have personally participated in such conversations with employees of Apple before those employees had even told Apple they were leaving.  But the Individual Defendants have contradicted this claim.  At least some Rivos employees ████████████████████████████████████████████████████.

**CLII.**124. Rivos's CEO claims that he has advised Apple employees, prior to their resignation from Apple, not to retain Apple confidential information when they depart Apple for Rivos.  ButMoreover, these alleged efforts would make even more striking the number of former Apple employees now at Rivos thatwho *did* retain Apple confidential information, along with the number who wiped or otherwise sanitized the records on their Apple devices.  And as explained further below, Rivos's conduct since Apple's initial complaint—blocking access to its employees, itsoffering shifting sands accountaccounts of its purported investigation—only raises more concerns that former Apple employees at Rivos deliberately retained Apple's confidential and trade secret information and that Rivos's supposed instructions against retaining Apple confidential information arehave been manifestly ineffective.  For instance, even armed with the "understanding" that former Apple employees may have Apple confidential information stored in their iCloud Drives, Rivos acknowledges that those folders are automatically synced with Rivos-owned devices.  Apple has now demonstrated that this "syncing" resulted in multiple Apple confidential documents being transferred to Individual Defendants' Rivos-owned devices.  Despite submitting a declaration on these issues, Rivos's CEO pointedly provided no information about Rivos's practices and policies once an employee is found to have retained Apple confidential information, as Rivos is now aware is the case.  As discussed below, Rivos's apparent practice has been one of turning a blind eye, as it has not returnedfailed to return all of Apple's confidential information nor segregated or returnedand segregate all such information in its employees' possession.

**G. Rivos Has Refused for Over Two Months to Return or Safeguard Apple Confidential Information in Its Employees' Possession and Has Blocked Apple from Securing the Return of Its Information Itself**

**A.     Rivos Is Using Apple Trade Secret Information in Its Chip Development**

CLIII. Former Apple and current Rivos employees have not just retained vast amounts of documents reflecting Apple's trade secrets.  They are also using Apple trade secret information in Rivos SoCs.  Each instance of use of an Apple trade secret described above is an example of trade secret misappropriation by Rivos, as Rivos employs each of these individuals, and the misappropriation by these individuals of Apple's SoC trade secrets occurred within the scope of their employment at Rivos and directly benefited Rivos at Apple's expense.  In addition to the examples described above, Rivos and its employees have used Apple's trade secrets through the following:

CLIV. Former Apple employees now employed by Rivos openly discuss Apple SoCs on which they worked in their development of Rivos SoCs.  In fact, a Rivos employee even admitted that it is "not taboo" to discuss Apple's SoC projects in the course of Rivos work.

CLV. For example, Mr. Hardage expressed to another Rivos employee his desire to ███████████████████████████████████████████████████████████████ ██████████████████████████████.

CLVI. Other Apple SoC features and technologies that Rivos employees have discussed include Apple's ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████.  Rivos employees have also relied on Apple's design methodologies when defining how to manage source code for multi-CPU SoCs.  And Rivos employees have considered Apple's timelines for developing SoCs ███ ████████████████████████████████.

CLVII. Rivos employees have also used and discussed Apple's trade secret workflows ████████████████████████████████████.  For example, a Rivos document that ██████████████████████████████████████████████████████████████████

1   ██████████████. ██████ is a proprietary tool built by Apple for managing and

2   coordinating its chip design process, making that process faster and more efficient.  This tool is

3   kept confidential at Apple and is not disclosed outside of Apple.

4       **CLVIII.** Rivos has relied on and incorporated Apple's trade secret SoC technology in

5   designing its SoCs and SoC components, including CPU cores.  Rivos's incorporation of Apple's

6   trade secrets is consistent with its ██████████████████████, which would be

7   implausible for a brand new startup that is building SoCs from the ground up without making use

8   of Apple's trade secrets and confidential information.

9       **CLIX.** As described above with respect to its SoCs more generally, Apple has taken

10  reasonable measures to keep secret these technologies used and incorporated by Rivos in its SoCs

11  and SoC development process.  These technologies each derive independent economic value,

12  actual or potential, from not being generally known to, and not being readily ascertainable

13  through proper means by, another person who can obtain economic value from the disclosure or

14  use of the information.

15      **A.**   **Rivos Repeatedly Frustrated Apple's Efforts to Recover and Secure Apple's**
         **Confidential Information and Failed to Adequately Investigate Its**
16       **Employees' Misappropriation**

17      **CLX.** ~~125.~~ When Apple became aware of Rivos's coordinated targeting of Apple

18  employees with access to its most sensitive SoC information, Apple promptly sent Rivos a letter

19  on July 9, 2021.  Rivos never responded to that letter and continued to hire away Apple

20  engineers.

21      **CLXI.** ~~126.~~ After conducting a detailed forensic investigation, Apple filed its initial

22  complaint on April 29, 2022 (ECF No. 1).  That same day, Apple sent letters to the ~~forty-two~~42

23  former Apple employees who had left for Rivos by that time, and to Rivos itself, informing them

24  of all Apple employees' obligations to return, and not misuse, Apple's ~~trade secret~~confidential

25  information.  In these letters, Apple sought to resolve ~~cooperatively~~ this dispute cooperatively by

26  seeking (1) return of any Apple ~~trade secret and~~ confidential information, (2) third-party forensic

27  examination of devices containing such information, and (3) an explanation from its former

28

employees regarding their false statements and attempts to wipe information from their

Apple-issued devices.  ~~Rivos told Apple they anticipated "being able to respond to the requests~~

~~Apple made regarding each employee by May 31."~~

**CLXII.**~~127. On May 4, 2022, Rivos's internal counsel provided "an initial response from~~

~~Rivos and each of the employees of Rivos to whom [Apple] sent letters."  Since then, all~~

~~correspondence from Rivos has come from outside counsel for Rivos and Ricky Wen.  Rivos has~~

Rivos frustrated Apple's attempts to have former employees return Apple's confidential and

proprietary information.  Only one former employee responded to the letters Apple sent on April

29, 2022: Defendant Wang.  Mr. Wang responded to Apple's letter, confirming that he had

retained Apple files on his iCloud Drive and indicating that he wanted to resolve the issue "in a

constructive manner."  Subsequently, however, Rivos stepped in and prevented Mr. Wang from

cooperating with Apple directly.  And for months, Rivos refused to turn over any of the Apple

confidential information that ~~Apple's former employees have retained (apart from information in~~

~~the possession of Mr. Wen, which it only agreed to provide after Apple filed a motion for a~~

~~Temporary Restraining Order), and has~~its employees had retained except as specifically required

by stipulated court orders.  At the same time, Rivos instructed Apple ~~to~~ not to contact any of

Rivos's employees to try to get its information back, forcing Apple to name additional individual

defendants to this lawsuit and to serve subpoenas on other employees.

~~128. It has been more than two months since Apple filed suit.  Apple has presented~~

~~forensic discovery that, in addition to Defendants Kaithamana and Wen, eight~~ former Apple

employees now at Rivos ~~transferred and retained information on devices or cloud accounts~~

~~shortly before leaving Apple, and nine others wiped their devices.  Despite acknowledging that it~~

~~advised these employees before they left Apple and subsequently interviewed them after joining~~

~~Rivos, Rivos has responded only as to one of these seventeen employees—Laurent Pinot.~~

~~Defendant Pinot retained a Time Machine backup of his entire Apple-issued MacBook Pro.~~

~~Rivos confirmed that Mr. Pinot still possesses Apple's information, and claims only that he did~~

~~not access it.  Rivos never voluntarily offered to return the information Mr. Pinot possesses.~~

129. Rivos never responded regarding the other sixteen employees identified by Apple as having taken Apple information when they left for Rivos or wiped their devices.  Rivos has not disputed that it has Apple's information.  Rivos has not returned or segregated this information.  Rivos has instructed Apple not to contact those employees, leaving Apple with no way to recover its information.

130. Rivos has confirmed, through its CEO, that it has interviewed each of the former Apple employees now employed at Rivos.  Rivos, through its counsel, also has confirmed that it has in its possession images of all of the devices that Apple identified in its request for expedited discovery and that some Rivos employees have turned over their personal devices to Rivos.  But Rivos has not confirmed  whether it has preserved  or segregated that information.

131. While refusing to provide Apple with any information about what it has learned from the former Apple employees, Rivos's CEO has confirmed that Rivos has found at least some relevant information in their possession, since Rivos acknowledges that it is collecting documents and other information from a subset of employees for further analysis and review.  Rivos has not identified that subset, nor has Rivos provided information for why and how that subset was selected.  Rivos has not provided information about what, if any, documents were found to be retained.  Rivos has failed to confirm that the documents were not used or shared.  Rivos has not provided confirmation that any documents they have found have been segregated.  Rivos claims that its internal investigation is ongoing.  But Rivos's outside counsel has not yet shared any meaningful details about the results of their investigation, nor have they returned information employees have already acknowledged as being in their possession.

132. For the four employees from whom Apple has received a response (Messrs. Wen, Kaithamana, Wang, and Pinot), Apple was correct:  These employees did retain Apple confidential information after leaving Apple.

**CLXIII.**Meanwhile, Rivos sought to deceive Apple and the Court by claiming that it had segregated all of the documents containing Apple's confidential information.  For nearly a year after this suit was first filed, Rivos repeatedly assured Apple and the Court that it had taken steps

to preserve and segregate potential repositories of Apple information in Rivos's or its employees' possession. It refused, however, to explain precisely what had been done to preserve and segregate, and has since disclosed that it did not in fact segregate the information as it claimed and that information has been destroyed.

**CLXIV.** Rivos did not adequately investigate and segregate devices in its and its employees' possession containing Apple information. For example, in February 2023, eight months after Rivos's claim that its counsel thoroughly interviewed the relevant employees, Mr. Wen disclosed for the first time four devices and two cloud drives containing Apple information. These devices and drives were accessible to Mr. Wen at least until February 2023, and Mr. Wen even regularly used some of them. Another month after that, Rivos was still revealing the existence of additional repositories of Apple confidential information to which Rivos employees had access, including: Mr. Wen's personal directory on Rivos's NFS system and Google Drive, Mr. Pinot's personal laptop, Mr. Ye's personal iCloud account, and Mr. Rajamani's personal iCloud account. In addition, some subpoenaed individuals likewise identified repositories of Apple information that have been in their possession all this time. And after the unilateral "remediation" by Rivos and the Individual Defendants of Apple information from their devices (discussed further below), the "remediated" devices that were returned to the Individual Defendants in some cases still held Apple trade secret and confidential information.

**CLXV.** Rivos thus failed to identify the existence of these repositories to Apple and segregate them properly for nearly a year after the time it claims to have first investigated them. The existence of these devices and drives should have been discovered, and all potential access to Apple confidential information cut off, at that time. Instead, Rivos knowingly allowed its employees to retain access to these repositories, contending that the employees needed them to perform their Rivos work.

**CLXVI.** Rivos's representations of preservation likewise were false. For example, in May 2022 Mr. Wen deleted a .tar file containing many Apple documents, including highly sensitive Verilog files. Mr. Wen informed Rivos by email on June 2, 2022 of what he had done. But

instead of notifying Apple, the next day Rivos submitted a brief to the Court falsely representing that Mr. Wen was complying with his document preservation obligations.  Rivos's brief further represented that Mr. Wen had not accessed, used, transferred, or copied any Apple information from his Google Drive account, even though Mr. Wen had transferred the .tar file to his Rivos-issued laptop and other Rivos repositories from that Google Drive.  Counsel for Rivos repeated these false representations at a hearing two weeks later.  Apple was only notified about Mr. Wen's destruction of evidence nine months after the deletion.

**CLXVII.** In addition, as noted above, Rivos, the Individual Defendants, and their forensic vendor have been "remediating" documents without Apple's knowledge or input.  This alleged "remediation" has caused the permanent deletion of documents and associated metadata.  Further contradicting Rivos's representations of complying with its preservation obligations, some of the forensic images that its vendor created have ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████.  Rivos and the Individual Defendants withheld the fact of these failures to preserve from Apple until June 22, 2023.

**CLXVIII.** Rivos also concealed direct evidence of the accessing and intermingling of Apple's trade secret information in Rivos's work product and systems.  For instance, Apple only learned in February 2023 that Mr. Pinot had accessed the Apple power grid specification and additional Apple confidential documents while working for Rivos, even though Mr. Pinot had informed Rivos of his access almost a year before.  Rivos also knew that its own internal network contained ████████████████████████████████████ but did not disclose this until Apple asked its CEO at his deposition.  And Rivos knew that Verilog and other sensitive

files containing Apple's confidential and trade secret information were located on Mr. Wen's Rivos-issued computer and his directory on Rivos's network, because Mr. Wen had alerted Rivos after deleting the evidence from his computer and then trying to restore it to the same computer.

**CLXIX.**Indeed, every Individual Defendant was in possession of Apple's confidential and trade secret information, several of them in very large volumes, while working for Rivos, despite knowing of their obligations to return any such information at the end of their Apple employment.  Rivos knew or should have known all of this long before it was disclosed to Apple.

**CLXX.**133. Rivos has also is awarerepeatedly frustrated Apple's efforts in recovering its trade secret documents by non-Defendant individuals and identifying their unauthorized proliferation and use.  For example, Rivos has long known that several former Apple employees have retained Apple confidential information in their iCloud drives, and that those iCloud drives have synced or may have automatically synesynced with the employees' Rivos work computers. For example, Mr. Wen's iCloud synced with his Rivos-issued computer, which resulted in some Apple files being stored on the Rivos-issued computer. Rivos has also long known that at least four of its non-Defendant employees—each of whom had an obligation under their IPAs to return to Apple any Apple confidential information—were in possession of Apple confidential information while working for Rivos.

134. On June 16, 2022, the parties appeared before Judge Davila for a hearing on Apple's Motion for a Temporary Restraining Order, Expedited Discovery, and Order to Show Cause.  At this hearing, Rivos stated that it would update Apple after interviewing the former Apple employees now at Rivos.  Apple has received no such update.  However, Rivos has acknowledged that it has found Apple files while searching through drives in Mr. Wen's possession.  Rivos has not turned over any of those images or files it found to Apple.

135. Despite multiple requests, Rivos has refused to state whether the devices Apple has identified as potentially containing Apple confidential and trade secret files have been imaged or segregated from Rivos or Rivos employees.

136. This information is available to Rivos, but Rivos has refused to provide it.

**FIRST CLAIM FOR RELIEF**

**(Breach of Contract Against Individual Defendants)**

CLXXI.137. Apple realleges and restates all prior paragraphs as if fully restated herein.

CLXXII.138. The IPAs signed by the Individual Defendants are valid and enforceable contracts. The confidentiality covenants and other provisions contained in these agreements are reasonably necessary to protect legitimate protectable interests in Apple's confidential, proprietary, and trade secret information.

CLXXIII.139. Apple has fully performed all of its obligations under these agreements. Apple has also attempted to obtain the return of its confidential information from Jim Hardage, Laurent Pinot, Kai Wang, Ricky Wen, Weidong Ye, and Prabhu Rajamani without the need to file a lawsuit. As discussed above, however, Rivos has blocked Apple's attempts to communicate directly with these employees and has refused to communicate with Apple on their behalf.

CLXXIV.140. The Individual Defendants took and retained Apple's documents in direct violation of the provisions of their IPAs, which required them to "promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple" and included an agreement "that you will not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information." The Individual Defendants breached these agreements by, at a minimum, failing to return Apple's property and confidential, proprietary, and trade secret information at the time of their departure from Apple, as they were obligated to do. The documents that have been improperly retained are described in more detail in the declarations above with respect to each Individual Defendant, in the declaration of forensic expert Daniel Roffman and Appendix B to that declaration (ECF Nos. 22-4 and 22-5), and in the declaration of Daniel Murray (ECF No. 22-3), which identify specific files and folders that were taken. The Individual Defendants have yet to return all of the improperly retained Apple documents to Apple in accordance with their IPAs.

1    **CLXXV.** 141. In addition, despite indicating adherence to all

2    contractually obligated contractually obligated termination protocols, many of the Individual

3    Defendants each deleted, scrubbed, or otherwise modified the contents of their Apple-issued

4    devices prior to returning them as set forth above.  These efforts obscured message histories, web

5    histories, and other details relating to the employees' use of Apple trade secret information,

6    departure their departures from Apple, and any decision decisions to improperly retain Apple trade

7    secret information in violation of, at least, the IPAs.

8        **CLXXVI.** 142. These actions by the Individual Defendants all were intentional.  Many

9    occurred in the days before they the Individual Defendants departed Apple.  These actions also

10   all, and followed the Individual Defendants receiving, and accepting, offers of employment in

11   parallel roles for Apple's competitor, Rivos.  And each action involved deliberate steps that the

12   Individual Defendant knew he should not have taken.  These actions have been described in detail

13   above for each individual.  To give just a few examples: Mr. Wen went out of his way to connect

14   numerous external drives to his Apple-issued laptop and retained over 390 GB of data, including

15   a .tar file he knew contained Apple's confidential information and that he later attempted to

16   delete, purportedly out of regret (although in an explanation to counsel he stated it was also

17   because he believed ███████████████████████

18   ██████ ).  Mr. Hardage likewise retained information he knew was proprietary to Apple and

19   subject to his IPA by connecting USB flash drives to his Apple-issued computer just before

20   leaving Apple.  Mr. Ye's searches for how to delete files from his Apple devices and how to

21   disconnect his iCloud account (on which he kept entire Apple source code repositories) had no

22   plausible purpose other than to actually delete files and disconnect his iCloud account.  Mr. Pinot

23   admitted that he kept Apple confidential information with the express purpose of using them in

24   the future.  Mr. Rajamani deliberately connected USB drives to his Apple-issued laptop and used

25   AirDrop to transfer specific code files to himself.  And Mr. Wang intentionally deleted 95 GB of

26   data from his Apple-issued computer.

27

28

**CLXXVII.**~~143.~~ As a result of the Individual Defendants' breach, Apple has suffered and continues to suffer monetary and non-monetary injury and harm in an amount to be proven at trial. The documents that have been improperly retained are the ~~product~~products of substantial research and development work over a period of many years. As described in the Declaration of Dan Murray, if a competitor had possession of these documents, it would cause substantial harm to Apple because the competitor would improperly gain a headstart in designing competing SoCs, avoiding potentially years of research and development.

**CLXXVIII.**~~144.~~ Moreover, as a result of the Individual Defendants' breach, Apple has been injured and faces irreparable harm. At a minimum, the Individual Defendants each signed IPAs acknowledging that a breach of that agreement would cause irreparable harm and significant injury to Apple. Apple is also threatened with losing its competitive advantage, trade secrets, customers, and technology goodwill in amounts ~~that~~for which it would be impossible to fully compensate ~~Apple~~ unless the Individual Defendants are enjoined and restrained by order of this Court.

## SECOND CLAIM FOR RELIEF

**(Misappropriation of Trade Secrets, Defend Trade Secrets Act, 18 USC § 1832(a)(1)**

**Against Rivos ~~and Individual Defendants Excluding Kai Wang~~, Ricky Wen, Jim Hardage, Laurent Pinot, and Prabhu Rajamani)**

**CLXXIX.**~~145.~~ Apple realleges and restates all prior paragraphs as if fully restated herein.

**CLXXX.**~~146.~~ As set forth above, Individual Defendants ~~excluding Kai Wang~~Ricky Wen, Jim Hardage, Laurent Pinot, and Prabhu Rajamani (the "TS Individuals Defendants") and Rivos (collectively with TS Individual Defendants, the "TS Defendants") improperly acquired and retained confidential and proprietary information of Apple constituting "trade secrets" as defined by 18 U.S.C. § 1839(3), including, but not limited to, design files, drawings, manufacturing information, device packaging information, sales and customer information, and financial and business development information~~, invention disclosures, and drafts of patent applications~~. These trade secrets pertain to Apple's personal computer and mobile device SoCs, including SoC

specifications, SoC designs, component designs (including for CPU cores, GPU cores, and cache memories), customized ISA instructions, source code for Apple products based on its SoCs, SoC development roadmaps, summaries of technical analyses of SoC characteristics and parameters, status reports, and other Apple-developed know-how gained from years of developing advanced SoCs. ~~Apple has identified these trade secrets with particularity, down to file names and file paths.  These trade secrets have been used in and/or were intended for use in interstate and/or foreign commerce.~~

**CLXXXI.** Apple has identified these trade secrets with particularity, down to file names and file paths.  Apple has also described in detail above trade secrets that were misappropriated by the Individual Defendants and accessed or used during the course of their work at Rivos.  In terms of broader categories, these trade secrets include ██████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████ . These trade secrets have been used in and/or were intended for use in interstate and/or foreign commerce.

1

**CLXXXII.** The trade secrets that have been taken by the TS Defendants are further

2

described in the paragraphs above and in the confidential declarations of forensic expert Daniel

3

Roffman (including Appendix B) (ECF Nos. 22-4 and 22-5) and Daniel Murray (ECF No. 22-3),

4

which identify specific files and folders that were taken.

5

**CLXXXIII.** 147. Apple's trade secrets derive independent economic value from not being

6

generally known to, and not being readily ascertainable by through proper means by, another

7

person who can obtain economic value from their disclosure or use of the information.  These

8

trade secrets are also the product of years of research and development at substantial cost to

9

Apple.  These trade secrets form the foundation of Apple's competitive advantages in the SoC

10

market.

11

**CLXXXIV.** 148. Apple has undertaken efforts that are reasonable under the circumstances

12

to maintain the secrecy of the trade secrets at issue.  These efforts include, but are not limited to:

13

the use of passwords and encryption to protect data on its computers, servers, and repositories;

14

the limited distribution of confidential information only to key Apple employees and executives

15

and on a need-to-know basis; the maintenance of written policies and procedures that emphasize

16

employees' duties to maintain the secrecy of Apple's confidential information; and the use of

17

confidentiality agreements and non-disclosure agreements to require vendors, customers,

18

partners, contractors, and employees to maintain the secrecy of Apple's confidential information.

19

**CLXXXV.** 149. Each TS Defendants Individual Defendant misappropriated Apple's trade

20

secrets at least by acquiring trade secrets them by improper means.  At least by virtue of the From

21

reviewing their IPAs and exit checklists they signed Checklists for HWT Departing Employees as

22

part of their exit process, the TS Individual Defendants were well aware knew that the Apple files

23

that were misappropriated are they had recently downloaded or were otherwise still in their

24

possession were confidential and trade secret, and could not properly be retained, disclosed, or

25

used by them information that they should not have been retaining.  Nevertheless, each TS

26

Individual Defendant executed a Checklist for HWT Departing Employees or Checklist for

27

Departing Employees in which they confirmed and acknowledged falsely certified that they had

28

returned all Apple proprietary and trade secret information.  To the extent that they were unaware at the time they left Apple of some of the Apple trade secret information in their possession, each TS Defendant became aware of it later, and chose not to return it to Apple.

150. The trade secret information that the TS Individual Defendants and other former employees now at Rivos have retained is embodied in Apple's documents and other information that was taken upon the TS Individual Defendants' and other former employees' departures from Apple.  The trade secret information includes at least chip specifications and designs for Apple's SoCs for the A14, M1, and future (unreleased) SoCs.  The trade secrets also include chip specifications and designs for related components (including CPU cores, GPU cores, and cache memories), chip development roadmaps, summaries of technical analyses of chip characteristics and parameters, status reports, and source code defining the operation of hardware devices incorporating Apple's SoCs.  The trade secrets that have been taken are described in more detail in the declarations of forensic expert Daniel Roffman and Appendix B to that declaration (ECF Nos. 22-4 and 22-5), and the declaration of Daniel Murray (ECF No. 22-3), which identify specific files and folders that were taken.

**CLXXXVI.** For example, Mr. Wen knew that his .tar folder contained much more Apple trade secret and confidential information than he admits he intended to retain.  But instead of informing Apple, he tried to destroy the evidence of his wrongful retention.  Mr. Hardage, too, knew that he was in possession of Apple confidential information after leaving Apple, because he deliberately downloaded it onto personal USB drives.  But he concealed this from Apple and had possession of the drives while working at Rivos.  Mr. Pinot was aware at least of the Apple confidential documents that he retained intentionally, and even accessed them while at Rivos. And Mr. Rajamani knowingly transferred scripts that he used for his work at Apple as he was leaving for Rivos.

**CLXXXVII.** 151. On July 9, 2021, shortly after Rivos began hiring Apple's former employees, Apple sent a letter to Rivos informing Rivos of the obligations of those former employees to maintain the confidentiality of Apple's trade secrets and confidential information,

1
and specifically informing Rivos of the provisions of the IPA.  Apple further informed Rivos that,

2
to the extent those former employees had retained Apple's trade secret and confidential

3
information, that information had to be returned immediately.  ~~Rivos never responded to that~~

4
~~letter~~Apple also sent similar letters to the employees, including each TS Individual Defendant.

5
~~152. Rivos admits that it has instructed Apple employees, prior to their resignation to joint~~

6
~~Rivos, regarding how to conduct their exit procedures.  These instructions purportedly included a~~

7
~~warning against retaining confidential information upon departure.  Nevertheless, many of these~~

8
~~former Apple employees took Apple confidential information before departing for Rivos and~~

9
~~retained it after leaving Apple.~~

10
**CLXXXVIII.**~~153.~~ The Apple trade secret information that each TS Individual Defendant

11
misappropriated was extensive.  Defendant Ricky Wen ~~has admitted to taking Apple trade~~

12
~~secrets.  Specifically, through counsel, Mr. Wen has admitted to retaining after his departure from~~

13
~~Apple at least some of the confidential and proprietary files Apple identified.  This admission~~

14
~~comes after~~ intentionally retained thousands of sensitive Apple SoC documents, including

15
microarchitecture specifications and Verilog code, in violation of his Apple IPA.  He did so by

16
deliberately connecting multiple external hard drives to download numerous Apple proprietary

17
and trade secret SoC design files and copying hundreds of gigabytes of data onto at least one of

18
the drives, knowing full well this data included sensitive Apple information.  Mr. Wen

19
understood that his retention of these documents after leaving Apple was improper, as evidenced

20
by the fact that he tried to delete some of the sensitive files he took, allegedly out of a sense of

21
guilt.  Mr. Wen also signed a valid agreement with Apple requiring him to return Apple's

22
confidential information when he left, ~~after Mr. Wen~~ signed an agreement with Rivos stating that

23
he would not bring ~~third party~~third-party confidential information with him to Rivos, and ~~after~~

24
~~Mr. Wen~~afterward falsely certified that he had returned all Apple confidential documents.~~  Mr.~~

25
~~Wen also does not dispute that he falsely confirmed he~~ had returned all Apple confidential

26
information ~~during his Apple exit interview.  Moreover, Rivos admitted that Mr. Wen synced his~~

27
~~iCloud Drive~~, in each instance acknowledging that any retention would have been improper.  The

28

documents that Mr. Wen took from Apple are relevant to his work at Rivos.  Mr. Wen intermingled Apple's confidential information with Rivos systems, including by maintaining a .tar file containing Apple confidential ~~files with~~documents on his Rivos-issued ~~device, which transferred the contents of that iCloud Drive to his Rivos-issued device.~~laptop, his Rivos email account, and his directory on Rivos's internal network.  He kept individual documents he extracted from the .tar file in folders on these repositories that he called "AAPL" and "Rivos_Work."  Although metadata potentially showing Mr. Wen's use of these documents has been destroyed because of his deliberate spoliation, it can be inferred from Mr. Wen's actions that he intended to, and likely did, use them to advance Rivos's SoC development, in turn harming Apple.

CLXXXIX.Defendant Jim Hardage intentionally removed 37 gigabytes of data, which he has admitted contained many Apple confidential documents, from his Apple-issued computer in the days leading up to his departure from Apple.  In fact, the documents that Mr. Hardage retained included extensive Verilog and supporting code files for various top secret Apple SoC projects.  After deliberately placing these documents onto personal USB drives, ██████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████  Mr. Hardage has also considered components and features of Apple SoCs in developing Rivos products, and discussed them with other Rivos employees, going so far as to express his desire to ██████████████████████████████.

CXC.Defendant Laurent Pinot kept hundreds of sensitive Apple SoC documents on his personal laptop, many of which were clearly marked "Apple Proprietary & Confidential."  In at least one instance, Mr. Pinot intentionally kept a copy of an Apple power grid specification with the specific purpose of using it to help him create similar documents in the future, after leaving Apple.  And after joining Rivos, he did, in fact, access that document multiple times.  He also accessed numerous other Apple SoC documents while a Rivos employee, and could not even say

1   whether he had accessed more or less than one hundred.  Like the other TS Individual

2   Defendants, he signed an IPA with Apple and certified that he had returned all Apple proprietary

3   information at the time he left the company.  The documents Mr. Pinot retained and accessed

4   relate closely to ██████████████████████████████████ SoC physical design.

5   Mr. Pinot's actions have thus benefited Rivos and harmed Apple.  Mr. Pinot also kept personal

6   Time Machine backups of his Apple-issued computer and other files that he deliberately retained,

7   despite knowing that this was improper.  He did not return his Time Capsule containing his

8   backups and even created a final backup on his last day at Apple.

9       154. Defendant Laurent Pinot has acknowledged through Rivos's counsel that he retained

10  multiple unencrypted Time Machine backups of all files on his Apple-issued laptop's hard drive,

11  including in the days before his resignation.  These unencrypted backups are located, at least, on

12  a network attached device that is unsecured in Mr. Pinot's home.  Among the highly confidential

13  files Mr. Pinot retained after leaving Apple, including for more than a dozen Apple trade secret

14  SoC design projects, are files pertaining to unreleased Apple SoC projects, highly confidential

15  technical specifications, and other details about Apple's SoC physical design.

16      155. Defendant Jim Hardage, on the day he resigned, and just days before his termination,

17  copied 37 gigabytes of data containing Apple confidential files from his Apple-issued device to

18  external flash drives.  This data includes at least nine directories named for confidential Apple

19  SoC projects.

20      **CXCI.**156. Defendant Prabhu Rajamani, on the same day he executed his Checklist for

21  HWT Departing Employees confirming he had not retained any Apple confidential and

22  proprietary information, accessed Apple's Confluence technical database before attempting to

23  obscure records of his access and browsing history.  On the same day, he disconnected his iCloud

24  Drive from his Apple-issued laptop, retaining Apple confidential information that was previously

25  synced to the iCloud Drive.  He also connected a USB drive to his Apple-issued laptop and used

26  AirDrop to copy four code files to himself.  After joining Rivos, Mr. Rajamani ███████████

27  ████████████████████████████████████████████████████████████████████.

28

For example, Mr. Rajamani used code that he wrote at Apple to ██████████████████

██████████████████████████████████████████.  Mr. Rajamani thus

intentionally, and in knowing violation of his IPA, used Apple's proprietary and confidential

SoC-related information to develop Rivos SoCs.

157. Defendant Weidong Ye saved multiple Apple source code repositories to his iCloud

Drive, including after departing from Apple, and he maintains access to these repositories even

today.

158. Rivos has engaged its own forensic consultant to image and dig into former Apple

employees' devices.  Rivos has admitted to finding that some of their current employees still

possess Apple confidential, proprietary, and trade secret information.  Rivos has not returned any

of it.  Nor has Rivos segregated Apple's confidential information.  At least Mr. Wen actually

transferred iCloud Drive data containing Apple confidential information to Rivos's systems.

Instead, Rivos has obstructed Apple's efforts to seek the return of its information from these

employees, including by blocking Apple's access to these employees while refusing to provide

any information about what Rivos's investigation identified.

**CXCII.** Neither the TS Individual Defendants' intentional, systematic, and improper

acquisitions of Apple's trade secret information nor their use of that information at Rivos were

isolated incidents.  They occurred as part of Rivos's campaign to hire away over 50 Apple

engineers who had extensive access to Apple's most sensitive SoC information.  That campaign

resulted in thousands of Apple's confidential and trade secret documents in the possession of at

least eleven Rivos employees—not just the TS Individual Defendants, but also Mr. Ye, Mr.

Wang, at least four non-defendants, and the above-mentioned employee who was originally a

defendant to this suit but has since been dismissed.  At least some of these Rivos employees, such

as Mr. Pinot, kept Apple trade secret information because they believed it would be useful for

their Rivos work.

**CXCIII.** Rivos's campaign of targeting Apple's SoC engineers also resulted in Rivos

employees using Apple information as part of their normal Rivos work responsibilities to develop

Rivos's own SoCs.  The use of Apple trade secrets at Rivos is widespread and in plain view.  For example, Rivos employees have openly discussed features and technologies of Apple SoCs on which they had worked and compared them with the technology they were developing at Rivos. They have also considered Apple's improved Verilog design methodology for multi-CPU SoCs. Rivos employees have discussed Apple's timelines for developing SoCs ████████████████ ██████████████, and discussed Apple's trade secret workflows ████████████████████ ████████.  And Rivos employees have incorporated Apple trade secret SoC component designs into Rivos's chips, as detailed above.

> **CXCIV.** These instances of use by the TS Individual Defendants and other Rivos employees exemplify trade secret misappropriation by Rivos.  Rivos employs each of these individuals, and the misappropriation by these individuals of Apple's SoC trade secrets occurred within the scope of their employment at Rivos and directly benefited Rivos at Apple's expense.

> **CXCV.** Rivos also ratified the TS Individual Defendants' misappropriation by: frustrating Apple's attempts to obtain the return of its information; failing to segregate Apple's confidential information that it was informed were in the possession of Apple's former employees and allowing them to continue to have access to it; and misrepresenting repeatedly that the documents had been segregated and that no documents had found their way on to Rivos laptops or the Rivos system.  As detailed above, Rivos prohibited its employees from working directly with Apple to return the information they had improperly retained, while simultaneously refusing for months to provide discovery about those employees' retention of Apple materials.  Rivos also falsely represented to the Court that all evidence had been preserved, when in fact it was aware that Mr. Wen had deleted data, and Rivos's alleged unilateral attempts at "remediating" Apple's information destroyed metadata.  Rivos further falsely represented that it had segregated all relevant devices and drives, even though numerous repositories containing Apple's trade secrets remained in the possession of and/or accessible to Rivos employees and even on the Rivos network, in some cases for nearly a year after this suit began.  And Rivos concealed evidence of its employees' intermingling of Apple information with Rivos systems.

1    **CXCVI.**From the start, Rivos has uniquely had possession of or access to the most
2    relevant and probative information regarding the use and disclosure of Apple's trade secrets at
3    Rivos.  But instead of cooperating with Apple to provide that information and purge its systems,
4    IP, and work product of Apple's information, Rivos withheld the information in the hopes that the
5    Court would dismiss the case and the evidence of its and its employees' misappropriation would
6    never see the light of day.  Rivos has not only knowingly failed to disclose such evidence, but
7    also effectively turned a blind eye to potential misappropriation by former-Apple, now-Rivos
8    employees whom Apple has not named as defendants to this suit.  Rivos's actions amount to
9    ratification of and acquiescence to its employees' misappropriation of Apple's trade secrets.

10   **CXCVII.**159. The information regarding the use and disclosure of this information at
11   Rivos is uniquely within the possession of the TS Individual Defendants and Rivos, and TS
12   Defendants have taken actions to conceal evidence regarding their conduct.  However, based
13   onFurthermore, in addition to all that has been alleged above, in view of (i) the number of
14   engineers that Rivos targeted and hired—and continues to target and hire even today—to perform
15   the same type of work they were performing at Apple, (ii) the fact that Apple notified Rivos of its
16   former employees' obligations and received no response, (iii) the large amountnumber of these
17   employees who have taken and retained Apple confidential information after communicating with
18   Rivos or accepting their offers withfrom Rivos, (iv) the volume of information taken, (v) the
19   nature of the information taken, (vi) the number of departing employees who deleted information
20   and tried to cover their tracks after accepting offers withfrom Rivos, (vii) Rivos's own efforts to
21   conceal its communications with these former Apple employees, (viii) Rivos's admissionclaim
22   that it was advising Apple's former employees regarding the retention ofhow not to retain
23   confidential information learned during the time they were still at Apple, andwhich has now
24   repeatedly been contradicted by the Individual Defendants, (ix) Rivos's refusal to cooperate with
25   returning or segregating trade secret documents to Apple that it knows are in its current
26   employees' possession while at the same time blocking Apple from retrieving this information
27   itself, Rivos knew, or at a minimum should have known, that theseand (x) ████████████
28

1  ██████████████████████████████ without the benefit of

2  substantial pre-existing knowledge, like that embodied in Apple's trade secrets, which would not

3  have been available to a brand new startup—Rivos knew that its employees improperly retained

4  Apple confidential and trade secret information and were ~~likely to make~~making use of it in the

5  course of their employment at Rivos.

6      CXCVIII. Further discovery will likely ~~show~~provide additional evidence that Apple's

7  trade secret information has been improperly disclosed to Rivos and used by Rivos and the TS

8  Individual Defendants.

9      **CXCIX.**~~160. The~~ TS Defendants' improper acquisition and/or unauthorized use or

10 disclosure, actual or threatened, violates the Defend Trade Secrets Act ("DTSA").

11     **CC.**~~161. It is clear that the~~ TS Defendants ~~have admitted to Apple and the Court that they~~

12 ~~possess~~improperly retained and used Apple's confidential trade secrets~~, but they have not~~

13 ~~provided any details as to when and how they will return them~~ in their work at Rivos.  It is also

14 clear that the TS Defendants have yet to investigate adequately to ensure that they are not

15 continuing to retain and use Apple's confidential trade secrets.  Each day that passes is another

16 day whereby Apple's competitive edge continues to lie in the hands of its competitor.  Each day

17 is another day where Apple cannot know where that information may go, or how Rivos or the

18 other TS Defendants may exploit it to build SoC products that directly compete with Apple's own

19 SoCs.  Once Apple's trade secrets have been embedded into such products, discovering and

20 mitigating the impacts of that misappropriation becomes increasingly difficult, if not impossible.

21     **CCI.**~~162.~~ As a direct and proximate result of TS Defendants' conduct, Apple has been

22 injured, and is threatened with further injury, in an amount that will be proven at trial.  Apple has

23 also incurred, and will continue to incur, additional damages, costs, and expenses, including

24 attorneys' fees, as a result of TS Defendants' misappropriation.  As a further proximate result of

25 the misappropriation and use of Apple's trade secrets, TS Defendants have been unjustly

26 enriched.

27

28

**CCII.**163. TS Defendants' conduct has been willful and malicious, justifying an award of exemplary damages.  As described in detail above, after receiving employment offers from Rivos and resigning from Apple, the TS Individual Defendants took and retained hundreds of gigabytes of Apple trade secret information regarding SoC designs, functions, and implementation.  This trade secret information includes some of the most competitively sensitive and confidential information that Apple possesses about its SoC designs, and much of it~~it~~this information was accessed and transferred during the final days of the TS Individual Defendants' employment.  Again, after accepting their employment offers from Rivos, the TS Individual Defendants, and many other former Apple employees who are now at Rivos, took steps to cover up the evidence of their actions, including, in some cases, wiping their entire devices.  The TS Individual Defendants and other former Apple employees now at Rivos falsely represented to Apple that they had returned all of Apple's confidential information and had not deleted the information from their devices.

~~164. Because Rivos has undertaken some of its own forensic investigation and interviewed former Apple employees now at Rivos, Rivos now knows that many of its employees have devices that Apple has identified as containing Apple confidential information, but Rivos has done nothing to sequester those devices or preserve that data, and also has failed to demonstrate they are doing anything to stop those employees from using the information in their jobs.  In fact, Rivos has confirmed on the record that it has not collected a number of the devices Apple identified; it therefore concedes it has not been able to safeguard their contents or ensure they have been segregated from Rivos devices.  Rivos has rejected Apple's repeated requests to return this information.~~

**CCIII.**165. Employees have been leaving Apple for Rivos as recently as June 2022; some have ~~taken~~used Apple's trade secret information; others have at least taken such information with them ~~downloaded content, while~~; and yet others likely continue to maintain access to Apple information because of Rivos's blocking of discovery.  TS Defendants' conduct constitutes transgressions of a continuing nature for which Apple has no adequate remedy at law.  Unless

and until enjoined and restrained by order of this Court, TS Defendants may continue to retain and use Apple's trade secret information to enrich themselves and divert business from Apple to Rivos.  Apple is entitled to a preliminary and permanent injunction against TS Defendants' actual and threatened potential violation of the DTSA.

### **PRAYER FOR RELIEF**

NOW, THEREFORE, Plaintiff Apple prays for judgment and relief against Defendants as follows:

a.  Judgment in Apple's favor and against Defendants on all causes of action alleged herein;

b.  Damages sufficient to compensate for the actual loss caused by TS Defendants' trade secret misappropriation;

c.  A further award of monetary recovery for any unjust enrichment caused by TS Defendants' misappropriation of the trade secrets;

d.  In lieu of damages measured by any other methods, a reasonable royalty for TS Defendants' misappropriation of trade secrets;

e.  Exemplary damages, based on TS Defendants' willful and malicious appropriation of trade secrets;

f.  For the entry of a Preliminary and Permanent Injunction against Defendants to prevent the actual or threatened misappropriation of Apple's trade secrets;

g.  For an Order directing Defendants to return all of Apple's property in their possession, custody, or control and cease any access to or use of Apple's trade secrets;

h.  For prejudgment and post-judgment interest at the maximum legal rate as applicable, as an element of damages that Apple has suffered as a result of Defendants' wrongful and unlawful acts;

i.  For reasonable attorneys' fees and costs incurred herein as allowed under the Defend Trade Secrets Act; and

1

       j.   For such other and further relief as the Court deems just and proper.

2

**DEMAND FOR JURY TRIAL**

3

     Apple hereby demands trial by jury for all causes of action, claims, or issues in this action

4

that are triable as a matter of right to a jury.

5

6

Dated:  ~~August 30, 2022~~August 29, 2023    MORRISON & FOERSTER LLP

7

8

        By  */s/ Bryan Wilson*
            BRYAN WILSON

9

        Attorneys for Plaintiff

10

        APPLE INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28