# EXHIBIT A

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  David Eiseman (Bar No. 114758)
  davideiseman@quinnemanuel.com
  Victoria B. Parker (Bar No. 290862)
  vickiparker@quinnemanuel.com
  Elle Xuemeng Wang (Bar No. 328839)
  ellewang@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

  Ryan Landes (Bar No. 252642)
  ryanlandes@quinnemanuel.com
865 S Figueroa St.
Los Angeles, CA 90017
Telephone:     (213) 443-3145
Facsimile:     (213) 443-3100

Attorneys for Defendants and
Counterclaim Plaintiffs Rivos Inc., Wen Shih-Chieh a/k/a Ricky Wen, Jim Hardage, Weidong Ye, Laurent Pinot, Prabhu Rajamani and Kai Wang

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., <br><br> Plaintiff, <br><br> vs. <br><br> RIVOS INC., WEN SHIH-CHIEH a/k/a RICKY WEN, JIM HARDAGE, WEIDONG YE, LAURENT PINOT, PRABHU RAJAMANI, AND KAI WANG, <br><br> Defendants. | Case No. 5:22-CV-2637-PCP <br><br> **DEFENDANTS AND COUNTERCLAIM PLAINTIFFS' COUNTERCLAIMS AGAINST APPLE INC.** <br><br> Courtroom: 8 <br> Judge: Hon. P. Casey Pitts <br><br> Date Action Filed: April 29, 2022 |
| RIVOS INC., WEN SHIH-CHIEH a/k/a RICKY WEN, JIM HARDAGE, WEIDONG YE, LAURENT PINOT, PRABHU RAJAMANI, AND KAI WANG, <br><br> Counterclaim Plaintiffs. <br><br> vs. <br><br> APPLE INC., <br><br> Counterclaim Defendant, | **Filed Under Seal** |

Defendants and Counterclaim Plaintiffs Rivos Inc., Wen Shih-Chieh a/k/a Ricky Wen, Jim Hardage, Weidong Ye, Laurent Pinot, Prabhu Rajamani and Kai Wang (together, "Counterclaim Plaintiffs") allege the following counterclaims, based on personal knowledge as to their own actions, and otherwise on information and belief, against Plaintiff and Counterclaim Defendant Apple Inc. as follows:

## NATURE OF THE ACTION

1. Afraid of any threat of legitimate competition in the marketplace, and hoping to frighten and send a message to any employees who might dare to leave Apple to work somewhere else, Apple has resorted to trying to thwart emerging start-ups through anticompetitive measures, including illegally restricting employee mobility. Counterclaim Plaintiffs bring these counterclaims because Apple has sought to impose overreaching obligations on its employees so that Apple can anticompetitively retaliate against them and any future employer of theirs if they dare to exercise their right to leave Apple to obtain employment elsewhere—especially when the employees choose to join a start-up that Apple perceives as a potential competitor.

2. Apple is relentless in these efforts. It forces its employees to sign contracts with provisions that run afoul of California law as a condition of their employment. These contracts purport to prohibit employees from retaining *anything* from their time at Apple—even general know-how that is not trade secret—and contain other provisions that are unenforceable because they violate California public policy. And yet Apple still wields these provisions to scare current and former employees into submission, and to chill activity that California law expressly allows.

3. Apple has no regard for employee rights or privacy in carrying out this anticompetitive scheme. Even when Apple knows its employees are leaving to work somewhere that Apple (rightly or wrongly) perceives as a competitive threat, it does not consistently conduct exit interviews or give employees any meaningful instruction about what they should do with supposedly "confidential" Apple material upon leaving. Whether by neglect or as part of a planned effort to generate a pretextual basis to sue the employees and their new employer for "stealing" Apple material, Apple lets these employees walk out the door with material they may have

inadvertently "retained" simply by using the Apple systems (such as iCloud or iMessage) that Apple effectively mandates they use as part of their work.

4. Then as soon as the employee is out the door, Apple scours any and all personal information it can find in order to make out some case of "retention" of Apple material so that Apple can set an example of the former employees and their new employers, which Apple then uses to intimidate any Apple employees who might think to leave. Without making any effort to shield or protect employees' personal information, Apple (or third parties it hires to do the work) looks through current and former employees' personal iCloud accounts, personal iMessages, personal Time Machine backups, personal web search histories, and more—then Apple weaponizes whatever it finds against the employees and their new employers.

5. Rivos is one such promising startup that caught Apple's ire, even though Rivos does not compete with Apple for anything except hiring talented engineers. Unlike Apple, which develops Systems on a Chip ("SoCs") for consumer-based products using architecture it licenses from ARM, Rivos is developing next-generation SoCs for use in servers based on the open-source RISC-V architecture. After learning of Rivos in May 2021, Apple immediately began strategizing to thwart its growth and to prevent any Apple employees from leaving to pursue promising opportunities at Rivos. Apple knew that Rivos was funded by two investors who had funded NUVIA, another start-up co-founded by a former Apple Senior Director of Platform Architecture against whom Apple had deployed the same anticompetitive playbook. Concerned that Rivos would become NUVIA 2.0, Apple set out to stop Rivos, and the employees who chose to leave Apple to join Rivos, from ever getting a product to the marketplace.

6. To support its campaign against Rivos and the former Apple employees Rivos hired, Apple has invoked unlawful and unenforceable provisions of its Intellectual Property Agreement (the "Apple IPA" (*see, e.g.*, Dkt. 256-1)) that fly in the face of California law and strong, important California policy. These counterclaims seek to prevent Apple from stifling employee mobility under the guise of enforcing an illegal and unenforceable contract that Apple foists on its employees.

7.      Apple does not hide its anger that over 50 former Apple employees chose to leave their positions at Apple, for a variety of personal and individual reasons, to pursue promising new opportunities at Rivos.  And, as one would expect and as California law expressly encourages, these former Apple employees pursued jobs at Rivos that would make use of their skills and know-how that they developed throughout their careers, including long before they started at Apple.  But Apple is desperate to punish Apple employees for leaving, and also to threaten other Apple employees who might think to leave, and Apple uses the Apple IPA as its primary weapon in this effort—including against Wen, Hardage, Ye, Pinot, Rajamani, and Wang, all of whom Apple demanded sign the Apple IPA as a condition of working at Apple.  And, in exchange for no consideration at all, Apple required that they sign it again, by way of a purported "exit checklist" when they left Apple.

8.      To conceal its true anticompetitive motives, Apple asserts that the Apple IPA merely prohibits employees from retaining or using information that Apple supposedly owns and that the employees are not allowed to keep.  Not so.  In violation of California law and public policy, the Apple IPA is so expansive as to cover anything "learned" during the course of employment, regardless whether it is a trade secret.  The Apple IPA also contains a non-solicitation provision, which is designed to, and Apple uses to, chill employee mobility and competition.

9.      Apple should not be permitted to force employees to agree to an illegal contract of adhesion as an end-run around California's protections of employee mobility and innovation, and as a means to squash entrant start-ups who hire former Apple employees.  Apple's actions not only violate the laws and public policy of the State of California, but also undermine the free and open competition that has made the state the birthplace of countless innovative businesses.  Apple's actions harm its current and former employees, Rivos and other California employers, and the State of California.

10.     Counterclaim Plaintiffs therefore bring these counterclaims to obtain a declaration that certain provisions of the Apple IPA are unenforceable.  They likewise seek restitution and an injunction prohibiting Apple from enforcing certain provisions of the Apple IPA against them and other similarly situated current and former Apple employees in violation of California law.

## JURISDICTION AND VENUE

11. Counterclaim Plaintiffs assert these counterclaims under Rule 13 of the Federal Rules of Civil Procedure. Apple's principal place of business is in this District and it has consented to jurisdiction and venue in this District by filing suit against Counterclaim Plaintiffs in this Court.

12. This Court has supplemental subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367 because they arise out of the same occurrence that is the basis for Apple's Defend Trade Secrets Act ("DTSA") claims and form part of the same case or controversy.

13. Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to these counterclaims occurred within this district.

## THE PARTIES

14. Counterclaim Plaintiff Rivos is Delaware corporation with a principal place of business in Santa Clara, California. Rivos is a startup that is developing a SoC using open-source architecture. Although other SoCs exist in the marketplace that rely on proprietary system architecture, Rivos aims to be one of the first companies to successfully build and commercialize an SoC for servers in data centers using the open-source RISC-V architecture. Since its founding in May 2021, Rivos has attracted engineers from around Silicon Valley and the world to work on its innovative technology. Rivos currently employs Counterclaim Plaintiffs Wen, Hardage, Ye, Pinot, Rajamani, and Wang.

15. Counterclaim Plaintiffs Wen, Ye, and Rajamani are residents of San Jose, California. Counterclaim Plaintiffs Hardage and Wang are residents of Austin, Texas. Counterclaim Plaintiff Pinot is a resident of Los Gatos, California.

16. Counterclaim Defendant Apple is a California corporation with a principal place of business in Cupertino, California.

## GENERAL ALLEGATIONS

**Rivos Is a Promising Startup Developing Server SoCs Using Open Source Architecture**

17. Rivos was founded in May 2021 by Puneet Kumar, Belli Kuttanna, and Mark Hayter, three successful engineers with long track records and a history of significant accomplishments in the industry and SoC development. Kumar briefly worked for Apple beginning in 2008 after Apple

acquired Kumar's previous employer, PA Semi, Inc., but Kumar spent his last eleven years at Google before leaving to found Rivos. Hayter followed the same track—working for Apple for a few months in 2008 after Apple acquired his employer PA Semi, and then working for Google for eleven years before co-founding Rivos. Kuttanna never worked for Apple, and spent most of his career at Intel.

18.     Kumar, Kuttanna, and Hayter founded Rivos with the goal of creating novel technical solutions for today's computing industry. To that end, Rivos is working to develop a high performance server SoC using the open-source RISC-V architecture. Because Rivos is building SoCs for use in large enterprise servers in data centers, as opposed to small consumer-based products, its SoCs are optimized for different features, and contain different components, than Apple's SoCs. For example, while mobile phones need to optimize for battery life, servers are plugged in and so optimize for speed or large storage capacities. Mobile phone SoCs need entire modules for graphics or camera systems; server SoCs do not. While Rivos does not yet have a product on the market, it has received considerable attention as a result of the prominence of its founders and the talent it has been able to attract.

19.     Since its founding, Rivos has hired talented engineers from Google, Intel, AMD, and Apple, amongst others. These engineers were attracted to Rivos for a variety of personal and professional reasons, including its cutting edge work on the RISC-V platform, the opportunity to try something new that the more established companies were not doing, and the excitement of building a new product from the ground up. And in the case of employees who joined from Apple, many of them left Apple because they were frustrated that their work at Apple had grown stale, and they were excited to look for new opportunities.

**Restrictive Covenants Are Illegal in California**

20.     With limited exceptions, California law declares "*every* contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. The California Legislature and California courts have made clear that agreements that limit competition or employee mobility, including overbroad non-

disclosure agreements and non-solicitation agreements, are unlawful, against public policy, and void.

21. An overbroad non-disclosure agreement restricts employees from practicing their trade by improperly restricting the information they may use in their new employment. For example, a non-disclosure agreement that prohibits employees from using or disclosing all information or know-how "learned" at their past employer—regardless whether it is a trade secret—is for all intents and purposes a covenant not to compete. Similarly, an employment agreement that purports to prohibit *former* employees from soliciting their former coworkers after they leave restricts employees from practicing their trade by restricting the people with whom they may work. Agreements with these provisions are contrary to California public policy.

**Apple Requires Employees to Sign a Broad and Improper IPA as a Condition of Employment**

22. Counterclaim Plaintiffs Wen, Hardage, Ye, Pinot, Rajamani, and Wang were each required to sign the Apple IPA at the commencement of their employment with Apple. Wen, Hardage, Ye, Pinot, Rajamani, and Wang's executed Apple IPAs are attached to Apple's Third Amended Complaint as Exhibits A-F. Dkt. 256. The Apple IPA is a contract of adhesion and the employees have no opportunity to modify it. The Apple IPA imposes expansive restrictions that purport to bind employees *forever*, even long after they leave Apple.

23. The Apple IPA defines "Proprietary Information" as "any information of a confidential, proprietary, and secret nature that may be disclosed to you or otherwise learned by you in the course of your employment at Apple, including but not limited to any confidential information of third parties disclosed to Apple." Apple IPA at 2.0. The Apple IPA further expands the definition of Proprietary Information as follows:

> Such confidential, proprietary, and secret information includes, but is not limited to, information and material relating to past, present, or future inventions, marketing plans, manufacturing and product plans, technical specifications, hardware designs and prototypes, business strategies, financial information and forecasts, personnel information, and customer lists.

*Id*.

24. For employees within the Hardware group, including Wen, Hardage, Ye, Pinot, Rajamani, and Wang, Apple reinforces—and even tries to expand—the impermissibly broad reach of the Apple IPA through an "exit checklist" it provides departing employees on their way out the door. An example is attached hereto as Exhibit A. That "checklist" states, "Everything you worked on at Apple stays here." Apple makes no attempt to separate properly protected trade secret information from any other information an employee may have learned or "worked on" during his or her employment at Apple.

25. These provisions violate California law, which specifically allows "a former employee [to] use general knowledge, skill, and experience acquired in his or her former employment." *Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009). "[G]eneral knowledge in the trade or [...] special knowledge of those persons who are skilled in the trade" are not trade secrets, even if they are learned through work at Apple. *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011).

26. Having provided such an expansive definition and interpretation of "Proprietary Information," the Apple IPA then prohibits Apple employees from using or disclosing such information without the "written consent" of Apple. Specifically, the Apple IPA provides:

> You understand and agree that your employment by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure of your employment ***and thereafter***, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple.

IPA at 2.0(a).

27. As one court explained when invalidating a provision similar to this one, complying with restrictions like these would essentially require departing employees to "perform a prefrontal lobotomy on himself or herself" or to completely exit their chosen field of work. *Fleming Sales Co., Inc. v. Bailey,* 611 F.Supp. 507, 514 (D.C. Ill. 1985). While Apple might prefer this regime for its departing employees, California law prohibits it.

28. In short, the Apple IPA prohibits Apple employees from using or disclosing information that Apple in its sole discretion deems to be "of a confidential, proprietary, and secret

1. nature" that is "learned" or "disclosed" during their employment with Apple, regardless of whether the information is trade secret. And as its actions against Rivos and the Apple employees who went to work for Rivos have shown, Apple apparently defines "confidential" and "proprietary" in an outrageously overbroad and self-serving way. Apple evidently includes within that definition employees' children's homework, tips for leg exercises, open source scripts downloaded from the internet, employees' personal tax filings that include information about their compensation from Apple, partial screenshots devoid of context or substantive meaning, and thousands of other absurd examples. This provision—in the expansive manner that Apple interprets it, attempts to enforce it, and threatens its employees with—serves no legitimate purpose to Apple. Rather, Apple uses it only to make it functionally impossible for someone to leave Apple and find new work elsewhere without facing Apple's retaliation.

29. Similarly, the Apple IPA provides that employees are not allowed to share personnel information without the written permission of Apple—in express violation of Labor Code section 232.5.

30. The Apple IPA also prohibits the solicitation of Apple employees for one year following the termination of employment. Specifically, the Apple IPA provides:

> During your employment *and for a period of one (1) year following your termination date*, you will not, directly or indirectly, solicit, encourage, recruit, or take any action intended to induce Apple employees or contractors to terminate their relationship with Apple.

IPA at 3.0(d).

31. These provisions of the Apple IPA are unlawful and have the effect of impeding employee mobility and restraining Wen, Hardage, Ye, Pinot, Rajamani, Wang, and other Apple employees from engaging in their choice of lawful profession, trade, or business. Thus, the provisions are void pursuant to California Business and Professions Code section 16600.

**Apple Becomes Concerned that Talented Engineers Will Leave Apple to Work for Rivos**

32. Dan Murray, Vice President of Silicon Engineering at Apple, learned of Rivos in May 2021 after a conversation with one of Rivos' founders, Puneet Kumar. Apple knew that Rivos was being funded by two of the investors who had also funded NUVIA, a start-up co-founded by Gerard Williams, a former Apple Senior Director of Platform Architecture who Apple had sued in

2019 for purported breach of the Apple IPA and trade secret misappropriation. *See Apple v. Williams*, Case No. 19-CV-352866, Santa Clara Superior Court.

33. Unsurprisingly, the Court correctly recognized that Apple's trade secret misappropriation claims against Williams were wholly unsupported. On September 29, 2021, the court in the *Williams* case denied Apple's requested preliminary injunction in full, finding, *inter alia* Apple's misappropriation narrative consisted of "whack-a-mole scenarios" that amounted to "an evidentiary stretch, dissipating into speculation and conjecture." Sept. 29, 2021 Order at 17.

34. In truth, Apple had no *legitimate* gripes with NUVIA or Williams, but instead was upset that Apple employees saw better opportunities working for NUVIA, and Apple wanted to scare any of its employees who might think to leave. With that sore spot from NUVIA in mind, and seeing that Rivos and NUVIA were funded by the same investors, Apple became concerned that Rivos would become NUVIA 2.0. And so Apple decided to unleash its hostility against Rivos and its employees using the same playbook it had deployed against Williams and NUVIA.

35. Indeed, Apple has a history of acting illegally to prevent employees from leaving Apple. On March 17, 2011, in an action brought against it by the U.S. Department of Justice, Apple stipulated to a final judgment that barred Apple from, among other things, "pressuring any person in any way to refrain from soliciting, cold calling, recruiting, or otherwise competing for employees" of its industry competitors. *See* Final Judgment, *United States v. Adobe Sys., Inc. et al.*, Case No. 1:10-cv-01629-RBW (D.D.C. Mar. 18, 2011). Apple's sweeping imposition of the Apple IPA and its improper anticompetitive provisions is a further attempt to restrict employee mobility and competition in the same way the Department of Justice barred it from doing more than a decade ago.

36. In keeping with this playbook, by June 2021, before a single Apple employee had left to join Rivos, Apple began holding regular meetings to strategize how to stop Rivos in its tracks, including by improperly obstructing employee mobility in violation of California law and California public policy. When employees began to announce their resignations to join Rivos, Apple rushed those employees out the door—usually without any formal exit interview or meaningful instruction at all—while knowing that Apple information likely remained in their possession. For example, Apple was well aware that its policy of allowing (and often effectively requiring) Apple employees

1  to store Apple documents in their personal iCloud accounts and iMessage histories was fraught with
2  security concerns, yet Apple took no steps to inspect the iCloud accounts or iMessages of its
3  departing employees before they left.  Nor did Apple provide any instruction to employees about
4  how to find copies of files that iCloud or iMessage might automatically generate on synced
5  devices—which copies the departing employees would not even know about because they were
6  automatically generated by the background operation of the Apple systems that Apple had its
7  employees use.

8       37.     Apple thus allowed, or at least failed to take reasonable measures to prevent, the
9  retention of Apple documents by departing employees.  This may have been due to Apple's neglect,
10 or because Apple knew it could use that retention to punish Rivos and the employees who dared
11 leave Apple to join Rivos.

12      38.     In any event, Apple's wrongful actions against Rivos and its employees were
13 motivated by Apple's desire to stop the loss of its engineering talent.  Even though employees are of
14 course perfectly free to pursue new employment, and Apple employees unsurprisingly wanted to
15 leave for better opportunities with better employers elsewhere, Apple knew that employees leaving
16 was causing it to fall behind its competitors in developing new technology.  As David Williamson,
17 Apple's Senior Director of Engineering (CPU) told Dan Murray in an November 17, 2021 email: "
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"

22 **Apple Employees Decide to Exercise Their Right to Seek Promising New Employment**

23      39.     Wen, Hardage, Ye, Pinot, Rajamani, and Wang each worked loyally for Apple for
24 many years.  Each worked on features in Apple's SoCs, which are based on a closed-source,
25 proprietary technology licensed from ARM.  Apple's products are exclusively aimed at the
26 consumer market, and include products such as iPhones, iPads, MacBooks, and Apple Watches.

27      40.     For each of their own individual personal and professional reasons, Wen, Hardage,
28 Ye, Pinot, Rajamani, and Wang decided they wanted to leave Apple to pursue new opportunities, as

is their right.  Some were frustrated that they were stuck iterating on the same products at Apple and were eager to try something new and innovative.  Others were impressed by the talented engineers that founded Rivos, and that Rivos had recruited to create a new vision for server SoCs.

41.     Although Apple claims to care deeply about ensuring that its so-called confidential and proprietary information does not leave Apple, Apple's conduct upon learning that an employee was resigning to join Rivos shows otherwise.  When an employee announced his or her intention to leave, Apple conducted only cursory exit interviews, if it conducted one at all, during which Apple forced its departing employees to sign an "exit checklist" without providing any meaningful explanation of how the employees were expected to comply with the items on the list, or even allowing the employees time to do so.  Apple's failure in this regard is particularly notable given that Apple's own policies encourage (and its day-to-day work practices effectively require) the intermingling of personal and work-related materials on personal iCloud accounts and iMessage conversations.  Despite knowing that Apple work-related materials are often stored in each employee's personal iCloud account, iMessage chats, and any synced locations that Apple's systems may automatically generate, Apple took no steps at the time the employees left to review these sources with the departing employees who were joining Rivos, or otherwise to explain to those employees how to segregate their personal information from work-related information.

42.     *After* the employees left, however, it was a completely different story.  Apple (or an outside vendor it hired) systematically scoured these departed employees' computers, files, and communications for any sign of retained materials.  In response to concerns from Apple's employees that Apple was reading their personal communications, one Apple Vice President who was especially upset about employees leaving for Rivos confirmed that Apple employees' concerns about Apple's intrusion on their personal communications were well founded; he said that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ And despite recognizing that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, looking for anything it could use against the former employees.

43. It did not stop there. Apple looked at files on employees' personal iCloud accounts and Time Machine backups, including photos, tax returns and other personal financial or family documents. Apple meticulously read through employees' web search histories. Apple may not have been specifically hunting for personal information, but it had no qualms whatsoever about looking at its former employees' personal communications and files in the course of its anticompetitive efforts.

44. Meanwhile, Apple did not only want to punish Rivos and the engineers who left Apple to work at Rivos, Apple also wanted to threaten its current employees about the consequences if they dared to leave. Apple began giving threatening presentations aimed at scaring its employees about what would supposedly happen to them if they joined Rivos or other promising startups.

**Apple's Conduct Creates A Concrete and Justiciable Controversy**

45. The Apple IPA, and the way Apple interprets it and tells employees to understand it, harms competition and is unlawful.

46. There is a concrete and justiciable controversy over the legality and enforceability of the Apple IPA as it relates to Rivos' recruitment and/or employment of Wen, Hardage, Ye, Pinot, Rajamani, and Wang.

47. There is a concrete and justiciable controversy over the legality and enforceability of the Apple IPA as it relates to Rivos' recruitment and/or employment of other current and former Apple employees for employment in California.

48. Wen, Hardage, Ye, Pinot, Rajamani, and Wang have standing to seek both declaratory and injunctive relief with respect to Apple's enforcement of the Apple IPA against them.

49. Rivos has standing to seek both declaratory and injunctive relief with respect to this controversy on behalf of itself and for the benefit of the public.

50. Evidence of the controversy between Apple and Counterclaim Plaintiffs over the Apple IPA includes the following:

   a. On April 29, 2022 Apple filed suit against Rivos, Wen, and a former Rivos employee in this Court;

      b. On August 29, 2023, Apple filed a Third Amended Complaint in this Court alleging, among other things, that Wen, Hardage, Ye, Pinot, Rajamani, and Wang breached their broad nondisclosure obligations as stated in the Apple IPA.

      c. With respect to Rivos, Apple alleges that, by recruiting Apple employees for employment at Rivos, and by supposedly employing them in positions that are similar to their positions at Apple, Rivos has misappropriated Apple trade secrets because the individuals will inevitably disclose and/or use Apple's alleged trade secrets given the similarity of their work.

51. In support of its claims against Rivos, Apple specifically relies upon Rivos' alleged "targeting," "soliciting," and employment of Wen, Hardage, Ye, Pinot, Rajamani, and Wang. *See* TAC ¶¶ 3, 47, 160, 193, 197.

52. Apple's claim relies on a theory of inevitable disclosure of trade secrets, which has been soundly rejected by courts in California, and indeed is sanctionable in California. *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1464 (2002) (rejecting inevitable disclosure theory as inconsistent with Business and Professions Code section 16600 and noting that "the inevitable disclosure doctrine cannot be used as a substitute for proving actual or threatened misappropriation of trade secrets."); *see also Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999) ("California trade-secrets law does not recognize the theory of inevitable disclosure; indeed, such a rule would run counter to the strong public policy in California favoring employee mobility.").

**Counterclaim Plaintiffs Injury-In-Fact as to Apple**

53. The Apple IPA, and Apple's interpretation and overreaching application of it, have caused Rivos, Wen, Hardage, Ye, Pinot, Rajamani, and Wang injury-in-fact and have caused them to lose money and property within the meaning of California's unfair competition law.

54. For example, Rivos retained the law firm of Quinn Emanuel Urquhart & Sullivan, LLP to defend it and its employees against Apple's claims. Rivos is paying its employees' defense costs.

55. A significant portion of the defense costs incurred arise directly from Apple's claims relating to the Apple IPA, and these defense costs would not have been incurred but for Apple's non-trade-secrets claims for relief. For example, Counterclaim Plaintiffs have both served and answered discovery relating to allegedly confidential (as opposed to trade secret) materials, reviewed and produced allegedly confidential (as opposed to trade secret) documents, and conducted legal and factual research necessary to defend against Apple's non-trade-secret allegations.

### FIRST CAUSE OF ACTION

### (Declaratory Relief Concerning the IPA)

56. Counterclaim Plaintiffs incorporate paragraphs 45-55 above as though fully set forth herein.

57. An actual controversy has arisen regarding the validity of certain provisions of Apple's IPA. Specifically, Apple has asserted that Wen, Hardage, Ye, Pinot, Rajamani, and Wang have violated the Apple IPA.

58. Rivos also has an interest in the Apple IPA, as Rivos employs employees purportedly subject to the IPA. Moreover, the Apple IPA generally inhibits Rivos' ability to recruit, hire, and employ Apple's current and former employees, including because employees are concerned about Apple enforcing its overbroad non-disclosure obligations and non-solicit obligations.

59. Business and Professions Code § 16600 renders every contract in restraint of trade void. Business and Professions Code §§ 17200 *et seq.* renders violations of Business & Professions Code § 16600 unfair and unlawful business practices.

60. The interests of employees in their own mobility and betterment in providing services to a California-based employer are deemed paramount to the competitive business interests of employers who seek to prevent competition.

61. Accordingly, Counterclaim Plaintiffs seek a declaratory judgment that Apple's IPA is unenforceable because it contravenes Business & Professions Code § 16600. Counterclaim Plaintiffs also seek a declaratory judgment that Apple's IPA is unenforceable to the extent it prohibits them, after their employment with Apple ends, from soliciting other Apple employees to leave Apple.

62.     Ancillary to this declaratory judgment, Counterclaim Plaintiffs seek an order enjoining Apple from entering into such contracts and requiring Apple to modify the Apple IPA so that its employees are free to provide services in California or to a California-based employer.

### THIRD CAUSE OF ACTION

**(Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

63.     Counterclaim Plaintiffs incorporate paragraphs 46-56 above as though fully set forth herein.

64.     Business and Professions Code § 16600 renders every contract in restraint of trade void. Business and Professions Code §§ 17200 *et seq.* renders violations of Business & Professions Code § 16600 unfair and unlawful business practices.

65.     California has a strong interest in protecting the freedom of movement of persons whom California-based employers wish to employ to provide services in California, regardless of the person's state of residence.

66.     California employers have a strong and legitimate interest in having broad freedom to choose from a national applicant pool in order to maximize the quality of the product or services they provide. The State of California has a strong interest in protecting California-based employers and their employees from anti-competitive conduct, such as Apple's, that interferes with the freedom of Rivos and its employees.

67.     Apple engages in unfair competition when it requires employees to enter into the Apple IPA in order to deter the recruitment and movement of its current and former employees.

68.     Apple's unfair competition has injured, and will continue to injure, Apple employees like Wen, Hardage, Ye, Pinot, Rajamani, and Wang who have a desire to leave their employment at Apple and work for a company that Apple views as a competitor.

69.     Apple's unfair competition has injured, and will continue to injure, Rivos, which has incurred costs, diverted resources, and spent excessive management and attorney time as a result of Apple's unfair competition. Counterclaim Plaintiffs seek all monetary and non-monetary relief allowed by law, including restitution of sums Counterclaims Plaintiffs expend as a result of the conduct alleged in their counterclaims.

70. Unless enjoined by the Court, Apple will continue to engage in the foregoing unfair business practices. Counterclaim Plaintiffs therefore request an order enjoining Apple from engaging in the unfair business practices described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiffs Rivos, Wen, Hardage, Ye, Pinot, Rajamani, and Wang pray for judgment and relief as follows:

a. For a declaratory judgment on their counterclaims;

b. For restitution on their counterclaim for violation of Business and Professions Code §§ 17200 *et seq.*;

c. For appropriate injunctive relief ancillary to the declaratory judgment;

d. For appropriate negative injunctive relief under Business and Professions Code §§ 17200 *et seq.*, both as to Rivos and its employees, and to the public. The negative injunctive relief includes, but is not limited to, a public injunction prohibiting Apple from: (i) forcing employees to sign illegal contracts of adhesion that purport to impose restrictions on them that are inconsistent with California law, (ii) seeking to enforce the Apple IPA against its current and former employees as described herein, and (iii) engaging in threatened or actual anti-competitive litigation against Rivos and other California employers arising from its illegal and unenforceable non-competes/NDAs as reflected in the Apple IPA;

e. For attorneys' fees and costs in this action as allowed by law; and

f. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Counterclaim Plaintiffs hereby demand trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Respectfully submitted,

DATED: September 22, 2023

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _____*/s/ David Eiseman*_____

DAVID EISEMAN
RYAN LANDES
VICTORIA B. PARKER

Attorneys for Defendants and Counterclaim Plaintiffs Rivos Inc., Wen Shih-Chieh a/k/a Ricky Wen, Jim Hardage, Weidong Ye, Laurent Pinot, Prabhu Rajamani and Kai Wang