# EXHIBIT A

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  David Eiseman (Bar No. 114758)
  davideiseman@quinnemanuel.com
  Victoria B. Parker (Bar No. 290862)
  vickiparker@quinnemanuel.com
  Elle Xuemeng Wang (Bar No. 328839)
  ellewang@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700

  Ryan Landes (Bar No. 252642)
  ryanlandes@quinnemanuel.com
865 S Figueroa St.
Los Angeles, CA 90017
Telephone:      (213) 443-3145
Facsimile:      (213) 443-3100

Attorneys for Defendants and
Counterclaim Plaintiffs Rivos Inc., Wen Shih-
Chieh a/k/a Ricky Wen, Jim Hardage, Weidong
Ye, Laurent Pinot, Prabhu Rajamani and Kai
Wang

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>                    Plaintiff,<br><br>        vs.<br><br>RIVOS INC., WEN SHIH-CHIEH a/k/a RICKY WEN, JIM HARDAGE, WEIDONG YE, LAURENT PINOT, PRABHU RAJAMANI, AND KAI WANG,<br><br>                    Defendants. | Case No. 5:22-CV-2637-PCP<br><br>**DEFENDANTS AND COUNTERCLAIM PLAINTIFFS' AMENDED COUNTERCLAIMS AGAINST APPLE INC.**<br><br>Courtroom: 8<br>Judge: Hon. P. Casey Pitts<br><br>Date Action Filed: April 29, 2022 |
| RIVOS INC., WEN SHIH-CHIEH a/k/a RICKY WEN, JIM HARDAGE, WEIDONG YE, LAURENT PINOT, PRABHU RAJAMANI, AND KAI WANG,<br><br>                    Counterclaim Plaintiffs.<br><br>        Vs.<br><br>APPLE INC.,<br><br>                    Counterclaim Defendant, | **Filed Under Seal** |

Defendants and Counterclaim Plaintiffs Rivos Inc., Wen Shih-Chieh a/k/a Ricky Wen, Jim Hardage, Weidong Ye, Laurent Pinot, Prabhu Rajamani and Kai Wang (together, "Counterclaim Plaintiffs") allege the following amended counterclaims, based on personal knowledge as to their own actions, and otherwise on information and belief, against Plaintiff and Counterclaim Defendant Apple Inc. as follows:

<strong><u>NATURE OF THE ACTION</u></strong>

1.      Afraid of any threat of legitimate competition in the marketplace, and hoping to frighten and send a message to any employees who might dare to leave Apple to work somewhere else, Apple has resorted to trying to thwart emerging startups through anticompetitive measures, including illegally restricting employee mobility.  Counterclaim Plaintiffs bring these counterclaims because Apple has sought to impose overreaching obligations on its employees so that Apple can anticompetitively retaliate against them and any future employer of theirs if they dare to exercise their right to leave Apple to obtain employment elsewhere—especially when the employees choose to join a startup that Apple perceives as a potential competitor for employees.

2.      Apple is relentless in these efforts.  It forces its employees to sign contracts with provisions that run afoul of California law as a condition of their employment.  These contracts purport to prohibit employees from retaining *anything* from their time at Apple—even general know-how that is not trade secret—and contain other provisions that are unenforceable because they violate California public policy.  They also purport to prohibit the post-termination solicitation of Apple employees.  And yet Apple still wields these provisions, which effectively function as non-compete provisions, to scare current and former employees into submission, and to chill activity that California law expressly allows.

3.      Apple has no regard for employee rights or privacy in carrying out this anticompetitive scheme.  Even when Apple knows its employees are leaving to work somewhere that Apple (rightly or wrongly) perceives as a competitive threat, it does not consistently conduct exit interviews or give employees any meaningful instruction about what they should do with supposedly "confidential" Apple material upon leaving.  Whether by neglect or as part of a planned effort to generate a pretextual basis to sue the employees and their new employer for "stealing"

1   Apple material, Apple lets these employees walk out the door with material they may have

2   inadvertently "retained" simply by using the Apple systems (such as iCloud or iMessage) that Apple

3   effectively mandates they use as part of their work.

4       4.    Then as soon as the employee is out the door, Apple scours any and all personal

5   information it can find in order to make out some case of "retention" of Apple material so that

6   Apple can set an example of the former employees and their new employers, which Apple then uses

7   to intimidate any Apple employees who might think to leave.  Without making any effort to shield

8   or protect employees' personal information, Apple (or third parties it hires to do the work) looks

9   through current and former employees' personal iCloud accounts, personal iMessages, personal

10  Time Machine backups, personal web search histories, and more—then Apple weaponizes whatever

11  it finds against the employees and their new employers.

12      5.    Rivos is one such promising startup that caught Apple's ire, even though Rivos does

13  not compete with Apple for anything except hiring talented SoC engineers.  Unlike Apple, which

14  develops Systems on a Chip ("SoCs") for consumer-based products using an architecture it licenses

15  from ARM, Rivos is developing next-generation SoCs for use in servers based on the open-source

16  RISC-V architecture.  Apple's Senior Director of Engineering (CPU), David Williamson,

17  acknowledged that the Central Processing Unit ("CPU ") Apple was building was ███████████

18  ███████████████████████" and even discouraged Apple from undertaking similar work ████████

19  ███████████ from the CPU team's work.

20      6.    Nevertheless, after learning of Rivos in May 2021, Apple immediately began

21  strategizing to thwart its growth and to prevent any Apple employees from leaving to pursue

22  promising opportunities at Rivos.  Apple knew that Rivos was funded by two investors who had

23  funded NUVIA, a startup co-founded by a former Apple Senior Director of Platform Architecture

24  against whom Apple had deployed the same anticompetitive playbook.  Concerned that Rivos would

25  become NUVIA 2.0, Apple set out to stop Rivos, and the employees who chose to leave Apple to

26  join Rivos, from ever getting a product to the marketplace.

27      7.    To support its campaign against Rivos and the former Apple employees Rivos hired,

28  Apple has invoked unlawful and unenforceable provisions of its Intellectual Property Agreement

DEFENDANTS AND COUNTERCLAIM PLAINTIFFS' AMENDED COUNTERCLAIMS AGAINST APPLE INC.

(the "Apple IPA" (*see, e.g.,* Dkt. 256-1)) that fly in the face of California law and strong, important California policy.

8.      These counterclaims seek to prevent Apple from stifling employee mobility and from competing unfairly under the guise of enforcing an illegal and unenforceable contract that Apple foists on its employees.

9.      Apple does not hide its anger that over 50 former Apple employees chose to leave their positions at Apple, for a variety of personal and individual reasons, to pursue promising new opportunities at Rivos.  And, as one would expect and as California law expressly encourages, these former Apple employees pursued jobs at Rivos that would make use of their skills and know-how that they developed throughout their careers, including long before they started at Apple.  But Apple is desperate to punish Apple employees for leaving, and also to threaten other Apple employees who might think to leave.  Apple uses the Apple IPA as its primary weapon in this effort—including against Wen, Hardage, Ye, Pinot, Rajamani, and Wang, all of whom Apple demanded sign the Apple IPA as a condition of working at Apple.  And, in exchange for no consideration at all, Apple required that they adopt it again, by way of a purported "exit checklist" when they left Apple.

10.      To conceal its true anticompetitive motives, Apple asserts that the Apple IPA merely prohibits employees from retaining or using information that Apple supposedly owns and that the employees are not allowed to keep.  Not so.  In violation of California law and public policy, the Apple IPA is so expansive as to cover anything "learned" during the course of employment, regardless of whether it is a trade secret.  The Apple IPA also contains a non-solicitation provision, which is designed to, and Apple uses to, chill employee mobility and competition.  These provisions stifle competition, entrepreneurship, innovation, job and wage growth, equality, and economic development.

11.      Apple should not be permitted to force employees to agree to an illegal contract of adhesion as an end-run around California's protections of employee mobility and innovation, and as a means to squash entrant startups who hire former Apple employees.  Apple's actions not only violate the laws and public policy of the State of California, but also undermine the free and open competition that has made the state the birthplace of countless innovative businesses.  Apple's

1    actions harm its current and former employees, Rivos and other California employers, and the State

2    of California.

3           12.    Counterclaim Plaintiffs therefore bring these counterclaims to obtain a declaration

4    that certain provisions of the Apple IPA are unenforceable.  They likewise seek restitution and an

5    injunction prohibiting Apple from enforcing certain provisions of the Apple IPA against them and

6    other similarly situated current and former Apple employees in violation of California law.

7                                    **JURISDICTION AND VENUE**

8           13.    Counterclaim Plaintiffs assert these counterclaims under Rule 13 of the Federal Rules

9    of Civil Procedure.  Apple's principal place of business is in this District and it has consented to

10   jurisdiction and venue in this District by filing suit against Counterclaim Plaintiffs in this Court.

11          14.    This Court has supplemental subject matter jurisdiction over these counterclaims

12   pursuant to 28 U.S.C. § 1367 because they arise out of the same occurrence that is the basis for

13   Apple's Defend Trade Secrets Act ("DTSA") claims and form part of the same case or controversy.

14          15.    Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial part

15   of the events or omissions giving rise to these counterclaims occurred within this District.

16                                       **THE PARTIES**

17          16.    Counterclaim Plaintiff Rivos is a Delaware corporation with a principal place of

18   business in Santa Clara, California.  Rivos is a startup that is developing a SoC using open-source

19   architecture.  Although other SoCs exist in the marketplace that rely on proprietary system

20   architecture, Rivos aims to be one of the first companies to successfully build and commercialize a

21   SoC for servers in data centers using the open-source RISC-V architecture.  Since its founding in

22   May 2021, Rivos has attracted engineers from around Silicon Valley and the world to work on its

23   innovative technology.  Rivos currently employs Counterclaim Plaintiffs Wen, Hardage, Ye, Pinot,

24   Rajamani, and Wang.

25          17.    Counterclaim Plaintiffs Wen, Ye, and Rajamani are residents of San Jose, California.

26   Counterclaim Plaintiffs Hardage and Wang are residents of Austin, Texas.  Counterclaim Plaintiff

27   Pinot is a resident of Los Gatos, California.

28

18.     Counterclaim Defendant Apple is a California corporation with a principal place of business in Cupertino, California.

## GENERAL ALLEGATIONS

**Rivos Is a Promising Startup Developing Server SoCs Using Open Source Architecture**

19.     Rivos was founded in May 2021 by Puneet Kumar, Belli Kuttanna, and Mark Hayter, three successful engineers with long track records and a history of significant accomplishments in the industry and SoC development.  Kumar and Hayter briefly worked for Apple beginning in 2008 after Apple acquired their previous employer, PA Semi, Inc.  Kumar and Hayter then co-founded a company that was acquired by Google and continued to work for Google for eleven years before co-founding Rivos.  Kuttanna never worked for Apple, and spent most of his career at Intel.

20.     Kumar, Kuttanna, and Hayter founded Rivos with the goal of creating novel technical solutions for today's computing industry.  To that end, Rivos is working to develop a high performance server SoC using the open-source RISC-V architecture.  Because Rivos is building SoCs for use in large enterprise servers in data centers, as opposed to small consumer-based products, its SoCs are optimized for different features, and contain different components, than Apple's SoCs.  For example, while mobile phones need to optimize for battery life, servers are plugged in and therefore can strike a different balance between power efficiency, speed, and storage capacity.  Mobile phone SoCs need entire modules for graphics or camera systems; server SoCs do not.  While Rivos does not yet have a product on the market, it has received considerable attention as a result of the prominence of its founders and the talent it has been able to attract.

21.     Since its founding, Rivos has hired talented engineers from Google, Intel, AMD, and Apple, amongst others.  These engineers were attracted to Rivos for a variety of personal and professional reasons, including its cutting edge work on the RISC-V platform, the opportunity to try something new that the more established companies were not doing, and the excitement of building a new product from the ground up.  And in the case of employees who joined from Apple, many of them left Apple because they were frustrated that their work at Apple had grown stale, and they were excited to look for new opportunities.

**Restrictive Covenants Are Illegal in California**

22. With limited exceptions, California law declares "*every* contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. The California Legislature and California courts have made clear that agreements that limit competition or employee mobility, including overbroad non-disclosure agreements and non-solicitation agreements, are unlawful, against public policy, and void. The California Legislature recently underscored its commitment to open competition and free employee mobility with new laws strengthening the protections for employees in section 16600.

23. An overbroad non-disclosure agreement restricts employees from practicing their trade by improperly restricting the information they may use in their new employment. For example, a non-disclosure agreement that prohibits employees from using or disclosing all information or know-how "learned" at their past employer—regardless of whether it is a trade secret—is for all intents and purposes a covenant not to compete. Similarly, an employment agreement that purports to prohibit *former* employees from soliciting their former coworkers after they leave restricts employees from practicing their trade by restricting the people with whom they may work. Agreements containing these provisions are contrary to California public policy.

**Apple Requires Employees to Sign a Broad and Improper IPA as a Condition of Employment**

24. Counterclaim Plaintiffs Wen, Hardage, Ye, Pinot, Rajamani, and Wang were each required to sign the Apple IPA at the commencement of their employment with Apple. Wen, Hardage, Ye, Pinot, Rajamani, and Wang's executed Apple IPAs are attached to Apple's Third Amended Complaint as Exhibits A-F. Dkt. 256. The Apple IPA is a contract of adhesion and the employees have no opportunity to modify it. The Apple IPA imposes expansive restrictions that purport to bind employees *forever*, even long after they leave Apple.

25. The Apple IPA defines "Proprietary Information" as "any information of a confidential, proprietary, and secret nature that may be disclosed to you or otherwise learned by you in the course of your employment at Apple, including but not limited to any confidential information of third parties disclosed to Apple." Apple IPA at 2.0. The Apple IPA further expands the definition of Proprietary Information as follows:

> Such confidential, proprietary, and secret information includes, but is not limited to, information and material relating to past, present, or future inventions, marketing plans, manufacturing and product plans, technical specifications, hardware designs and prototypes, business strategies, financial information and forecasts, personnel information, and customer lists.

*Id.*

26.     For employees within the Hardware group, including Wen, Hardage, Ye, Pinot, Rajamani, and Wang, Apple reinforces—and even tries to expand—the impermissibly broad reach of the Apple IPA through an "exit checklist" it demands departing employees sign on their way out the door.  An example is attached hereto as Exhibit A.  That "checklist" states, "Everything you worked on at Apple stays here."  Apple makes no attempt to separate properly protected trade secret information from any other information an employee may have learned or "worked on" during his or her employment at Apple.

27.     These provisions violate California law, which specifically allows "a former employee [to] use general knowledge, skill, and experience acquired in his or her former employment."  *Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009).  "[G]eneral knowledge in the trade or [...] special knowledge of those persons who are skilled in the trade" are not trade secrets, even if they are learned through work at Apple.  *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011).

28.     Having provided such an expansive definition and interpretation of "Proprietary Information," the Apple IPA then purports to prohibit Apple employees from using or disclosing such information without the "written consent" of Apple.  Specifically, the Apple IPA provides:

> You understand and agree that your employment by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure of your employment *and thereafter*, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple.

Apple IPA at 2.0(a).

29.     As one court explained when invalidating a provision similar to this one, complying with restrictions like these would essentially require departing employees to "perform a prefrontal lobotomy on himself or herself" or to completely exit their chosen field of work.  *Fleming Sales Co.,*

*Inc. v. Bailey*, 611 F. Supp. 507, 514 (D.C. Ill. 1985). While Apple might prefer this regime for its departing employees, California law prohibits it.

30. In short, the Apple IPA prohibits Apple employees from using or disclosing information that Apple, in its sole discretion, deems to be "of a confidential, proprietary, and secret nature" that is "learned" or "disclosed" during their employment with Apple, regardless of whether the information is trade secret. And as its actions against Rivos and the former Apple employees who went to work for Rivos have shown, Apple apparently defines "confidential" and "proprietary" in an outrageously overbroad and self-serving way. Apple evidently includes within that definition employees' children's homework, tips for leg exercises, open source scripts downloaded from the internet, employees' personal tax filings that include information about their compensation from Apple, partial screenshots devoid of context or substantive meaning, and thousands of other absurd examples.

31. The "confidentiality" provision in the Apple IPA—in the expansive manner that Apple interprets it, attempts to enforce it, and threatens its employees with—serves no legitimate purpose to Apple. Rather, Apple uses it only to make it functionally impossible for someone to leave Apple and find new work elsewhere without facing Apple's retaliation.

32. Apple's fear campaign achieved its intended effect of preventing employee mobility. As one Apple employee told Rivos after receiving a job offer from Rivos, he had "decided not to pursue the offer further" as he could not "take the risk" of being the target of Apple's anticompetitive tactics against former employees.

33. Similarly, the Apple IPA provides that employees are not allowed to share personnel information without the written permission of Apple—in express violation of Labor Code section 232.5.

34. The Apple IPA also prohibits the solicitation of Apple employees for one year following termination of employment. Specifically, the Apple IPA provides:

> During your employment ***and for a period of one (1) year following your termination date***, you will not, directly or indirectly, solicit, encourage, recruit, or take any action intended to induce Apple employees or contractors to terminate their relationship with Apple.

Apple IPA at 3.0(d).

35.     Apple knows and intends that the mere presence of this non-solicitation provision—and Apple's internal emphasis to employees regarding the supposed consequences of violating it—discourages its employees from exercising their rights under California law to contact other Apple employees after they leave Apple.  Indeed, after learning that one departing employee had been approached by Rivos, Apple's Vice President of the Silicon Engineering Group, Sribalan Santhanam, wrote:  "Who in Rivos approached him?  If a non-solicit was violated, this needs to be escalated."  Even though the provision is illegal and unenforceable, Apple's overreach has again accomplished its desired effect, as former Apple employees at Rivos have been very careful to steer clear of this provision for fear of retaliation from Apple.

36.     These provisions of the Apple IPA are unlawful and have the effect of impeding employee mobility and restraining Wen, Hardage, Ye, Pinot, Rajamani, Wang, and other Apple employees from engaging in their choice of lawful profession, trade, or business.  Thus, the provisions are void pursuant to California Business and Professions Code section 16600.

**Apple Becomes Concerned that Talented Engineers Will Leave Apple to Work for Rivos**

37.     Dan Murray, Vice President of Silicon Engineering at Apple, learned of Rivos in May 2021 after a conversation with one of Rivos' founders, Puneet Kumar.  Apple knew that Rivos was being funded by two of the investors who had also funded NUVIA, a startup co-founded by Gerard Williams, a former Apple Senior Director of Platform Architecture who Apple had sued in 2019 for purported breach of the Apple IPA and trade secret misappropriation.  *See Apple v. Williams*, Case No. 19-CV-352866, Santa Clara Superior Court.

38.     Unsurprisingly, the Court correctly recognized that Apple's trade secret misappropriation claims against Williams were wholly unsupported.  On September 29, 2021, the court in the *Williams* case denied Apple's requested preliminary injunction in full, finding, *inter alia*, Apple's misappropriation narrative consisted of "whack-a-mole scenarios" that amounted to "an evidentiary stretch, dissipating into speculation and conjecture."  Sept. 29, 2021 Order at 17.

39.     In truth, Apple had no *legitimate* gripes with NUVIA or Williams, but instead was upset that Apple employees saw better opportunities working for NUVIA, and Apple wanted to scare any of its employees who might think to leave.  With that sore spot from NUVIA in mind, and

seeing that Rivos and NUVIA were funded by the same investors, Apple became concerned that Rivos would become "NUVIA 2.0."  In fact, Apple's Senior Vice President of Hardware Technology, Johny Srouji, chided Rivos' investor, saying he "wants to repeat the exercise of funding another startup while targeting our team, and sell it a couple years later (as he did with Nuvia)."  And so Apple decided to unleash its hostility against Rivos and its employees using the same playbook it had deployed against Williams and NUVIA.

40.     Indeed, Apple has a history of acting illegally to prevent employees from leaving Apple.  On March 17, 2011, in an action brought against it by the U.S. Department of Justice, Apple stipulated to a final judgment that barred Apple from, among other things, "pressuring any person in any way to refrain from soliciting, cold calling, recruiting, or otherwise competing for employees" of its industry competitors.  *See* Final Judgment, *United States v. Adobe Sys., Inc. et al.*, Case No. 1:10-cv-01629-RBW (D.D.C. Mar. 18, 2011).  Apple's sweeping imposition of the Apple IPA and its improper anticompetitive provisions is a further attempt to restrict employee mobility and competition in the same way the Department of Justice barred it from doing more than a decade ago.

41.     In keeping with this playbook, by June 2021, before a single Apple employee had left to join Rivos, Apple began holding regular meetings to strategize how to stop Rivos in its tracks, including by improperly obstructing employee mobility in violation of California law and California public policy.  When employees began to announce their resignations to join Rivos, Apple implemented the "Rivos exit protocol," pursuant to which Apple rushed those employees out the door—usually without any formal exit interview or meaningful instruction at all.  Apple did so with the knowledge that something Apple might claim to be "Apple information" likely remained in their possession, and then immediately "scrubbed" their Apple devices and accounts—reviewing both personal and work-related materials—to find evidence of that information.

42.     Apple's wrongful actions against Rivos and its employees were motivated by Apple's desire to stop the loss of its engineering talent.  Even though employees are of course perfectly free to pursue new employment, and Apple employees unsurprisingly wanted to leave for better opportunities with better employers elsewhere, Apple knew that employees leaving was causing it to fall behind its competitors in developing new technology.  As David Williamson,

Apple's Senior Director of Engineering (CPU) told Dan Murray in a November 17, 2021 email: "I think this round is worse than what we had with Nuvia. We've lost more poeple [sic] to Rivos alone [than] to Nuvia and we are losing to these other companies now as well. . . On the competitive comp quote about Apple falling behind, that's not just one senior CPU lea[v]ing saying that. I think that's a common belief in the team both leadership and all the way through."

43.     One factor motiving employee departures was Apple's well-known compensation problems. In many cases, the salaries it paid its engineers were "███████," and Apple's managers had "█████████████████████████████████" Although Apple worked on a plan to adjust salaries to "███████████," it ultimately decided ███████████ of what managers recommended to retain Apple's talent. Unable to incentivize retention through innovative products, attractive compensation, or an inviting and supportive workplace environment, Apple resorted to threatening tactics to avoid any further "damage" to "Apple's team DNA and culture" caused by employees looking for more attractive places to work.

44.     As Apple began to implement its plans to use the Apple IPA and open threats of retaliation to quell employee mobility, the number of Apple employees willing to work for Rivos dropped to nearly zero, a number that Apple closely tracked on a monthly basis in its "████████████████████████████████" Apple management held meetings and prepared presentations where they congratulated themselves about how to prevent employees from leaving Apple to go to Rivos and how to destroy Rivos as a company. Seeing that Apple's efforts to quell employee mobility and prevent competition for its talented engineers were paying off, Apple executives gloated that the "start up called Rivos was grounded."

**Apple Employees Decide to Exercise Their Right to Seek Promising New Employment**

45.     Wen, Hardage, Ye, Pinot, Rajamani, and Wang each worked loyally for Apple for many years. Each worked on features in Apple's SoCs, which are based on a closed-source, proprietary technology licensed from ARM. Apple's products are exclusively aimed at the consumer market, and include products such as iPhones, iPads, MacBooks, and Apple Watches.

46.     Wen, Hardage, Ye, Pinot, Rajamani, and Wang were talented engineers working on SoCs and SoC components, including CPUs. They, like many other Apple engineers, had years of

experience and know-how from working with SoCs and SoC components—including, in some cases, from their prior positions at other companies—which made them valuable employees that are not easily replaced by other engineers.  Indeed, as Apple itself recognizes, it "need[s] people with CPU experience."  Although "smart people can learn," there is a significant cost barrier to hiring employees who do not have any subject matter experience, and so Apple relies on people with a "CPU background" to do the specialized work required for its designs.

47.     For each of their own individual personal and professional reasons, Wen, Hardage, Ye, Pinot, Rajamani, and Wang decided they wanted to leave Apple to pursue new opportunities, as is their right.  Some were frustrated that they were stuck iterating on the same products at Apple and were eager to try something new and innovative.  Others were impressed by the talented engineers that founded Rivos, and that Rivos had recruited to create a new vision for server SoCs.  Given the valuable SoC experience these engineers (as well as other people leaving for Rivos) had, Apple became concerned that it was "having to make choices about what we can actually do."  In internal discussions, Apple was emphatic about the risks it faced *from losing talent*, but apparently much less interested in any supposed risk that departing employees might steal so-called "Apple information."

48.     Although Apple claims to care deeply about ensuring that its so-called confidential and proprietary information does not leave Apple, Apple's conduct upon learning that an employee was resigning to join Rivos shows otherwise.  Consistent with the playbook when an employee announced his or her intention to leave to join Rivos, Apple employed its "Rivos exit protocol."  Pursuant to that protocol, Apple conducted only cursory exit interviews, if it conducted one at all, during which Apple forced its departing employees to sign a newly created "exit checklist" without necessarily showing it to employees in advance of their cursory exit process or providing any meaningful explanation of how the employees were expected to comply with the items on the list, or even allowing the employees adequate time to do so.  In some instances, Apple managers would even fill out the exit checklist themselves and then demand the departing employee sign it without going over it with the employee or making any effort to confirm that the purported representations in the checklist were accurate.  The rushed nature of this "Rivos exit protocol" was intentional:

Apple executives did not actually want to prevent departing employees from retaining so-called confidential or proprietary information; instead, Apple directed that managers "need to get [the departing employee's] equipment and scrub" for any potential information that Apple could use against the departing employee as evidence of a breach of the Apple IPA.

49.     The exit checklist also repeated the directive—contrary to California law—that departing employees were not permitted to solicit Apple employees.

50.     Nor did Apple do anything to address known security risks.  For example, Apple was well aware that its policy of encouraging (and often effectively requiring) Apple employees to store Apple documents in their personal iCloud accounts and iMessage histories was fraught with security concerns.  Apple recognized that unless Apple work files "███████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████;"  Yet, despite knowing that the default settings on Apple's iCloud and Apple's workplace policies and practices created "██████ ███████████ for departing employees, Apple took no steps to inspect the iCloud accounts or iMessages of its departing employees before they left.  Similarly, Apple did not provide any instruction to employees about how to find copies of files that iCloud or iMessage might automatically generate on synced devices—which copies the departing employees would not even know about because they were automatically generated by the background operation of the Apple systems that Apple developed and had its employees use.

51.     Apple thus allowed, or at least failed to take reasonable measures to prevent, the retention of Apple documents by departing employees.  This may have been due to Apple's neglect, or because Apple knew it could use that retention to punish Rivos and the employees who dared leave Apple to join Rivos.

**Apple Engages in Systematic Intimidation Scheme to Quell Employee Mobility**

52.     *After* the employees left, however, it was a completely different story.  Once Apple realized Rivos was hiring a number of its SoC engineers, Apple began quickly walking all employees departing to Rivos out of the building immediately.  These employees were escorted out in a public fashion in front of their friends and coworkers, as though they were criminals.  Apple did

this so that it could set a humiliating example of what would happen if employees considered leaving for Rivos.

53.     Once the employee was out the door, Apple (or an outside vendor it hired) systematically scoured (or "scrubbed") these departed employees' computers, files, and communications for any sign of retained materials.  In response to concerns from Apple's employees that Apple was reading their personal communications, one Apple Vice President who was especially upset about employees leaving for Rivos confirmed that Apple employees' concerns about Apple's intrusion on their personal communications were well founded; he said that "[t]here shouldn't be any assumption of privacy . . . for personal communications" on email or Slack.  And despite recognizing that employees used iMessage for both personal and work communication, Apple (or some outside vendor Apple hired) read through iMessage histories, looking for anything it could use against former employees.

54.     It did not stop there.  Apple looked at files on employees' personal iCloud accounts and Time Machine backups, including photos, tax returns, and other personal financial or family documents.  Apple meticulously read through employees' web search histories.  Apple may not have been specifically hunting for personal information, but it had no qualms whatsoever about looking at its former employees' personal communications and files in the course of its anticompetitive efforts to find some pretext for retaliation.

55.     Apple executives also began looking for evidence that "someone who left for Rivos must have violated the non-solicit" contained within the Apple IPA, further deterring anyone from even considering contacting a former coworker.

56.     Meanwhile, Apple did not only want to punish Rivos and the engineers who left Apple to work at Rivos, Apple also wanted to threaten its current employees about the consequences if they thought about following suit.

57.     Apple began giving threatening presentations aimed at scaring its employees about what would supposedly happen to them if they joined Rivos or other promising startups.  In those presentations, Apple emphasized the financial risks and downsides of joining a start-up.  Apple even went so far as to display the resumes of individuals who had left for Rivos and tell current Apple

1   employees that those individuals had betrayed Apple and should never be considered for future

2   employment.

3   **Apple's Scheme of Intimidation and Weaponization of the Illegal IPA Harms Competition**

4       58.     Apple's use of intimidation tactics to retain employees harms competition for

5   talented SoC engineers.  Apple's scheme limits employee movement amongst companies in a

6   manner that violates California law and public policy and deprives other companies of access to

7   talented employees who would otherwise be in the market for new employment opportunities.

8       59.     Apple's misconduct harms companies building SoCs and SoC components, even

9   beyond the consumer product market into which Apple sells its products.  Indeed, Apple's unfair

10  competition harms Rivos, which is building a server product, as Rivos is unable to fairly compete in

11  the market for talented SoC engineers.  Other companies like Rivos that want to hire SoC engineers,

12  but are unable to do so as a result of Apple's tactics, are likewise harmed.

13      60.     Apple's scheme also keeps salaries and other forms of compensation artificially low

14  for employees as, absent such intimidation tactics and the use of illegal employment contracts,

15  Apple would be required to increase the benefits it offers to its engineers in order to retain them.

16      61.     Demonstrating Apple's true goal of quashing competition, after putting Apple's plan

17  to shut down Rivos into action, Apple executive Sribalan Santhaman remarked that he was

18  "[s]urprised they aren't slowing down..I guess the money is still flowing.."

19  **Apple's Conduct Creates A Concrete and Justiciable Controversy**

20      62.     The Apple IPA, and the way Apple interprets it and tells employees to understand it,

21  harms competition and is unlawful.  Specifically, Apple interprets the definition of "Proprietary

22  Information" under the Apple IPA to include documents that are personal in nature, publicly

23  available, or not derived from work done at Apple.  Apple also interprets the non-solicit provision as

24  enforceable as written, as confirmed by Apple's internal communications and the deposition

25  testimony of Apple's current and former employees.

26      63.     In support of its claims against Rivos, Apple specifically relies upon Rivos' alleged

27  "targeting," "soliciting," and employment of Wen, Hardage, Ye, Pinot, Rajamani, and Wang.  *See*

28  TAC ¶¶ 3, 47, 160, 193, 197.  And, as has become clear, Apple's claims of trade secret

misappropriation have morphed to become wholly divorced from the documents allegedly retained, and now instead depend on information and general know-how purportedly "retained" in the heads of Rivos employees.  Apple pursues these claims even though the things that Apple claims as "trade secrets" are technologies that are expressly described in academic journals, available in open-source software, repeatedly disclosed in Apple's own patents, or are mundane, even "generic" and necessary approaches to solving common problems in designing CPUs.

64.     Apple's claim relies on a theory of inevitable disclosure of trade secrets, which has been soundly rejected by courts in California, and indeed is sanctionable in California.  *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1464 (2002) (rejecting inevitable disclosure theory as inconsistent with Business and Professions Code § 16600 and noting that "the inevitable disclosure doctrine cannot be used as a substitute for proving actual or threatened misappropriation of trade secrets"); *see also Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999) ("California trade-secrets law does not recognize the theory of inevitable disclosure; indeed, such a rule would run counter to the strong public policy in California favoring employee mobility.").

**Counterclaim Plaintiffs' Injury-In-Fact as to Apple**

65.     The Apple IPA, and Apple's overreaching interpretation and application of it, have caused Rivos, Wen, Hardage, Ye, Pinot, Rajamani, and Wang injury-in-fact and have caused them to lose money and property within the meaning of California's unfair competition law.

66.     Rivos has incurred increased business costs, including increased recruiting costs, as a result of its difficulty in hiring engineers from Apple.  This difficulty is a direct result of Apple's interpretation and improper retaliatory enforcement of the Apple IPA and the presence of the illegal non-solicitation provision in the Apple IPA.  Rivos has also lost engineering talent as a result of Apple employees' fear of retaliation by Apple if they choose to leave Apple, including loss of candidates who accepted positions with Rivos but then reconsidered in light of Apple's tactics.

67.     Rivos has also incurred increased development costs as a result of its employees' fears of using their general knowledge and experience, which Apple claims as its "Proprietary

1    Information," regardless of whether that information is publicly available or did not originate from
2    work at Apple.

3         68.     Further, Rivos retained the law firm of Quinn Emanuel Urquhart & Sullivan, LLP to
4    defend it and its employees against Apple's claims.  Rivos is paying its employees' defense costs.
5    A significant portion of the defense costs incurred arise directly from Apple's claims relating to the
6    Apple IPA, and these defense costs would not have been incurred but for Apple's non-trade-secret
7    claims for relief and Apple's improper attempts to enforce unenforceable provisions of the Apple
8    IPA.  For example, Counterclaim Plaintiffs have both served and answered discovery relating to
9    allegedly confidential (as opposed to trade secret) materials, answered discovery about their
10   solicitation of Apple employees, reviewed and produced allegedly confidential (as opposed to trade
11   secret) documents, and conducted legal and factual research necessary to defend against Apple's
12   non-trade-secret allegations.

13        69.     Wen, Hardage, Ye, Pinot, Rajamani, and Wang have been harmed in the form of lost
14   productivity, including as a result of distraction from fear of retaliation by Apple for their decision
15   to pursue career opportunities outside Apple, as well as irreparable harm to their reputations.

16                            **FIRST CAUSE OF ACTION**
17                      **(Declaratory Relief Concerning the IPA)**

18        70.     Wen, Hardage, Ye, Pinot, Rajamani, and Wang incorporate the foregoing paragraphs
19   as though fully set forth herein.

20        71.     An actual controversy has arisen regarding the validity of certain provisions of the
21   Apple IPA.  Specifically, Apple has asserted that Wen, Hardage, Ye, Pinot, Rajamani, and Wang
22   have violated the Apple IPA.

23        72.     Wen, Hardage, Ye, Pinot, Rajamani, and Wang have standing to seek both
24   declaratory and injunctive relief with respect to Apple's enforcement of the Apple IPA against them.

25        73.     Apple's interpretation of its overbroad Apple IPA against these employees has
26   impeded their ability to practice in their chosen profession of engineering, as it has made
27   transitioning jobs nearly impossible.  Apple's interpretation of the definition of "Proprietary
28   Information" under the Apple IPA includes documents that are publicly available, not derived from

1   work at Apple, or documents that are personal in nature, such as tax, salary, and medical

2   information, simply because they were maintained on an Apple-issued device.

3       74.     Business and Professions Code § 16600 renders every contract in restraint of trade

4   void.  Business and Professions Code §§ 17200 *et seq.* renders violations of Business & Professions

5   Code § 16600 unfair and unlawful business practices.

6       75.     The interests of employees in their own mobility and betterment in providing services

7   to a California-based employer are deemed paramount to the competitive business interests of

8   employers who seek to prevent competition.

9       76.     Accordingly, Wen, Hardage, Ye, Pinot, Rajamani, and Wang seek a declaratory

10  judgment that the Apple IPA is unenforceable because it contravenes Business & Professions Code

11  § 16600.  Counterclaim Plaintiffs also seek a declaratory judgment that the Apple IPA is

12  unenforceable to the extent it prohibits or deters them, after their employment with Apple ends, from

13  soliciting other Apple employees to leave Apple.

14      77.     Ancillary to this declaratory judgment, Counterclaim Plaintiffs seek an order

15  enjoining Apple from entering into such contracts and requiring Apple to modify the Apple IPA so

16  that its employees are free to provide services in California or to a California-based employer.

17                          **SECOND CAUSE OF ACTION**

18                  **(Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

19      78.     Counterclaim Plaintiffs incorporate the foregoing paragraphs as though fully set forth

20  herein.

21      79.     Business and Professions Code § 16600 renders every contract in restraint of trade

22  void.  Business and Professions Code §§ 17200 *et seq.* renders violations of Business & Professions

23  Code § 16600 unfair and unlawful business practices (the "UCL").

24      80.     California has a strong interest in protecting the freedom of movement of persons

25  whom California-based employers wish to employ to provide services in California, regardless of

26  the person's state of residence.

27      81.     California employers have a strong and legitimate interest in having broad freedom to

28  choose from a national applicant pool in order to maximize the quality of the product or services

they provide.  The State of California has a strong interest in protecting California-based employers and their employees from anticompetitive conduct, such as Apple's, that interferes with the freedom of Rivos and its employees.

82.     Apple engages in unfair competition when it requires employees to enter into the Apple IPA in order to deter the recruitment and movement of its current and former employees.

83.     Specifically, Apple requires its employees to sign an overbroad Apple IPA as a condition of their employment and uses the Apple IPA as a deterrent to employees seeking new employment opportunities for fear that Apple will enforce the overbroad IPA against them. Additionally, Apple maintains an unenforceable non-solicitation provision in the Apple IPA to deter former employees from exercising their right under California law to contact or recruit Apple employees.

84.     As a result of Apple's anticompetitive interpretation and use of its Apple IPA, Apple employees have been intimidated from leaving Apple, or from contacting former coworkers if they do choose to leave Apple.

85.     Rivos has an interest in Apple's anticompetitive use of the Apple IPA, as Rivos  hires and employs employees purportedly subject to the Apple IPA.  Moreover, the Apple IPA generally inhibits Rivos' ability to recruit, hire, and employ Apple's current and former employees, including because employees are concerned about Apple enforcing its overbroad non-disclosure obligations and illegal non-solicit obligations.  Specifically, as a result of Apple's overbroad interpretation of the Apple IPA, as well as the presence of an unenforceable non-solicitation provision aimed at deterring former employees from exercising their rights to contact and/or recruit current Apple employees, Rivos has stopped hiring talented engineers from Apple, and candidates to whom Rivos has extended offers have turned down those offers due to the risk of retaliation from Apple.

86.     Apple's unfair competition has injured, and will continue to injure, Apple employees like Wen, Hardage, Ye, Pinot, Rajamani, and Wang who have a desire to leave their employment at Apple and work for a company that Apple views as a competitor.  Apple benefits from this anticompetitive conduct as it avoids recruiting and training costs, or increased compensation costs, that it would otherwise incur were its employees able to freely pursue alternative employment.

87.     Apple's unfair competition has injured, and will continue to injure, Rivos, which has been hindered in its ability to recruit and hire talented engineers and has incurred costs, diverted resources, and spent excessive management and attorney time as a result of Apple's unfair competition.

88.     Counterclaim Plaintiffs seek all monetary and non-monetary relief allowed by law, including restitution of sums Counterclaims Plaintiffs expend as a result of the conduct alleged in their counterclaims.

89.     Unless enjoined by the Court, Apple will continue to engage in the foregoing unfair business practices.  Counterclaim Plaintiffs therefore request an order enjoining Apple from engaging in the unfair business practices described herein.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiffs Rivos, Wen, Hardage, Ye, Pinot, Rajamani, and Wang pray for judgment and relief as follows:

a.     For a declaratory judgment on their counterclaims;

b.     For actual damages incurred from Apple's improper attempts to enforce the unenforceable Apple IPA;

c.     For restitution on their counterclaim for violation of Business and Professions Code §§ 17200 *et seq.*;

d.     For appropriate injunctive relief ancillary to the declaratory judgment;

e.     For appropriate negative injunctive relief under Business and Professions Code §§ 17200 *et seq.*, both as to Rivos and its employees, and to the public.  The injunctive relief includes, but is not limited to, a public injunction requiring Apple to inform current and former employees that the Apple IPA is void, at least to the extent it includes the unlawful provisions detailed above; and prohibiting Apple from: (i) forcing employees to sign illegal contracts of adhesion that purport to impose restrictions on them that are inconsistent with California law, (ii) seeking to enforce the Apple IPA against its current and former employees as described herein, and (iii) engaging in threatened or actual anticompetitive litigation against Rivos and

1    other California employers arising from its illegal and unenforceable non-

2    competes/NDAs as reflected in the Apple IPA;

3    f.    For attorneys' fees and costs in this action as allowed by law, including the

4          Counterclaim Plaintiffs' fees arising from Apple's attempts to enforce the

5          unenforceable and void Apple IPA; and

6    g.    For such other and further relief as the Court deems just and proper.

7                           **<u>DEMAND FOR JURY TRIAL</u>**

8    Counterclaim Plaintiffs hereby demand trial by jury for all causes of action, claims, or issues

9    in this action that are triable as a matter of right to a jury.

10                                   Respectfully submitted,

11   DATED:  November 3, 2023        QUINN EMANUEL URQUHART & SULLIVAN,
                                     LLP
12

13

14                                   By _____
                                            */s/ David Eiseman*

15                                        DAVID EISEMAN
                                          RYAN LANDES
16                                        VICTORIA B. PARKER

17                                        Attorneys for Defendants and Counterclaim
18                                        Plaintiffs Rivos Inc., Wen Shih-Chieh a/k/a Ricky
                                          Wen, Jim Hardage, Weidong Ye, Laurent Pinot,
19                                        Prabhu Rajamani and Kai Wang

20

21

22

23

24

25

26

27

28

**DEFENDANTS AND COUNTERCLAIM PLAINTIFFS' AMENDED COUNTERCLAIMS AGAINST APPLE INC.**